IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80994

NITV FEDERAL SERVICES, LLC,

     Plaintiff,

v.

DEKTOR CORPORATION and ARTHUR
HERRING, III,

     Defendants.

_____

## COMPLAINT

Plaintiff NITV Federal Services, LLC ("Plaintiff") sues defendants Dektor Corporation ("Dektor") and Arthur Herring, III ("Herring") (collectively, the "Defendants"), and alleges as follows:

## THE PARTIES

1.     Plaintiff is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business located in Palm Beach County, Florida. All members of Plaintiff are individuals who are citizens of Florida and no other State.

2.     Dektor is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business located at 400 E. Station Ave., #225, Coopersburg, PA 18036.

3.     Herring is an individual who is a citizen of the State of Pennsylvania. Upon information and belief, Herring resides at 26 Chancery Court, Souderton, PA 18964.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over Plaintiff's claims arising under the

Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367(a).

5.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different States.

6.      This Court has jurisdiction over Defendants because they have maintained sufficient minimum contacts with Florida such that the exercise of personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.  Further, as set forth herein, Defendants purposefully directed their disparaging statements to the State of Florida by making false statements about Plaintiff, a company they know to be located in Florida.  The effects of these disparaging remarks were clearly felt in the State of Florida, where Plaintiff suffered loss of goodwill, harm to its reputation, and pecuniary loss.

7.      Venue properly lies in this district because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTS

### I.      Plaintiff's Business and History

8.      Plaintiff is the manufacturer and sole source for the patented Computer Voice Stress Analyzer® II (the "CVSA"), the most widely used truth verification tool in the United States law enforcement community.  The CVSA has been assisting law enforcement around the world in solving crimes and screening potential candidates for 25 years and has largely replaced the old polygraph in the United States.

9.      Plaintiff has been offering training in voice stress analysis since 1980 and is recognized throughout the world as the leader in the field of voice stress analysis.

10.    Plaintiff's founder, Charles Humble, is considered by many to be the 'father' of modern voice stress analysis technology.

11.    Plaintiff is the only company in the world to be awarded three patents in forensic voice stress analysis/voice related technologies.

12.    Unlike a polygraph, the subject of computer voice stress analysis is not "wired to" an instrument when undergoing an examination. Only a microphone is used, which is plugged into the computer to analyze the subject's responses. As the subject speaks, a voice pattern is displayed and numbered, and saved to a chart to file.

13.    Drugs or medical problems do not affect the results of the examination, and there are really no "counter measures" that could cause an inconclusive result such as those that occur with a polygraph.

14.    The computer voice stress analyzer notes the frequency changes in the subject's voice and "identifies" the vocal stress related to the specific facts under investigation. The computer processes the voice frequencies and displays a graph "picture" of them.

15.    There is no need for strictly "yes" or "no" answers, and the computer process can "follow" unstructured conversation, recorded conversations, and live telephone conversations.

16.    Micro tremors are tiny frequency modulations in the human voice and, when a subject is lying, the automatic or involuntary nervous system causes inaudible changes in those micro tremor frequencies. The computer voice stress analyzer detects, measures, quantifies and displays those changes in a graph format that can be evaluated and quantified for stress.

17.    The technology is digitized and incorporated into a multi-functional notebook computer that is easily carried and that also has facsimile and e-mail capability for the sending of charts for cold call review by other examiners.

18. The CVSA is used by approximately 2,000 local, state, federal, and international law enforcement agencies, including approximately 175 agencies within the State of Florida and approximately 13 federal government agencies.

## II. The Original "Dektor" – Dektor Counterintelligence and Security, Inc.

19. In 1972, Allan D. Bell, Jr., Wilson H. Ford, and Charles R. McQuiston – the three principals of Dektor Counterintelligence and Security, Inc. –patented an invention which would become known and sold as the "Psychological Stress Evaluator" (the "PSE").

