IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80994-DLB

NITV FEDERAL SERVICES, LLC,

     Plaintiff,

v.

DEKTOR CORPORATION and ARTHUR
HERRING, III,

     Defendants.

_____

## PLAINTIFF'S VERIFIED MOTION FOR DEFAULT
## FINAL JUDGMENT AGAINST DEKTOR CORPORATION

Plaintiff NITV Federal Services, LLC ("Plaintiff"), by and through undersigned counsel

and pursuant to Fed. R. Civ. P. 55(b)(2), hereby move for entry of a Default Final Judgment against

defendant Dektor Corporation ("Dektor"), and states as follows:

### PROCEDURAL SUPPORT FOR DEFAULT FINAL JUDGMENT

1.      On July 27, 2018, Plaintiff filed its Complaint in this action against Dektor and co-

defendant Arthur Herring, III ("Herring") (collectively, the "Defendants").[1] Defendants.   The

Complaint contains four causes of action against Defendants: (1) False Advertising, Unfair

Competition, and Product Disparagement Under the Lanham Act; (2) Deceptive and Unfair Trade

Practices; (3) Defamation/Business Disparagement; and (4) Tortious Interference.   All claims are

asserted against both Defendants.

---

[1]     On March 7, 2019, undersigned counsel received an e-mail purporting to attach a "Suggestion of
Bankruptcy" filed by Herring.  The Suggestion of Bankruptcy states that Herring filed a bankruptcy petition in the
Eastern District of Pennsylvania.  To date, the Suggestion of Bankruptcy has not been filed in this action.  In an
abundance of caution so as not to violate any stay that may be in place, this Motion does not seek relief against
Herring individually (unless the Court believes it proper to proceed against both Defendants in light of Herring's
failure to file the Suggestion of Bankruptcy herein).

2.      On September 5, 2016, Defendants filed a Motion to Dismiss Plaintiff's Complaint and Incorporated Memorandum of Law [D.E. 15].

3.      On February 15, 2019, the Court entered an Order Denying Defendants' Motion to Dismiss [D.E. 71].  That Order required Defendants to file an Answer to the Complaint on or before March 4, 2019.

4.      That same day, the Court entered an Order Granting Defendants' Unopposed Motion to Withdraw as Counsel for Defendants [D.E. 72].  That Order required Defendants to retain new counsel by March 4, 2019.

5.      On March 5, 2019, with no appearance of replacement counsel and no Answer filed by Defendants, Plaintiff filed a Motion for Entry of Default Against Dektor Corporation [D.E. 82].

6.      The Court granted Plaintiff's default motion on March 12, 2019 [D.E. 84] and the Clerk entered a Default against Dektor later that same day [D.E. 85].

## FACTUAL SUPPORT FOR DEFAULT FINAL JUDGMENT

I.    **Plaintiff's Business and History**

1.      Plaintiff is the manufacturer and sole source for the patented Computer Voice Stress Analyzer® II (the "CVSA"), the most widely used truth verification tool in the United States law enforcement community.  The CVSA has been assisting law enforcement around the world in solving crimes and screening potential candidates for 25 years and has largely replaced the old polygraph in the United States.

2.      Plaintiff has been offering training in voice stress analysis since 1980 and is recognized throughout the world as the leader in the field of voice stress analysis.

3.      Plaintiff's founder, Charles Humble, is considered by many to be the 'father' of modern voice stress analysis technology.

2

4.      Plaintiff is the only company in the world to be awarded three patents in forensic voice stress analysis/voice related technologies.

5.      Unlike a polygraph, the subject of computer voice stress analysis is not "wired to" an instrument when undergoing an examination. Only a microphone is used, which is plugged into the computer to analyze the subject's responses. As the subject speaks, a voice pattern is displayed and numbered, and saved to a chart to file.

6.      Drugs or medical problems do not affect the results of the examination, and there are really no "counter measures" that could cause an inconclusive result such as those that occur with a polygraph.

7.      The computer voice stress analyzer notes the frequency changes in the subject's voice and "identifies" the vocal stress related to the specific facts under investigation. The computer processes the voice frequencies and displays a graph "picture" of them.

8.      There is no need for strictly "yes" or "no" answers, and the computer process can "follow" unstructured conversation, recorded conversations, and live telephone conversations.

9.      Micro tremors are tiny frequency modulations in the human voice and, when a subject is lying, the automatic or involuntary nervous system causes inaudible changes in those micro tremor frequencies. The computer voice stress analyzer detects, measures, quantifies and displays those changes in a graph format that can be evaluated and quantified for stress.

10.     The technology is digitized and incorporated into a multi-functional notebook computer that is easily carried and that also has facsimile and e-mail capability for the sending of charts for cold call review by other examiners.

