EXHIBIT "1"

Arthur Herring, III
October 24, 2018

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

NITV FEDERAL SERVICES, LLC    :    CASE No.
    :
    :    9:18-cv-80994
    PLAINTIFF,    :
    :
    -VS-    :
    :
DEKTOR CORPORATION and    :
ARTHUR HERRING, III.    :
    :
    Defendant.    :

_____

- - -

Wednesday, OCTOBER 24, 2018

- - -

Oral deposition of ARTHUR HERRING, III was taken at Strehlow & Associates, 54 Friends Lane, Suite 116, Newtown, Pennsylvania 18940 before Kathryn Hurlman, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania, on the above date, commencing at 9:30 a.m.

STREHLOW & ASSOCIATES

PHONE: (215) 504-4622

FAX: (205) 504-7155

COURT REPORTERS - VIDEOGRAPHERS

54 FRIENDS LANE, SUITE 116

NEWTOWN, PENNSYLVANIA 18940

WWW.STREHLOWCOURTREPORTING.COM

Arthur Herring, III
October 24, 2018

Page 2

A P P E A R A N C E S:

DESOUZA LAW, P.A.
101 NE Third Avenue , Suite 1500
Fort Lauderdale, Florida 33301
(954) 603-1340
BY:  Daniel DeSouza (over the phone)
     DDSOUZA@DESOUZALAW.COM
     Representing the Claimant

LAW OFFICE OF ROBERT ECKARD & ASSOCIATES, P.A.
3110 Alternate US 19 North
Palm Harbor, florida 34683
(727)771-7940
BY:  Robert Eckard (over the phone)

     Representing the Defendant


ALSO PRESENT:

James D'Loughy (over the phone)

2855 PGA Boulevard

Palm Beach Gardens, Florida 33410

(561) 622-7788

     Representing the Plaintiff

Arthur Herring, III
October 24, 2018

INDEX

EXAMINATION

Witness Name                                          Page   Line

ARTHUR HERRING, III

    Direct By MR. DESOUZA ................... 4      7

EXHIBITS

Exhibit     Description                              Page

Exhibit-1   Notice of deposition                     5

Exhibit-2   Amended responses                        57

Arthur Herring, III
October 24, 2018

Page 4

1                           - - -

2              ARTHUR HERRING, III, after having been first

3        duly sworn, was examined and testified as follows:

4                           - - -

5                       DIRECT EXAMINATION

6                           - - -

7        BY MR. DESOUZA:

8            Q.    Good morning, Mr. Herring.

9            A.    I'm here.

10           Q.    Okay.  Mr. Herring, can you state your full name

11       for the record, please?

12           A.    Arthur Herring, III.

13           Q.    And what's your current home address?

14           A.    1045 North West End Boulevard, Quakertown.

15           Q.    Do you have a business address?

16           A.    Same one.

17           Q.    Do you have any intention to move from that

18       premises within the next six months or so?

19           A.    I have no idea.

20           Q.    Okay.

21                 MR. DESOUZA:  Madam Court Reporter,

22           do we have a copy of the deposition notice?

23                 COURT REPORTER:  We do, yes.

24                 MR. DESOUZA:  Let's go ahead and mark

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Arthur Herring, III
October 24, 2018

Page 5

1          that as Exhibit-1 for today's deposition.

2              (Exhibit-1 was marked for identification.)

3                  Please give that to the witness.

4    BY MR. DESOUZA:

5      Q.    Mr. Herring, I handed you what's been marked as

6    Exhibit-1 to today's deposition.  It is a deposition

7    notice for Dektor Corporation.  It also includes a of

8    topics for today's deposition.

9                  Do you have that document in front of

10     you?

11     A.    Yup.

12     Q.    Have you seen this document before?

13     A.    I don't recall.

14     Q.    Have you seen some version of a notice of taking

15   a deposition of Dektor Corporation for this lawsuit prior

16   to today?

17     A.    Yes.

18     Q.    Okay.  Can you look at the list of topics that

19   are in this document, please?

20     A.    Yes.

21     Q.    Okay.  Have you had a chance to read these

22   topics prior to today?

23     A.    I don't recall.

24     Q.    I don't want to get into the subjects of any

Arthur Herring, III
October 24, 2018

Page 6

1   conversations you have had with Counsel, Mr. Eckard,

2   who's on the phone as well, but could you let me know if

3   Mr. Eckard ever sent you a copy of this deposition notice

4   for Dektor Corporation for this case before?

5       A.   I believe he did.

6       Q.   You just don't recall if you, actually, looked

7   at the deposition topics or not?

8       A.   No, I do not recall.

9       Q.   You understand that you are here testifying

10  today, not only as Arthur Herring, but also as the

11  corporate representative of Dektor Corporation?

12      A.   I understand.

13      Q.   Okay.  So you understand as the corporate

14  representative of the Dektor Corporation, you will be

15  providing testimony today on the topics Nos. 1 through 7

16  that are in the deposition notice?

17      A.   I understand.

18      Q.   And you understand that your testimony today

19  will bind Dektor Corporation as to the subject matter of

20  these topics one through seven?

21      A.   I understand.

22      Q.   Are you prepared today to provide testimony

23  today in respect to all seven of these topics?

24      A.   Possibly.

Arthur Herring, III
October 24, 2018

Page 7

1      Q.    We don't operate in the land of possibly and

2    maybes, so what I would like you to do is go ahead and

3    read over the seven topics and let me now if there's

4    anything that you are not prepared to provide testimony

5    on.

6      A.    Probably No. 6.

7             MR. ECKARD:   Dan for the record, are

8       we looking at the 30(b)(6) or the individual

9       notice?

10            MR. DESOUZA:   The 30(b)(6).

11   BY MR. DESOUZA:

12     Q.    I'm sorry, Mr. Herring, did you say something?

13     A.    I said, probably No. 6.

14     Q.    So you don't believe that you are prepared today

15   to answer questions with respect to topic No. 6 dealing

16   with website analytics?

17     A.    I have no idea what that is.

18     Q.    Then tell me what efforts you made prior to

19   today to prepare prior to this deposition.

20     A.    Basically, none.

21     Q.    Okay.  Did you make any effort to learn or

22   obtain information with respect to topic No. 6 in this

23   deposition notice?

24     A.    Well --

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Arthur Herring, III
October 24, 2018

Page 8

1    Q.    Did you ask any employees in Dektor for

2    assistance with preparing for topic No. 6?

3    A.    As far as No. 6, I never looked into web

4    visitors or anything else that go to my website.

5    Q.    Tell me about this hard drive crash that's

6    referenced in your responses to interrogatories and

7    document requests.

8          There's reference to a hard drive crash from a

9    computer virus that, apparently, interfered with your

10   ability to gather or secure documents in response to our

11   discovery request.

12         So give me some information about that hard

13   drive crash.

14   A.    Well, as everybody knows, viruses are very

15   rampant, and I do get virus warnings from my antivirus

16   software from time to time.  And one day, I did get a

17   virus warning, and in the next day or two the computer

18   was unable to be used.  And I just assumed it was the

19   virus.

20         Upon later discussion with my IT person, he told

21   me the hard drive simply stopped working, it crashed.

22   Q.    You said one day this happened.

23         When did it happen?

24   A.    I think it happened around the middle of May or

Arthur Herring, III
October 24, 2018

Page 9

1    so.

2        Q.   Around the middle of May, you think?

3        A.   It was about that.

4        Q.   Could it have happened in June?

5        A.   I don't recall really, exactly when.

6        Q.   I want to lock it down as best I can.

7             Is it possible this occurred in July?

8        A.   I think it was either May or June that it

9    happened.  We had to order a new hard drive, and I don't

10   recall when it was actually installed.

11       Q.   Well, this lawsuit was filed on July 27th.

12            Do you believe it happened prior to the lawsuit

13   being filed?

14       A.   Positively.

15       Q.   Obviously, it occurred prior to you being served

16   with a copy of the lawsuit because that would have

17   occurred afterwards, correct?

18       A.   To the best of my knowledge.

19       Q.   Well, I'll put it to you differently.  By the

20   time you found out about the existence of this lawsuit,

21   this hard drive crash had already occurred, correct?

22       A.   Yes.

23       Q.   Okay.  Now, you mention an IT person that you

24   spoke to.  Is that an IT person that does work for Dektor

Arthur Herring, III
October 24, 2018

Page 10

```
 1   Corporation?

 2        A.   From time to time.

 3        Q.   But not an employee of Dektor, correct?

 4        A.   Yes.

 5        Q.   Are you the only employee of Dektor?

 6        A.   Yes.

 7        Q.   Okay.  What's the name of the IT person that you

 8   talked to?

 9        A.   Vanderson Technology.

10        Q.   How do you spell that?

11        A.   V-A-N-D-E-R-S-O-N, technology.

12        Q.   And what's his name?  To the best of your

13   recollection.

14        A.   Matt Vanderhoff.

15        Q.   How do I spell that?

16        A.   Matt, V-A-N-D-E-R-H-O-F-F.

17        Q.   Do you have any contact information for

18   Mr. Vanderhoff?

19        A.   Not with me.

20        Q.   Do you have it available that you can obtain it

21   after the deposition?

22        A.   Yes.

23        Q.   Do you have his email address, telephone number,

24   contact information like that?
```

Arthur Herring, III
October 24, 2018

Page 11

```
 1      A.   Yes.

 2      Q.   Are you willing to provide us with that contact

 3   information?

 4      A.   Yes.

 5      Q.   Now, you mentioned it was a computer.

 6           What computer was it?  Was it a laptop, a

 7   desktop, that was affected by the crash?

 8      A.   It's a laptop.

 9      Q.   And what brand of laptop was it?

10      A.   I don't recall.

11      Q.   When did you buy the laptop?

12      A.   I don't recall.

13      Q.   Just this year?

14      A.   I don't recall.

15      Q.   Where is the laptop now?

16      A.   It's in my office.

17      Q.   Are you still using it today?

18      A.   Yes.

19      Q.   Okay.  Tell me how you are able to use it after

20   the crash?

21      A.   A new hard drive was installed.

22      Q.   So a new hard drive went into the laptop, and

23   you have been using the laptop with the new hard drive

24   since the crash, correct?
```

Arthur Herring, III
October 24, 2018

Page 12

1     A.   Yes.

2     Q.   What happened to the hard drive on which the

3  computer virus was present?

4     A.   Well, originally, I thought it was disposed, and

5  I understand that Mr. Vanderhoff still has it.

6     Q.   Where is Mr. Vanderhoff located?  Is he in

7  Pennsylvania?

8     A.   Yes.

9     Q.   How did you get the hard drive from your home to

10  Mr. Vanderhoff's possession?

11     A.   I took the laptop to his office.

12     Q.   Do you know what efforts Mr. Vanderhoff made to

13  recover any data on the laptop?

14     A.   I do not know.

15     Q.   Do you know whether Mr. Vanderhoff erased the

16  hard drive or deleted any data off of it?

17     A.   To my knowledge the hard drive was totally

18  useless and nothing could be salvaged from it.

19     Q.   Do you have any opposition to my retaining some

20  type of forensic computer person, IT person to try to

21  recover data from the hard drive?

22     A.   You can have anybody you want, but the hard

23  drive stays with my IT person, and it doesn't leave his

24  possession at all.

Arthur Herring, III
October 24, 2018

Page 13

1      Q.    Can you tell me why that is?

2      A.    Because knowing the depth of corruption by your

3    plaintiff, I would not trust him with possession of a

4    hard drive where possibly information could be added that

5    would be untruthful.

6      Q.    Okay.  So you don't want the hard drive to be in

7    the possession of my client, correct?

8      A.    Obviously.

9      Q.    But do you have an objection to the hard drive

10   being in the possession of some type IT professional,

11   some third-party IT professional that's not employed by

12   my client?

13     A.    As I stated, you can have any IT person come up

14   here and discuss it with Mr. Vanderhoff, but it will not

15   leave his possession.

16     Q.    What type of data was stored on this hard drive?

17   Is this your work laptop where everything you did was

18   stored on this laptop?

19     A.    No.  It's both work and personal.

20     Q.    Okay.  So let's focus on Dektor-related business

21   at this point.

22           What kind of Dektor-related data was stored on

23   this hard drive?

24     A.    Articles, emails...

Arthur Herring, III
October 24, 2018

Page 14

1      Q.    Anything else?

2      A.    Articles, emails pertaining to anything and

3   everything.

4      Q.    What about records of where Dektor has sold

5   products to, customer lists, receipts, invoices.  Are

6   those types of documents that were stored on the laptop?

7   I'm sorry, on the hard drive?

8                MR. ECKARD:  I'm going to object to

9        the form, but you can answer it.

10               THE WITNESS:  I don't keep customer

11       lists.  I don't keep records of emails that I

12       have sent out to various people or whatever.

13   BY MR. DESOUZA:

14      Q.    Well, let me just ask you then, presumably

15   Dektor Corporation sells a product, correct?

16      A.    Yes.

17      Q.    A PSE product; is that correct?  Is that right,

18   Mr. Herring?

19      A.    Repeat the question.

20      Q.    What products does Dektor Corporation sell?

21      A.    We sell the PSE program and the training for it.

22      Q.    And customers pay Dektor Corporation for that

23   program or for that training, correct?

24      A.    Correct.

Arthur Herring, III
October 24, 2018

Page 15

1      Q.    Does Dektor Corporation generate invoices when

2   it sells the software to its customers?

3      A.    We don't send out invoices, we send out a letter

4   itemizing what the costs will be for the number of

5   instruments sold, and the number of people to be trained.

6      Q.    Okay.  Now, the letter that gets sent out, does

7   Dektor Corporation retain a copy of that somewhere?

8      A.    I keep it in paper form.

9      Q.    So letters to customers would not be stored on

10   the hard drive that got damaged by the virus; is that

11   right?

12      A.    Correct.

13      Q.    What about the Word version of those letters,

14   would that be on the hard drive?

15      A.    Maybe only generic Word documents, where I just

16   fill in the blanks.

17      Q.    What other records of sales to customers does

18   Dektor maintain other than the letters that get sent to

19   the customers?

20      A.    To my knowledge, none.

21      Q.    Well, at the end of the year, presumably, you

22   got to put together your financial records for filing a

23   tax return, correct?

24      A.    Right.

Arthur Herring, III
October 24, 2018

Page 16

1      Q.    Okay.  And what data do you rely on in doing

2   Dektor's tax returns?

3      A.    Well, the Dektor bank account and the credit

4   card statements of what expenses I use pertaining to

5   Dektor.

6      Q.    Do you accept wire transfers from customers?

7      A.    To my bank.

8      Q.    What about checks?

9      A.    Never.

10     Q.    So what forms of payment does Dektor accept?

11     A.    Wire transfers only.

12     Q.    So when you mentioned credit cards, that was

13  expenses, not customers purchasing something on a credit

14  card; is that right?

15     A.    Correct.

16     Q.    So the only payment that Dektor accepts is wire

17  transfers from customers, correct?

18     A.    Yes.

19     Q.    And where does Dektor have a bank account? Which

20  financial entity?

21     A.    Harleysville.

22     Q.    I'm sorry.  What was that?

23     A.    Harleysville Bank.

24     Q.    Is that a local Pennsylvania bank?

Arthur Herring, III
October 24, 2018

Page 17

1        A.    Yes.

2        Q.    One of the interrogatories that we sent both to

3    you and to Dektor was asking to identify any sales that

4    Dektor Corporation has made to customers before; do you

5    recall that?

6        A.    Yes.

7        Q.    And I believe the response was "none;" is that

8    correct?

9        A.    To my knowledge, yes.

10       Q.    Okay.  Well, to your knowledge, is what I'm

11   concerned about.

12             What did you do to confirm whether any sales had

13   been made from Dektor Corporation to customers in

14   Florida?

15       A.    To my knowledge, there were no --

16       Q.    Well, did you check Dektor's bank account

17   statements for records of any payments coming from any

18   entities from Florida?

19       A.    I did a reasonable search.  I did not find any.

20       Q.    Define what a "reasonable search" is.

21       A.    I would not know how to give that definition.

22       Q.    I'm using your words.  You told me you did a

23   "reasonable search."

24             What did you do?

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Arthur Herring, III
October 24, 2018

Page 18

1       A.    I checked my documents.  I checked by bank

2   account.

3       Q.    What documents did you check?

4       A.    Any documents in my files pertaining to

5   business.

6       Q.    Would those be paper documents or electronic?

7       A.    Paper.

8       Q.    Did you check any electronic documents?

9       A.    As I said the hard drive had crashed, so there

10  was nothing that could be obtained from that.  So to the

11  best of my recollection and the best of my abilities of

12  documents I had, I could not find anybody that I sold it

13  to in Florida as Dektor.

14      Q.    Let me ask, generally, in 2018 so far, and I

15  don't expect you to know the number to a T, how many PSE

16  products had you sold in 2018?

17      A.    Well, I believe that's corporate information.  I

18  don't see the relevance in stating that.

19      Q.    Well, sir, your attorney hasn't objected to it,

20  and I would like an answer to it.  And, respectfully, I

21  don't think you are the best gage of what's relevant or

22  not for this deposition.  And unless instructed not to

23  answer the question, I want you to answer the question.

24  I'm not asking you to identify who your customers are,

Arthur Herring, III
October 24, 2018

Page 19

1   how much you sold it for, I'm simply asking for a general

2   number of how many products you sold this year.

3       A.   Well, as I said, corporation is entitled certain

4   secrets, as they say, and your concerned with how many

5   did I sell in Florida pertaining to the issue of

6   jurisdiction, and I have said, "None."

7       Q.   Are you refusing to answer my question?  Not

8   withstanding the fact that your attorney hasn't

9   instructed you not to answer?  Because we can ask it

10  again and again.  You are either going to answer it, or

11  you are going to refuse to answer it.  And if you refuse,

12  we can get the judge involved, but that's up to you.

13              MR. ECKARD:  Dan, let me just ask --

14        I think the question is:  How many machines

15        have been sold by Dektor in 2018?

16              MR. DESOUZA:  Yes.

17              MR. ECKARD:  Can you narrow the scope

18        for the purposes of jurisdictional discovery?

19              MR. DESOUZA:  I really can't because

20        he's taking the position that he has no

21        knowledge of sales to Florida.  I want to find

22        out how many products he sells per year, on

23        average, and how many customers.  And if he's

24        telling me hundreds and hundreds, it's going to

Arthur Herring, III
October 24, 2018

Page 20

1      seem odd that none of those sales over the last

2      few years have been in Florida.

