IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

NITV FEDERAL SERVICES, LLC    :        9:18-cv-80994-DLB
    Plaintiff

                                  :

vs

                                  :

ARTHUR HERRING III, AND
DEKTOR CORPORATION            :
    Defendants                :

FILED BY _cbs_ D.C.
JUN 17 2019
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

........................................................................................................................................

## MOTION TO DISCLOSE

    I, Arthur Herring III, defendant, is requesting the contact information (publisher, address, phone, email, website) of a so-called "scientific journal" (Nitv's words on their website) called Criminalistics and Court Expertise, 2012 Annual edition, #57.  Nitv and their Cvsa member association claim on their website and in literature the "journal" published a "study" claiming it proves their Cvsa lie detector is 98% accurate. The 14 page "study" was "written" by a 20 year employee of Nitv called James Chapman in 2012. He died in 2012. The 14 page "study" is available to see, but NO contact information is given in it of a publisher. FACT: the "study" NEVER mentions Nitv or Cvsa. So how can Nitv claim it proves Cvsa is 98% accurate if Cvsa is NEVER mentioned?

    The ENTIRE basis of Nitv's lawsuit against Dektor and myself is basically that I have stated lies about Cvsa, Nitv and its owner Humble for years. The facts on my Dektor website and www.nitvcvsaexposed.com have always been backed up with documents, including those by Nitv.  If no REAL contact information for the "journal" is given by Nitv, then I have PROVEN my claim beyond any legal doubt that I have told the truth about Nitv, Humble, etc, and that Nitv and Cvsa have always been a fraud and scam on law enforcement and the public for 30 years and Nitv had NO reason to sue Dektor and me. Nitv has used this fake study and other fake studys to keep their fraud going and making more money. If no REAL contact information is given by Nitv, then this lawsuit would have to be totally dismissed, severe sanctions filed against Nitv and its owners for filing a frivolous lawsuit, abuse of civil procedures, violating my Constitutional rights and civil rights. Severe sanctions, including suspensions (maybe disbarrment) must be filed against Nitv lawyers for being a part of Nitv's LEGAL TERRORISM by using the court as a weapon against me and my business for this past year only to make themselves more money and to put me out of business at Nitv's demands. Those same court weapons of made up lawsuits have been used by Nitv and their other lawyers for decades against other people. The court dockets do not lie. Nitv usually always lose their made up lawsuits, but their objective is ONLY file them in federal court to waste the defendents money and to put them out of business.  In one case, about 15 years ago, Nitv sued a business, who also sells a unproven lie detector. Nitv claimed that business was selling Nitv's software program for lie detection. Nitv lost their case, but it cost the defendant about $2 million dollars. In another case, Nitv was sued about 13 years ago by someone else also selling a unproven lie detector and Nitv lost. The judgement against Nitv was about $500,000. The Florida Supreme court ruled they had to pay, plus 8% interest every year until it was paid off. To this day, Nitv has NOT paid a dime of that current judgement of about $800,000. But, about three years ago, Nitv sued that person for basically what they are suing me for only for revenge. Nitv has made up vicious stories about its ex-employees and sued its ex-employees only for revenge. If Nitv has the lawyer money to sue me, the other person and money to defend itself for not paying the judgement, why don't they pay the judgement? Nitv/owners have proven to be serial litigators and should not be allowed to continually file fake lawsuits. Nitv and their lawyers should be held accountable by the courts and heavily sanctioned and fined.

The fact is, NO one can find the so-called "journal" location. No Google search locates it, Library of Congress says it does not exist and many university librarians contacted checked their massive data bases and they say it does not exist. The co-author of that so-called "study", Marigo Statis, girlfriend of Nitv co-owner James Kane, would know of any contact information, IF the "journal" exists. Stathis is paid by Nitv to promote and sell Cvsa to law enforcement using the "Chapman Study". When she is contacted, Stathis hangs up on people and does not return emails. Why?

If Nitv cannot produce the contact information of the "journal", it will be absolute proof that for the past 7 years Nitv made up and used the fake "journal" only to make their buyers (law enforcement) think the "study" was actually published and real. That is fraud and false advertising. Nitv hopes law enforcement will buy Cvsa because people will think the "study" is real. Nitv, Cvsa and its owners Humble/Kane, have been well documented in the news media for the past 30 years as being a major fraud. A massive amount of documents were posted proving various lies by Nitv and Humble on my website www.nitvcvsaexposed.com before Nitv complained to the court and this court ordered the site removed.