20. Originally named the "Physiological Response Analysis Method and Apparatus," Dektor Counterintelligence and Security, Inc.'s invention used a method called the McQuiston-Ford algorithm, which detects microtremors which typically fall into the range of 8 to 12 Hz in an individual who is not experiencing stress or being deceptive. These FM frequencies are not audible to the naked human ear and can only be captured through this method. The algorithm simply computes a sequence and converts it into patterns or charts. As a person is being deceptive, the stress they feel causes variations in the frequency modulation, which shows a flattening effect on the graphic display or chart. This allows trained examiners to read the charts in relation to questions that caused this flattening event and correlate it to a stressor.

21. Dektor Counterintelligence and Security, Inc.'s voice stress analyzer was ground-breaking at the time, but the product has since disappeared from the market after the company went out of business in the late 1990's.

## III. Defendants and Their Business

22. Dektor was formed as a Pennsylvania corporation in 1999. Herring is Dektor's President and, upon information and belief, sole shareholder.

23. Dektor is not a successor-in-interest or otherwise connected in any way to Dektor

4

Counterintelligence and Security, Inc.

24.     Defendants did not purchase or otherwise receive any of Dektor Counterintelligence and Security, Inc.'s intellectual property or assets – rather, as set forth herein, they simply appropriated the "Dektor" name, reverse engineered Dektor Counterintelligence and Security, Inc.'s product, and then began selling their own "PSE" voice stress analyzer while capitalizing on the name and storied history of Dektor Counterintelligence and Security, Inc.

25.     Defendants' attempt to capitalize on the "Dektor" name and history is evident through a review of Dektor's website (http://www.dektorpse.com/) which contains numerous misrepresentations attempting to draw a link between the two companies:

> PSE® stands for Psychological Stress Evaluator®. *Since 1969*, all PSE® models ( PSE 7010, PSE 5128, PSE 4202, PSE 2000, PSE Dek, PSE 101, PSE 1) detect, measure, and graphically display the degree of presence or absence of inaudible body tremors known as micro-muscle tremors.[1]

> Thousands of various PSE models have been sold worldwide *for 45 years*.[2]

> *For 50 years*, PSE® has been known worldwide because PSE® constantly proves it is the most superior system for truth verification. Only the Dektor system has proven it is the real technology for Voice Stress Analysis™.[3]

26.     Today, Dektor markets and sells the "PSE-7010," a software-based voice stress analyzer in direct competition with Plaintiff's CVSA.

27.     According to Dektor's website, "[t]housands of various PSE models have been sold worldwide for 45 years" and PSE's are used by law enforcement agencies, Fortune 500 companies,

---

[1]        Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[2]        Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[3]        Available at http://www.dektorpse.com/products/ (emphasis added).

security companies, military, and others.

28.     In short, Dektor markets its PSE product to the same law enforcement agencies, military agencies, private corporations, and other entities/agencies that Plaintiff markets and sells its CVSA product to.

**IV.     Defendants' Disparagement of and Interference with Plaintiff's Business**

29.     Defendants are engaged in a public campaign to smear Plaintiff's name and CVSA product in an effort to unfairly gain a competitive advantage in the marketplace.

30.     Herring himself is no stranger to the legal system or the consequences associated with publicly spreading lies when he does not get his way.  Indeed, in 2012, Herring was convicted of harassment in Pennsylvania County Court after handing out pamphlets accusing a college professor at Lehigh University of being a conman, protesting outside the professor's office, and demanding compensation from the university's President in exchange for stopping the harassment.

31.     After Herring's conviction was upheld, he was quoted in the courthouse hallway as stating: "I think the judge is (expletive) up…. They don't know a thing about free speech."

32.     Herring, unfortunately, has not learned his lesson and has turned his focus to harassing, defaming, and disparaging Plaintiff and its products in an effort to capture a piece of the voice stress analyzer market that Plaintiff dominates.

33.     Defendants' campaign of harassment has taken a multi-faceted approach – Defendants have used Dektor's website (which contains 28 pages of defamatory material concerning Plaintiff and its founder), e-mails to law enforcement agencies, telephone calls, and professional speaking engagements to spread numerous and material lies about Plaintiff and its CVSA product.