11.     The CVSA is used by approximately 2,000 local, state, federal, and international law enforcement agencies, including approximately 175 agencies within the State of Florida and

approximately 13 federal government agencies.

II. **The Original "Dektor" – Dektor Counterintelligence and Security, Inc.**

12.     In 1972, Allan D. Bell, Jr., Wilson H. Ford, and Charles R. McQuiston – the three principals of Dektor Counterintelligence and Security, Inc. –patented an invention which would become known and sold as the "Psychological Stress Evaluator" (the "PSE").

13.     Originally named the "Physiological Response Analysis Method and Apparatus," Dektor Counterintelligence and Security, Inc.'s invention used a method called the McQuiston-Ford algorithm, which detects microtremors which typically fall into the range of 8 to 12 Hz in an individual who is not experiencing stress or being deceptive.  These FM frequencies are not audible to the naked human ear and can only be captured through this method. The algorithm simply computes a sequence and converts it into patterns or charts. As a person is being deceptive, the stress they feel causes variations in the frequency modulation, which shows a flattening effect on the graphic display or chart. This allows trained examiners to read the charts in relation to questions that caused this flattening event and correlate it to a stressor.

14.     Dektor Counterintelligence and Security, Inc.'s voice stress analyzer was ground-breaking at the time, but the product has since disappeared from the market after the company went out of business in the late 1990's.

III. **Defendants and Their Business**

15.     Dektor was formed as a Pennsylvania corporation in 1999.  Herring is Dektor's President and, upon information and belief, sole shareholder.

16.     Dektor is not a successor-in-interest or otherwise connected in any way to Dektor Counterintelligence and Security, Inc.

17.     Defendants   did   not   purchase   or   otherwise   receive   any   of   Dektor

4

Counterintelligence and Security, Inc.'s intellectual property or assets – rather, as set forth herein, they simply appropriated the "Dektor" name, reverse engineered Dektor Counterintelligence and Security, Inc.'s product, and then began selling their own "PSE" voice stress analyzer while capitalizing on the name and storied history of Dektor Counterintelligence and Security, Inc.

18.     Defendants' attempt to capitalize on the "Dektor" name and history is evident through a review of Dektor's website (http://www.dektorpse.com/) which contains numerous misrepresentations attempting to draw a link between the two companies:

> PSE® stands for Psychological Stress Evaluator®. *Since 1969*, all PSE® models ( PSE 7010, PSE 5128, PSE 4202, PSE 2000, PSE Dek, PSE 101, PSE 1) detect, measure, and graphically display the degree of presence or absence of inaudible body tremors known as micro-muscle tremors.[2]

> Thousands of various PSE models have been sold worldwide *for 45 years*.[3]

> *For 50 years*, PSE® has been known worldwide because PSE® constantly proves it is the most superior system for truth verification. Only the   Dektor   system   has   proven   it   is the real technology for Voice Stress Analysis™.[4]

19.     Today, Dektor markets and sells the "PSE-7010," a software-based voice stress analyzer in direct competition with Plaintiff's CVSA.

20.     According to Dektor's website, "[t]housands of various PSE models have been sold worldwide for 45 years" and PSE's are used by law enforcement agencies, Fortune 500 companies, security companies, military, and others.

21.     In short, Dektor markets its PSE product to the same law enforcement agencies,

---

[2]     Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[3]     Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[4]     Available at http://www.dektorpse.com/products/ (emphasis added).

military agencies, private corporations, and other entities/agencies that Plaintiff markets and sells its CVSA product to.

IV. **Defendants' Disparagement of and Interference with Plaintiff's Business**

22.     Defendants are engaged in a public campaign to smear Plaintiff's name and CVSA product in an effort to unfairly gain a competitive advantage in the marketplace.

23.     Herring himself is no stranger to the legal system or the consequences associated with publicly spreading lies when he does not get his way.  Indeed, in 2012, Herring was convicted of harassment in Pennsylvania County Court after handing out pamphlets accusing a college professor at Lehigh University of being a conman, protesting outside the professor's office, and demanding compensation from the university's President in exchange for stopping the harassment.

24.     After Herring's conviction was upheld, he was quoted in the courthouse hallway as stating: "I think the judge is (expletive) up…. They don't know a thing about free speech."

25.     Herring, unfortunately, has not learned his lesson and has turned his focus to harassing, defaming, and disparaging Plaintiff and its products in an effort to capture a piece of the voice stress analyzer market that Plaintiff dominates.

26.     Defendants' campaign of harassment has taken a multi-faceted approach – Defendants have used Dektor's website (which contains 28 pages of defamatory material concerning Plaintiff and its founder), e-mails to law enforcement agencies, telephone calls, and professional speaking engagements to spread numerous and material lies about Plaintiff and its CVSA product.