3              I'm testing the voracity of the

4      statement he's making.  And he may have

5      knowledge, he may not have knowledge.  But I

6      think I'm entitled to know, generally, without

7      just taking his word for it, that to his best

8      recollection, he doesn't know.

9              MR. ECKARD:  And the question was for

10     2018?

11             MR. DESOUZA:  Right now I'm in 2018,

12     yes.

13             MR. ECKARD:  Okay.  So to the extent

14     the question is beyond the scope of the purpose

15     of the jurisdictional discovery, I'll object.

16     I'm not going to instruct him to not answer,

17     but I think it's beyond the scope the of the

18     jurisdictional discovery for establishing

19     personal jurisdiction in Florida.

20             MR. DESOUZA:  Okay.  Mr. Herring, you

21     can answer.

22             THE WITNESS:  Well, as I said, I did

23     not sell any in Florida this year or

24     previously.

Arthur Herring, III
October 24, 2018

Page 21

1    BY MR. DESOUZA:

2        Q.    Okay.  Mr. Herring, I would like to get out of

3    here this morning, so let's listen carefully to the

4    question, okay?

5            How many PSE products have you sold in 2018 so

6    far?

7        A.    I'm not the going to answer that.  Get the judge

8    to answer it.

9        Q.    You are refusing to answer that question,

10   correct?

11       A.    I'm refusing to answer because this deposition

12   is about jurisdiction in Florida, and you are in a

13   fishing expedition to try to find out how many I sell,

14   which is totally irrelevant in this matter.

15           And I know where that information would go, so

16   I'm not going to answer it.  It's a corporation secret,

17   as far as how many we sell.

18           You want to know how many are sold in Florida?

19   To my knowledge, none.

20       Q.    Are you finished, Mr. Herring?

21       A.    Yes.  I'm finished.  Next question.

22       Q.    Mr. Herring, how many PSE products has Dektor

23   Corporation sold in the year 2017?

24       A.    Same answer.  If you want to know how many --

Arthur Herring, III
October 24, 2018

Page 22

1    Q.    Hold on, Mr. Herring.  Same answer being, you
2    refuse to answer?
3    A.    I am refusing to answer because it does not deal
4    with the jurisdiction of Florida, which this is what this
5    matter is about for location of the case.
6    Q.    Mr. Herring -- sorry, go ahead, Rob.
7              MR. ECKARD:  So I just want to
8         reassert the same objection to the
9         jurisdiction.
10   BY MR. DESOUZA:
11   Q.    Mr. Herring, on average, how many PSE products
12   has Dektor sold annually, over the last five years?
13   A.    I'm not going to answer it.  I told you the
14   answer in Florida is zero, to the best of my knowledge.
15   Q.    How many states, to your knowledge, has Dektor
16   Corporation sold PSE products for training to customers
17   in those states?
18             MR. ECKARD:  Objection.  Beyond the
19        scope of the deposition.  You can answer, if
20        you can.
21             THE WITNESS:  I'm not going to answer
22        it.
23             MR. DESOUZA:  You are refusing so
24        answer that question as well?

Arthur Herring, III
October 24, 2018

Page 23

1                    THE WITNESS:  That's right.  It has

2         nothing to do with the jurisdiction issue,

3         which is what this is about today.

4    BY MR. DESOUZA:

5         Q.   Has Dektor Corporation sold PSE products to more

6    than 25 states, to customers in more than 25 states?

7         A.   Same answer.  I'm not going to answer.

8                    MR. ECKARD:  Hold on, Arthur, Arthur,

9         hold on.  Just let me get the objection down.

10                   Object to the form.  Beyond the scope

11        of the 30(b)(6) jurisdiction discovery.  You

12        can answer if you can.

13                   THE WITNESS:  No.  I'm not going to

14        answer.

15   BY MR. DESOUZA:

16        Q.   You mentioned that emails were stored on this

17   hard drive, correct?

18        A.   Various types of emails.

19        Q.   You have an email address with Dektor

20   Corporation, correct?

21        A.   Yes.

22        Q.   What is that?

23        A.   Admin@DektorPSE.com.

24        Q.   Is that the only email address you used to

Arthur Herring, III
October 24, 2018

Page 24

1    conduct Dektor-related business?

2        A.    Yes.

3        Q.    Do you have any other email addresses that you

4    use?

5        A.    That is my business email address.

6        Q.    That's not the question I asked you.

7              Is there any other email addresses that you use,

8    Mr. Herring?

9        A.    Not pertaining to business.

10       Q.    Okay.  Mr. Herring, this will go a lot quicker

11   if you answer the question before the fifth time I have

12   to repeat it, okay?

13             Yes or no, are there any other email addresses

14   that you use?

15       A.    The email address I use for Dektor is

16   Admin@DektorPSE.com.

17       Q.    I'm asking Arthur Herring, who's also being

18   deposed today, are there any other email addresses that

19   you use other than Admin@DektorPSE.com?

20       A.    Not for Dektor.

21       Q.    Okay.  Sir, is today Wednesday?

22       A.    To the best of my knowledge.

23       Q.    Are you speaking to me via telephone right know?

24       A.    Describe a telephone.

Arthur Herring, III
October 24, 2018

Page 25

1    Q.   Unfortunately, your attorney's going to have to

2    catch a flight, and we are still going to be talking

3    hours from now if you I can't answer a simple yes or no

4    question, Mr. Herring.

5           I understand you don't want to be here, but I'm

6    going to ask my questions and I'm going to get answers to

7    them whether you like to answer them or not.

8           So in fairness to both of us and to your

9    attorney who I'm sure would like to catch a flight at

10   some point this morning, I would appreciate it if you

11   could try to answer my questions.

12   A.   The deposition was scheduled for this morning

13   and I'm here at 9:30 and I'm willing to go through with

14   this deposition.

15   Q.   Does Arthur Herring use any other email

16   addresses other than Admin@DektorPSE.com; yes or no?

17   A.   I am not Arthur Herring.

18   Q.   Who are you, sir?

19   A.   I am Arthur Herring, III.

20   Q.   Okay.  Let's make this simple for you because it

21   seems to be very complex.  Can I make it simpler for you,

22   can I?

23   A.   You can ask me any question you want.

24   Q.   Do you use any other email addresses other than

Arthur Herring, III
October 24, 2018

Page 26

1   Admin@DektorPSE.com; yes or no?

2        A.   That is not relevant to the issue of

3   jurisdiction.

4        Q.   Are you refusing to answer that question?

5        A.   I answered it that the business and only

6   business email for Dektor is Admin@DektorPSE.com.

7                MR. DESOUZA:   Madam Court Reporter,

8        can you repeat the question, please?

9        (The last question was read back as requested.)

10  BY MR. DESOUZA:

11       Q.   What's the answer Mr. Herring?

12       A.   I'll state it again.   The only email --

13       Q.   Mr. Herring, I don't want you to state it again.

14  It's a yes or no answer.

15           Do you use any other email addresses other than

16  Admin@DektorPSE.com?

17           It's a very simple question.   I would like a yes

18  or no answer to it or I refuse to answer.   I don't want

19  you to repeat, I want a yes or no answer.   This is

20  simple.

21       A.   I have other email addresses.

22       Q.   Thank you.   What other emails do you use?

23       A.   The only email address I have for Dektor is

24  Admin@DektorPSE.com.

Arthur Herring, III
October 24, 2018

Page 27

1      Q.    What other email addresses do you use?

2      A.    That's irrelevant for the issue of jurisdiction.

3                  MR. ECKARD:  Arthur, unfortunately --

4                  THE WITNESS:  It has nothing to do

5         with jurisdiction.

6                  MR. ECKARD:  Arthur, let me just say,

7         relevance is a very broad category, very low

8         threshold for purposes of discovery.  In fact,

9         counsel need not even ask information that

10        would be necessarily admissible in trial, but

11        might lead to admissible evidence.

12                 To the extent there's a relevancy

13        objection, although you believe it's not

14        relevant, the Courts decide relevancy.  It's a

15        very low threshold, so we certainly don't want

16        to be back here doing this again.  And we

17        certainly don't want the Court to impose

18        sanctions, which could range from striking of

19        your pleadings, dismissing the motion to

20        dismiss, imposing fees against you, so if it's

21        going to be irrelevance, I appreciate the

22        concern, but you got to answer unless I

23        instruct you otherwise.

24                 THE WITNESS:  Well, you are not aware

Arthur Herring, III
October 24, 2018

Page 28

1     that the plaintiff has had many situations

2     where information has been obtained without

3     legal process including tapping into emails,

4     tapping into phone conversations, and that's

5     why I object to it.

6               It has nothing to do with business.

7     Dektor is being sued.  It's not relevant, as

8     far as what other email addresses I have, which

9     will be the next question he's going to ask:

10    Which ones?  What are they?

11              Now, why is counsel asking me other

12    email address that have nothing to do with my

13    business?

14              MR. ECKARD:  Again, Arthur, I think

15    given the rules of civil procedure and the

16    rules of evidence, I think you are,

17    potentially, looking at being re-deposed.

18              THE WITNESS:  Is he going to ask me

19    what those addresses are?  Because I already

20    said I have --

21              MR. DESOUZA:  Mr. Herring, I have

22    already asked you what those email addresses

23    are.  Remember you are not being sued just as

24    Dektor.  You are here being sued in this case

Arthur Herring, III
October 24, 2018

Page 29

1        individually and as Dektor Corporation, and you

2        are testifying today individually and as Dektor

3        Corporation.

4                MR. ECKARD:  How about this, Arthur,

5        provided that information that you believe to

6        somehow be proprietary, trade secrets,

7        confidential somehow that falls in the chapter

8        of 688 of the Florida statute or some other

9        federal proprietary protection, we can

10       certainly -- Dan if you will allow for us to

11       agree to bring that matter before the Court and

12       if the Court deems that information to be

13       sensitive in nature to Mr. Herring's business

14       or trade secrets, we can later petition for

15       that information to be for Counsel's eyes only,

16       or to be sealed; is that fair.

17               MR. DESOUZA:  I'll agree that

18       somewhere in the next 14 days, if he wants to

19       file a motion for protective order, to seek

20       that, he can do so.  I'm going on the oppose

21       it.  I don't see how his email addresses are

22       confidential or subject to any privilege, but

23       for purposes of today, I want an answer,

24       certainly.

Arthur Herring, III
October 24, 2018

Page 30

```
1              MR. ECKARD:  Right.  So I'll agree in
2      the next 14 days that portion of the transcript
3      that identifies his other email addresses that
4      he uses --
5              THE WITNESS:  What is the purpose of
6      the other email addresses?
7              MR. DESOUZA:  Mr. Herring, we are not
8      here to answer your questions, okay.  You are
9      here to answer our questions.
10             THE WITNESS:  Well, I am representing
11     Dektor.
12             MR. DESOUZA:  I'm willing to go so
13     far, I'm not here to answer your questions,
14     okay?  I'll talk to your attorney and I'll ask
15     you questions.
16             So, Rob, I'll agree that within the
17     next 14 days, if he wants to file a motion for
18     protective orders to be treated as
19     confidential, he certainly can.  I'll oppose
20     it.  I'm definitely not going to agree to it.
21     And that I will not share, I'll treat it as
22     confidential for purposes of the next 14 days,
23     and I won't provide that portion of any
24     transcripts to my client.
```

Arthur Herring, III
October 24, 2018

1          MR. ECKARD:  Okay.  There we go,

2     Arthur, to the extent there's been a

3     representation from Mr. DeSouza on the

4     protection of this data or testimony for the,

5     at least, 14 days without the necessity of a

6     federal court order or confidentiality

7     agreement, it will be not disclosed to his

8     client.

9          THE WITNESS:  Do you really believe

10     that?  Do you really believe that?

11          MR. ECKARD:  Let me just finish.  To

12     the extent that you believe that a federal

13     court order is necessary, you have the right,

14     and you will have the right to file a motion

15     with the Court for the Court to enter an order

16     protecting that information.

17          So listen, there is no more level of

18     protection you can get, short of not providing

19     it, which I think, again, I'm advising you that

20     you will likely find yourself, maybe, in the

21     judge's chambers answering these questions.

22     Which I certainly don't suggest.

23          So you hired my to give you advise,

24     that's my advise.  You should answer the

Arthur Herring, III
October 24, 2018

Page 32

1          question.  You have the intended protection at

2          this limited juncture.

3                    If you want to re-ask the question,

4          Dan, and if Mr. Herring understands the

5          question, he should answer it.

6     BY MR. DESOUZA:

7          Q.   I'll ask it one more time.  Mr. Herring, other

8     than the Admin@DektorPSE.com email address, what other

9     emails do you use?

10         A.   I use Ed@Detectornews.com.

11         Q.   Is that E-D?

12         A.   Yup.

13         Q.   At detector, D-E -- spell that.

14         A.   D-E-T-E-C-T-O-R-N-E-W-S.

15         Q.   Are there any other email addresses that you

16    use?

17         A.   Nope.

18         Q.   What do you use the Ed@Detectornews.com address

19    for?

20         A.   I have a news website.

21         Q.   Is the website Detectornews.com?

22         A.   Yup.

23         Q.   And going by the name of it, is that a website

24    that publishes news in the lie detector, voice analysis

Arthur Herring, III
October 24, 2018

Page 33

1   field?

2       A.   No.  It pertains to news articles.

3       Q.   About what?  Anything?

4       A.   Various topics.

5       Q.   Like kittens being rescued out of the tree by

6   the fire department?

7       A.   So far that story hasn't been posted.

8       Q.   Okay.  So what types of stories?

9       A.   Various types of stories that would be of

10  interest.

11      Q.   Has Detectornews.com published any stories about

12  lie detectors?

13      A.   Some of those topics are.

14      Q.   Has Detectornews published any stories about

15  voice stress analysis?

16      A.   Not to my knowledge.

17      Q.   Has Detectornews published any news or articles

18  about NITV?

19      A.   Not to my knowledge.

20      Q.   Does Detectornews have a website?

21      A.   Yes.

22      Q.   Is it operational?

23      A.   Yes.

24      Q.   And what's the website for Detectornews?

Arthur Herring, III
October 24, 2018

Page 34

1      A.   Detectornews.com.

2      Q.   Would that be www dot D-E-T-E-C-T-O-R-N-E-W-S

3  dot com?

4      A.   Yeah.

5      Q.   I just tried to visit it, but I don't see

6  anything.  It says Detectornews.com is for sale.  I don't

7  see a website.

8           MR. ECKARD:  I object to the form.

9       Is there a question?

10          MR. DESOUZA:  He said it's

11      operational, but I just tried to visit it and I

12      don't see the website.  Perhaps I am typing

13      something in wrong.

14  BY MR. DESOUZA:

15     Q.   Have you visited it recently?

16     A.   What do you mean by recently?

17     Q.   Let's say over the last month.

18     A.   Not that I can recall.

19     Q.   Have you published any articles over the last

20  month?

21     A.   No.

22     Q.   When was the last time you published a news

23  article on Detectornews.com?

24     A.   I don't recall.

Arthur Herring, III
October 24, 2018

Page 35

1      Q.    Was it this year?

2      A.    I don't recall.

3      Q.    How long have you had the Ed@Detectornews.com

4   address?

5      A.    I don't recall.

6      Q.    Has it been more than a year?

7      A.    Yes.

8      Q.    Has it been more than five years?

9      A.    Probably.

10     Q.    Going back to the hard drive that was affected

11  by the computer virus.

12           Do you believe there's any data on that hard

13  drive pertaining to NITV?

14     A.    Most likely.

15     Q.    And what type of data would that have been?

16     A.    Articles that I saved.

17     Q.    Articles about NITV?

18     A.    Yes.

19     Q.    Any other data that would have been on that hard

20  drive pertaining to NITV?

21     A.    Articles, various police departments and others

22  in the news pertaining to it, news articles about it.

23     Q.    How many articles are we talking about?  A

24  handful, dozens?

Arthur Herring, III
October 24, 2018

Page 36

1       A.   I don't know.

2       Q.   How about emails?  Would emails pertaining to

3   NITV have been on that hard drive?

4       A.   Emails that I have sent to various people.

5       Q.   Explain to me how the emails would have been on

6   the hard drive?

7       A.   Emails I sent, sometimes I save them.

8       Q.   So if you sent an email you may have saved it

9   locally on the hard drive and then the hard drive would

10  be effected by the virus and you wouldn't have access to

11  those emails on that hard drive, correct?

12      A.   Well, your statement was not correct, the way

13  you phrased it.

14      Q.   Tell me what would make it correct?

15      A.   Well, you stated that it was effected by a virus

16  and I believe it was established that the hard drive

17  crashed.

18      Q.   Okay.  The hard drive crashed, but

19  theoretically, you sent an email to someone, right?

20           I'm just trying to walk through the steps here.

21  You sent an email and you then saved that email locally

22  on the hard drive of your laptop computer?

23      A.   Yes.

24      Q.   An you did that with all of the emails that you

Arthur Herring, III
October 24, 2018

Page 37

1   sent or just some?

2       A.   Just some.

3       Q.   So it's possible that there were emails on this

4   hard drive that had been saved locally that pertain to

5   NITV, correct?

6       A.   Yes.

7       Q.   Do you know one way or the other whether there

8   were emails pertaining to NITV that were stored locally

9   on that hard drive?

10      A.   I'm sure there have been.

11      Q.   Do you know whether there were any emails saved

12  locally on that hard drive that pertained to NITV's

13  product, the CVSA product?

14      A.   I have no ability that I can recall what emails

15  contained what content.

16      Q.   Once the hard drive crash occurred did you,

17  yourself, attempt to recover any of the data on the hard

18  drive?

19      A.   I had Mr. Vanderhoff attempt to.

20      Q.   Right.  But other than Mr. Vanderhoff, did you

21  attempt to recover any data?

22      A.   I have no abilities pertaining to that.

23      Q.   Other than Mr. Vanderhoff, did you take the hard

24  drive to any other IT professionals?

Arthur Herring, III
October 24, 2018

Page 38

1    A.    No.

2    Q.    Did you pay Mr. Vanderhoff or his company any

3    money in connection with trying to recover data on the

4    hard drive?

5    A.    I believe I did.

6    Q.    Okay.  Would there be a record of that payment

7    in your possession?

8    A.    I would have to check my checkbook.

9    Q.    If you had paid Mr. Vanderhoff or his company,

10   it would have been by check?

11   A.    Most likely.

12   Q.    Could it have been by credit card?

13   A.    No.

14   Q.    Is it Mr. Vanderhoff that told you that a

15   computer virus is what caused the computer to crash?

16   A.    No.

17   Q.    Is that what you determined based on your own

18   review of the hard drive and the laptop?