This court, by ordering my two websites down containing factual documents and my company website forced to delete all facts about Nitv, Cvsa or Humble, clearly violated my Constitutional rights of freedom of speech, freedom of expression and freedom of the press. That court order is also keeping the public and various law enforcement types ignorant of the grave harm a fake lie detector has done to the public for 30 years because law enforcement use it because they think it is real and they falsely accuse innocent people of crimes. My company has lost millions of dollars to Nitv because Nitv lies make clients think Cvsa is better than PSE®. Many of those documents proving various Nitv/cvsa lies that are on my websites were from the news media and are easily found on the internet posted by other people. The fact is, the website www.antipolygraph.org had archived the entire www.nitvcvsaexposed.com website recently and it is back up for the world to see. The ABC News investigation in 2006 documenting the Nitv fraud has been on the internet, posted by others, since 2005 and it cannot be removed. Nitv knows facts about it will ruin their scam and Nitv will no longer have money.

It has also been documented that Nitv has made up at least two accuracy "studys/surveys" Nitv claims were done by the military, about 2005, because those "studies/surveys" also do not have any contact information to verify who did them. A major part of the Nitv fraud, for 30 years, has been posting various lies on their website and in their brochures to convince law enforcement to buy Cvsa. FACT: the military spent almost $1 million to buy some Cvsa's and training in about 2003. By about 2005, the Cvsa was banned from the entire U.S. military because of very poor accuracy. That article was also on the website www.nitvcvsaexposed.com that was ordered removed by this court from the internet.

Any contact information given by Nitv for that "publisher", MUST be verified as being a real location and in business at least since 2012 when the "Chapman Study, 2012 annual issue, #57" was first mentioned by Nitv. Positive proof of physical location and contact information must be confirmed because Nitv has lied about too many things. For example, Nitv claims its Cvsa member association called Nacvsa is located in Delaware and has a 800 type number. Delaware does NOT charge a state income tax. The Nacvsa "address" is only a <u>business</u> renting PO boxes and the 800 number actually rings the Nitv office in Florida. The association is NOT registered in Florida as any business, so Nitv has avoided paying state income tax on its members dues of $400, per person, every two years, for life, for at least 15 years. Nacvsa/nitv has thousands of members.

EXHIBITS

Exhibit A - Article published in the American Polygraph Association magazine, 2014; Article shows proof that the So-called "Chapman Study" is severely flawed and no location of the journal it was "published" can be found.

Arthur Herring III, Defendant
400 E. Station Ave. #225
Coopersburg, PA 18036
Phone: 215.631.1448

Email: Admin@dektorpse.com

## CERTIFICATE OF SERVICE

I certify that on June 12, I filed this document with the Clerk of Court by certified mail and served this document by U.S. mail to Plaintiff's lawyers, Desousa and D'loughy as listed on their documents.

Arthur Herring III

# The Chapman Study

Exhibit A

## by Jim Wygant

A flurry of press releases, purportedly originating from the National Association of Computer Voice Stress Analysts (NACVSA), has recently promoted a "new" study showing 96 per cent validity for voice stress analysis. Sometimes referred to as the "Chapman Study," it is described by NACVSA in one of their press releases as:

> The 18-year field study was conducted by Professor James L. Chapman, the world's foremost authority on the application of Voice Stress Analysis technologies. The peer-reviewed study, titled "Long-Term Field Evaluation of Voice Stress Analysis In a North American Criminal Justice Setting" was ground-breaking in that it validated the tremendous decades-long success of the CVSA in the criminal justice system.

The study was published in a journal identified as *"Criminalistics and Court Expertise."* Although it is claimed by NACVSA to be a once-a-year, peer reviewed scientific journal, no trace of a publication by that name can be found on the Internet, although copies of the article itself are available.

James L. Chapman died in 2011 at the age of 69 after spending many years using and advocating voice stress analysis. His study, published in 2012, is offered as a counter to abundant research papers published in recognized peer reviewed journals, repeatedly showing results at chance levels, as good as flipping a coin, when used to assess deception. Chapman's study is sometimes misrepresented as being drawn from thousands of cases over nearly two decades. In reality, Chapman's selection process from his cases would probably

---

Jim Wygant has been a private polygraph examiner in the State of Oregon for over 35 years. He is also an author and has contributed many articles that have appeared in the publications of the APA. The opinions expressed in this article may not necessarily represent those of the American Polygraph Association.

not be acceptable to most known peer reviewed journals.

As Chapman explained in his report, "The original group of total case subjects (n > 3,000) tested over an 18-year period was culled for those that could be retrospectively studied, such that they met the following requirements: a confession had been a potential outcome (i.e., a crime had been committed in which the individual was implicated); there was no involvement with non-criminal statement veracity testing; no employment clearance was involved; the case was not used as a confirmation of witness testimony; and controlled testing had occurred (i.e., responses could be verified by the VSA [voice stress analysis] process by means of structured re-questioning). Following the excluded group, the cases that remained were (n=2,109)." Chapman then numbered those cases and conducted a random sampling using the numbers alone as a means of selecting files. He wrote, "From this final set of cases (n=236), there were (n=329) possible confession outcomes." There is some confusion regarding his counts, since it appears that some "cases" must have included more than one examination. Chapman excluded from his count of "possible confession outcomes" any confessions to something other than the issue being tested.