34.     For example, on March 18, 2014, Herring was a speaker at the Texas Polygraph

Summit which was hosted by the Texas Department of Licensing and Regulation.  During his speech, Herring publicly berated Plaintiff and its CVSA product as being scams that were proven to be unreliable (no more reliable than a coin toss or 50% accuracy).  Of course, Herring touted his PSE product and its storied (albeit false) history dating back some 50 years.

35.     Subsequent thereto, Herring has contacted (telephonically and/or via e-mail) dozens (if not hundreds) of law enforcement agencies across the country in an effort to discredit Plaintiff and its CVSA product.  In these communications, Herring refers to CVSA as a "scam," states that CVSA has been proven to be unreliable (no more than 50% accuracy), states that Plaintiff only sells to law enforcement because Plaintiff knows such agencies will not sue Plaintiff for selling an unreliable product as doing so would reopen cases on which CVSA was used, states that Plaintiff's founder obtained a "store bought" diploma, and conveys various other false and disparaging information (falsely represented by Herring as 'facts') concerning Plaintiff and its CVSA product.

36.     As just one example of this multitude of communications, on July 22, 2018, Herring (using e-mail address admin@dektorpse.com) e-mailed a detective with the Garfield County Sheriff's Office in Glenwood Springs, CO with the subject line "lie detection scam."

37.     Herring's e-mail was unsolicited (as the Garfield County Sheriff's Office uses Plaintiff's CVSA product) and contains numerous paragraphs of lies and disparaging material concerning Plaintiff and its CVSA product.

38.     While the e-mail spreads numerous falsehoods about Plaintiff's product, it touts the reliability and "proven superiority" of Dektor's PSE product in an effort to solicit business from the Garfield County Sheriff's Office.

39.     Herring's July 22, 2018 e-mail to the Garfield County Sheriff's Office is just one

of dozens (if not hundreds) of similar e-mails to US law enforcement agencies that Herring has sent in 2018 alone. Each of these e-mails refers to Plaintiff and its CVSA product as scams, falsely accuses the CVSA product of not being more than 50% reliable, and contains numerous other material falsehoods about Plaintiff and its CVSA product.

40.     As yet another example, on July 25, 2018, Herring sent substantially the same e-mail (with "voice lie detector scam" as the subject line) to the Executive Director of the Missouri Police Chiefs Association (which represents over 600 members in the State of Missouri). The Executive Director then forwarded Herring's e-mail to the organization's membership, meaning that with one e-mail Herring essentially spread his falsehoods and disparaging remarks throughout the entire State.

41.     In May 2018, Defendants contacted the organizers of the Dallas Crimes Against Children's conference (at which Plaintiff was scheduled to speak). That conference is scheduled to take place August 13 – 16, 2018.

42.     Defendants contacted the organizers of the conference with the specific intent to interfere with Plaintiff's contract and participation at the conference. To accomplish this goal, Defendants made numerous false statements of fact to the conference organizers about Plaintiff, Plaintiff's employees (such as making false statements that an employee scheduled to speak at the conference had been dishonorably fired from his prior position as a sex crimes investigator when in reality he actually retired), and Plaintiff's CVSA product (the same factual allegations as described above with respect to Defendant's e-mails and other communications).

43.     Plaintiff was a speaker at the 2017 Dallas Crimes Against Children's conference and gained substantial business/sales as a result of that speaking engagement. For the 2018 conference, Plaintiff had invested substantial sums to be a presenter, and had a signed contract in

place (paid in full) to again speak at the conference.

44.    As a result of Defendants' false and disparaging comments, Plaintiff was uninvited/barred from presenting at the 2018 conference (notwithstanding Plaintiff's paid contract with the organizers) and therefore suffered a tremendous loss of goodwill/reputation in addition to lost sales associated therewith.

45.    As discussed above, Herring boasts that Dektor's website contains approximately 28 pages of negative information about Plaintiff and its CVSA product which 'prove' them to be ineffective scams.