27.     For example, on March 18, 2014, Herring was a speaker at the Texas Polygraph Summit which was hosted by the Texas Department of Licensing and Regulation.  During his speech, Herring publicly berated Plaintiff and its CVSA product as being scams that were proven

6

to be unreliable (no more reliable than a coin toss or 50% accuracy).  Of course, Herring touted his PSE product and its storied (albeit false) history dating back some 50 years.

28.     Subsequent thereto, Herring has contacted (telephonically and/or via e-mail) dozens (if not hundreds) of law enforcement agencies across the country in an effort to discredit Plaintiff and its CVSA product.  In these communications, Herring refers to CVSA as a "scam," states that CVSA has been proven to be unreliable (no more than 50% accuracy), states that Plaintiff only sells to law enforcement because Plaintiff knows such agencies will not sue Plaintiff for selling an unreliable product as doing so would reopen cases on which CVSA was used, states that Plaintiff's founder obtained a "store bought" diploma, and conveys various other false and disparaging information (falsely represented by Herring as 'facts') concerning Plaintiff and its CVSA product.

29.     As just one example of this multitude of communications, on July 22, 2018, Herring (using e-mail address admin@dektorpse.com) e-mailed a detective with the Garfield County Sheriff's Office in Glenwood Springs, CO with the subject line "lie detection scam."

30.     Herring's e-mail was unsolicited (as the Garfield County Sheriff's Office uses Plaintiff's CVSA product) and contains numerous paragraphs of lies and disparaging material concerning Plaintiff and its CVSA product.

31.     While the e-mail spreads numerous falsehoods about Plaintiff's product, it touts the reliability and "proven superiority" of Dektor's PSE product in an effort to solicit business from the Garfield County Sheriff's Office.

32.     Herring's July 22, 2018 e-mail to the Garfield County Sheriff's Office is just one of dozens (if not hundreds) of similar e-mails to US law enforcement agencies that Herring has sent in 2018 alone.  Each of these e-mails refers to Plaintiff and its CVSA product as scams, falsely

accuses the CVSA product of not being more than 50% reliable, and contains numerous other material falsehoods about Plaintiff and its CVSA product.

33.     As yet another example, on July 25, 2018, Herring sent substantially the same e-mail (with "voice lie detector scam" as the subject line) to the Executive Director of the Missouri Police Chiefs Association (which represents over 600 members in the State of Missouri).  The Executive Director then forwarded Herring's e-mail to the organization's membership, meaning that with one e-mail Herring essentially spread his falsehoods and disparaging remarks throughout the entire State.

34.      In May 2018, Defendants contacted the organizers of the Dallas Crimes Against Children's conference (at which Plaintiff was scheduled to speak).  That conference is scheduled to take place August 13 – 16, 2018.

35.     Defendants contacted the organizers of the conference with the specific intent to interfere with Plaintiff's contract and participation at the conference.  To accomplish this goal, Defendants made numerous false statements of fact to the conference organizers about Plaintiff, Plaintiff's employees (such as making false statements that an employee scheduled to speak at the conference had been dishonorably fired from his prior position as a sex crimes investigator when in reality he actually retired), and Plaintiff's CVSA product (the same factual allegations as described above with respect to Defendant's e-mails and other communications).

36.     Plaintiff was a speaker at the 2017 Dallas Crimes Against Children's conference and gained substantial business/sales as a result of that speaking engagement.  For the 2018 conference, Plaintiff had invested substantial sums to be a presenter, and had a signed contract in place (paid in full) to again speak at the conference.

37.     As a result of Defendants' false and disparaging comments, Plaintiff was

uninvited/barred from presenting at the 2018 conference (notwithstanding Plaintiff's paid contract with the organizers) and therefore suffered a tremendous loss of goodwill/reputation in addition to lost sales associated therewith.

38.     As discussed above, Herring boasts that Dektor's website contains approximately 28 pages of negative information about Plaintiff and its CVSA product which 'prove' them to be ineffective scams.

39.     True to his word, Dektor's website does contain an entire section (available at http://www.dektorpse.com/information/cvsa/) specifically dedicated to Plaintiff and the CVSA (with the section stating that it was last updated in June 2018).

40.     As with Herring's e-mails, telephone calls, and in-person communications, the Dektor website contains numerous false allegations of fact about Plaintiff and its CVSA product.

41.     Notably, before Herring begins his 28-page diatribe, he endeavors to equate Plaintiff and its CVSA product with Joseph Goebbels, the Reich Minister of Propaganda of Nazi Germany from 1933 to 1945:

## CVSA

*"The bigger the lies, the more people will tend to believe them"*

*"The more you tell those lies, the more people will tend to believe them."*

Joseph Goebbels, Hitler's propaganda minister

42.     One of the false statements of fact on Dektor's website which relate specifically to Plaintiff and its CVSA product is: "NITV has claimed CVSA is 97% accurate.  But, CVSA has never shown any studies that prove it is better than a coin toss in real crimes." (available at http://www.dektorpse.com/information/imitations/).