19   A.    It was my initial thought that a virus, based on

20   warnings that I had gotten in the previous days or weeks,

21   caused it.

22   Q.    Did Mr. Vanderhoff opine on the cause of the

23   crash?

24   A.    He told me the hard drive simply crashed.

Arthur Herring, III
October 24, 2018

Page 39

1     Q.    And any of the data was not recoverable?

2     A.    That is correct.

3     Q.    When did you obtain a new hard drive after the

4     crash?

5     A.    He ordered one, it was several weeks before he

6     could install it.

7     Q.    Were you still able to conduct Dektor-related

8     business during that two- to three-week period that you

9     didn't have a hard drive or the laptop?

10    A.    Not using my computer.

11    Q.    Okay.  Were you using someone else's computer?

12    A.    No.

13    Q.    Did you send any emails from the Admin@DektorPSE

14    email address during that period of time that you did not

15    have your laptop computer?

16    A.    No.

17    Q.    Did you receive any emails to your

18    Admin@DektorPSE email address during that period of time

19    that you did not have your laptop?

20    A.    I believe they were sent and stored, but I,

21    obviously, did not get them.

22    Q.    So you are not checking your emails during that

23    two- to three-week period?

24    A.    I had no ability to do so.

Arthur Herring, III
October 24, 2018

Page 40

1      Q.   But as you sit here today, you have a

2   functioning laptop and you have access to your

3   Admin@DektorPSE.com email address, correct?

4      A.   Yes.

5      Q.   Have you access to your inbox, right?

6      A.   Yes.

7      Q.   And you have access to your sent items as well,

8   correct?

9      A.   Yes.

10      Q.   And the email that you have in your

11   Admin@DektorPSE.com email address -- strike that.

12         How far back does your inbox go on your

13   Admin@DektorPSE.com email address?

14      A.   From when the new hard drive was installed.

15      Q.   Which would have been when?  Some time in June

16   or July?

17      A.   I really don't recall exactly when.  Probably

18   June.

19      Q.   Okay.  So your testimony is in terms of your old

20   emails, if you go in your inbox, you don't have any

21   emails in your inbox that predate the hard drive crash?

22      A.   No.

23      Q.   And your sent items, you don't have any emails

24   in your sent mail that predate the hard drive crash?

Arthur Herring, III
October 24, 2018

Page 41

1       A.   Correct.

2       Q.   Do you know why that is?

3       A.   No.

4       Q.   Do you know where Dektor's -- let me ask you

5    this:  The email address is @DektorPSE.com, correct?

6       A.   No.

7       Q.   Well, the domain name as to where your email

8    address is @DektorPSE.com, right?

9       A.   I don't understand what you mean.

10       Q.   Okay.  Your email address, the

11    Admin@DektorPSE.com, that is an email address that is

12    provided through the Dektor website, correct?

13       A.   I really I don't know.

14       Q.   You don't know where your emails are hosted

15    through?

16       A.   I don't understand that much of computerese.

17       Q.   Okay.  So if my email address was @AOL.com, then

18    AOL is providing the address.  If my address was

19    @Gmail.com, my emails are provided through Gmail.

20            Do you understand that much?

21       A.   Yes.

22       Q.   So your email is @DektorPSE.com.  You agree with

23    me, correct?  The domain portion after the "Admin."

24       A.   Like I said, I'm not sure how to answer your

Arthur Herring, III
October 24, 2018

Page 42

1    question because I don't understand that much of jargon,

2    terminology, whatever.  I have an email address, I have a

3    telephone, I don't know where it comes from.

4         Q.   Prior to hard drive crash, how far back did your

5    emails go?

6         A.   I don't recall.

7         Q.   A year?  Two years?

8         A.   I have no idea.

9         Q.   Ninety days?

10        A.   I have no idea.

11        Q.   Prior to the hard drive crash did you have any

12   policy of deleting old emails after a certain amount of

13   time?

14        A.   Probably when I got done reading, I deleted it.

15        Q.   Do you have a policy of saving emails.

16        A.   Certain ones I would save.

17        Q.   Have you made any effort to recover any emails

18   pertaining to the substance of this lawsuit that were

19   received or sent prior to the hard drive crash?

20        A.   I don't understand your question.

21        Q.   Okay.  We served document requests to both you,

22   individually and to Dektor, request for production.

23             Do you recall that?

24        A.   I don't recall.

Arthur Herring, III
October 24, 2018

Page 43

1    Q.   Okay.  Do you recall being provided by counsel,

2    and I'm asking you again, for substance of any

3    communication?  Do you recall being provided by your

4    counsel any documents in this lawsuit that requested you

5    to provide or produce documents to my client?

6    A.   I really don't have those documents in front of

7    me, so I really can't answer that question.

8         MR. DESOUZA:  Madame Court Reporter, do we have

9    access to email over there that I can email you something

10   and we can print it up and use it as an exhibit?

11        COURT REPORTER:  I'm sure we can.

12        MR. DESOUZA:  Okay.  We'll go a

13     little longer and we'll take a break, and then

14     I'll email you something that we'll use as an

15     exhibit.

16        COURT REPORTER:  Okay.

17   BY MR. DESOUZA:

18   Q.   In 2018, Mr. Herring, have you sent any emails

19   to any representative to the Florida law enforcement

20   agency with a subject line, "Voice lie detector scam" or

21   "Lie detector scam"?

22   A.   I don't recall, offhand.

23   Q.   Is it possible that you sent such an email, you

24   just don't recall?

Arthur Herring, III
October 24, 2018

Page 44

1      A.    I don't believe I did.

2      Q.    Well, there's a difference between "I don't

3  recall" and "I don't believe I did."

4            You would agree with me there, correct?

5      A.    All right.  Then my answer will be, I don't

6  believe I did.

7      Q.    Do you know for sure?

8      A.    Well, since my new hard drive was installed, I

9  positively did not, and I don't recall ever sending any

10  emails to Florida law enforcement pertaining to that

11  subject matter.

12     Q.    So since the new hard drive was installed, you

13  have not, correct?

14     A.    Positively not.

15     Q.    Prior to the new hard drive being installed, you

16  don't believe so, correct?

17     A.    I don't believe so, yes.

18     Q.    Okay.  Do you recall sending any emails in 2018

19  with a subject line, "Voice lie detector scam"?

20     A.    I don't recall.

21     Q.    Do you recall sending any emails in 2018 with

22  the subject line saying "Lie detector scam"?

23     A.    I don't recall.

24     Q.    From the Admin@DektorPSE.com email address, how

Arthur Herring, III
October 24, 2018

Page 45

1    many emails had you sent in 2018?

2         A.   I have no idea.

3         Q.   Hundreds?

4         A.   I have no idea.

5         Q.   Tens of thousands?

6         A.   I have no idea.

7         Q.   One?

8         A.   Most likely, I have sent at least one.

9         Q.   Okay.  Do you remember any law enforcement

10   agency you communicated with in 2018 via that

11   Admin@DektorPSE.com email address?

12        A.   No.

13        Q.   Do you recall any law enforcement agencies you

14   communicated with in 2018 from the Admin@DektorPSE.com

15   email address?

16        A.   I don't recall.

17        Q.   Not a single law enforcement agency?

18        A.   I don't recall, offhand.

19        Q.   Do you recall a single government agency that

20   you communicated with via the Admin@DektorPSE.com email

21   address in the year 2018?

22        A.   I don't recall.

23        Q.   How about 2017, do you recall any law

24   enforcement agency that you communicated with from that

Arthur Herring, III
October 24, 2018

Page 46

1   address?

2       A.   I don't recall.

3       Q.   Do you recall any government agency that you

4   communicated with in 2017 from that email address?

5       A.   I don't recall.

6       Q.   Well, given you don't recall a single law

7   enforcement or government agency, is it possible that

8   somewhere in 2018 you did communicate with a

9   representative of a Florida law enforcement agency?

10              MR. ECKARD:  Object to the form.

11  BY MR. DESOUZA:

12      Q.   You can answer.

13      A.   What was the question?

14      Q.   Okay.  You don't recall a single law enforcement

15  or government agency that you communicated with via your

16  Admin@DektorPSE.com email address in year 2018, correct?

17      A.   I don't recall that's the question.

18      Q.   I'll ask you a different question.

19      A.   What about the previous one?

20              MR. DESOUZA:  Madam Court Reporter,

21       can you read back that last question?

22       (The last question was read back as requested.)

23              THE WITNESS:  No, I did not.

24  BY MR. DESOUZA:

Arthur Herring, III
October 24, 2018

Page 47

1       Q.    How do you know that to be certain given that
2  you can't tell me a single law enforcement or government
3  agency as that you did communicate with?
4       A.    Well, this matter is about jurisdiction in
5  Florida, so that's where I concentrated.
6       Q.    You have communicated with law enforcement
7  agencies via your Admin@DektorPSE.com email address in
8  2018, correct?
9       A.    I really can't recall.
10      Q.    And and you have communicated with government
11 agencies via your Admin@DektorPSE.com email address in
12 2018, correct?
13      A.    I don't recall.
14      Q.    How would you know whether you communicated with
15 a Florida law enforcement agency via email in 2017?
16      A.    Well, because this issue is pertaining to
17 jurisdiction.  I searched my files and, again, on my new
18 hard drive I know I did not send anything to Florida as
19 far as law enforcement or government agency.
20      Q.    Right.  But your new hard drive is only
21 somewhere in May, June, or July of 2018, correct?
22           You told me that you don't have emails prior to
23 the date of the install of the new hard drive, right?
24      A.    Because the information was not -- any

Arthur Herring, III
October 24, 2018

Page 48

1    information was not able to be recovered from the old

2    hard drive.  All I can speak of are any paper documents I

3    may have or what is on the new hard drive.

4        Q.    Okay.  So can you confidently tell me that in

5    the year of 2018, you have not sent any emails from your

6    Admin@DektorPSE.com email address to a Florida law

7    enforcement or government agency?

8        A.    Positively, it is not on my new hard drive, and

9    I cannot find any documents that I did so.

10       Q.    Well, I'm talking about your emails.  You don't

11   have access to anything from January of 2018 through the

12   date of the install of the new hard drive, correct?

13       A.    That's correct.

14       Q.    And you don't have any emails from your

15   Admin@DektorPSE.com email address from January 2017

16   through December 31st, 2017, correct?

17       A.    Right.

18       Q.    You and don't have any emails from January of

19   2015 through December 31st of 2016 with respect to your

20   Admin@DektorPSE.com email address, correct?

21       A.    Yes.

22       Q.    Okay.  So in the year 2016, can you tell me one

23   way or the other whether you communicated via email with

24   a Florida law enforcement or government agency?

Arthur Herring, III
October 24, 2018

Page 49

1      A.     There's no way I could recall any of that

2    information.

3      Q.     Is it possible that you did?

4      A.     I don't recall.

5      Q.     If someone was asking you to sign an affidavit

6    that said, "I never communicated with a representative of

7    a Florida law enforcement agency in the year of 2016," is

8    that something you could sign?

9      A.     No.  I can't because I don't recall if I did or

10   not.

11     Q.     And same thing for 2017.  You don't recall one

12   way or the other whether or not you communicated with any

13   Florida law enforcement or government agency via email in

14   2017, correct?

15     A.     Well, you did not include the state of Florida,

16   so, again, I don't recall.  I may, I may not, I can't

17   state one way or the other.

18     Q.     So if I exclude Florida -- that was my mistake.

19   Let's focus on Florida.

20            In the year 2017, do you recall one way or the

21   other whether you sent any emails from your

22   Admin@DektorPSE.com email address to any representative

23   of a Florida law enforcement or government agency?

24     A.     I don't recall.

Arthur Herring, III
October 24, 2018

Page 50

1    Q.   Do you keep track whatsoever the law enforcement

2  or government agencies that you email?

3    A.   Usually not.

4    Q.   So where do you get the idea to send an email to

5  say, someone in Missouri or Colorado or California some

6  sort of an agency that you want to email about Dektor's

7  products?

8    A.   I might see an ad or article in the newspaper or

9  online, and if there's an email address, I'll send out

10  the introductory letter.

11    Q.   How about telephone calls.  Do you have any

12  telephone calls in 2018 with any representative of a

13  Florida law enforcement or government agency?

14    A.   I don't keep logs as far as who I call.

15    Q.   Well, do you recall one way or the other?

16    A.   I don't recall that I did.

17    Q.   Do you recall that you didn't?

18    A.   I don't recall.

19    Q.   Is it possible that you made a phone call to a

20  representative of a Florida law enforcement or government

21  agency in 2018?

22    A.   I don't recall.

23    Q.   Well, it's either possible or not possible,

24  right?  I know you don't recall, but are you saying it's

Arthur Herring, III
October 24, 2018

Page 51

1    out of the question, it never happened, or it might have

2    happened or you just don't know?

3         A.   I don't know.

4         Q.   Okay.  How about 2017.  Did you make my phone

5    calls to any representatives of Florida law enforcement

6    or government agencies?

7         A.   I don't know.

8         Q.   How about 2016?

9         A.   I don't know.

10        Q.   Do you use a cell phone to conduct business?

11        A.   Yes.

12        Q.   Does Dektor have a hard-line phone, separate

13   from your cell phone number?

14        A.   No.

15        Q.   So if you were making phone calls to any law

16   enforcement or government agency in 2018, would it have

17   been from your cell phone?

18        A.   Yes.

19        Q.   Did you make any effort, prior to today, to

20   review your cell phone bills to see phone numbers that

21   you telephoned whether you telephoned any phone numbers

22   in the State of Florida?

23        A.   I don't keep cell phone records.

24        Q.   You receive monthly bills for your cell phone,

Arthur Herring, III
October 24, 2018

Page 52

1    correct?

2       A.   Yes.

3       Q.   Do you know who the provider is for your cell

4    phone?  Is it Verizon, Sprint, Nextel?

5       A.   T-Mobile.

6       Q.   T-Mobile.  Did you make any effort either to

7    obtain your monthly bills from T-Mobile to determine

8    whether you made any phone calls to Florida law

9    enforcement or government agencies in 2018?

10      A.   No.

11      Q.   Did you make any effort to contact T-Mobile and

12   obtain your monthly invoices so that you could do that

13   confirmation for 2017?

14      A.   No.

15      Q.   How about for 2016?

16      A.   No.

17      Q.   Are you familiar with the gentleman by the name

18   of Greg Roebuck?

19      A.   No.

20      Q.   You have never heard the name before?

21      A.   I think maybe seven or eight years ago, I might

22   have talked to him about buying a PSE.

23      Q.   Have you communicated with Mr. Roebuck in 2018?

24      A.   No.

Arthur Herring, III
October 24, 2018

1      Q.    Have you heard the name Al Hall before?

2      A.    No.

3      Q.    Are you familiar with the company Vipre,

4    V-I-P-R-E?

5      A.    I have heard of them.

6      Q.    Is that a competitor that sells its own lie

7    detection or truth verification product?

8      A.    Well, you used the word "competitor."   In my

9    definition a competitor has something of equal value or

10   quality.  From what I know about Vipre, they are just as

11   much a scam as NITV, in my opinion.

12     Q.    Vipre is based in Florida, correct?

13     A.    That is correct.

14     Q.    Have you communicated with anyone associated

15   with Vipre in 2018?

16     A.    No.

17     Q.    Have you communicated with anyone associated

18   with Vipre in 2017?

19     A.    No.

20     Q.    Other than yourself, is there anyone associated

21   with Dektor that could have sent any emails to Florida

22   law enforcement or government agencies?

23     A.    As I stated, I'm the only employee of Dektor.

24     Q.    Does Dektor have any third-party contractors?

Arthur Herring, III
October 24, 2018

Page 54

1      A.    What do you mean by contractors?

2      Q.    Well, you said you are the only employee.  Are

3  there any independent contractors that Dektor uses?

4      A.    Not officially.

5      Q.    Anybody else with a Dektor email address?

6      A.    No.

7      Q.    Did you send any emails to the Missouri Police

8  Chiefs Association concerning NITV?

9            MR. ECKARD:  Object to the form.

10      Beyond the scope.

11  BY MR. DESOUZA:

12      Q.    You can answer.

13      A.    I don't recall.

14      Q.    Did you send any emails to the Sheldon Lineback

15  with the Missouri Police Chiefs Association?

16            MR. ECKARD:  Object to the form.

17      Beyond the scope.

18            THE WITNESS:  I don't recall.

19  BY MR. DESOUZA:

20      Q.    If you sent an email to Mr. Lineback on July

21  25th, 2018, that would have been after the hard drive

22  crash, correct?

23      A.    It would appear.

24      Q.    And July 25th, 2018 would also be after you

Arthur Herring, III
October 24, 2018

Page 55

1    received a new hard drive, correct?

2        A.    I believe so.

3        Q.    Let me ask you a different way.

4             You could not have sent an email from

5    Admin@DektorPSE.com on July 25, 2018 unless you had a

6    functioning laptop, correct?

7        A.    I believe so.

8        Q.    You testified earlier you had no means of

9    accessing your Admin@DektorPSE.com email account other

10   than through your laptop, correct?

11       A.    That is correct.

12       Q.    Okay.  So if you sent an email on July 25, 2018

13   from your Dektor email address, that email would have

14   been sent from your laptop, correct?

15       A.    If I sent one.

16       Q.    Have you sent emails in 2018 to any person

17   associated with the Garfield County Sheriffs Office in

18   Glenwood Springs, Colorado?

19             MR. ECKARD:  Object to the scope.

20             THE WITNESS:  I don't recall.

21   BY MR. DESOUZA:

22       Q.    Do you recall sending an email to Detective

23   Tamra Alstatt who's with the Garfield County Sheriffs

24   Department?  First name is, T-A-M-R-A, last name,

Arthur Herring, III
October 24, 2018

Page 56

1    A-L-S-T-A-T-T.

2         A.    I do not recall.

3         Q.    Do you recall emailing Detective Alstatt on July

4    22nd, 2018?

5         A.    I don't recall.

6         Q.    If you sent Detective Alstatt an email on July

7    22nd, 2018, that would have been after the hard drive

8    crash, correct?

9         A.    If it was.

10        Q.    If what was?  If you sent the email?

11        A.    Yes.

12        Q.    Okay.  And July 22nd, 2018 would also be after

13   you received a new hard drive in your laptop, correct?

14        A.    It would seem to be.

15        Q.    Prior to today, did you go through your sent

16   items in your Dektor email account to identify any emails

17   that you sent to law enforcement or government agencies?

18        A.    No.

19              MR. DESOUZA:  Let's go ahead and take

20         a brief break because I want to use as an

21         exhibit those document requests.