To add to the confusion about how many examinations and how many people he included in his study, he reported that the number of people was 279, ranging in age from 5 to 74, and 84 per cent male. Of that total number of people tested, 259 were suspects and 20 were alleged victims.

The testing procedure did not follow any formal routine. He described the test process as "initial VSA questions asked (9-31 questions, yes/no answers)", which was followed by "retest, as required, using reformulated questions for those issues where stress was observed until no stress was observed or stress could not be eliminated." There were only two possible conclusions to a test: "no stress indicated" meant that he had "cleared subject", while "stress indicated" led to "post-exam interview of subject to determine reason for stress." The lack of a rigid, repetitive test format, as is customary in most validity studies, is again contrary to usual practices.

Chapman concluded, "In each of the cases reviewed here (n=236), inclusive of (n=329) confession possibilities, stress was indicated in 92 per cent of the examinations (n=303), leaving 8 per cent of the exams with a no-stress result (n=26). Confessions were obtained from 89 per cent of the interviewees

(n=292), leaving an overall 11 per cent no-confession rate (n=37). Most notably, among all interviews conducted, where stress was indicated, 96.4 per cent resulted in suspects making self-incriminating confessions."

Within the small number of no-stress results (26), apparently 19 of those came from one case in which 20 people were examined for the same theft. One was reported as stress and then confessed, which would verify the no-stress results of the other 19.

If a polygraph examiner wrote a report claiming to establish the validity of his work based upon his review of his own work, no one would believe him. Polygraph validity studies that rely upon test results verified by confession are typically reviewed in a double-blind fashion: the review being done by a different examiner than the one who conducted the test, who also does not know what the original examiner decided. In other words, the charts themselves are reviewed, not just the conclusions of the original examiner.

It seems odd that 89 per cent of all of those included in Chapman's study made "self-incriminating confessions," since that figure far exceeds that norm in criminal investigations. It is well known that the standard for what constitutes a "confession" varies among interrogators, who have a stake in establishing their expertise and might include partial admissions or even non-denials that help bolster their confession rates. Because nearly no one in this study was reported as truthful, the selection process and the determination of the accuracy of individual tests is questionable. Ultimately, ground truth was not established for these cases. Legitimate studies of VSA validity published in reputable scientific journals have been done by disinterested third parties, such as academic institutions and the federal government, which have no stake in establishing or refuting the validity of VSA. Chapman's report of 96 per cent accuracy is based entirely on his analysis of a small portion of his own work, in which he presumably maintained an interest in establishing himself as an expert. No study exists, published in any conventional scientific journal, that supports Chapman's conclusion or even comes close to the results he reported.

The results of this "study" are frequently misquoted. We have heard claims that this was a study of several thousand cases, which is untrue. We have also heard the oft repeated claim that it proves 96 per cent accuracy, which can not reasonably be concluded from the methods used.

Repeated "press releases" from NACVSA have identified Chapman as the world's foremost authority on voice stress analysis and have emphasized 96 per cent accuracy. Any claims by NACVSA are suspect, since it appears to be an arm of the National Institute of Truth Verification (NITV), the primary marketer of voice stress analysis devices in the United States. NACVSA requires that members buy classes from NITV to maintain membership. If the American Polygraph Association required that members buy classes from any equipment manufacturer to maintain membership, there might be some suspicion of collusion between the marketer and the Association.

## THE POLYGRAPH QUESTION

<u>Countermeasure question</u>

Who is responsible for the following quotation regarding respiratory suppression?

*"In studying the influence of intellectual and emotional states upon the respiratory movements, the writer, in a series of experiments, found in general that concentration of thought, as in mathematical calculations or in reading, lessens the respiratory movements considerably."*

- A.   Howard Timm, 1982
- B.   Cleve Backster, 1958
- C.   John Reid, 1945
- D.   John Larsen, 1925
- E.   Vittorio Benussi, 1914
- F.   Arthur MacDonald, 1905

*answer on page 70*



Screen capture of a Matte Quadri-Track ZCT. Subject is masked to protect his identity.

©2014 DANIEL MANGAN    A PAID POLITICAL ADVERTISEMENT

Make sure your contact information is corre
Email:  manager@polygraph.org
or call 1-800-APA-8037

Herri
400 E. Station Ave #225
Coopersburg, PA 18036

U.S. District Court
Southern District of Florida
701 Clematis St.
Room 202 Clerks Office
W. Palm Beach, FL 33401