46.    True to his word, Dektor's website does contain an entire section (available at http://www.dektorpse.com/information/cvsa/) specifically dedicated to Plaintiff and the CVSA (with the section stating that it was last updated in June 2018).

47.    As with Herring's e-mails, telephone calls, and in-person communications, the Dektor website contains numerous false allegations of fact about Plaintiff and its CVSA product.

48.    Notably, before Herring begins his 28-page diatribe, he endeavors to equate Plaintiff and its CVSA product with Joseph Goebbels, the Reich Minister of Propaganda of Nazi Germany from 1933 to 1945:

**CVSA**

> "The bigger the lies, the more people will tend to believe them"
> "The more you tell those lies, the more people will tend to believe them."
>
> Joseph Goebbels, Hitler's propaganda minister

49.    One of the false statements of fact on Dektor's website which relate specifically to Plaintiff and its CVSA product is: "NITV has claimed CVSA is 97% accurate.  But, CVSA has never shown any studies that prove it is better than a coin toss in real crimes." (available at

http://www.dektorpse.com/information/imitations/).

50.     This statement is absolutely false as a 2012 peer reviewed published study (which Defendants are well aware of) of the CVSA showed its error rate to be less than 1%, thus exceeding the 97% accuracy rate claimed by Plaintiff.

51.     The Dektor website further states that "CVSA is about $13,000 per device." (available at http://www.dektorpse.com/information/imitations/).

52.     This statement is false as the price of the CVSA is less than $9,000.00 and has been at that price point for a number of years.

53.     With respect to Plaintiff's founder, the Dektor website states: "Its 'promoter/owner' gave himself the unearned (fake) title of 'Dr' (PhD). The fact was, the title was based on a 'mail order' type of certificate that the promotor bought from a store located near his original NITV office in Indiana. That same type of unearned educational 'diploma' anyone can buy from the internet today for about $100. Most people would call that type of store a 'diploma mill', a business that sells unearned educational degrees only for money." (available at http://www.dektorpse.com/information/cvsa/).

54.     This statement is false.  Plaintiff's founder (Charles Humble) was bestowed an Honorary Doctorate from Indiana Christian University in 1987.  It was one of only five that were granted within the previous five years.  The others were for commencement speakers.  Indiana Christian University has never been listed on any site or accused of being a diploma mill (other than by Defendants).

55.     The Dektor website further states that: "The seller of CVSA having a earned educational title of "Dr" (PhD.) would be the first, of many lies, that would be revealed by the news     media     and     the     courts     in     the     many     years     ahead."     (available     at

http://www.dektorpse.com/information/cvsa/).

56.     This statement is false as neither Plaintiff nor Charles Humble has ever claimed that the honorary degree was an "academic" degree.  Indeed, Charles Humble's personal website (available at http://www.charleshumble.com/background/) specifically explains that the degree is honorary.

57.     The Dektor website further states that: "By 2018, after 25 years of being marketed to almost anyone as a "new" type of "computer voice stress" lie detector, CVSA and NITV training have been shown to be just an expensive prop by law enforcement types because of NITV's many untruths and gross exaggerations. This conclusion is based according to many law enforcement types contacted through the years who bought the CVSA…." (available at http://www.dektorpse.com/information/cvsa/).  This passage was recently updated by Defendants as it previously contended that CVSA was considered an expensive prop "according to almost all law enforcement types who bought it."

58.     This statement is false as nearly 2,000 law enforcement agencies worldwide are utilizing the CVSA system, including approximately 175 agencies in Florida alone.

59.     The Dektor website further states that: "CVSA, its training and chart analysis techniques have not shown proven reliable accuracy better than about 50% in studies and real crimes."  (available at http://www.dektorpse.com/information/cvsa/).

60.     This statement is false.  As explained above, a 2012 peer-reviewed and published study of the CVSA showed its error rate to be less than 1%.  Further, a 2007 U.S. Department of Defense survey of law enforcement users of the CVSA found that approximately 86% of the respondents indicated they thought the CVSA was either "very" or "extremely" effective in detecting stress.