43.     This statement is absolutely false as a 2012 peer reviewed published study (which

Defendants are well aware of) of the CVSA showed its error rate to be less than 1%, thus exceeding the 97% accuracy rate claimed by Plaintiff.

44.     The Dektor website further states that "CVSA is about $13,000 per device." (available at http://www.dektorpse.com/information/imitations/).

45.     This statement is false as the price of the CVSA is less than $9,000.00 and has been at that price point for a number of years.

46.     With respect to Plaintiff's founder, the Dektor website states: "Its 'promoter/owner' gave himself the unearned (fake) title of 'Dr' (PhD). The fact was, the title was based on a 'mail order' type of certificate that the promotor bought from a store located near his original NITV office in Indiana. That same type of unearned educational 'diploma' anyone can buy from the internet today for about $100. Most people would call that type of store a 'diploma mill', a business that sells unearned educational degrees only for money." (available at http://www.dektorpse.com/information/cvsa/).

47.     This statement is false.  Plaintiff's founder (Charles Humble) was bestowed an Honorary Doctorate from Indiana Christian University in 1987.  It was one of only five that were granted within the previous five years.  The others were for commencement speakers.  Indiana Christian University has never been listed on any site or accused of being a diploma mill (other than by Defendants).

48.     The Dektor website further states that: "The seller of CVSA having a earned educational title of "Dr" (PhD.) would be the first, of many lies, that would be revealed by the news media and the courts in the many years ahead." (available at http://www.dektorpse.com/information/cvsa/).

49.     This statement is false as neither Plaintiff nor Charles Humble has ever claimed

10

that the honorary degree was an "academic" degree.  Indeed, Charles Humble's personal website (available at http://www.charleshumble.com/background/) specifically explains that the degree is honorary.

50.     The Dektor website further states that: "By 2018, after 25 years of being marketed to almost anyone as a "new" type of "computer voice stress" lie detector, CVSA and NITV training have been shown to be just an expensive prop by law enforcement types because of NITV's many untruths and gross exaggerations. This conclusion is based according to many law enforcement types contacted through the years who bought the CVSA…." (available at http://www.dektorpse.com/information/cvsa/).  This passage was recently updated by Defendants as it previously contended that CVSA was considered an expensive prop "according to almost all law enforcement types who bought it."

51.     This statement is false as nearly 2,000 law enforcement agencies worldwide are utilizing the CVSA system, including approximately 175 agencies in Florida alone.

52.     The Dektor website further states that: "CVSA, its training and chart analysis techniques have not shown proven reliable accuracy better than about 50% in studies and real crimes."  (available at http://www.dektorpse.com/information/cvsa/).

53.     This statement is false.  As explained above, a 2012 peer-reviewed and published study of the CVSA showed its error rate to be less than 1%.  Further, a 2007 U.S. Department of Defense survey of law enforcement users of the CVSA found that approximately 86% of the respondents indicated they thought the CVSA was either "very" or "extremely" effective in detecting stress.

54.     The Dektor website further states: "It has appeared through the years that none of the CVSA buyers had ever asked for a study that proved any CVSA accuracy BEFORE they

11

wasted taxpayer's money and ruined criminal cases using the CVSA gadget. The law enforcement department, their detectives and the city themselves would certainly be sued when the public becomes aware their law enforcement department wasted the taxpayer's money on such expensive gadgets, useless training and wasteful 'recertification fees'. Lawsuits would also be brought against prisons, college campus police, district attorney's, probation departments and the federal government who bought the CVSA and training. Add to them ALL the people who ever took the CVSA tests who would claim they were innocent of their charge and they also would sue the law enforcement department, city, mayor, city council, etc. Hundreds of thousands of convicted criminals nationwide would be filing lawsuits because they would claim they were falsely accused because they 'flunked' those very unreliable CVSA tests. Minorities would sue either for their conviction or because they had no choice except to make a plea deal because they had flunked a CVSA test. Add to those costs in the lawsuits the huge amount of lawyer fees for each case against the law enforcement department, city, mayor, etc. Plus, the costs to the falsely accused of their lost wages because they went to jail and lost their jobs, loss of time with their families if they went to jail and more. On top of THOSE costs, the fact individuals of the law enforcement department would have judgements against themselves because they were careless and reckless for buying and using the CVSA without checking it out for accuracy BEFORE they used it on people.  NITV knew any non-law enforcement buyer (PI'S, etc) WOULD sue NITV if they bought a CVSA and training then they had discovered they had been lied to about the CVSA/training credibility, wasted their money and had been cheated." (available at http://www.dektorpse.com/information/cvsa/).