22              COURT REPORTER:  Okay.

23              MR. DESOUZA:  Is there an email

24         address that I can email you that over there?

Arthur Herring, III
October 24, 2018

Page 57

1          COURT REPORTER:  Yes.  I will get

2     that for you.

3                    -  -  -

4     (Recess was taken from 10:38 a.m. to 11:02 a.m.)

5                    -  -  -

6  BY MR. DESOUZA:

7     Q.   Mr. Herring, we have handed you what is marked

8  as Exhibit-2.  It's a copy of the amended responses to

9  claimants first request for production to defendants.

10        (Exhibit-2 was marked for identification.)

11        Do you have that document in front of you?

12     A.   Yes.

13     Q.   Have you seen this document prior to today?

14     A.   Probably.

15     Q.   Okay.  Take a glance through it and confirm for

16  me, there appears to be thirty different requests for

17  production.  Basically, my client is asking you and

18  Dektor to produce certain categories of documents,

19  followed by responses, which would be on behalf of

20  yourself and Dektor.

21        So go ahead and flip through it, read through

22  it, and get familiar with it.

23        Just let me know when you are ready.

24     A.   All right.  I skimmed through it.

Arthur Herring, III
October 24, 2018

Page 58

1    Q.    Does this help refresh your memory, sir, that my

2    client served what I'll call document requests on both

3    you, individually, and Dektor in connection with this

4    lawsuit?

5    A.    Well, it's the answers that I filled in for my

6    attorney and he typed up for these documents.

7    Q.    Okay.  Well, these requests for production, some

8    of the categories here, I don't want to go through ever

9    one of them, but they do ask you to produce

10   communications with law enforcement or government

11   agencies that refer to NITV or its CVSA products.

12         You would agree with me, correct?

13   A.    Yes.

14   Q.    So for example, if you look at request No. 3,

15   which begins on page 2 of the document, it asks for

16   communications to or from U.S. law enforcement agencies

17   referring to Plaintiff or CVSA.

18         Do you see that?

19   A.    Yeah.

20   Q.    And the response is, "At this time, Defendants

21   are not in possession, custody, or control of any

22   documents responsive to this request."

23         Do you see that?

24   A.    Yes.

Arthur Herring, III
October 24, 2018

Page 59

1     Q.    Okay.  Now, this document was submitted on

2   October 16th, of 2018.  I'm trying to figure out what "at

3   this time" means.

4          Did you make any effort to look in your inbox or

5   sent items for emails that would be responsive to the

6   requests?

7     A.    Yes.

8     Q.    What effort did you make?  What did you do?

9     A.    Well, I looked at my emails that I saved.  I

10  looked in my files for any documents that I might have

11  saved, and I don't find any.

12    Q.    Well, I'm not asking about what's saved, at this

13  point.

14          Did you log in to your Admin@DektorPSE.com email

15  address and look in your sent items and your inbox for

16  any emails that would be responsive for this request?

17    A.    I did, and I did not find any.

18    Q.    So you didn't find any emails to the Garfield

19  County Sheriffs Department, correct?

20    A.    As I recall, no.

21    Q.    Well, if you had sent an email to someone

22  associated with the Garfield County Sheriffs Office,

23  which referred to Plaintiff or CVSA, you would have

24  produced it, correct?

Arthur Herring, III
October 24, 2018

Page 60

1        A.    As I said, I don't recall ever seeing anything

2    like that.

3        Q.    And do you recall seeing any emails that were

4    sent to anyone with the Missouri Police Chiefs

5    Association?

6        A.    I did not find any.

7        Q.    You didn't find any emails in your sent box or

8    your inbox that referred to Plaintiff or CVSA?

9        A.    I did not see any.

10       Q.    Did you find any emails in your inbox or your

11   sent box that were responsive to any of these thirty

12   requests?

13       A.    To the best of my knowledge, I did not find

14   anything.

15       Q.    Who owns the website that's located at

16   www.DektorPSE.com?

17       A.    What was your question?

18       Q.    Who owns the website that's located at

19   www.DektorPSE.com?

20       A.    I do.

21       Q.    Individually, Arthur Herring, III?

22       A.    Yes.

23       Q.    Okay.  Do you own any other website other than

24   the DektorPSE.com website?

Arthur Herring, III
October 24, 2018

Page 61

1      A.    Detectornews.

2      Q.    Detectornews.com?

3      A.    Yeah.

4      Q.    Other than that website, are there any other

5   websites that you own?

6      A.    Yeah.

7      Q.    Which ones?

8      A.    It's called NITVCVSAexposed.com.

9      Q.    What is NITVCVSAexposed.com?

10     A.    Well, it's a huge, beautiful website of all the

11  documents and information showing that your client is a

12  liar, a con man, and a scam artist, in my opinion.

13     Q.    When did you start NITVCVSAexposed.com?

14     A.    I believe I started it after I was served for

15  the lawsuit.

16     Q.    So what's the purpose of that website?

17     A.    Education purposes only.

18     Q.    Did you create this website yourself, the

19  NTIVCVSAexposed.com?

20     A.    No.

21     Q.    You had help doing it?

22     A.    I did not create that website.

23     Q.    Okay.  Well, who created the website?

24     A.    My IT person.

Arthur Herring, III
October 24, 2018

Page 62

1     Q.   Would that be the same IT person that's in

2  possession of your hard drive from your laptop,

3  Mr. Vanderhoff?

4     A.   Yes.

5     Q.   So you asked Mr. Vanderhoff to create this

6  website for you?  Do you provide him information to

7  publish on that website?

8     A.   Yes.

9     Q.   Okay.  And the website was created, you say,

10  after you were served for this lawsuit?

11     A.   Yes.

12     Q.   And on the NITVCVSA website, you published

13  information about NITV and the CVSA products?

14     A.   Among others.

15     Q.   And it's owner and NITV principal, or founder,

16  Mr. Humble; is that correct?

17     A.   Among others.

18     Q.   Who else, other than Mr. Humble, NITV, and CVSA

19  are you publishing information about on this

20  NITVCVSAexposed website?

21     A.   Well, the co-director, Cain.  Also, various

22  people and entities that I have dealt with through the

23  years pertaining to the scam.

24     Q.   Is the purpose of this website to spread the

Arthur Herring, III
October 24, 2018

Page 63

1    information about this scam for anybody who wants to

2    review it?

3         A.   It's for information purposes only.

4         Q.   You have sent links of this website to anybody?

5         A.   Yes.

6         Q.   Okay.  To who?

7         A.   So far, approximately, 1100 press releases have

8    gone out to, approximately, 1100 investigator reporters

9    in this country, both the newspaper and TV.

10        Q.   When did you send those 1100 press releases?

11        A.   Well, I'm still sending them.  It's been about a

12   week now since I started sending out press releases about

13   the lawsuit.

14        Q.   Are you sending those press releases via email?

15        A.   Yes.

16        Q.   Are you sending them via your

17   Admin@DektorPSE.com email address?

18        A.   Yes.

19        Q.   Is there some reason why you have not produced

20   those press releases to your counsel for production to my

21   client in this lawsuit?

22        A.   I don't recall --

23             MR. ECKARD:  Hold on.  Hold on.  I'm

24        going to object to the extent the answer may

Arthur Herring, III
October 24, 2018

Page 64

1          call for attorney-client communications.

2                    So with that being said, Arthur, you

3          can answer the question so long as it does not

4          involve communications that you and I have had

5          pertaining to that topic.

6                    THE WITNESS:  What was your question?

7                    MR. DESOUZA: Mr. Herring, is there

8          some reason you have not provided the 1100 or

9          so emails, press releases that you were just

10         referencing to your attorney so that those

11         documents can be produced to my client in this

12         lawsuit?

13                   THE WITNESS:  I don't think the

14         question ever came up.

15   BY MR. DESOUZA:

16        Q.   Let's look at Exhibit No. 2, which is the

17   responses to the documents requests, okay?

18             Do you have that in front of you?

19        A.   Yeah.

20        Q.   Look at request No. 1.  That asked you to

21   produce documents and communications that refer or relate

22   to CVSA.

23             Do you see that?

24        A.   Yeah.

Arthur Herring, III
October 24, 2018

Page 65

1        Q.    Look at No. 2.  That asked you to produce

2    documents and communications that refer or relate to

3    Plaintiff.

4              Do you see that?

5        A.    Yeah.

6        Q.    Do you agree with me that the 1100 or so emails

7    you have sent out over the last week refer to CVSA?

8        A.    Well, I have not sent out 1100 so far, but I

9    will be.  Maybe, right now, only 150 or so that I have

10   sent out.  But again, press releases was not,

11   specifically, mentioned in this document.

12       Q.    Have you sent any emails over the last week that

13   refer or relate to CVSA?

14       A.    Yes.

15       Q.    Have you sent any emails over the last week that

16   refer or relate to Plaintiff, NITV?

17       A.    Yes.

18       Q.    Why is it you have not produced those in this

19   lawsuit yet?

20       A.    I didn't think that it pertained to that.

21       Q.    You don't think that an email you send, sending

22   a link to NITVCVSAexposed that was a press release that

23   was about the scam that my client is running is relevant

24   to this lawsuit?

Arthur Herring, III
October 24, 2018

Page 66

1          You don't think that?

2     A.    No.  I was thinking more in terms of letters, or

3   like you said, emails specifically stating that.  I just

4   did not think of including press releases.  The subject

5   never came up as far as press releases being used.

6     Q.    You sent those press releases via email,

7   correct?

8     A.    Um-hum.

9     Q.    And emails, to your knowledge, is a

10  communication of one person to another, correct?

11    A.    As I said, it did not occur to me that that

12  would include press releases.  I was thinking more in

13  terms of formal letters, or as it was questioned, other

14  types of documents, but I was not thinking of press

15  releases.

16    Q.    Of the 150 or so that you sent already over the

17  last week, have you sent any of those emails to anyone in

18  Florida?

19    A.    I don't recall.

20    Q.    You don't know one way or the other do you?

21    A.    No.  The email addresses are nation -- well,

22  world wide.  So I don't remember offhand where I sent

23  particular ones.

24    Q.    And the remainder that you have yet to send,

Arthur Herring, III
October 24, 2018

Page 67

1    that you are planning to send, are you planning to send

2    any of those to individuals or entities located in

3    Florida?

4        A.   I believe there's newspapers and TV stations in

5    Florida.

6        Q.   Which ones.

7        A.   I don't know.  I wish I had a hard drive for a

8    brain, I could recall those things.

9        Q.   But you do plan to send press releases about the

10   NITVCVSAexposed website?  And the allegation is that my

11   client is running a scam to newspapers and reporters in

12   the State of Florida, correct?

13               MR. ECKARD:  Object to the form.

14               THE WITNESS:  Do I answer?

15               MR. DESOUZA:  Yes.

16               THE WITNESS:  No, I'm asking

17          Mr. Eckard.

18               MR. ECKARD:  Yes.  You can answer.

19               THE WITNESS:  Well, the press release

20          dealt with the lawsuit.  It was not just about

21          informing them and educating them about a scam

22          that's gone nationwide since 1990, so it was

23          about the lawsuit.

24   BY MR. DESOUZA:

Arthur Herring, III
October 24, 2018

Page 68

1      Q.   I'm at a loss here because I don't have the

2   press release in front of me.

3          So why don't you tell me what's in the press

4   release?

5              MR. ECKARD:  And for the record, nor

6          do I.

7              THE WITNESS:  On what?

8              MR. DESOUZA:  If I had the press

9          release in front of me, I would read it myself,

10         Mr. Herring.  So you are going to have to do

11         your best to educate me on what the press

12         release actually says.

13             THE WITNESS:  Well, Mr. Eckard said

14         something about, "Nor do I," I don't

15         understand.

16             MR. ECKARD:  He's asking you about

17         the press release that you indicated that was

18         sent or to be sent.  And, Counsel, Mr. DeSouza

19         advised you that he did not have a copy of

20         that.  And I just wanted to make sure that the

21         record was clear that I did not either have a

22         copy of that.

23             THE WITNESS:  Okay.  What's the

24         question?

Arthur Herring, III
October 24, 2018

Page 69

1   BY MR. DESOUZA:

2       Q.   Walk me through the press release.

3            What does it say?

4       A.   Well, I introduced myself, my company.  I said I

5   was being sued or my company was being sued for $10

6   million for a worthless lawsuit.  I explained what NITV

7   was who was suing me, and I explained all the

8   different -- well, not all, there are just too many of

9   them, but a few of the lies that Humble, the owner, and

10  Cain , who's co-director, have stated to get people to

11  buy their gadget.

12           And I conclude by saying this is not about

13  competition, this is about somebody that's been scamming

14  law enforcement, military, and ruining the lives of

15  innocent people because they were falsely accused, and

16  wasting taxpayer's money.

17      Q.   Does the press release include a link to the

18  NITVCVSAexposed website?

19      A.   Yes, it does.

20      Q.   Does the website include a link to the

21  DektorPSE.com website?

22      A.   I believe it does.

23      Q.   Have you made any efforts to restrict access to

24  the NITVCVSA website from anyone or particular states?

Arthur Herring, III
October 24, 2018

Page 70

1       A.   I don't know how that can be done.

2       Q.   Well, I understand you didn't create the

3   website.  You had your IT guy do it, correct?

4       A.   Yes.

5       Q.   Did you provide any instructions to Mr.

6   Vanderhoff that he should limit access to that website so

7   that people in Florida can't view it?

8       A.   I can't recall if I did or not.

9       Q.   Did Mr. Vanderhoff also create the DektorPSE

10  website?

11      A.   Yes, he did.

12      Q.   Did you provide any instructions to

13  Mr. Vanderhoff to restrict access to that website so that

14  the people in Florida cannot access it?

15      A.   I don't recall.

16      Q.   Do you know one way or the other if there are

17  restrictions for people in Florida to not be able to

18  access either the DektorPSE website or the

19  NITVCVSAexposed website?

20      A.   I don't know.

21      Q.   Has Dektor ever sold PSE products directly from

22  its website?

23      A.   There's no ability to buy directly from that

24  website, as some other types of commerce websites have.

Arthur Herring, III
October 24, 2018

Page 71

1      Q.    There's no basket where I can add products to

2   and purchase it from the website; right?

3      A.    That is correct.

4      Q.    Has there ever been that option on the Dektor

5   website?

6      A.    No.

7      Q.    Rather than do that, the Dektor website provides

8   your contact information, your email address and your

9   telephone number for people to call or email you,

10  correct?

11     A.    Yes.

12     Q.    And you provide that contact information and

13  hope that someone is going to call or email and order

14  Dektor PSE products from you, correct?

15     A.    That's why I'm in business.

16     Q.    That's what people do, correct?  When you make a

17  sale, generally, someone is emailing you or calling you

18  on the phone numbers that are provided on that website?

19     A.    Not all the time.  It could be ads in newspapers

20  or brochures that I sent out.

21     Q.    If someone called from the State of Florida, a

22  representative of a Florida law enforcement agency, would

23  you turn them away?

24              MR. ECKARD:  Object to the form.  You

Arthur Herring, III
October 24, 2018

Page 72

1       can answer.

2               THE WITNESS:  I would have reasons

3       why I would decline a sale.

4    BY MR. DESOUZA:

5       Q.   Well, if the Florida highway patrol called you

6    today and wanted to buy your PSE product, is there any

7    reason you would decline that sale?

8               MR. ECKARD:  Same objection.  You can

9       answer.

10              THE WITNESS:  There would be reasons

11      I would decline.

12   BY MR. DESOUZA:

13      Q.   Like what?

14      A.   Well, if the indications are that it might be

15   used in an illegal way by a detective -- again, the

16   police department as a whole doesn't contact me, it's an

17   individual detective, or chief or whatever.  But if they

18   give me indications that it's going to be used illegally

19   or immorally, I would object.  I would not sell it to

20   them.

21              Or, for example, let's say they had bought one

22   of those fake CVSA machines and they just wanted to by a

23   PSA, but not get retrained to the real training of voice

24   stress analysis, I would decline to sell it to them.

Arthur Herring, III
October 24, 2018

Page 73

1          It would be like you were trying to put Ford

2     parts into a Chevy.  They are not going to work right.

3          And since the training has proven to be

4     unreliable, and that's a polite term, I would decline to

5     sell it to them because that would reflect upon the

6     accuracy and the ability of the PSE system.

7          Q.   You don't have any policy of not selling to

8     individuals or entities in the State of Florida, correct?

9          A.   As a whole, no.

10         Q.   There's no state in this country that you just

11    refuse to sell the PSE products to, correct?

12         A.   Wrong.

13         Q.   Okay.  Correct me.

14         A.   Offhand, I believe there are about seven states

15    where the use of anything else but polygraph is illegal,

16    that includes law enforcement.  So I would advise them

17    that it would be illegal to use it in their state and

18    they would be wasting their money if they bought it.

19         Q.   I'm assuming Florida is not one of those seven

20    states, correct?

21         A.   Voice stress analysis is allowed in Florida.

22         Q.   Okay.  So you could sell product to individuals

23    or agencies in the State of Florida, correct?

24         A.   Legally, I would be allowed to.  It would be up

Arthur Herring, III
October 24, 2018

Page 74

1    to me to decide if I wanted to sell it to them.

2        Q.    But Dektor does not have any policy in place

3    that says, "We will would not sell any products to

4    anybody in the State of Florida, correct?

5        A.    We do not have any such policy.

6        Q.    Have you made any effort to confirm whether the

7    Dektor website has received any Florida visitors?

8    Anybody in Florida viewing the website?

9        A.    I have no idea.

10       Q.    Have you spoken to your IT person,

11   Mr. Vanderhoff, about whether that's something that

12   Dektor had the ability to find out?

13       A.    I have no idea about computers other than emails

14   and going through the internet.

15       Q.    Well, one of the discovery requests that we

16   served on you, Mr. Herring and on Dektor, was asking for

17   whether anybody from Florida has visited the Dektor

18   website and to produce any document that is showing any

19   web analytics as to whether anyone from Florida has

20   visited to Dektor website.

21            So my question is: What efforts did you make in

22   response of that request; did you do anything?

23       A.    I don't recall if I asked Mr. Vanderhoff,

24   specifically, could he, is there such an ability to find

Arthur Herring, III
October 24, 2018

Page 75

1    out which individuals or whatever, went to my website,

2    either nationwide or worldwide or how that would work.

3        Q.    You don't now whether you asked Mr. Vanderhoff

4    that or not?