61.     The Dektor website further states: "It has appeared through the years that none of the CVSA buyers had ever asked for a study that proved any CVSA accuracy BEFORE they wasted taxpayer's money and ruined criminal cases using the CVSA gadget. The law enforcement department, their detectives and the city themselves would certainly be sued when the public becomes aware their law enforcement department wasted the taxpayer's money on such expensive gadgets, useless training and wasteful 'recertification fees'. Lawsuits would also be brought against prisons, college campus police, district attorney's, probation departments and the federal government who bought the CVSA and training. Add to them ALL the people who ever took the CVSA tests who would claim they were innocent of their charge and they also would sue the law enforcement department, city, mayor, city council, etc. Hundreds of thousands of convicted criminals nationwide would be filing lawsuits because they would claim they were falsely accused because they 'flunked' those very unreliable CVSA tests. Minorities would sue either for their conviction or because they had no choice except to make a plea deal because they had flunked a CVSA test. Add to those costs in the lawsuits the huge amount of lawyer fees for each case against the law enforcement department, city, mayor, etc. Plus, the costs to the falsely accused of their lost wages because they went to jail and lost their jobs, loss of time with their families if they went to jail and more. On top of THOSE costs, the fact individuals of the law enforcement department would have judgements against themselves because they were careless and reckless for buying and using the CVSA without checking it out for accuracy BEFORE they used it on people.  NITV knew any non-law enforcement buyer (PI'S, etc) WOULD sue NITV if they bought a CVSA and training then they had discovered they had been lied to about the CVSA/training credibility, wasted their money and had been cheated." (available at http://www.dektorpse.com/information/cvsa/).

62.     This statement is false. There is no mass series of lawsuits against Plaintiff and/or law enforcement agencies in connection with unreliable results.  Indeed, in March 2014, Northern District of New York Chief Judge Norman A. Mordue ruled that sex offenders can be required to submit to CVSA examinations as part of their post-release supervision because CVSA  is analogous to polygraph examinations, which have been accepted by the 2nd U.S. Circuit Court of Appeals as a way to monitor the activities of those under post-release supervision.

63.     The Dektor website further states: "At least one police officer had been wrongly fired because he flunked a CVSA test, but it was later shown he was truthful." (available at http://www.dektorpse.com/information/cvsa/).

64.     This statement is false.  Plaintiff is unaware of any such scenario occurring and Defendants have never provided any actual facts or names in support of their contention.

65.     The Dektor website further states: "NITV "ideas" used in training, such as numeric scoring, DSR (Delayed Stress Response), cold calling, kinesics, F.A.C.T. and DBR (Defense Barrier Removal) have never been shown to have any real substance or credibility. Those ideas were invented by the NITV promoter /owner as part of his hype to sell his gadgets and to create the image he is some type of proven expert in lie detection." (available at http://www.dektorpse.com/information/cvsa/).

66.     This statement (and those that follow it which purport to explain why these methodologies are useless) is false.  Neither Herring nor any of his agents/employees have ever attended Plaintiff's training courses or have any actual information concerning Plaintiff's training techniques.  These techniques are both credible and effective and the reason why hundreds of law enforcement agencies and personnel attend Plaintiff's training courses on an annual basis.

13

67.     The Dektor website further states: "We have heard from many ex-CVSA examiners who have told us that they simply guessed on the final answer to a test because the NITV training ideas did not give them reliability and accuracy on lie detection tests. Dektor has heard from CVSA examiners that the software used for CVSA has serious flaws that cause the program to crash or freeze. The software program appears to be extremely basic as what the CVSA examiner can do using it."  (available at http://www.dektorpse.com/information/cvsa/).

68.     This statement is false as Defendants have not "heard from" any current or former CVSA examiners with respect to this subject matter – plainly stated, Defendants are making up allegations with no basis in fact.  There are no "serious flaws" with CVSA's software and guessing on the final exam will result in failure.