55.    This statement is false. There is no mass series of lawsuits against Plaintiff and/or law enforcement agencies in connection with unreliable results.  Indeed, in March 2014,

Northern District of New York Chief Judge Norman A. Mordue ruled that sex offenders can be required to submit to CVSA examinations as part of their post-release supervision because CVSA is analogous to polygraph examinations, which have been accepted by the 2nd U.S. Circuit Court of Appeals as a way to monitor the activities of those under post-release supervision.

56.    The Dektor website further states: "At least one police officer had been wrongly fired because he flunked a CVSA test, but it was later shown he was truthful." (available at http://www.dektorpse.com/information/cvsa/).

57.    This statement is false.  Plaintiff is unaware of any such scenario occurring and Defendants have never provided any actual facts or names in support of their contention.

58.    The Dektor website further states: "NITV "ideas" used in training, such as numeric scoring, DSR (Delayed Stress Response), cold calling, kinesics, F.A.C.T. and DBR (Defense Barrier Removal) have never been shown to have any real substance or credibility. Those ideas were invented by the NITV promoter /owner as part of his hype to sell his gadgets and to create the image he is some type of proven expert in lie detection." (available at http://www.dektorpse.com/information/cvsa/).

59.    This statement (and those that follow it which purport to explain why these methodologies are useless) is false.  Neither Herring nor any of his agents/employees have ever attended Plaintiff's training courses or have any actual information concerning Plaintiff's training techniques.  These techniques are both credible and effective and the reason why hundreds of law enforcement agencies and personnel attend Plaintiff's training courses on an annual basis.

60.    The Dektor website further states: "We have heard from many ex-CVSA examiners who have told us that they simply guessed on the final answer to a test because the NITV training

ideas did not give them reliability and accuracy on lie detection tests. Dektor has heard from CVSA examiners that the software used for CVSA has serious flaws that cause the program to crash or freeze. The software program appears to be extremely basic as what the CVSA examiner can do using it." (available at http://www.dektorpse.com/information/cvsa/).

61.     This statement is false as Defendants have not "heard from" any current or former CVSA examiners with respect to this subject matter – plainly stated, Defendants are making up allegations with no basis in fact.  There are no "serious flaws" with CVSA's software and guessing on the final exam will result in failure.

62.     The Dektor website further states: "In 2007, a very large study, using real crimes and NITV instructors found an accuracy rate of only about chance level. That same study found VERY serious design flaws with the CVSA design that will produce flawed patterns, thus incorrect results."  (available at http://www.dektorpse.com/information/cvsa/).

63.     This statement is false and appears to be completely fabricated by Defendants.

64.     The Dektor website further states: "On page 69, of the NITV training manual, it states that recently it was learned that if a person taking a CVSA test holds the microphone, it could cause static electricity and that could cause a distortion of CVSA patterns. Those same patterns are used to decide if a person is innocent or guilty. NITV has always told the person to hold the microphone since 1990. How many thousands of times did that problem happen and ruin a test, BUT nobody knew it? How many innocent people were falsely accused? How many GUILTY people were let go to commit more crimes (rape, murder, robbery, etc) because law enforcement      thought      they      were      innocent?"      (available      at http://www.dektorpse.com/information/cvsa/).

65.     This statement (that Plaintiff tells the person to hold the microphone) is false.

Plaintiff has never taught anyone to hold the microphone during an examination.  Plaintiff has always taught examiners to utilize a clip-on microphone, which is provided with all the CVSA systems when they are sold.

66.    The Dektor website further states: "The facts indicate that the 'recertifications', according to former users and NITV's own CVSA association, are only 'bullshit' type classes of 3 days of the same things that were taught in the original course."   (available at http://www.dektorpse.com/information/cvsa/).

67.    This statement is false and inflammatory.  The recertification courses offered by Plaintiff (of which Herring or any of his agents/employees have never attended) ensure CVSA examiners are kept up to date on CVSA developments, allow CVSA examiners to receive free software upgrades, and reinforce the correct use of CVSA protocols.  Again, Defendants did not actually receive information from "former users and NITV's own CVSA association" – they simply made these statements up for purposes of the Dektor website.

68.    The Dektor website further states: "In fact, the person at SoCom (Special Operations Command) in the DoD who approved almost $700,000 to buy the CVSA devices pled guilty in 2006 to taking a bribe." (available at http://www.dektorpse.com/information/cvsa/).

69.    This statement is akin to Defendants' attempt to link Plaintiff with Joseph Goebbels and/or the Nazi party.   Here, Defendants are indirectly suggesting that Plaintiff bribed a government agent for use of its CVSA product – that allegation, of course, is completely false as any conviction (if one exists) certainly did not involve a bribe from Plaintiff (as none exists).