5        A.    I don't recall if I did or I did not.

6        Q.    Okay.  And do you know whether anyone in the

7    State of Florida, other than myself and my co-counsel on

8    the phone have visited Dektor's website in the State of

9    Florida?

10       A.    I don't know.

11       Q.    Other than perhaps asking Mr. Vanderhoff, you

12   don't remember anything else that you did to try to find

13   that out, correct?

14       A.    Correct.

15       Q.    What about the NITVCVSAexposed website, do you

16   know whether anyone in the State of Florida has visited

17   that website?

18       A.    I do not.

19       Q.    Again, you would have to ask Mr. Vanderhoff as

20   to if there is any way of figuring that out, correct?

21       A.    Correct.

22       Q.    Do you know what Google analytics are?

23       A.    Nope.

24       Q.    And other than speaking to Mr. Vanderhoff, you

Arthur Herring, III
October 24, 2018

Page 76

1    don't know whether Dektor's website has any ability to

2    track the number of visitors to the site or where your

3    visitors are located, correct?

4        A.   I don't know.

5        Q.   If anyone knows, would it be Mr. Vanderhoff?

6        A.   Yes.

7        Q.   And you stated earlier that Mr. Vanderhoff was

8    in possession of the hard drive that crashed, correct?

9    To your knowledge?

10       A.   Yes.

11       Q.   And to your knowledge, Mr. Vanderhoff has not

12   deleted or erased any information off of that hard drive,

13   correct?

14       A.   It's my understanding that the hard drive is not

15   able to be used or salvaged in anyway with any of the

16   information that's on it.

17       Q.   Right.  But my question is: To your

18   understanding, Mr. Vanderhoff has not actively erased or

19   deleted whatever else is on that hard drive, right?

20       A.   It's my understanding.

21       Q.   And do you agree that you are not going to

22   instruct Mr. Vanderhoff to delete or destroy any

23   information on that hard drive?

24       A.   Yes.

Arthur Herring, III
October 24, 2018

Page 77

1      Q.   Do you understand that as a litigant in this
2    case, you have an obligation to maintain and preserve
3    documentation or data that may be relevant to this
4    lawsuit?
5      A.   Yes.
6      Q.   Okay.  So you are not going to instruct
7    Mr. Vanderhoff to delete any information off that website
8    correct?
9      A.   Yes.
10     Q.   Will you, actually, call Mr. Vanderhoff and
11   instruct him not to delete any information off that
12   website -- off that hard drive?
13     A.   If I'm informed to by my attorney.
14            MR. DESOUZA:  Mr. Eckard, is that
15        something we can arrange because I have a
16        concern about where the hard drive is and
17        what's on it.
18            MR. ECKARD:  Depending on my status
19        in the case, I certainly have no problem with
20        advising my client now that there's a duty to
21        preserve any and all evidence or documents or
22        materials that may be subject to this
23        litigation.
24            So, yes, there is a duty, a statutory

Arthur Herring, III
October 24, 2018

Page 78

1         common law duty to preserve that evidence, and

2         to notify whoever maybe in control or oversee

3         such evidence that they have, that they are to

4         preserve that evidence.

5    BY MR. DESOUZA:

6         Q.    Mr. Herring, because we don't know how long

7    Mr. Eckard is going to be in this case, will you agree to

8    provide to Mr. Eckard's office Mr. Vanderhoff's contact

9    information at some point today?

10        A.    If I can get to my computer.

11        Q.    If you can get to your computer, you will

12   provide the contact information for Mr. Vanderhoff to Mr.

13   Eckard's office?

14        A.    Yes.  I'm not sure about today.

15        Q.    Have you had any communications with the

16   Criminal Justice Associates of Florida?

17        A.    I don't know what that is.

18        Q.    Have you ever heard of the Criminal Justice

19   Associates?

20        A.    Not to my recollection.

21        Q.    How about the Baker Group of Florida?

22        A.    Yes.  To a very limited degree.  What I should

23   say, a limited degree.

24        Q.    What is the Baker Group of Florida; to your

Arthur Herring, III
October 24, 2018

Page 79

1    knowledge?

2        A.   Well, to my knowledge it's been around for a

3    about 15 years.  It's another voice lie detector gadget

4    that's being sold, just like some others, world wide.

5    Baker claims many things about himself, which some of

6    them I have learned, they are not true.

7            I have no communications with him on a business

8    level.

9        Q.   That's what my question was doing to be.

10           Have you had any communications with Mr. Baker

11   or anybody else associated with the Baker Group of

12   Florida in 2018?

13       A.   Yes.

14       Q.   Okay.  Have you communicated with Mr. Baker with

15   respect to debt-related business?

16       A.   In a way.

17       Q.   Have you communicated about NITV?

18       A.   Yes.

19       Q.   Have you communicated with Mr. Baker about NITV,

20   CVSA products?

21       A.   In a way.

22       Q.   Okay.  Tell me what you mean by "in a way"?

23       A.   Well, in our conversation, I might have said the

24   words CVSA or NITV.  I contacted Baker nine months ago, a

Arthur Herring, III
October 24, 2018

Page 80

1    year ago, whatever.  I wanted a copy of the deposition of

2    Humble when Baker was suing him.

3        Q.   And did Mr. Baker provide you with the

4    deposition transcript of Mr. Humble?

5        A.   He claims he couldn't find one.

6        Q.   You have emails with Mr. Baker or was this a

7    telephone call?

8        A.   I believe it was an emails.

9        Q.   Do you still have copies of the email today?

10       A.   No.  That was on the crashed hard drive.

11       Q.   Did you ever visit Mr. Baker in the panhandle or

12   anyone else in Florida?

13       A.   I think it was about 18 years ago when I met him

14   for the first time.

15       Q.   How about over the last two years have you come

16   to Florida and seen Mr. Baker?

17       A.   No.

18       Q.   In the last two years, have you come to Florida

19   for any reason?

20       A.   No.

21       Q.   Other than asking Mr. Baker for a copy of

22   Humble's deposition transcript, did you discuss NITV or

23   CVSA in any other way?

24       A.   There might have been at just a comment or so.

Arthur Herring, III
October 24, 2018

Page 81

1      Q.    Do you recall telling Mr. Baker that the NITV is

2   a scam?

3      A.    Everybody in the business knows that, including

4   the polygraph business.  We've known that since 1990.

5      Q.    Well, did you tell that to Mr. Baker when you

6   saw him that nine months, a year ago?

7      A.    Oh, he's quite familiar with Humble and his

8   scam.

9      Q.    The question is: Did you refer to NITV or a CVSA

10  product when speaking to Mr. Baker as a scam?

11     A.    I can't recall our exact words in the

12  conversation or in the email.  But again, everybody's

13  known this since 1990, including that fake title of

14  Doctor that he uses.

15     Q.    Do you have have your cell phone with you,

16  Mr. Herring?

17     A.    Nope.

18     Q.    You didn't bring it today's deposition?

19     A.    Nope.

20     Q.    Where is your cell phone?

21     A.    My phone is in my office.

22     Q.    Back home?

23     A.    Yes.

24     Q.    Is Mr. Vanderhoff's contact information saved in

Arthur Herring, III
October 24, 2018

Page 82

1    your cell phone?

2        A.    I don't know how cell phones, basically, work,

3    other than call and get messages.

4        Q.    Do you have Mr. Vanderhoff's contact information

5    in your cell phone?  Do you type his name out and his

6    name just pops up with his cell phone number?

7        A.    I have never done anything like that.

8        Q.    Have you ever communicated with Mr. Vanderhoff

9    via smoke signal?

10       A.    I'm sorry --

11               MR. ECKARD:  Object to the form.

12               THE WITNESS: -- what was the last

13          question?

14               MR. DESOUZA:  Have you ever

15          communicated with Mr. Vanderhoff via smoke

16          signal?

17               MR. ECKARD:  Same objection.

18               THE WITNESS:  Well, I got to tell

19          you, that's one of the dumbest questions I've

20          ever been asked, and the most unprofessional

21          ones.

22               No.  I don't recall using smoke

23          signals.  I don't know how they work.

24               How do they work?

Arthur Herring, III
October 24, 2018

Page 83

1    BY MR. DESOUZA:

2        Q.   How have you communicated with Mr. Vanderhoff?

3        A.   Cell phone, email, visits.

4        Q.   Do you have his cell phone number stored some

5    where?

6        A.   Yeah.  It's up on my bulletin board, up in my

7    office.

8        Q.   Oh, it's on a bulletin board.  On a physical

9    bulletin board?

10       A.   Yes, that I have in my office along with other

11   people's numbers and whatever.

12       Q.   At some point in 2018, on Dektor's website,

13   there was a description or a link to a Florida newspaper

14   article about a Jerry Crotty.

15            Do you recall that?

16       A.   Yes.

17       Q.   Okay.  And do you recall that that information

18   was removed from Dektor's website at some point in time

19   in 2018?

20       A.   Okay.  Ask that last question again, I wasn't

21   following.

22       Q.   Do you recall that information about Jerry

23   Crotty being removed from Dektor's website at some point

24   in 2018?

Arthur Herring, III
October 24, 2018

Page 84

1        A.    I don't recall that information on my website,

2    the on DektorPSE.  I don't recall it offhand.

3        Q.    You dot recall it being on the Dektor's website?

4        A.    I do not recall it.

5        Q.    Okay.  In the year of 2018, do you recall

6    speaking to anyone on the phone where that person was in

7    the State of Florida, other than with someone associated

8    with Mr. Eckard's office?

9        A.    I don't recall offhand.

10       Q.    You don't recall speaking to any law

11   enforcement, any government agency, or any other

12   individual in the State of Florida other than someone in

13   Mr. Eckard's office?

14       A.    I don't recall ever doing so.

15       Q.    All right.  We'll take a brief break.

16                        -  -  -

17   (Recess was taken from 11:31 a.m. and 11:34 a.m.)

18                        -  -  -

19            MR. DESOUZA:  All right.  Mr.

20        Herring, I have no further questions at this

21        time for the jurisdictional deposition.

22        However, we are reserving, given some of the

23        questions, which you refused to answer and with

24        respect to documents that have not yet been

Arthur Herring, III
October 24, 2018

Page 85

1        produced, we certainly reserve the right to

2        call you back for a deposition, once we have

3        resolved those issues with the Court.

4                    Rob, I don't know if you have any

5        questions.

6                    MR. ECKARD:  No.  To the extent this

7        becomes final, Mr. Herring will read, if it's

8        simply adjourned, then we'll deal with that

9        issue later on, too.

10                   If I'm in, if I'm not, then somebody

11       else will.

12                   MR. DESOUZA:  And we are ordering a

13       copy of the transcript on as quick of a basis

14       as we can get it.

15                   MR. DESOUZA:  That's all we have.

16       Thanks gentlemen.

17                            -   -   -

18   (Whereupon testimony of Arthur Herring, III concluded at

19                       11:38 a.m.)

20                            -   -   -

21

22

23

24

Arthur Herring, III
October 24, 2018

Page 86

1                    C E R T I F I C A T I O N

2

3          I hereby certify that the proceedings and

4    evidence noted are contained fully and accurately in the

5    stenographic notes taken by me upon the foregoing matter

6    that this is a correct transcript of the same.

7

8    _____

9              Kathryn E. Hurlman

9              Court Reporter - Notary Public

10

11         (The foregoing certification of this transcript

12   does not apply to any reproduction of the same by any

13   means, unless under the direct control and/or supervision

14   of the certifying reporter.)

15                       .

16

17

18

19

20

21

22

23

24

| A | | | | | | | |
|---|---|---|---|---|---|---|---|
| **A-L-S-T-A-...** | 45:15,21 | 45:10,17,19 | 22:24 23:7 | 64:2 85:18 | aware 27:24 | blanks 15:16 | cards 16:12 |
| 56:1 | 46:1,4,16 | 45:24 46:3 | 23:7,12,14 | article 34:23 | | board 83:6,8 | carefully 21:3 |
| a.m 1:16 57:4 | 47:7,11 | 46:7,9,15 | 24:11 25:3 | 50:8 83:14 | **B** | 83:9 | case 1:2 6:4 |
| 57:4 84:17 | 48:6,15,20 | 47:3,15,19 | 25:7,11 | articles 13:24 | back 26:9 | bought 72:21 | 22:5 28:24 |
| 84:17 85:19 | 49:22 50:9 | 48:7,24 | 26:4,11,14 | 14:2 33:2 | 27:16 35:10 | 73:18 | 77:2,19 |
| abilities | 54:5 55:13 | 49:7,13,23 | 26:18,18,19 | 33:17 34:19 | 40:12 42:4 | Boulevard | 78:7 |
| 18:11 37:22 | 56:24 59:15 | 50:6,13,21 | 27:22 29:23 | 35:16,17,21 | 46:21,22 | 2:13 4:14 | catch 25:2,9 |
| ability 8:10 | 63:17 71:8 | 51:16 71:22 | 30:8,9,13 | 35:22,23 | 81:22 85:2 | box 60:7,11 | categories |
| 37:14 39:24 | addresses | 84:11 | 31:24 32:5 | artist 61:12 | Baker 78:21 | brain 67:8 | 57:18 58:8 |
| 70:23 73:6 | 24:3,7,13 | ago 52:21 | 41:24 43:7 | asked 24:6 | 78:24 79:5 | brand 11:9 | category 27:7 |
| 74:12,24 | 24:18 25:16 | 79:24 80:1 | 44:5 46:12 | 28:22 62:5 | 79:10,11,14 | break 43:13 | cause 38:22 |
| 76:1 | 25:24 26:15 | 80:13 81:6 | 54:12 63:24 | 64:20 65:1 | 79:19,24 | 56:20 84:15 | caused 38:15 |
| able 11:19 | 26:21 27:1 | agree 29:11 | 64:3 67:14 | 74:23 75:3 | 80:2,3,6,11 | brief 56:20 | 38:21 |
| 39:7 48:1 | 28:8,19,22 | 29:17 30:1 | 67:18 72:1 | 82:20 | 80:16,21 | 84:15 | cell 51:10,13 |
| 70:17 76:15 | 29:21 30:3 | 30:16,20 | 72:9 84:23 | asking 17:3 | 81:1,5,10 | bring 29:11 | 51:17,20,23 |
| accept 16:6 | 30:6 32:15 | 41:22 44:4 | answered | 18:24 19:1 | bank 16:3,7 | 81:18 | 51:24 52:3 |
| 16:10 | 66:21 | 58:12 65:6 | 26:5 | 24:17 28:11 | 16:19,23,24 | broad 27:7 | 81:15,20 |
| accepts 16:16 | adjourned | 76:21 78:7 | answering | 43:2 49:5 | 17:16 18:1 | brochures | 82:1,2,5,6 |
| access 36:10 | 85:8 | agreement | 31:21 | 57:17 59:12 | based 38:17 | 71:20 | 83:3,4 |
| 40:2,5,7 | Admin 41:23 | 31:7 | answers 25:6 | 67:16 68:16 | 38:19 53:12 | bulletin 83:6 | certain 19:3 |
| 43:9 48:11 | Admin@De... | ahead 4:24 | 58:5 | 74:16 75:11 | basically 7:20 | 83:8,9 | 42:12,16 |
| 69:23 70:6 | 39:13,18 | 7:2 22:6 | antivirus | 80:21 | 57:17 82:2 | business 4:15 | 47:1 57:18 |
| 70:13,14,18 | Admin@De... | 56:19 57:21 | 8:15 | asks 58:15 | basis 85:13 | 13:20 18:5 | certainly |
| accessing | 23:23 24:16 | AI 53:1 | anybody | assistance 8:2 | basket 71:1 | 24:1,5,9 | 27:15,17 |
| 55:9 | 24:19 25:16 | allegation | 12:22 18:12 | associated | Beach 2:14 | 26:5,6 28:6 | 29:10,24 |
| account 16:3 | 26:1,6,16 | 67:10 | 54:5 63:1,4 | 53:14,17,20 | beautiful | 28:13 29:13 | 30:19 31:22 |
| 16:19 17:16 | 26:24 32:8 | allow 29:10 | 74:4,8,17 | 55:17 59:22 | 61:10 | 39:8 51:10 | 77:19 85:1 |
| 18:2 55:9 | 40:3,11,13 | allowed 73:21 | 79:11 | 79:11 84:7 | begins 58:15 | 71:15 79:7 | certification |
| 56:16 | 41:11 44:24 | 73:24 | anyway 76:15 | Associates | behalf 57:19 | 79:15 81:3 | 86:11 |
| accuracy | 45:11,14,20 | Alstatt 55:23 | AOL 41:18 | 1:13,18 2:6 | believe 6:5 | 81:4 | certify 86:3 |
| 73:6 | 46:16 47:7 | 56:3,6 | AOL.com | 78:16,19 | 7:14 9:12 | buy 11:11 | certifying |
| accurately | 47:11 48:6 | Alternate 2:6 | 41:17 | Association | 17:7 18:17 | 69:11 70:23 | 86:14 |
| 86:4 | 48:15,20 | amended | apparently | 54:8,15 | 27:13 29:5 | 72:6 | chambers |
| accused | 49:22 55:5 | 3:10 57:8 | 8:9 | 60:5 | 31:9,10,12 | buying 52:22 | 31:21 |
| 69:15 | 55:9 59:14 | amount 42:12 | appear 54:23 | assumed 8:18 | 35:12 36:16 | | chance 5:21 |
| actively 76:18 | 63:17 | analysis | appears | assuming | 38:5 39:20 | **C** | chapter 29:7 |
| ad 50:8 | admissible | 32:24 33:15 | 57:16 | 73:19 | 44:1,3,6,16 | C 2:1 86:1,1 | check 17:16 |
| add 71:1 | 27:10,11 | 72:24 73:21 | apply 86:12 | attempt | 44:17 55:2 | Cain 62:21 | 18:3,8 38:8 |
| added 13:4 | ads 71:19 | analytics 7:16 | appreciate | 37:17,19,21 | 55:7 61:14 | 69:10 | 38:10 |
| address 4:13 | advise 31:23 | 74:19 75:22 | 25:10 27:21 | attorney | 67:4 69:22 | California | checkbook |
| 4:15 10:23 | 31:24 73:16 | and/or 86:13 | approximat... | 18:19 19:8 | 73:14 80:8 | 50:5 | 38:8 |
| 23:19,24 | advised 68:19 | annually | 63:7,8 | 25:9 30:14 | best 9:6,18 | call 50:14,19 | checked 18:1 |
| 24:5,15 | advising | 22:12 | arrange | 58:6 64:10 | 10:12 18:11 | 58:2 64:1 | 18:1 |
| 26:23 28:12 | 31:19 77:20 | answer 7:15 | 77:15 | 77:13 | 18:11,21 | 71:9,13 | checking |
| 32:8,18 | affidavit 49:5 | 14:9 18:20 | Arthur 1:6 | attorney's | 20:7 22:14 | 77:10 80:7 | 39:22 |
| 35:4 39:14 | agencies | 18:23,23 | 1:12 3:4 4:2 | 25:1 | 24:22 60:13 | 82:3 85:2 | checks 16:8 |
| 39:18 40:3 | 45:13 47:7 | 19:7,9,10 | 4:12 6:10 | attorney-cli... | 68:11 | called 61:8 | Chevy 73:2 |
| 40:11,13 | 47:11 50:2 | 19:11 20:16 | 23:8,8 | 64:1 | beyond 20:14 | 71:21 72:5 | chief 72:17 |
| 41:5,8,10 | 51:6 52:9 | 20:21 21:7 | 24:17 25:15 | available | 20:17 22:18 | calling 71:17 | Chiefs 54:8 |
| 41:11,17,18 | 53:22 56:17 | 21:8,9,11 | 25:17,19 | 10:20 | 23:10 54:10 | calls 50:11,12 | 54:15 60:4 |
| 41:18 42:2 | 58:11,16 | 21:16,24 | 27:3,6 | Avenue 2:2 | 54:17 | 51:5,15 | civil 28:15 |
| 44:24 45:11 | 73:23 | 22:1,2,3,13 | 28:14 29:4 | average | bills 51:20,24 | 52:8 | Claimant 2:5 |
| | agency 43:20 | 22:14,19,21 | 31:2 60:21 | 19:23 22:11 | 52:7 | card 16:4,14 | claimants |
| | | | | | bind 6:19 | 38:12 | |