69.     The Dektor website further states: "In 2007, a very large study, using real crimes and NITV instructors found an accuracy rate of only about chance level. That same study found VERY serious design flaws with the CVSA design that will produce flawed patterns, thus incorrect results."  (available at http://www.dektorpse.com/information/cvsa/).

70.     This statement is false and appears to be completely fabricated by Defendants.

71.     The Dektor website further states: "On page 69, of the NITV training manual, it states that recently it was learned that if a person taking a CVSA test holds the microphone, it could cause static electricity and that could cause a distortion of CVSA patterns. Those same patterns are used to decide if a person is innocent or guilty. NITV has always told the person to hold the microphone since 1990. How many thousands of times did that problem happen and ruin a test, BUT nobody knew it? How many innocent people were falsely accused? How many GUILTY people were let go to commit more crimes (rape, murder, robbery, etc) because law enforcement        thought        they        were        innocent?"        (available        at

14

http://www.dektorpse.com/information/cvsa/).

72.     This statement (that Plaintiff tells the person to hold the microphone) is false.

Plaintiff has never taught anyone to hold the microphone during an examination.  Plaintiff has

always taught examiners to utilize a clip-on microphone, which is provided with all the CVSA

systems when they are sold.

73.     The Dektor website further states: "The facts indicate that the 'recertifications',

according to former users and NITV's own CVSA association, are only 'bullshit' type classes of

3 days of the same things that were taught in the original course."   (available at

http://www.dektorpse.com/information/cvsa/).

74.     This statement is false and inflammatory.  The recertification courses offered by

Plaintiff (of which Herring or any of his agents/employees have never attended) ensure CVSA

examiners are kept up to date on CVSA developments, allow CVSA examiners to receive free

software upgrades, and reinforce the correct use of CVSA protocols.  Again, Defendants did not

actually receive information from "former users and NITV's own CVSA association" – they

simply made these statements up for purposes of the Dektor website.

75.     The Dektor website further states: "In fact, the person at SoCom (Special

Operations Command) in the DoD who approved almost $700,000 to buy the CVSA devices pled

guilty in 2006 to taking a bribe." (available at http://www.dektorpse.com/information/cvsa/).

76.     This statement is akin to Defendants' attempt to link Plaintiff with Joseph Goebbels

and/or the Nazi party.   Here, Defendants are indirectly suggesting that Plaintiff bribed a

government agent for use of its CVSA product – that allegation, of course, is completely false as

any conviction (if one exists) certainly did not involve a bribe from Plaintiff (as none exists).

77.     The Dektor website further states: "NITV has sued at least one business selling a

imitation claiming the other imitation "stole" their machine and training from NITV. There seems to be no honor among thieves." (available at http://www.dektorpse.com/information/cvsa/).

78.     This statement is indicative of other statements throughout the Dektor website which accuse Plaintiff of 'stealing' Dektor Counterintelligence and Security, Inc.'s intellectual property.  This accusation is false and somewhat ironic given that Defendants misappropriated the 'Dektor' name, reverse engineered its PSE product, and have improperly capitalized on the 'Dektor' name for nearly 20 years.

79.     The Dektor website further states: "In late 2006, NITV began to advertise in insurance magazines with full page ads. It appears they were trying to make up for the drastic drop in CVSA sales to law enforcement. NITV tried to get insurance companies to buy CVSA and use it as a over-the-phone lie detector for insurance fraud. If they did so, millions of real claims would be denied because of the poor accuracy caused by unreliable CVSA technology and unreliable NITV training. Dektor contacted the magazine and educated them about NITV. Soon, NITV was banned from advertising in those insurance magazines." (available at http://www.dektorpse.com/information/cvsa/).

80.     This statement is false.  Plaintiff did not experience any drop in sales to law enforcement and was never banned from advertising in insurance magazines.

81.     These are just some of the dozens of defamatory and disparaging remarks about Plaintiff and its CVSA product that are prevalent throughout the Dektor website.

82.     Defendants' false statements (which they know to be untrue or which were made with reckless disregard for their truth) are incredibly damaging to Plaintiff's reputation and goodwill.