70.    The Dektor website further states: "NITV has sued at least one business selling a imitation claiming the other imitation "stole" their machine and training from NITV. There seems to be no honor among thieves." (available at http://www.dektorpse.com/information/cvsa/).

71.     This statement is indicative of other statements throughout the Dektor website which accuse Plaintiff of 'stealing' Dektor Counterintelligence and Security, Inc.'s intellectual property.  This accusation is false and somewhat ironic given that Defendants misappropriated the 'Dektor' name, reverse engineered its PSE product, and have improperly capitalized on the 'Dektor' name for nearly 20 years.

72.     The Dektor website further states: "In late 2006, NITV began to advertise in insurance magazines with full page ads. It appears they were trying to make up for the drastic drop in CVSA sales to law enforcement. NITV tried to get insurance companies to buy CVSA and use it as a over-the-phone lie detector for insurance fraud. If they did so, millions of real claims would be denied because of the poor accuracy caused by unreliable CVSA technology and unreliable NITV training. Dektor contacted the magazine and educated them about NITV. Soon, NITV was banned from advertising in those insurance magazines." (available at http://www.dektorpse.com/information/cvsa/).

73.     This statement is false.  Plaintiff did not experience any drop in sales to law enforcement and was never banned from advertising in insurance magazines.

74.     These are just some of the dozens of defamatory and disparaging remarks about Plaintiff and its CVSA product that are prevalent throughout the Dektor website.

### PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

The above facts (all of which have been verified by Plaintiff's founder/President, Charles Humble), are sufficient to establish liability against Dektor on each of Plaintiff's four (4) causes of action.  Defendants have clearly and unequivocally engaged in false advertising (by virtue of their wrongful suggestion that they are somehow linked to Dektor Counterintelligence and Security, Inc.).   Defendants further violated the Lanham Act by engaging in product

disparagement.[5]   There is no question that Defendants' plethora of e-mails/letters/websites constitutes commercial advertising whose purpose was to steer customers toward Defendants' competing product.

There is likewise no question that the above conduct constitutes a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"),[6] defamation/business disparagement,[7] and tortious interference.[8]

## PLAINTIFF'S DAMAGES

### I.      Plaintiff's Base Damages

75.     Defendants' false statements (which they know to be untrue or which were made with reckless disregard for their truth) are incredibly damaging to Plaintiff's reputation and goodwill.

76.     Such statements (whether made in-person, via e-mail, via telephone, or through Dektor's website) have caused and will cause Plaintiff to lose sales of CVSA product and

---

[5]     See Fun Spot of Fla., Inc. v. Magical Midway of Cent. Fla., Ltd., 242 F. Supp. 2d 1183, 1203 n.3 (M.D. Fla. 2002) (Under the Lanham Act, a "cause of action for product disparagement includes the following elements: 1) there must be 'commercial advertising or promotion' constituting commercial speech of or concerning another's goods or services or commercial activities, 2) by a defendant who is in commercial competition with plaintiff, 3) for the purpose of influencing consumers to buy defendant's goods or services, and 4) the promotion must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.").

[6]     See BPI Sports, LLC v. Labdoor, Inc., No. 15-62212-CIV-BLOOM, 2016 U.S. Dist. LEXIS 23033, at *11 (S.D. Fla. Feb. 25, 2016) ("FDUTPA's purpose is to 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.' Fla. Stat. § 501.202(2. A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages.").

[7]     Bassler v. George Weston Bakeries Distribution, No. 3:08-cv-595-J-32JRK, 2008 U.S. Dist. LEXIS 111209, at *7-8 (M.D. Fla. Oct. 24, 2008) ("Under Florida law, the elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.").

[8]     Ethan Allen v. Georgetown Manor, 647 So. 2d 812, 814 (Fla. 1994) ("The elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.").

certification courses.

77.     Although Defendants actively prevented Plaintiff from discovering the full scale of their campaign of disparagement (due to Defendants' failure to participate in discovery), Plaintiff is aware of dozens (if not hundreds or thousands) of e-mails sent by Defendants over the last year to a multitude of law enforcement and/or media agencies with the sole purpose of disparaging Plaintiff and its CVSA product.

78.     During their deposition, Defendants boasted that they had sent or were sending (in just the two-week period thereof) approximately 1,100 press releases to various media entities around the country with the primary subject being Defendants' scam contentions:

> A. So far, approximately, 1100 press releases have gone out to, approximately, 1100 investigator reporters in this country, both the newspaper and TV.
> Q. When did you send those 1100 press releases?
> A. Well, I'm still sending them. It's been about a week now since I started sending out press releases about the lawsuit.
> Q. Are you sending those press releases via email?
> A. Yes.
> Q. Are you sending them via your Admin@DektorPSE.com email address?
> A. Yes.[9]

79.     Nearly every day since this lawsuit has been pending, Plaintiff receives notice from one or more law enforcement customers or prospective customers asking about communications received by Herring in which he repeats the same scam/other disparaging allegations as stated above.