Arthur Herring, III
October 24, 2018

Page 2

57:9
claims 79:5
  80:5
clear 68:21
client 13:7,12
  30:24 31:8
  43:5 57:17
  58:2 61:11
  63:21 64:11
  65:23 67:11
  77:20
co-counsel
  75:7
co-director
  62:21 69:10
Colorado
  50:5 55:18
com 34:3
come 13:13
  80:15,18
comes 42:3
coming 17:17
commencing
  1:16
comment
  80:24
commerce
  70:24
common 78:1
Commonwe...
  1:15
communicate
  46:8 47:3
communica...
  45:10,14,20
  45:24 46:4
  46:15 47:6
  47:10,14
  48:23 49:6
  49:12 52:23
  53:14,17
  79:14,17,19
  82:8,15
  83:2
communica...
  43:3 66:10
communica...
  58:10,16
  64:1,4,21
  65:2 78:15
  79:7,10
company
  38:2,9 53:3

69:4,5
competition
  69:13
competitor
  53:6,8,9
complex
  25:21
computer 8:9
  8:17 11:5,6
  12:3,20
  35:11 36:22
  38:15,15
  39:10,11,15
  78:10,11
computerese
  41:16
computers
  74:13
con 61:12
concentrated
  47:5
concern
  27:22 77:16
concerned
  17:11 19:4
concerning
  54:8
conclude
  69:12
concluded
  85:18
conduct 24:1
  39:7 51:10
confidential
  29:7,22
  30:19,22
confidential...
  31:6
confidently
  48:4
confirm
  17:12 57:15
  74:6
confirmation
  52:13
connection
  38:3 58:3
contact 10:17
  10:24 11:2
  52:11 71:8
  71:12 72:16
  78:8,12
  81:24 82:4

contacted
  79:24
contained
  37:15 86:4
content 37:15
contractors
  53:24 54:1
  54:3
control 58:21
  78:2 86:13
conversation
  79:23 81:12
conversations
  6:1 28:4
copies 80:9
copy 4:22 6:3
  9:16 15:7
  57:8 68:19
  68:22 80:1
  80:21 85:13
corporate
  6:11,13
  18:17
corporation
  1:6 5:7,15
  6:4,11,14
  6:19 10:1
  14:15,20,22
  15:1,7 17:4
  17:13 19:3
  21:16,23
  22:16 23:5
  23:20 29:1
  29:3
correct 9:17
  9:21 10:3
  11:24 13:7
  14:15,17,23
  14:24 15:12
  15:23 16:15
  16:17 17:8
  21:10 23:17
  23:20 36:11
  36:12,14
  37:5 39:2
  40:3,8 41:1
  41:5,12,23
  44:4,13,16
  46:16 47:8
  47:12,21
  48:12,13,16
  48:20 49:14
  52:1 53:12

53:13 54:22
  55:1,6,10
  55:11,14
  56:8,13
  58:12 59:19
  59:24 62:16
  66:7,10
  67:12 70:3
  71:3,10,14
  71:16 73:8
  73:11,13,20
  73:23 74:4
  75:13,14,20
  75:21 76:3
  76:8,13
  77:8 86:6
corruption
  13:2
costs 15:4
counsel 6:1
  27:9 28:11
  43:1,4
  63:20 68:18
Counsel's
  29:15
country 63:9
  73:10
County 55:17
  55:23 59:19
  59:22
court 1:1,15
  1:21 4:21
  4:23 26:7
  27:17 29:11
  29:12 31:6
  31:13,15,15
  43:8,11,16
  46:20 56:22
  57:1 85:3
  86:9
Courts 27:14
crash 8:5,8
  8:13 9:21
  11:7,20,24
  37:16 38:15
  38:23 39:4
  40:21,24
  42:4,11,19
  54:22 56:8
crashed 8:21
  18:9 36:17
  36:18 38:24
  76:8 80:10

create 61:18
  61:22 62:5
  70:2,9
created 61:23
  62:9
credit 16:3,12
  16:13 38:12
Criminal
  78:16,18
Crotty 83:14
  83:23
current 4:13
custody 58:21
customer
  14:5,10
customers
  14:22 15:2
  15:9,17,19
  16:6,13,17
  17:4,13
  18:24 19:23
  22:16 23:6
CVSA 37:13
  58:11,17
  59:23 60:8
  62:13,18
  64:22 65:7
  65:13 72:22
  79:20,24
  80:23 81:9

—————
D
—————
D'Loughy
  2:12
D-E 32:13
D-E-T-E-C...
  32:14 34:2
damaged
  15:10
Dan 7:7
  19:13 29:10
  32:4
Daniel 2:4
data 12:13,16
  12:21 13:16
  13:22 16:1
  31:4 35:12
  35:15,19
  37:17,21
  38:3 39:1
  77:3
date 1:16
  47:23 48:12
day 8:16,17

8:22
days 29:18
  30:2,17,22
  31:5 38:20
  42:9
DDSOUZA...
  2:4
deal 22:3
  85:8
dealing 7:15
dealt 62:22
  67:20
debt-related
  79:15
December
  48:16,19
decide 27:14
  74:1
decline 72:3,7
  72:11,24
  73:4
deems 29:12
Defendant
  1:7 2:9
defendants
  57:9 58:20
Define 17:20
definitely
  30:20
definition
  17:21 53:9
degree 78:22
  78:23
Dektor 1:6
  6:11,14,19
  8:1 9:24
  10:3,5 14:4
  14:15,20,22
  15:1,7,18
  16:3,5,10
  16:16,19
  17:3,4,13
  18:13 19:15
  21:22 22:12
  22:15 23:5
  23:19 24:15
  24:20 26:6
  26:23 28:7
  28:24 29:1
  29:2 30:11
  41:12 42:22
  51:12 53:21

53:23,24
  54:3,5
  55:13 56:16
  57:18,20
  58:3 70:21
  71:4,7,14
  74:2,7,12
  74:16,17,20
Dektor's 16:2
  17:16 41:4
  50:6 75:8
  76:1 83:12
  83:18,23
  84:3
Dektor-rela...
  13:20,22
  24:1 39:7
DektorPSE
  70:9,18
  84:2
DektorPSE....
  41:5,8,22
  60:24 69:21
delete 76:22
  77:7,11
deleted 12:16
  42:14 76:12
  76:19
deleting
  42:12
department
  33:6 55:24
  59:19 72:16
departments
  35:21
Depending
  77:18
deposed
  24:18
deposition
  1:12 3:8
  4:22 5:1,6,6
  5:8,15 6:3,7
  6:16 7:19
  7:23 10:21
  18:22 21:11
  22:19 25:12
  25:14 80:1
  80:4,22
  81:18 84:21
  85:2
depth 13:2
Describe

24:24
description
  3:7 83:13
desktop 11:7
DeSouza 2:2
  2:4 3:5 4:7
  4:21,24 5:4
  7:10,11
  14:13 19:16
  19:19 20:11
  20:20 21:1
  22:10,23
  23:4,15
  26:7,10
  28:21 29:17
  30:7,12
  31:3 32:6
  34:10,14
  43:8,12,17
  46:11,20,24
  54:11,19
  55:21 56:19
  56:23 57:6
  64:7,15
  67:15,24
  68:8,18
  69:1 72:4
  72:12 77:14
  78:5 82:14
  83:1 84:19
  85:12,15
destroy 76:22
detection
  53:7
detective
  55:22 56:3
  56:6 72:15
  72:17
detector
  32:13,24
  43:20,21
  44:19,22
  79:3
Detectornews
  33:14,17,20
  33:24 61:1
Detectorne...
  32:21 33:11
  34:1,6,23
  61:2
detectors
  33:12
determine

Arthur Herring, III
October 24, 2018

Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **determined** 38:17 | 79:9 84:14 | 30:1 31:1 | 40:3,10,11 | 74:13 80:6 | **example** 58:14 72:21 | **figure** 59:2 | 70:7,14,17 |
| **difference** 44:2 | **domain** 41:7 41:23 | 31:11 34:8 46:10 54:9 | 40:13 41:5 41:7,10,11 | 80:8 **employed** | **exclude** 49:18 **exhibit** 3:7 | **figuring** 75:20 | 71:21,22 72:5 73:8 |
| **different** 46:18 55:3 | **dot** 34:2,3 84:3 | 54:16 55:19 63:23 67:13 | 41:17,22 42:2 43:9,9 | 13:11 **employee** | 43:10,15 56:21 64:16 | **file** 29:19 30:17 31:14 | 73:19,21,23 74:4,7,8,17 |
| 57:16 69:8 | **dozens** 35:24 | 67:17,18 | 43:14,23 | 10:3,5 | **Exhibit-1** 3:8 | **filed** 9:11,13 | 74:19 75:7 |
| **differently** 9:19 | **drive** 8:5,8,13 8:21 9:9,21 | 68:5,13,16 71:24 72:8 | 44:24 45:11 45:15,20 | 53:23 54:2 **employees** | 5:1,2,6 **Exhibit-2** | **files** 18:4 47:17 59:10 | 75:9,16 78:16,21,24 |
| **direct** 3:5 4:5 86:13 | 11:21,22,23 12:2,9,16 | 77:14,18 78:7 82:11 | 46:4,16 47:7,11,15 | 8:1 **enforcement** | 3:10 57:8 57:10 | **filing** 15:22 **fill** 15:16 | 79:12 80:12 80:16,18 |
| **directly** 70:21 70:23 | 12:17,21,23 13:4,6,9,16 | 82:17 85:6 **Eckard's** | 48:6,15,20 48:23 49:13 | 43:19 44:10 45:9,13,17 | **EXHIBITS** 3:6 | **filled** 58:5 **final** 85:7 | 83:13 84:7 84:12 |
| **disclosed** 31:7 | 13:23 14:7 15:10,14 | 78:8,13 84:8,13 | 49:22 50:2 50:4,6,9 | 45:24 46:7 46:9,14 | **existence** 9:20 **expect** 18:15 | **financial** 15:22 16:20 | **focus** 13:20 49:19 |
| **discovery** 8:11 19:18 | 18:9 23:17 35:10,13,20 | **Ed@Detect...** 32:10,18 | 54:5,20 55:4,9,12 | 47:2,6,15 47:19 48:7 | **expedition** 21:13 | **find** 17:19 18:12 19:21 | **followed** 57:19 |
| 20:15,18 23:11 27:8 | 36:3,6,9,9 36:11,16,18 | 35:3 **educate** 68:11 | 55:13,13,22 56:6,10,16 | 48:24 49:7 49:13,23 | **expenses** 16:4 16:13 | 21:13 31:20 48:9 59:11 | **following** 83:21 |
| 74:15 **discuss** 13:14 | 36:22 37:4 37:9,12,16 | **educating** 67:21 | 56:23,24 59:14,21 | 50:1,13,20 51:5,16 | **Explain** 36:5 **explained** | 59:17,18 60:6,7,10 | **follows** 4:3 **Ford** 73:1 |
| 80:22 **discussion** | 37:18,24 38:4,18,24 | **Education** 61:17 | 63:14,17 65:21 66:6 | 52:9 53:22 56:17 58:10 | 69:6,7 **extent** 20:13 | 60:13 74:12 74:24 75:12 | **foregoing** 86:5,11 |
| 8:20 **dismiss** 27:20 | 39:3,9 40:14,21,24 | **effected** 36:10 36:15 | 66:21 71:8 71:9,13 | 58:16 69:14 71:22 73:16 | 27:12 31:2 31:12 63:24 | 80:5 **finish** 31:11 | **forensic** 12:20 |
| **dismissing** 27:19 | 42:4,11,19 44:8,12,15 | **effort** 7:21 42:17 51:19 | 80:9 81:12 83:3 | 84:11 **enter** 31:15 | 85:6 **eyes** 29:15 | **finished** 21:20,21 | **form** 14:9 15:8 23:10 |
| **disposed** 12:4 **DISTRICT** | 47:18,20,23 48:2,3,8,12 | 52:6,11 59:4,8 74:6 | **emailing** 56:3 71:17 | **entities** 17:18 62:22 67:2 | | **fire** 33:6 **first** 4:2 55:24 | 34:8 46:10 54:9,16 |
| 1:1,1 **Doctor** 81:14 | 54:21 55:1 56:7,13 | **efforts** 7:18 12:12 69:23 | **emails** 13:24 14:2,11 | 73:8 **entitled** 19:3 | **F** | 57:9 80:14 **fishing** 21:13 | 67:13 71:24 82:11 |
| **document** 5:9 5:12,19 8:7 | 62:2 67:7 76:8,12,14 | 74:21 **eight** 52:21 | 23:16,18 26:22 28:3 | 20:6 **entity** 16:20 | **F** 86:1 **fact** 19:8 27:8 | **five** 22:12 35:8 | **formal** 66:13 **forms** 16:10 |
| 42:21 56:21 57:11,13 | 76:19,23 77:12,16 | **either** 9:8 19:10 50:23 | 32:9 36:2,2 36:24 37:3 | **equal** 53:9 **erased** 12:15 | **fair** 29:16 **fairness** 25:8 | **flight** 25:2,9 **flip** 57:21 | **Fort** 2:3 **found** 9:20 |
| 58:2,15 59:1 65:11 | 80:10 **duly** 4:3 | 52:6 68:21 70:18 75:2 | 37:8,11,14 39:13,17,22 | 76:12,18 **established** | 72:22 81:13 **falls** 29:7 | **florida** 1:1 2:3,7,14 | **founder** 62:15 |
| 74:18 **documentat...** | **dumbest** 82:19 | **electronic** 18:6,8 | 40:20,21,23 41:14,19 | 36:16 **establishing** | **falsely** 69:15 **familiar** | 17:14,18 18:13 19:5 | **Friends** 1:13 1:22 |
| 77:3 **documents** | **duty** 77:20,24 78:1 | **else's** 39:11 **email** 10:23 | 42:5,12,15 42:17 43:18 | 20:18 **everybody** | 52:17 53:3 57:22 81:7 | 19:21 20:2 20:19,23 | **front** 5:9 43:6 57:11 64:18 |
| 8:10 14:6 15:15 18:1 | **E** | 23:19,24 24:3,5,7,13 | 44:10,18,21 45:1 47:22 | 8:14 81:3 **everybody's** | **far** 8:3 18:14 21:6,17 | 21:12,18 22:4,14 | 68:2,9 **full** 4:10 |
| 18:3,4,6,8 18:12 43:4 | **E** 2:1,1 86:1,9 | 24:15,18 25:15,24 | 48:5,10,14 48:18 49:21 | 81:12 **evidence** | 28:8 30:13 33:7 40:12 | 29:8 43:19 44:10 46:9 | **fully** 86:4 |
| 43:5,6 48:2 48:9 57:18 | **E-D** 32:11 **earlier** 55:8 | 26:6,12,15 26:21,23 | 53:21 54:7 54:14 55:16 | 27:11 28:16 77:21 78:1 | 42:4 47:19 50:14 63:7 | 47:5,15,18 48:6,24 | **functioning** 40:2 55:6 |
| 58:6,22 59:10 61:11 | 76:7 **Eckard** 2:6,8 | 27:1 28:8 28:12,22 | 56:16 59:5 59:9,16,18 | 78:3,4 86:4 **exact** 81:11 | 65:8 66:5 **FAX** 11:7 | 49:7,13,15 49:18,19,23 | **further** 84:20 |
| 64:11,17,21 65:2 66:14 | 6:1,3 7:7 14:8 19:13 | 29:21 30:3 30:6 32:8 | 60:3,7,10 64:9 65:6 | **exactly** 9:5 40:17 | **federal** 1:2 29:9 31:6 | 50:13,20 51:5,22 | **G** |
| 77:21 84:24 **doing** 16:1 | 19:17 20:9 20:13 22:7 | 32:15 36:8 36:19,21,21 | 65:12,15 66:3,9,17 | **EXAMINA...** 3:2 4:5 | 31:12 **fees** 27:20 | 52:8 53:13 53:21 66:18 | **gadget** 69:11 79:3 |
| 27:16 61:21 | 22:18 23:8 27:3,6 28:14 29:4 | 39:14,18 | | **examined** 4:3 | **field** 33:1 **fifth** 24:11 | 67:3,5,12 | **gage** 18:21 **Gardens** 2:14 **Garfield** 55:17,23 |

Arthur Herring, III
October 24, 2018

Page 4

59:18,22
gather 8:10
general 19:1
generally
    18:14 20:6
    71:17
generate 15:1
generic 15:15
gentleman
    52:17
gentlemen
    85:16
give 5:3 8:12
    17:21 31:23
    72:18
given 28:15
    46:6 47:1
    84:22
glance 57:15
Glenwood
    55:18
Gmail 41:19
Gmail.com
    41:19
go 4:24 7:2
    8:4 21:15
    22:6 24:10
    25:13 30:12
    31:1 40:12
    40:20 42:5
    43:12 56:15
    56:19 57:21
    58:8
going 14:8
    19:10,11,24
    20:16 21:7
    21:16 22:13
    22:21 23:7
    23:13 25:1
    25:2,6,6
    27:21 28:9
    28:18 29:20
    30:20 32:23
    35:10 63:24
    68:10 71:13
    72:18 73:2
    74:14 76:21
    77:6 78:7
Good 4:8
Google 75:22
gotten 38:20
government
    45:19 46:3