83.     Such statements (whether made in-person, via e-mail, via telephone, or through

Dektor's website) have caused and will cause Plaintiff to lose sales of CVSA product and certification courses.

84.     With respect to just one licensing board in the State of Texas, Plaintiff invested approximately $200,000.00 in connection with having its CVSA product approved.  As a direct and proximate result of Defendants' false and disparaging statements to that licensing board, Plaintiff was not approved and therefore lost not only its $200,000.00 investment, but also millions of dollars in sales.

85.     Plaintiff's actual damages – when factoring in the sheer number of law enforcement agencies that Defendants have directly contacted and/or which have reviewed the extensive false information on Defendants' website – are estimated to exceed $7 million.

86.     Upon information and belief, Defendants have steered hundreds of thousands of dollars of law enforcement business away from Plaintiff's CVSA product to their 'PSE' product based solely on the lies spread by Defendants with respect to Plaintiff, Plaintiff's CVSA product, and Defendants' supposed link to Dektor Counterintelligence and Security, Inc.

87.     All conditions precedent to this action have been performed or have been waived.

## COUNT I – FALSE ADVERTISING, UNFAIR COMPETITION, AND PRODUCT DISPARAGEMENT UNDER THE LANHAM ACT

88.     Plaintiff re-alleges and incorporates paragraphs 1 through 87 as set forth above.

89.     Defendants' publication of false and disparaging statements about Plaintiff and its CVSA product constitutes product disparagement, unfair competition, false advertising, and false description under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

90.     Defendants' publication of false statements purporting to link themselves to Dektor Counterintelligence and Security, Inc. and its PSE product likewise constitute false advertising and false description under the Lanham Act.

17

91.     Defendants made the above-referenced false statements of fact in commercial promotion of their own PSE product, in direct competition with Plaintiff's product, and in an effort to drive sales away from Plaintiff and toward Defendants.

92.     The above-referenced statements are literally false.

93.     The above-referenced statements actually deceived or had the tendency to deceive a substantial segment of the law enforcement, government agencies, and other prospective purchasers of CVSA's products.

94.     Defendants' deception is material in that it is likely to influence purchasing decision.  Specifically, consumers of Plaintiff's products have been deceived to believe that the products are no more effective than a coin toss, that some vast conspiracy exists amongst law enforcement to mask this ineffectiveness, that Plaintiff's founder purchased his honorary doctorate from a diploma mill, that Plaintiff somehow stole Dektor Counterintelligence and Security, Inc.'s intellectual property (when it was Defendants who have done precisely that), and various other lies as described more fully above.

95.     Defendants caused these false statements to enter interstate commerce by sending dozens (if not hundreds) of e-mails to various law enforcement agencies and by posting a 'manifesto' of lies on the Dektor website which is visible to consumers throughout the United States and worldwide.

96.     Defendants are competitors of Plaintiff in that they market and sell a voice stress analyzer (the PSE) to the same law enforcement and other agencies that Plaintiff markets and sells its own voice stress analyzer (the CVSA).

97.     In an industry in which reputation, word of mouth, and online advertising are critical to the success of a given company (as evidenced by Dektor Counterintelligence and

18

Security, Inc.'s cessation of business notwithstanding ownership of a good/functional product), false statements such as those by Defendants are highly detrimental to Plaintiff's reputation, goodwill, and sales.

98.     As a direct and proximate result of Defendants' conduct, Plaintiff has sustained substantial damages (both direct in the form of lost sales and indirect in the form of loss of goodwill/reputation), the full amount of which will be established at trial of this matter.

99.     Defendants' false statements have caused, and will continue to cause, irreparable harm to Plaintiffs unless Defendants are enjoined by the Court.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages, treble damages pursuant to 15 U.S.C. § 1117, an award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, preliminary and permanent injunction relief, and such other relief as the Court deems just and proper.

## COUNT TWO: DECEPTIVE AND UNFAIR TRADE PRACTICES

100.     Plaintiff re-alleges and incorporates paragraphs 1 through 87 as set forth above.

101.   The foregoing conduct constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Florida Statutes, § 501.201 et seq.