80.     In the last two weeks, Plaintiff has been contacted by $10 - 12$ news organizations (including the Miami Herald) which have inquired into the veracity/effectiveness of Plaintiff's CVSA product as a result of communications received from Herring.

---

[9]     See Deposition Transcript of Arthur Herring, III, dated October 24, 2018, a true and correct copy of which is attached hereto as Exhibit "1," at $63:7 - 63:18$.

81.     Defendants have shown no sign of slowing down their onslaught – indeed, they doubled down on effort *after* this lawsuit was filed.  Several months after this lawsuit was filed, Defendants registered and published a new website, www.NITVCVSAexposed.com, whose sole purpose is to focus on the spread of lies against Plaintiff.[10]

82.     With respect to just one licensing board in the State of Texas, Plaintiff invested approximately ***$200,000.00*** in connection with having its CVSA product approved.  As a direct and proximate result of Defendants' false and disparaging statements to that licensing board, Plaintiff was not approved and therefore lost not only its $200,000.00 investment, but also approximately ***$1,000,000.00*** in expected net profit over the first two years of the project.  See Gregg v. U.S. Indus., 887 F.2d 1462, 1469 (11th Cir. 1989) (plaintiff could provide opinion on his company's value, noting, "in Florida, an owner of property is qualified to testify regarding the value of his property…" and "an officer of a corporation may testify to the value of the property 'if the officer is qualified by virtue of his experience, his management of the affairs of the company and his knowledge of relevant value.'").  Plaintiff's estimate of lost profit is based upon Plaintiff's internal financial documents in addition to the knowledge/experience of Charles Humble (Plaintiff's founder and President) in negotiating this and similar projects.

83.     Plaintiff received notice that the Groveport (OH) Police Department was sent one of the aforementioned 'scam' letters by the Defendants.  Plaintiff was informed that Defendants' letter caused the Groveport police department to discontinue dealing with Plaintiff and to instead purchase Dektor's product.  This cost Plaintiff ***$10,000.00*** in business from the Groveport police department.

---

[10]     A printout of the NITVCVSAexposed.com website (accessed on March 21, 2019) is attached hereto as Exhibit "2."

84. In 2018, Plaintiff was scheduled to be a speaker at the Crimes Against Children Conference in Dallas, Texas. This was an industry event with hundreds of law enforcement agency participants. Plaintiff had presented at previous conferences for the same entity and had secured substantial business as a direct and proximate result of its presentations. Defendants, however, sent a defamatory/disparaging letter to the organizers of the conference (with substantially the same allegations as discussed above) which caused Plaintiff to be excluded from the conference. Based upon prior business generated from the same conference, Plaintiff estimates its losses as a result of this letter to be approximately ***$150,000.00***.

85. There is no question that Defendants have sent thousands (if not tens of thousands) of e-mails and letters to law enforcement agencies (current and prospective customers of Plaintiff) over the last two years. Based upon Plaintiff's intimate knowledge of its business and its profitability over the last 25+ years, Plaintiff can with good faith estimate that the damage caused to its business by Defendant's attacks exceeds ***$7,000,000.00***.

86. Plaintiff intended to support that full damages figure with expert testimony after review of the full extent of Defendants' e-mails, but the exigency of Defendants' increased attacks necessitates that Plaintiff seek final judgment (in conjunction with injunctive relief) now. As such, Plaintiff seeks the following base damages as identified above: $200,000.00 + $1,000,000.00 + $10,000.00 + $150,000.00 = **$1,360,000.00**.

## II.    Plaintiff's Lanham Act Damages

87. In addition to the obvious damage to Plaintiff's business as a result of Defendants' onslaught, Plaintiff has suffered additional damage as a result of Defendants' violations of the Lanham Act. Importantly, Plaintiff is entitled to recover both compensatory damages on its state law claims and additional damages under the Lanham Act as such damages are awarded for two

"set of wrongs."  See Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1566 (11th Cir. 1986) (upholding award of both liquidated damages [19]  and trademark infringement damages because such damages were awarded for two "set of wrongs"); Choice Hotels Int'l, Inc. v. Chewl's Hasp., Inc., 91 F. App'x 810, 817 (4th Cir. 2003) (noting that breach of contract and trademark infringement claims are independent claims that are separately compensable); see also La Quinta Corp. v. Heartland Properties LLC, 603 F.3d 327, 345 (6th Cir. 2010) (finding that award of both liquidated damages for breach of contract and treble damages for trademark infringement was permissible because "[c]laims for breach of contract and trademark infringement are distinct actions, based on separate conduct and addressing disparate harms").