46:7,15
47:2,10,19
48:7,24
49:13,23
50:2,13,20
51:6,16
52:9 53:22
56:17 58:10
84:11
Greg 52:18
Group 78:21
    78:24 79:11
guy 70:3

                H
Hall 53:1
handed 5:5
    57:7
handful
    35:24
happen 8:23
happened
    8:22,24 9:4
    9:9,12 12:2
    51:1,2
Harbor 2:7
hard 8:5,8,12
    8:21 9:9,21
    11:21,22,23
    12:2,9,16
    12:17,21,22
    13:4,6,9,16
    13:23 14:7
    15:10,14
    18:9 23:17
    35:10,12,19
    36:3,6,9,9
    36:11,16,18
    36:22 37:4
    37:9,12,16
    37:17,23
    38:4,18,24
    39:3,9
    40:14,21,24
    42:4,11,19
    44:8,12,15
    47:18,20,23
    48:2,3,8,12
    54:21 55:1
    56:7,13
    62:2 67:7
    76:8,12,14
    76:19,23
    77:12,16

80:10
hard-line
    51:12
Harleysville
    16:21,23
heard 52:20
    53:1,5
    78:18
help 58:1
    61:21
Herring 1:6
    1:12 3:4 4:2
    4:8,10,12
    5:5 6:10
    7:12 14:18
    20:20 21:2
    21:20,22
    22:1,6,11
    24:8,10,17
    25:4,15,17
    25:19 26:11
    26:13 28:21
    30:7 32:4,7
    43:18 57:7
    60:21 64:7
    68:10 74:16
    78:6 81:16
    84:20 85:7
    85:18
Herring's
    29:13
highway 72:5
hired 31:23
hold 22:1
    23:8,9
    63:23,23
home 4:13
    12:9 81:22
hope 71:13
hosted 41:14
hours 25:3
huge 61:10
Humble
    62:16,18
    69:9 80:2,4
    81:7
Humble's
    80:22
hundreds
    19:24,24
    45:3
Hurlman
    1:14 86:9

                I
idea 4:19
    7:17 42:8
    42:10 45:2
    45:4,6 50:4
    74:9,13
identification
    5:2 57:10
identifies
    30:3
identify 17:3
    18:24 56:16
III 1:6,12 3:4
    4:2,12
    25:19 60:21
    85:18
illegal 72:15
    73:15,17
illegally
    72:18
immorally
    72:19
impose 27:17
imposing
    27:20
inbox 40:5,12
    40:20,21
    59:4,15
    60:8,10
include 49:15
    66:12 69:17
    69:20
includes 5:7
    73:16
including
    28:3 66:4
    81:3,13
independent
    54:3
INDEX 3:1
indicated
    68:17
indications
    72:14,18
individual
    7:8 72:17
    84:12
individually
    29:1,2
    42:22 58:3
    60:21
individuals
    67:2 73:8

73:22 75:1
information
    7:22 8:12
    10:17,24
    11:3 13:4
    18:17 21:15
    27:9 28:2
    29:5,12,15
    31:16 47:24
    48:1 49:2
    61:11 62:6
    62:13,19
    63:1,3 71:8
    71:12 76:12
    76:16,23
    77:7,11
    78:9,12
    81:24 82:4
    83:17,22
    84:1
informed
    77:13
informing
    67:21
initial 38:19
innocent
    69:15
install 39:6
    47:23 48:12
installed 9:10
    11:21 40:14
    44:8,12,15
instruct
    20:16 27:23
    76:22 77:6
    77:11
instructed
    18:22 19:9
instructions
    70:5,12
instruments
    15:5
intended 32:1
    40:15,18
    47:21
interest 33:10
interfered 8:9
internet
    74:14
interrogato...
    8:6 17:2
introduced
    69:4

introductory
    50:10
investigator
    63:8
invoices 14:5
    15:1,3
    52:12
involve 64:4
involved
    19:12
irrelevance
    27:21
irrelevant
    21:14 27:2
issue 19:5
    23:2 26:2
    27:2 47:16
    85:9
issues 85:3
itemizing
    15:4
items 40:7,23
    56:16 59:5
    59:15

                J
James 2:12
January
    48:1,11,15,18
jargon 42:1
Jerry 83:14
    83:22
judge 19:12
    21:7
judge's 31:21
July 9:7,11
    40:16 47:21
    54:20,24
    55:5,12
    56:3,6,12
juncture 32:2
June 9:4,8
    40:15,18
    47:21
jurisdiction
    19:6 20:19
    21:12 22:4
    22:9 23:2
    23:11 26:3
    27:2,5 47:4
    47:17
jurisdictional
    19:18 20:15
    20:18 84:21

Justice 78:16
    78:18

                K
Kathryn 1:14
    86:9
keep 14:10,11
    15:8 50:1
    50:14 51:23
kind 13:22
kittens 33:5
know 6:2
    12:12,14,15
    17:21 18:15
    20:6,8
    21:15,18,24
    24:23 36:1
    37:7,11
    41:2,4,13
    41:14 42:3
    44:7 47:1
    47:14,18
    50:24 51:2
    51:3,7,9
    52:3 53:10
    57:23 66:20
    67:7 70:1
    70:16,20
    75:6,10,16
    75:22 76:1
    76:4 78:6
    78:17 82:2
    82:23 85:4
knowing 13:2
knowledge
    9:18 12:17
    15:20 17:9
    17:10,15
    19:21 20:5
    20:5 21:19
    22:14,15
    24:22 33:16
    33:19 60:13
    66:9 76:9
    76:11 79:1
    79:2
known 81:4
    81:13
knows 8:14
    76:5 81:3

                L
land 7:1
Lane 1:13,22

laptop 11:6,8
    11:9,11,15
    11:22,23
    12:11,13
    13:17,18
    14:6 36:22
    38:18 39:9
    39:15,19
    40:2 55:6
    55:10,14
    56:13 62:2
Lauderdale
    2:3
law 2:2,6
    43:19 44:10
    45:9,13,17
    45:23 46:6
    46:9,14
    47:2,6,15
    47:19 48:6
    48:24 49:7
    49:13,23
    50:1,13,20
    51:5,15
    52:8 53:22
    56:17 58:10
    58:16 69:14
    71:22 73:16
    78:1 84:10
lawsuit 5:15
    9:11,12,16
    9:20 42:18
    43:4 58:4
    61:15 62:10
    63:13,21
    64:12 65:19
    65:24 67:20
    67:23 69:6
    77:4
lead 27:11
learn 7:21
learned 79:6
leave 12:23
    13:15
legal 28:3
Legally 73:24
let's 4:24
    13:20 21:3
    25:20 34:17
    49:19 56:19
    64:16 72:21
letter 15:3,6
    50:10

letters 15:9
  15:13,18
  66:2,13
level 31:17
  79:8
liar 61:12
lie 32:24
  33:12 43:20
  43:21 44:19
  44:22 53:6
  79:3
lies 69:9
limit 70:6
limited 32:2
  78:22,23
line 3:3 43:20
  44:19,22
Lineback
  54:14,20
link 65:22
  69:17,20
  83:13
links 63:4
list 5:18
listen 21:3
  31:17
lists 14:5,11
litigant 77:1
litigation
  77:23
little 43:13
lives 69:14
LLC 1:2
local 16:24
locally 36:9
  36:21 37:4
  37:8,12
located 12:6
  60:15,18
  67:2 76:3
location 22:5
lock 9:6
log 59:14
logs 50:14
long 35:3
  64:3 78:6
longer 43:13
look 5:18
  58:14 59:4
  59:15 64:16
  64:20 65:1
looked 6:6
  8:3 59:9,10

looking 7:8
  28:17
loss 68:1
lot 24:10
low 27:7,15

— **M** —

machines
  19:14 72:22
Madam 4:21
  26:7 46:20
Madame
  43:8
mail 40:24
maintain
  15:18 77:2
making 20:4
  51:15
man 61:12
mark 4:24
marked 5:2,5
  57:7,10
materials
  77:22
Matt 10:14
  10:16
matter 6:19
  21:14 22:5
  29:11 44:11
  47:4 86:5
maybes 7:2
mean 34:16
  41:9 54:1
  79:22
means 55:8
  59:3 86:13
memory 58:1
mention 9:23
mentioned
  11:5 16:12
  23:16 65:11
messages
  82:3
met 80:13
middle 8:24
  9:2
military
  69:14
million 69:6
Missouri 50:5
  54:7,15
  60:4
mistake
  49:18

money 38:3
  69:16 73:18
month 34:17
  34:20
monthly
  51:24 52:7
  52:12
months 4:18
  79:24 81:6
morning 4:8
  21:3 25:10
  25:12
motion 27:19
  29:19 30:17
  31:14
move 4:17

— **N** —

N 2:1 86:1
name 3:3
  4:10 10:7
  10:12 32:23
  41:7 52:17
  52:20 53:1
  55:24,24
  82:5,6
narrow 19:17
nation 66:21
nationwide
  67:22 75:2
nature 29:13
NE 2:2
necessarily
  27:10
necessary
  31:13
necessity 31:5
need 27:9
never 8:3
  16:9 49:6
new 9:9 11:21
  11:22,23
  39:3 40:14
  44:8,12,15
  47:17,20,23
  48:3,8,12
  55:1 56:13
news 32:20
  32:24 33:2
  33:17 34:22
  35:22,22
newspaper

50:8 63:9
  83:13
newspapers
  67:4,11
  71:19
Newtown
  1:14,23
Nextel 52:4
nine 79:24
  81:6
Ninety 42:9
NITV 1:2
  33:18 35:13
  35:17,20
  36:3 37:5,8
  53:11 54:8
  58:11 62:13
  62:15,18
  65:16 69:6
  79:17,19,24
  80:22 81:1
  81:9
NITV's 37:12
NITVCVSA
  62:12 69:24
NITVCVS...
  62:20 65:22
  67:10 69:18
  70:19 75:15
NITVCVS...
  61:8,9,13
Nope 32:17
  75:23 81:17
  81:19
North 2:6
  4:14
Nos 6:15
Notary 1:15
  86:9
noted 86:4
notes 86:5
notice 3:8
  4:22 5:7,14
  6:3,16 7:9
  7:23
notify 78:2
NTIVCVS...
  61:19
number
  10:23 15:4
  15:5 18:15
  19:2 51:13
  71:9 76:2

82:6 83:4
numbers
  51:20,21
  71:18 83:11

— **O** —

O 86:1
object 14:8
  20:15 23:10
  28:5 34:8
  46:10 54:9
  54:16 55:19
  63:24 67:13
  71:24 72:19
  82:11
objected
  18:19
objection
  13:9 22:8
  22:18 23:9
  27:13 72:8
  82:17
obligation
  77:2
obtain 7:22
  10:20 39:3
  52:7,12
obtained
  18:10 28:2
obviously
  9:15 13:8
  39:21
occur 66:11
occurred 9:7
  9:15,17,21
  37:16
October 1:10
  59:2
odd 20:1
offhand
  43:22 45:18
  66:22 73:14
  84:2,9
office 2:6
  11:16 12:11
  55:17 59:22
  78:8,13
  81:21 83:7
  83:10 84:8
  84:13
officially 54:4
Oh 81:7 83:8
okay 4:10,20
  5:18,21

6:13 7:21
  9:23 10:7
  11:19 13:6
  13:20 15:6
  16:1 17:10
  20:13,20
  21:2,4
  24:10,12,21
  25:20 30:8
  30:14 31:1
  33:8 36:18
  38:6 39:11
  40:19 41:10
  41:17 42:21
  43:1,12,16
  44:18 45:9
  46:14 48:4
  48:22 51:4
  55:12 56:12
  56:22 57:15
  58:7 59:1
  60:23 61:23
  62:9 63:6
  64:17 68:23
  73:13,22
  75:6 77:6
  79:14,22
  83:17,20
  84:5
old 40:19
  42:12 48:1
once 37:16
  85:2
ones 28:10
  42:16 61:7
  66:23 67:6
  82:21
online 50:9
operate 7:1
operational
  33:22 34:11
opine 38:22
opinion 53:11
  61:12
oppose 29:20
  30:19
opposition
  12:19
option 71:4
Oral 1:12
order 9:9
  29:19 31:6
  31:13,15

71:13
ordered 39:5
ordering
  85:12
orders 30:18
originally
  12:4
oversee 78:2
owner 62:15
  69:9
owns 60:15
  60:18

— **P** —

P 2:1,1
P.A 2:2,6
page 3:3,7
  58:15
paid 38:9
Palm 2:7,14
panhandle
  80:11
paper 15:8
  18:6,7 48:2
particular
  66:23 69:24
parts 73:2
patrol 72:5
pay 14:22
  38:2
payment
  16:10,16
  38:6
payments
  17:17
Pennsylvania
  1:14,16,23
  12:7 16:24
people 14:12
  15:5 36:4
  62:22 69:10
  69:15 70:7
  70:14,17
  71:9,16
people's
  83:11
period 39:8
  39:14,18,23
person 8:20
  9:23,24
  10:7 12:20
  12:20,23
  13:13 55:16
  61:24 62:1

66:10 74:10
  84:6
personal
  13:19 20:19
pertain 37:4
pertained
  37:12 65:20
pertaining
  14:2 16:4
  18:4 19:5
  24:9 35:13
  35:20,22
  36:2 37:8
  37:22 42:18
  44:10 47:16
  62:23 64:5
pertains 33:2
petition 29:14
PGA 2:13
phone 1:19
  2:4,8,12 6:2
  28:4 50:19
  51:4,10,12
  51:13,15,17
  51:20,20,21
  51:23,24
  52:4,8
  71:18 75:8
  81:15,20,21
  82:1,5,6
  83:3,4 84:6
phones 82:2
phrased
  36:13
physical 83:8
place 74:2
plaintiff 1:4
  2:16 13:3
  28:1 58:17
  59:23 60:8
  65:3,16
plan 67:9
planning 67:1
  67:1
pleadings
  27:19
please 4:11
  5:3,19 26:8
point 13:21
  25:10 59:13
  78:9 83:12
  83:18,23
police 35:21

Arthur Herring, III
October 24, 2018

Page 6

54:7,15
60:4 72:16
**policy** 42:12
42:15 73:7
74:2,5
**polite** 73:4
**polygraph**
73:15 81:4
**pops** 82:6
**portion** 30:2
30:23 41:23
**position**
19:20
**positively**
9:14 44:9
44:14 48:8
**possession**
12:10,24
13:3,7,10
13:15 38:7
58:21 62:2
76:8
**possible** 9:7
37:3 43:23
46:7 49:3
50:19,23,23
**possibly** 6:24
7:1 13:4
**posted** 33:7
**potentially**
28:17
**predate** 40:21
40:24
**premises** 4:18
**prepare** 7:19
**prepared**
6:22 7:4,14
**preparing** 8:2
**present** 2:11
12:3
**preserve** 77:2
77:21 78:1
78:4
**press** 63:7,10
63:12,14,20
64:9 65:10
65:22 66:4
66:5,6,12
66:14 67:9
67:19 68:2
68:3,8,11
68:17 69:2
69:17

**presumably**
14:14 15:21
**previous**
38:20 46:19
**previously**
20:24
**principal**
62:15
**print** 43:10
**prior** 5:15,22
7:18,19
9:12,15
42:4,11,19
44:15 47:22
51:19 56:15
57:13
**privilege**
29:22
**probably** 7:6
7:13 35:9
40:17 42:14
57:14
**problem**
77:19
**procedure**
28:15
**proceedings**
86:3
**process** 28:3
**produce** 43:5
57:18 58:9
64:21 65:1
74:18
**produced**
59:24 63:19
64:11 65:18
85:1
**product**
14:15,17
37:13,13
53:7 72:6
73:22 81:10
**production**
42:22 57:9
57:17 58:7
63:20
**products** 14:5
14:20 18:16
19:2,22
21:5,22
22:11,16
23:5 50:7
58:11 62:13

70:21 71:1
71:14 73:11
74:3 79:20
**professional**
13:10,11
**professionals**
37:24
**program**
14:21,23
**proprietary**
29:6,9
**protecting**
31:16
**protection**
29:9 31:4
31:18 32:1
**protective**
29:19 30:18
**proven** 73:3
**provide** 6:22
7:4 11:2
30:23 43:5
62:6 70:5
70:12 71:12
78:8,12
80:3
**provided**
29:5 41:12
41:19 43:1
43:3 64:8
71:18
**provider** 52:3
**provides** 71:7
**providing**
6:15 31:18
41:18
**PSA** 72:23
**PSE** 14:17,21
18:15 21:5
21:22 22:11
22:16 23:5
52:22 70:21
71:14 72:6
73:6,11
**Public** 1:15
86:9
**publish** 62:7
**published**
33:11,14,17
34:19,22
62:12
**publishes**
32:24

**publishing**
62:19
**purchase**
71:2
**purchasing**
16:13
**purpose**
20:14 30:5
61:16 62:24
**purposes**
19:18 27:8
29:23 30:22
61:17 63:3
**put** 9:19
15:22 73:1

— Q —

**Quakertown**
4:14
**quality** 53:10
**question**
14:19 18:23
18:23 19:7
19:14 20:9
20:14 21:4
21:9,21
22:24 24:6
24:11 25:4
25:23 26:4
26:8,9,17
28:9 32:1,3
32:5 34:9
42:1,20
43:7 46:13
46:17,18,21
46:22 51:1
60:17 64:3
64:6,14
68:24 74:21
76:17 79:9
81:9 82:13
83:20
**questioned**
66:13
**questions**
7:15 25:6
25:11 30:8
30:9,13,15
31:21 82:19
84:20,23
85:5
**quick** 85:13
**quicker** 24:10
**quite** 81:7

— R —

**R** 2:1 86:1
**rampant** 8:15
**range** 27:18
**re-ask** 32:3
**re-deposed**
28:17
**read** 5:21 7:3
26:9 46:21
46:22 57:21
68:9 85:7
**reading** 42:14
**ready** 57:23
**real** 72:23
**really** 9:5
19:19 31:9
31:10 40:17
41:13 43:6
43:7 47:9
**reason** 63:19
64:8 72:7
80:19
**reasonable**
17:19,20,23
**reasons** 72:2
72:10
**reassert** 22:8
**recall** 5:13,23
6:6,8 9:5,10
11:10,12,14
17:5 34:18
34:24 35:2
35:5 37:14
40:17 42:6
42:23,24
43:1,3,22
43:24 44:3
44:9,18,20
44:21,23
45:13,16,18
45:19,22,23
46:2,3,5,6
46:14,17
47:9,13
49:1,4,9,11
49:16,20,24
50:15,16,17
50:18,22,24
54:13,18
55:20,22
56:2,3,5
59:20 60:1
60:3 63:22