102. Defendants' campaign of spreading false and disparaging statements about Plaintiff, Plaintiff's CVSA product, and Defendants' own link to Dektor Counterintelligence and Security, Inc. constitutes a "deceptive act or practice" in the conduct of trade/commerce (specifically the sale of voice stress analyzer products in Florida, throughout the United States, and worldwide).

103.   As a direct and proximate result of Defendants' deceptive act or practice, Plaintiff suffered substantial damages, including but not limited to lost profits from consumers who were

steered away from purchasing Plaintiff's CVSA product and/or purchased Defendants' PSE product as a result of Defendants' lies.  These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction as they are estimated to exceed $10 million.

104.  Defendants' conduct is willful in that they actively misrepresent their history to consumers and knowingly make false statements concerning Plaintiff and its products in an effort to mislead consumers and unfairly drive business away from Plaintiff and toward Defendants.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, preliminary and permanent injunctive relief, an award of costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.2105, and such other relief as the Court deems just and proper.

## COUNT THREE: DEFAMATION/BUSINESS DISPARAGEMENT

105.  Plaintiff re-alleges and incorporates paragraphs 1 through 87 as set forth above.

106.  As set forth more fully above, Defendants have made numerous defamatory and disparaging statements about Plaintiff and Plaintiff's CVSA product to dozens (if not hundreds) of law enforcement agencies and other consumers of Plaintiff's products and services.

107.  Defendants' statements were false when made.

108.  Defendants knew the aforementioned statements were false at the time they were made.

109.  As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial damages, including but not limited to lost profits from consumers who were steered away from purchasing Plaintiff's CVSA product and/or purchased Defendants' PSE product as a result of Defendants' lies.  These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction as they are estimated to exceed $10 million.

110.    In conducting such acts, Defendants acted with malice or disregard for Plaintiff's rights; therefore, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, preliminary and permanent injunctive relief, an award of costs, and such other relief as the Court deems just and proper.

### COUNT FOUR: TORTIOUS INTERFERENCE

111.    Plaintiff re-alleges and incorporates paragraphs 1 through 87 as set forth above.

112.    Plaintiff had an existing contractual relationship with law enforcement and other agencies for the sale of its CVSA product and/or provision of training/certification courses. Alternatively, Plaintiff had a prospective business relationship with specifically identifiable law enforcement and other agencies to which Plaintiff would have completed sales but for Defendants' conduct as alleged herein.

113.    Defendants had actual knowledge of Plaintiff's contractual relationships and/or prospective business relationships (as evidenced by Defendant's e-mails and in-person communications specifically attempting to dissuade known CVSA users from using Plaintiff's product and steer them toward Defendants' PSE product).

114.    Defendants intentionally and unjustifiably interfered with Plaintiff's business relationships by making the false and defamatory statements described more fully above.

115.    As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial damages, including but not limited to lost profits from consumers who were steered away from purchasing Plaintiff's CVSA product and/or purchased Defendants' PSE product as a result of Defendants' lies.  These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction as they are estimated to exceed $10 million.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, preliminary and permanent injunctive relief, costs, and such other relief as the Court deems just and proper.

### Demand For Jury Trial

Plaintiff demands a trial by jury on all issued so triable.

Dated: July 27, 2018.


ADVISOR LAW, PLLC
2855 PGA Boulevard
Palm Beach Gardens, FL 33410
Telephone:  (561) 622-7788
jdloughy@advisorlaw.com

By: /s/ James D'Loughy, Esq._____
        James D'Loughy, Esq.
        Florida Bar No.:  0052700

DESOUZA LAW, P.A.
101 NE Third Avenue
Suite 1500
Fort Lauderdale, FL 33301
Telephone:  (954) 603-1340
DDesouza@desouzalaw.com

By: /s/ Daniel DeSouza, Esq._____
        Daniel DeSouza, Esq.
        Florida Bar No.:  19291

4841-1795-7485, v. 1