88.     In assessing damages for violation of 15 U.S.C. § 1125(a), "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  See 15 U.S.C. § 1117(a).  Any such enhanced award is discretionary "but it may not be punitive."  Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 Fed. Appx. 899, 903 (11th Cir. 2007).  Importantly, an enhanced award under § 1117(a) may serve a deterrent function – sending a strong signal to potential infringers – without such award being considered punitive.  See La Quinta Corp. v. Heartland Properties LLC, 603 F.3d 327, 342 (6th Cir. 2010) (quoting Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 113 (2d Cir. 1988)) ("So long as its purpose is to compensate a plaintiff for its actual injuries—even though the award is designed to deter wrongful conduct—the Lanham Act remains remedial.").

89.     Here, Plaintiff's damages should not be limited to the handful of examples of lost business identified above.  Defendants have sent thousands (if not tens of thousands) of additional defamatory messages to law enforcement/government agencies around the country and have

stymied Plaintiff's efforts to discover the full extent of Defendants' conduct (even necessitating an Order authorizing a forensic examination of Defendants' computers which is ongoing). Defendants' willful conduct here warrants an enhanced award under § 1117(a).  The full extent of damage caused by Defendants' actions will likely never be known given Defendants' refusal to participate in discovery, and therefore Plaintiff requests that the Court treble Plaintiff's known damages of $1,360,000.00 and award Plaintiff compensatory damages of **$4,080,000.00**.  This trebling is appropriate in situations such as these where Defendants acted willfully and where Plaintiff has presented a conservative picture of its actual damages.  See Tracfone Wireless, Inc. v. Truc, 281 F.R.D. 692, 695 (S.D. Fla. 2012) ("The Court finds in light of Truc's willful violations of the Lanham Act, use of stolen credit card information or other stolen funds, absence from this case, and the unknown amount of additional unidentified transactions causing damage beyond that confirmed by TracFone's investigation, trebling is appropriate here. Accordingly, the Court awards TracFone three times the amount of actual damages proved in this case, or $184,913.94."); Choice Hotels Int'l, Inc. v. Zeal, LLC, Civil Action No. 4:13-01961-BHH, 2016 U.S. Dist. LEXIS 99342, at *19 (D.S.C. July 29, 2016) (trebling summary judgment damages of $148,225.53 and noting that would be infringers would be incentivized if court did not do so); Gillette Co. v. Save & Disc. LLC, No. 1:15-cv-636, 2016 U.S. Dist. LEXIS 90925, at *8 (S.D. Ohio July 13, 2016) ("Given Defendant's willful infringement, the Court finds that Plaintiff is entitled to recover three times its conservative estimate of damages, or $55,047.42.").

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting this Motion for Default Final Judgment against Dektor.  Plaintiff seeks final judgment in favor of Plaintiff in the sum of $**4,080,000.00** (trebled compensatory damages).  Plaintiff shall file a

separate motion for entry of a permanent injunction against Dektor.

Respectfully submitted                    Respectfully submitted,

ADVISORLAW PLLC                           DESOUZA LAW, P.A.
2925 PGA Boulevard                        101 NE Third Avenue
Suite 204                                 Suite 1500
Palm Beach Gardens, FL 33410              Fort Lauderdale, FL 33301
Telephone: (561) 622-7788                 Telephone:  (954) 603-1340
Jdloughy@advisorlaw.com                   DDesouza@desouzalaw.com

By:/s/ James D'Loughy                     By: /s/ Daniel DeSouza, Esq._____
     James D'Loughy, Esq.                      Daniel DeSouza, Esq.
     Florida Bar No: 052700                    Florida Bar No.:  19291

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record.  I further certify that on March 22, 2019, I served the foregoing document via US Mail to Dektor Corporation and Arthur Herring, III, 400 E. Station Avenue, Coopersburg, PA 18036 and via e-mail to admin@dektorpse.com.

/s/ Daniel DeSouza___
Daniel DeSouza, Esq.

4841-1795-7485, v. 1

## **VERIFICATION**

I, Charles Humble, President of NITV Federal Service, LLC, hereby attest that I have read the foregoing Verified Motion for Default Final Judgment and the allegations contained therein are true and correct to the best of my knowledge and belief.

Affiant

The foregoing instrument was acknowledged before me, under oath, this 22nd day of March, 2019 by Charles Humble, who is personally known to me or has produced ⎯Florida Driver License⎯ as identification.

XENIA SEDANO
NOTARY
My Comm. Expires
January 29, 2021
No. GG 67160
PUBLIC
STATE OF FLORIDA

NOTARY PUBLIC

Xenia Sedano

**Printed Name of Notary Public**

My Commission Expires:

01/29/2021