66:19 67:8
70:8,15
74:23 75:5
81:1,11
82:22 83:15
83:17,22
84:1,2,3,4,5
84:9,10,14
**receipts** 14:5
**receive** 39:17
51:24
**received**
42:19 55:1
56:13 74:7
**Recess** 57:4
84:17
**recollection**
10:13 18:11
20:8 78:20
**record** 4:11
7:7 38:6
68:5,21
**records** 14:4
14:11 15:17
15:22 17:17
51:23
**recover** 12:13
12:21 37:17
37:21 38:3
42:17
**recoverable**
39:1
**recovered**
48:1
**refer** 58:11
64:21 65:2
65:7,13,16
81:9
**reference** 8:8
**referenced**
8:6
**referencing**
64:10
**referred**
59:23 60:8
**referring**
58:17
**reflect** 73:5
**refresh** 58:1
**refuse** 19:11
19:11 22:2
26:18 73:11
**refused** 84:23

**refusing** 19:7
21:9,11
22:3,23
26:4
**relate** 64:21
65:2,13,16
**release** 65:22
67:19 68:2
68:4,9,12
68:17 69:2
69:17
**releases** 63:7
63:10,12,14
63:20 64:9
65:10 66:4
66:5,6,12
66:15 67:9
**relevance**
18:18 27:7
**relevancy**
27:12,14
**relevant**
18:21 26:2
27:14 28:7
65:23 77:3
**rely** 16:1
**remainder**
66:24
**remember**
28:23 45:9
66:22 75:12
**removed**
83:18,23
**repeat** 14:19
24:12 26:8
26:19
**reporter** 1:15
4:21,23
26:7 43:8
43:11,16
46:20 56:22
57:1 86:9
86:14
**reporters**
1:21 63:8
67:11
**representat...**
31:3
**representat...**
6:11,14
43:19 46:9
49:6,22
50:12,20

71:22
**representat...**
51:5
**representing**
2:5,9,16
30:10
**reproduction**
86:12
**request** 8:11
42:22 57:9
58:14,22
59:16 64:20
74:22
**requested**
26:9 43:4
46:22
**requests** 8:7
42:21 56:21
57:16 58:2
58:7 59:6
60:12 64:17
74:15
**rescued** 33:5
**reserve** 85:1
**reserving**
84:22
**resolved** 85:3
**respect** 6:23
7:15,22
48:19 79:15
84:24
**respectfully**
18:20
**response** 8:10
17:7 58:20
74:22
**responses**
3:10 8:6
57:8,19
64:17
**responsive**
58:22 59:5
59:16 60:11
**restrict** 69:23
70:13
**restrictions**
70:17
**retain** 15:7
**retaining**
12:19
**retrained**
72:23
**return** 15:23

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Arthur Herring, III
October 24, 2018

returns 16:2
review 38:18
  51:20 63:2
right 14:17
  15:11,24
  16:14 20:11
  23:1 24:23
  30:1 31:13
  31:14 36:19
  37:20 40:5
  41:8 44:5
  47:20,23
  48:17 50:24
  57:24 65:9
  71:2 73:2
  76:17,19
  84:15,19
  85:1
Rob 22:6
  30:16 85:4
Robert 2:6,8
Roebuck
  52:18,23
ruining 69:14
rules 28:15
  28:16
running
  65:23 67:11

**S**

S 2:1
sale 34:6
  71:17 72:3
  72:7
sales 15:17
  17:3,12
  19:21 20:1
salvaged
  12:18 76:15
sanctions
  27:18
save 36:7
  42:16
saved 35:16
  36:8,21
  37:4,11
  59:9,11,12
  81:24
saving 42:15
saw 81:6
saying 44:22
  50:24 69:12
says 34:6
  68:12 74:3

scam 43:20
  43:21 44:19
  44:22 53:11
  61:12 62:23
  63:1 65:23
  67:11,21
  81:2,8,10
scamming
  69:13
scheduled
  25:12
scope 19:17
  20:14,17
  22:19 23:10
  54:10,17
  55:19
sealed 29:16
search 17:19
  17:20,23
searched
  47:17
secret 21:16
secrets 19:4
  29:6,14
secure 8:10
see 18:18
  29:21 34:5
  34:7,12
  50:8 51:20
  58:18,23
  60:9 64:23
  65:4
seeing 60:1,3
seek 29:19
seen 5:12,14
  57:13 80:16
sell 14:20,21
  19:5 20:23
  21:13,17
  72:19,24
  73:5,11,22
  74:1,3
selling 73:7
sells 14:15
  15:2 19:22
  53:6
send 15:3,3
  39:13 47:18
  50:4,9 54:7
  54:14 63:10
  65:21 66:24
  67:1,1,9
sending 44:9

44:18,21
  55:22 63:11
  63:12,14,16
  65:21
sensitive
  29:13
sent 6:3 14:12
  15:6,18
  17:2 36:4,7
  36:8,19,21
  37:1 39:20
  40:7,23,24
  42:19 43:18
  43:23 45:1
  45:8 48:5
  49:21 53:21
  54:20 55:4
  55:12,14,15
  55:16 56:6
  56:10,15,17
  59:5,15,21
  60:4,7,11
  63:4 65:7,8
  65:10,12,15
  66:6,16,17
  66:22 68:18
  68:18 71:20
separate
  51:12
served 9:15
  42:21 58:2
  61:14 62:10
  74:16
SERVICES
  1:2
seven 6:20,23
  7:3 52:21
  73:14,19
share 30:21
Sheldon
  54:14
Sheriffs 55:17
  55:23 59:19
  59:22
short 31:18
showing
  61:11 74:18
sign 49:5,8
signal 82:9,16
signals 82:23
simple 25:3
  25:20 26:17
  26:20

simpler 25:21
simply 8:21
  19:1 38:24
  85:8
single 45:17
  45:19 46:6
  46:14 47:2
sir 18:19
  24:21 25:18
  58:1
sit 40:1
site 76:2
situations
  28:1
six 4:18
skimmed
  57:24
smoke 82:9
  82:15,22
software 8:16
  15:2
sold 14:4 15:5
  18:12,16
  19:1,2,15
  21:5,18,23
  22:12,16
  23:5 70:21
  79:4
somebody
  69:13 85:10
sorry 7:12
  14:7 16:22
  22:6 82:10
sort 50:6
SOUTHERN
  1:1
speak 48:2
speaking
  24:23 75:24
  81:10 84:6
  84:10
specifically
  65:11 66:3
  74:24
spell 10:10,15
  32:13
spoke 9:24
spoken 74:10
spread 62:24
Springs 55:18
Sprint 52:4
start 61:13
started 61:14

63:12
state 4:10
  26:12,13
  49:15,17
  51:22 67:12
  71:21 73:8
  73:10,17,23
  74:4 75:7,8
  75:16 84:7
  84:12
stated 13:13
  36:15 53:23
  69:10 76:7
statement
  20:4 36:12
statements
  16:4 17:17
states 1:1
  22:15,17
  23:6,6
  69:24 73:14
  73:20
stating 18:18
  66:3
stations 67:4
status 77:18
statute 29:8
statutory
  77:24
stays 12:23
stenographic
  86:5
steps 36:20
stopped 8:21
stored 13:16
  13:18,22
  14:6 15:9
  23:16 37:8
  39:20 83:4
stories 33:8,9
  33:11,14
story 33:7
Strehlow 1:13
  1:18
stress 33:15
  72:24 73:21
strike 40:11
striking
  27:18
subject 6:19
  29:22 43:20
  44:11,19,22
  66:4 77:22

subjects 5:24
submitted
  59:1
substance
  42:18 43:2
sued 28:7,23
  28:24 69:5
  69:5
suggest 31:22
suing 69:7
  80:2
Suite 1:13,22
  2:2
supervision
  86:13
sure 25:9
  37:10 41:24
  43:11 44:7
  68:20 78:14
sworn 4:3
system 73:6

**T**

T 18:15 86:1
  86:1
T-A-M-R-A
  55:24
T-Mobile
  52:5,6,7,11
take 37:23
  43:13 56:19
  57:15 84:15
taken 1:13
  57:4 84:17
  86:5
talk 30:14
talked 10:8
  52:22
talking 25:2
  35:23 48:10
Tamra 55:23
tapping 28:3
  28:4
tax 15:23
  16:2
taxpayer's
  69:16
technology
  10:9,11
telephone
  10:23 24:23
  24:24 42:3
  50:11,12
  71:9 80:7

telephoned
  51:21,21
tell 7:18 8:5
  11:19 13:1
  36:14 47:2
  48:4,22
  68:3 79:22
  81:5 82:18
telling 19:24
  81:1
Tens 45:5
term 73:4
terminology
  42:2
terms 40:19
  66:2,13
testified 4:3
  55:8
testifying 6:9
  29:2
testimony
  6:15,18,22
  7:4 31:4
  40:19 85:18
testing 20:3
Thank 26:22
Thanks 85:16
theoretically
  36:19
thing 49:11
things 67:8
  79:5
think 8:24
  9:2,8 18:21
  19:14 20:6
  20:17 28:14
  28:16 31:19
  52:21 64:13
  65:20,21
  66:1,4
  80:13
thinking 66:2
  66:12,14
Third 2:2
third-party
  13:11 53:24
thirty 57:16
  60:11
thought 12:4
  38:19
thousands
  45:5
three-week

39:8,23
threshold
  27:8,15
time 8:16,16
  9:20 10:2,2
  24:11 32:7
  34:22 39:14
  39:18 40:15
  42:13 58:20
  59:3 71:19
  80:14 83:18
  84:21
title 81:13
today 5:16,22
  6:10,15,18
  6:22,23
  7:14,19
  11:17 23:3
  24:18,21
  29:2,23
  40:1 51:19
  56:15 57:13
  72:6 78:9
  78:14 80:9
today's 5:1,6
  5:8 81:18
told 8:20
  17:22 22:13
  38:14,24
  47:22
topic 7:15,22
  8:2 64:5
topics 5:8,18
  5:22 6:7,15
  6:20,23 7:3
  33:4,13
totally 12:17
  21:14
track 50:1
  76:2
trade 29:6,14
trained 15:5
training
  14:21,23
  22:16 72:23
  73:3
transcript
  30:2 80:4
  80:22 85:13
  86:6,11
transcripts
  30:24
transfers

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Arthur Herring, III
October 24, 2018

Page 8

16:6,11,17
**treat** 30:21
**treated** 30:18
**tree** 33:5
**trial** 27:10
**tried** 34:5,11
**true** 79:6
**trust** 13:3
**truth** 53:7
**try** 12:20
  21:13 25:11
  75:12
**trying** 36:20
  38:3 59:2
  73:1
**turn** 71:23
**TV** 63:9 67:4
**two** 8:17 42:7
  80:15,18
**two-** 39:8,23
**type** 12:20
  13:10,16
  35:15 82:5
**typed** 58:6
**types** 14:6
  23:18 33:8
  33:9 66:14
  70:24
**typing** 34:12

**U**

**U.S** 58:16
**Um-hum**
  66:8
**unable** 8:18
**understand**
  6:9,12,13
  6:17,18,21
  12:5 25:5
  41:9,16,20
  42:1,20
  68:15 70:2
  77:1
**understand...**
  76:14,18,20
**understands**
  32:4
**unfortunat...**
  25:1 27:3
**UNITED** 1:1
**unprofessio...**
  82:20
**unreliable**
  73:4

**untruthful**
  13:5
**use** 11:19
  16:4 24:4,7
  24:14,15,19
  25:15,24
  26:15,22
  27:1 32:9
  32:10,16,18
  43:10,14
  51:10 56:20
  73:15,17
**useless** 12:18
**uses** 30:4
  54:3 81:14
**Usually** 50:3

**V**

**V-A-N-D-E-...**
  10:16
**V-A-N-D-E-...**
  10:11
**V-I-P-R-E**
  53:4
**value** 53:9
**Vanderhoff**
  10:14,18
  12:5,6,12
  12:15 13:14
  37:19,20,23
  38:2,9,14
  38:22 62:3
  62:5 70:6,9
  70:13 74:11
  74:23 75:3
  75:11,19,24
  76:5,7,11
  76:18,22
  77:7,10
  78:12 82:8
  82:15 83:2
**Vanderhoff's**
  12:10 78:8
  81:24 82:4
**Vanderson**
  10:9
**various** 14:12
  23:18 33:4
  33:9 35:21
  36:4 62:21
**verification**
  53:7
**Verizon** 52:4
**version** 5:14

15:13
**VIDEOGR...**
  1:21
**view** 70:7
**viewing** 74:8
**Vipre** 53:3,10
  53:12,15,18
**virus** 8:9,15
  8:17,19
  12:3 15:10
  35:11 36:10
  36:15 38:15
  38:19
**viruses** 8:14
**visit** 34:5,11
  80:11
**visited** 34:15
  74:17,20
  75:8,16
**visitors** 8:4
  74:7 76:2,3
**visits** 83:3
**voice** 32:24
  33:15 43:20
  44:19 72:23
  73:21 79:3
**voracity** 20:3
**VS-** 1:5

**W**

**walk** 36:20
  69:2
**want** 5:24 9:6
  12:22 13:6
  18:23 19:21
  21:18,24
  22:7 25:5
  25:23 26:13
  26:18,19
  27:15,17
  29:23 32:3
  50:6 56:20
  58:8
**wanted** 68:20
  72:6,22
  74:1 80:1
**wants** 29:18
  30:17 63:1
**warning** 8:17
**warnings**
  8:15 38:20
**wasn't** 83:20
**wasting** 69:16
  73:18

**way** 36:12
  37:7 48:23
  49:1,12,17
  49:20 50:15
  55:3 66:20
  70:16 72:15
  75:20 79:16
  79:21,22
  80:23
**we'll** 43:12,13
  43:14 84:15
  85:8
**We've** 81:4
**web** 8:3 74:19
**website** 7:16
  8:4 32:20
  32:21,23
  33:20,24
  34:7,12
  41:12 60:15
  60:18,23,24
  61:4,10,16
  61:18,22,23
  62:6,7,9,12
  62:20,24
  63:4 67:10
  69:18,20,21
  69:24 70:3
  70:6,10,13
  70:18,19,22
  70:24 71:2
  71:5,7,18
  74:7,8,18
  74:20 75:1
  75:8,15,17
  76:1 77:7
  77:12 83:12
  83:18,23
  84:1,3
**websites** 61:5
  70:24
**Wednesday**
  1:10 24:21
**week** 63:12
  65:7,12,15
  66:17
**weeks** 38:20
  39:5
**went** 11:22
  75:1
**West** 4:14
**whatsoever**
  50:1

**wide** 66:22
  79:4
**willing** 11:2
  25:13 30:12
**wire** 16:6,11
  16:16
**wish** 67:7
**withstanding**
  19:8
**witness** 3:3
  5:3 14:10
  20:22 22:21
  23:1,13
  27:4,24
  28:18 30:5
  30:10 31:9
  46:23 54:18
  55:20 64:6
  64:13 67:14
  67:16,19
  68:7,13,23
  72:2,10
  82:12,18
**word** 15:13
  15:15 20:7
  53:8
**words** 17:22
  79:24 81:11
**work** 9:24
  13:17,19
  73:2 75:2
  82:2,23,24
**working** 8:21
**world** 66:22
  79:4
**worldwide**
  75:2
**worthless**
  69:6
**wouldn't**
  36:10
**wrong** 34:13
  73:12
**www** 34:2
**www.Dekto...**
  60:16,19
**WWW.ST...**
  1:24

**X**

**Y**

**Yeah** 34:4
  58:19 61:3

61:6 64:19
  64:24 65:5
  83:6
**year** 11:13
  15:21 19:2
  19:22 20:23
  21:23 35:1
  35:6 42:7
  45:21 46:16
  48:5,22
  49:7,20
  80:1 81:6
  84:5
**years** 20:2
  22:12 35:8
  42:7 52:21
  62:23 79:3
  80:13,15,18
**Yup** 5:11
  32:12,22

**Z**

**zero** 22:14

**0**

**1**

**1** 6:15 64:20
**10** 69:5
**10:38** 57:4
**101** 2:2
**1045** 4:14
**11:02** 57:4
**11:31** 84:17
**11:34** 84:17
**11:38** 85:19
**1100** 63:7,8
  63:10 64:8
  65:6,8
**116** 1:14,22
**14** 29:18 30:2
  30:17,22
  31:5
**15** 79:3
**150** 65:9
  66:16
**1500** 2:2
**16th** 59:2
**18** 80:13
**18940** 1:14
  1:23
**19** 2:6
**1990** 67:22
  81:4,13

**2**

**2** 58:15 64:16
  65:1
**2015** 48:19
**2016** 48:19
  48:22 49:7
  51:8 52:15
**2017** 21:23
  45:23 46:4
  47:15 48:15
  48:16 49:11
  49:14,20
  51:4 52:13
  53:18
**2018** 1:10
  18:14,16
  19:15 20:10
  20:11 21:5
  43:18 44:18
  44:21 45:1
  45:10,14,21
  46:8,16
  47:8,12,21
  48:5,11
  50:12,21
  51:16 52:9
  52:23 53:15
  54:21,24
  55:5,12,16
  56:4,7,12
  59:2 79:12
  83:12,19,24
  84:5
**205** 1:20
**215** 1:19
**22nd** 56:4,7
  56:12
**24** 1:10
**25** 23:6,6
  55:5,12
**25th** 54:21,24
**27th** 9:11
**2855** 2:13

**3**

**3** 58:14
**30(b)(6)** 7:8
  7:10 23:11
**3110** 2:6
**31st** 48:16,19
**33301** 2:3
**33410** 2:14
**34683** 2:7

**4**

**4** 3:5

**5**

**5** 3:8
**504-4622**
  1:19
**504-7155**
  1:20
**54** 1:13,22
**561** 2:15
**57** 3:10

**6**

**6** 7:6,13,15,22
  8:2,3
**603-1340** 2:3
**622-7788**
  2:15
**688** 29:8

**7**

**7** 3:5 6:15
**727)771-7940**
  2:7

**8**

**9**

**9:18-cv-809...**
  1:3
**9:30** 1:16
  25:13
**954** 2:3