IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80994-DLB

NITV FEDERAL SERVICES, LLC,

      Plaintiff,

v.

DEKTOR CORPORATION and ARTHUR
HERRING, III,

      Defendants.

_____

**PLAINTIFF'S MOTION FOR DEFAULT
FINAL JUDGMENT AGAINST DEFENDANTS**

      Plaintiff NITV Federal Services, LLC ("Plaintiff"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 55(b)(2), hereby move for entry of a Default Final Judgment against defendants Dektor Corporation ("Dektor")[1] and Arthur Herring, III ("Herring") (collectively, the "Defendants"), and states as follows:

**PROCEDURAL SUPPORT FOR DEFAULT FINAL JUDGMENT**

      1.      On July 27, 2018, Plaintiff filed its Complaint in this action against Dektor and co-defendant Arthur Herring, III ("Herring") (collectively, the "Defendants"). The Complaint contains four causes of action against Defendants: (1) False Advertising, Unfair Competition, and Product Disparagement Under the Lanham Act; (2) Deceptive and Unfair Trade Practices; (3)

---

[1] On May 17, 2019, the Court entered its Order on Motions for Final Default Judgment and Permanent Injunction Against Dektor Corporation (the "Dektor Judgment/Injunction Order") [D.E. 95]. That Order entered final judgment (liability only) against Dektor and also issued a permanent injunction prohibiting Dektor (or its agents) from engaging in the conduct specified therein. On May 29, 2019, Dektor filed a Suggestion of Bankruptcy [DE. 97] noting that Dektor had filed a bankruptcy proceeding in the Eastern District of Pennsylvania on May 16, 2019 (prior to entry of the Dektor Judgment/Injunction Order). Because the Dektor Judgment/Injunction Order did not impose a monetary judgment and to the extent the bankruptcy automatic stay affected the Dektor Judgment/Injunction Order, Plaintiff is including both Defendants in this Motion.

Defamation/Business Disparagement; and (4) Tortious Interference.   All claims are asserted against both Defendants.

2.      On September 5, 2016, Defendants filed a Motion to Dismiss Plaintiff's Complaint and Incorporated Memorandum of Law [D.E. 15].

3.      On February 15, 2019, the Court entered an Order Denying Defendants' Motion to Dismiss [D.E. 71].  That Order required Defendants to file an Answer to the Complaint on or before March 4, 2019.

4.      That same day, the Court entered an Order Granting Defendants' Unopposed Motion to Withdraw as Counsel for Defendants [D.E. 72].  That Order required Defendants to retain new counsel by March 4, 2019.

**I.      Dektor**

5.      On March 5, 2019, with no appearance of replacement counsel and no Answer filed by Defendants, Plaintiff filed a Motion for Entry of Default Against Dektor Corporation [D.E. 82] as the corporate entity could not appear in this action without counsel.

6.      The Court granted Plaintiff's default motion on March 12, 2019 [D.E. 84] and the Clerk entered a Default against Dektor later that same day [D.E. 85].

7.      On March 22, 2019, Plaintiff filed a Verified Motion for Default Final Judgment Against Dektor Corporation [D.E. 88] which the Court granted (in part – on liability only) on May 17, 2019 [D.E. 95].

**II.      Herring**

8.      On June 7, 2019, the Court entered an Order Lifting Stay as to Defendant Arthur Herring III [D.E. 102].  As the Court knows, Herring (like Dektor) filed a separate bankruptcy

2

proceeding in the Eastern District of Pennsylvania (for purposes of delaying/interfering with these proceedings) and both bankruptcies were ultimately dismissed.

9.      On June 10, 2019, Plaintiff filed a Motion for Sanctions Against Herring for Spoliation of Evidence and Discovery Abuse (the "Motion for Sanction") [D.E. 103]. As a result of severe discovery abuses, the Motion for Sanctions requested that the Court enter a default against Herring (or strike any Answer filed in the interim) and direct Plaintiff to file a motion for default final judgment against him.

10.      Following a series of baseless motions filed by Herring[2] (all of which were denied after careful consideration), the Court on September 20, 2019 entered an Order Granting Plaintiff's Motion for Sanctions for Spoliation of Evidence and Discovery Abuse [D.E. 1133]. That Order entered a default against Herring and directed Plaintiff to file an appropriate motion for default final judgment within 21 days thereof.

## FACTUAL SUPPORT FOR DEFAULT FINAL JUDGMENT[3]

### I.      Plaintiff's Business and History

1.      Plaintiff is the manufacturer and sole source for the patented Computer Voice Stress Analyzer® II (the "CVSA"), the most widely used truth verification tool in the United States law enforcement community. The CVSA has been assisting law enforcement around the world in solving crimes and screening potential candidates for 25 years and has largely replaced the old polygraph in the United States.[4]

---

[2] See, e.g. D.E. 109 (Motion to Disclose); 111 (Motion to Disclose NACVSA Location); 112 (Motion to Dismiss NITV Lawsuits); 117 (Motion to Reassign Case/To Demand Removal of Judge Brannon); and 118 (Motion to Produce).

[3] "When a defendant defaults, it admits as true all well-pleaded factual allegations in the complaint." Enable Creative, LLC v. Charles Rutenberg Realty, LLC, No. 19-20789-CIV-MARTINEZ/MCALILEY, 2019 U.S. Dist. LEXIS 155224, at *2 (S.D. Fla. Sep. 10, 2019) (citing Tyco Fire & Sec., LLC v. Alcocer, 218 F. App'x 860, 863 (11th Cir. 2007)).

[4] See the October 11, 2019 Declaration of Charles W. Humble (the "Humble Decl."), a true and correct copy of which

2.      Plaintiff has been offering training in voice stress analysis since 1980 and is recognized throughout the world as the leader in the field of voice stress analysis.

3.      Plaintiff's founder, Charles Humble, is considered by many to be the 'father' of modern voice stress analysis technology.

4.      Plaintiff is the only company in the world to be awarded three patents in forensic voice stress analysis/voice related technologies.

5.      Unlike a polygraph, the subject of computer voice stress analysis is not "wired to" an instrument when undergoing an examination. Only a microphone is used, which is plugged into the computer to analyze the subject's responses. As the subject speaks, a voice pattern is displayed and numbered, and saved to a chart to file.

6.      Drugs or medical problems do not affect the results of the examination, and there are really no "counter measures" that could cause an inconclusive result such as those that occur with a polygraph.

7.      The computer voice stress analyzer notes the frequency changes in the subject's voice and "identifies" the vocal stress related to the specific facts under investigation. The computer processes the voice frequencies and displays a graph "picture" of them.

8.      There is no need for strictly "yes" or "no" answers, and the computer process can "follow" unstructured conversation, recorded conversations, and live telephone conversations.

9.      Micro tremors are tiny frequency modulations in the human voice and, when a subject is lying, the automatic or involuntary nervous system causes inaudible changes in those micro tremor frequencies. The computer voice stress analyzer detects, measures, quantifies and displays those changes in a graph format that can be evaluated and quantified for stress.

_____

is attached hereto as Exhibit "1." All of the factual allegations herein are based on Mr. Humble's Sworn Declaration.

4

10.     The technology is digitized and incorporated into a multi-functional notebook computer that is easily carried and that also has facsimile and e-mail capability for the sending of charts for cold call review by other examiners.

11.     The CVSA is used by approximately 2,500 local, state, federal, and international law enforcement agencies, including approximately 175 agencies within the State of Florida and approximately 13 federal government agencies.

## II.     The Original "Dektor" – Dektor Counterintelligence and Security, Inc.

12.     In 1972, Allan D. Bell, Jr., Wilson H. Ford, and Charles R. McQuiston – the three principals of Dektor Counterintelligence and Security, Inc. –patented an invention which would become known and sold as the "Psychological Stress Evaluator" (the "PSE").

13.     Originally named the "Physiological Response Analysis Method and Apparatus," Dektor Counterintelligence and Security, Inc.'s invention used a method called the McQuiston-Ford algorithm, which detects microtremors which typically fall into the range of 8 to 12 Hz in an individual who is not experiencing stress or being deceptive.  These FM frequencies are not audible to the naked human ear and can only be captured through this method. The algorithm simply computes a sequence and converts it into patterns or charts. As a person is being deceptive, the stress they feel causes variations in the frequency modulation, which shows a flattening effect on the graphic display or chart. This allows trained examiners to read the charts in relation to questions that caused this flattening event and correlate it to a stressor.

14.     Dektor Counterintelligence and Security, Inc.'s voice stress analyzer was ground-breaking at the time, but the product has since disappeared from the market after the company went out of business in the late 1990's.

### III.    Defendants and Their Business

15.    Dektor was formed as a Pennsylvania corporation in 1999.  Herring is Dektor's President and, upon information and belief, sole shareholder.

16.    Dektor is not a successor-in-interest or otherwise connected in any way to Dektor Counterintelligence and Security, Inc.

17.    Defendants   did   not   purchase   or   otherwise   receive   any   of   Dektor Counterintelligence and Security, Inc.'s intellectual property or assets – rather, as set forth herein, they simply appropriated the "Dektor" name, reverse engineered Dektor Counterintelligence and Security, Inc.'s product, and then began selling their own "PSE" voice stress analyzer while capitalizing on the name and storied history of Dektor Counterintelligence and Security, Inc.

18.    Defendants' attempt to capitalize on the "Dektor" name and history is evident through a review of Dektor's website (http://www.dektorpse.com/) which contains numerous misrepresentations attempting to draw a link between the two companies:

> PSE® stands for Psychological Stress Evaluator®. *Since 1969,* all PSE® models (PSE 7010, PSE 5128, PSE 4202, PSE 2000, PSE Dek, PSE 101, PSE 1) detect, measure, and graphically display the degree of presence or absence of inaudible body tremors known as micro-muscle tremors.[5]

> Thousands of various PSE models have been sold worldwide *for 45 years*.[6]

> *For 50 years*, PSE® has been known worldwide because PSE® constantly proves it is the most superior system for truth verification. Only the   Dektor   system   has   proven   it   is the real technology for Voice Stress Analysis™.[7]

---

[5]    Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[6]    Available at http://www.dektorpse.com/information/pse/ (emphasis added).

[7]    Available at http://www.dektorpse.com/products/ (emphasis added).

19.    Today, Dektor markets and sells the "PSE-7010," a software-based voice stress analyzer in direct competition with Plaintiff's CVSA.

20.    According to Dektor's website, "[t]housands of various PSE models have been sold worldwide for 45 years" and PSE's are used by law enforcement agencies, Fortune 500 companies, security companies, military, and others.

21.    In short, Dektor markets its PSE product to the same law enforcement agencies, military agencies, private corporations, and other entities/agencies that Plaintiff markets and sells its CVSA product to.

**IV.    Defendants' Disparagement of and Interference with Plaintiff's Business**

22.    Defendants are engaged in a public campaign to smear Plaintiff's name and CVSA product in an effort to unfairly gain a competitive advantage in the marketplace.

23.    Herring himself is no stranger to the legal system or the consequences associated with publicly spreading lies when he does not get his way.  Indeed, in 2012, Herring was convicted of harassment in Pennsylvania County Court after handing out pamphlets accusing a college professor at Lehigh University of being a conman, protesting outside the professor's office, and demanding compensation from the university's President in exchange for stopping the harassment.

24.    After Herring's conviction was upheld, he was quoted in the courthouse hallway as stating: "I think the judge is (expletive) up…. They don't know a thing about free speech."

25.    Herring, unfortunately, has not learned his lesson and has turned his focus to harassing, defaming, and disparaging Plaintiff and its products in an effort to capture a piece of the voice stress analyzer market that Plaintiff dominates.

26.    Defendants' campaign of harassment has taken a multi-faceted approach – Defendants have used Dektor's website (which contains 28 pages of defamatory material

7

concerning Plaintiff and its founder), e-mails to law enforcement agencies, telephone calls, and professional speaking engagements to spread numerous and material lies about Plaintiff and its CVSA product.

27.     For example, on March 18, 2014, Herring was a speaker at the Texas Polygraph Summit which was hosted by the Texas Department of Licensing and Regulation.  During his speech, Herring publicly berated Plaintiff and its CVSA product as being scams that were proven to be unreliable (no more reliable than a coin toss or 50% accuracy).  Of course, Herring touted his PSE product and its storied (albeit false) history dating back some 50 years.

28.     Subsequent thereto, Herring has contacted thousands of law enforcement agencies across the country in an effort to discredit Plaintiff and its CVSA product.  In these communications, Herring refers to CVSA as a "scam," states that CVSA has been proven to be unreliable (no more than 50% accuracy), states that Plaintiff only sells to law enforcement because Plaintiff knows such agencies will not sue Plaintiff for selling an unreliable product as doing so would reopen cases on which CVSA was used, states that Plaintiff's founder obtained a "store bought" diploma, and conveys various other false and disparaging information (falsely represented by Herring as 'facts') concerning Plaintiff and its CVSA product.

29.     As just one example of this multitude of communications, on July 22, 2018, Herring (using e-mail address admin@dektorpse.com) e-mailed a detective with the Garfield County Sheriff's Office in Glenwood Springs, CO with the subject line "lie detection scam."

30.     Herring's e-mail was unsolicited (as the Garfield County Sheriff's Office uses Plaintiff's CVSA product) and contains numerous paragraphs of lies and disparaging material concerning Plaintiff and its CVSA product.

31.     While the e-mail spreads numerous falsehoods about Plaintiff's product, it touts the

8

reliability and "proven superiority" of Dektor's PSE product in an effort to solicit business from the Garfield County Sheriff's Office.

32.     Herring's July 22, 2018 e-mail to the Garfield County Sheriff's Office is just one ***thousands*** of similar e-mails to US law enforcement agencies that Herring has sent in 2018 alone.[8] Each of these e-mails refers to Plaintiff and its CVSA product as scams, falsely accuses the CVSA product of not being more than 50% reliable, and contains numerous other material falsehoods about Plaintiff and its CVSA product.

33.     As yet another example, on July 25, 2018, Herring sent substantially the same e-mail (with "voice lie detector scam" as the subject line) to the Executive Director of the Missouri Police Chiefs Association (which represents over 600 members in the State of Missouri).  The Executive Director then forwarded Herring's e-mail to the organization's membership, meaning that with one e-mail Herring essentially spread his falsehoods and disparaging remarks throughout the entire State.

34.     In May 2018, Defendants contacted the organizers of the Dallas Crimes Against Children's conference (at which Plaintiff was scheduled to speak).  That conference is scheduled to take place August 13 – 16, 2018.

35.     Defendants contacted the organizers of the conference with the specific intent to interfere with Plaintiff's contract and participation at the conference.  To accomplish this goal, Defendants made numerous false statements of fact to the conference organizers about Plaintiff, Plaintiff's employees (such as making false statements that an employee scheduled to speak at the conference had been dishonorably fired from his prior position as a sex crimes investigator when

---

[8] As the Court will recall, Herring attempted to delete hundreds of e-mails with the subject line "lie detector scam" or "voice lie detector scam."  See, e.g. D.E. 103-5.  This is in addition to the thousands of similar additional e-mails (that were not deleted) identified by Mr. Reisman through his forensic inspection of Herring's laptop hard drive.

in reality he actually retired), and Plaintiff's CVSA product (the same factual allegations as described above with respect to Defendant's e-mails and other communications).

36.     Plaintiff was a speaker at the 2017 Dallas Crimes Against Children's conference and gained substantial business/sales as a result of that speaking engagement.  For the 2018 conference, Plaintiff had invested substantial sums to be a presenter, and had a signed contract in place (paid in full) to again speak at the conference.

37.     As a result of Defendants' false and disparaging comments, Plaintiff was uninvited/barred from presenting at the 2018 conference (notwithstanding Plaintiff's paid contract with the organizers) and therefore suffered a tremendous loss of goodwill/reputation in addition to lost sales associated therewith.

38.     Herring's conduct did not cease in 2018 nor did it cease following the Dektor Judgment/Injunction Order.  Indeed, Herring seems only to have been emboldened by such.

39.     For example, Plaintiff was recently barred from speaking at the 2019 Dallas Crimes Against Children's conference as a direct result of several defamatory e-mails sent by Herring to the conference organizers in September 2019.  The organizers directly confirmed to Plaintiff that, based on Mr. Herring's communications, Plaintiff's invitation to speak thereat was being revoked.

40.     As a further example, on August 26, 2019, Plaintiff filed a Notice of Filing Herring E-mail [D.E. 131] which attached thereto an August 22, 2019 e-mail from Herring with the subject line "lie detector scam" that was sent to Chief Sean Marschke of the Sturtevant Police Department. The substance of the e-mail was nearly identical to the thousands of similar e-mails sent by Herring to law enforcement agencies around the country.

41.     More recently, on September 29, 2019, Herring sent substantially the same e-mail to the Chief of Police of the Wausau Police Department (Wausau, WI).  Again, Plaintiff only

discovers these e-mails if/when the recipients forward the e-mails to Plaintiff. It is impossible to determine how many of the same e-mails Herring has sent this year, let alone how many he has sent since being permanently enjoined from doing so.

42.    As discussed above, Herring boasts that Dektor's website contains approximately 28 pages of negative information about Plaintiff and its CVSA product which 'prove' them to be ineffective scams.

43.    True to his word, Dektor's website did contain[9] an entire section (previously available at http://www.dektorpse.com/information/cvsa/) specifically dedicated to Plaintiff and the CVSA (with the section stating that it was last updated in June 2018).

44.    As with Herring's e-mails, telephone calls, and in-person communications, the Dektor website contained numerous false allegations of fact about Plaintiff and its CVSA product.

45.    Notably, before Herring begins his 28-page diatribe, he endeavors to equate Plaintiff and its CVSA product with Joseph Goebbels, the Reich Minister of Propaganda of Nazi Germany from 1933 to 1945:

**CVSA**

> "The bigger the lies, the more people will tend to believe them"
>
> "The more you tell those lies, the more people will tend to believe them."
>
> Joseph Goebbels, Hitler's propaganda minister

46.    One of the false statements of fact on Dektor's website which relate specifically to Plaintiff and its CVSA product was: "NITV has claimed CVSA is 97% accurate. But, CVSA has

---

[9] The portions of the website described herein appear to have been down (by Matt Vanderhoff – Herring's IT professional) after entry of the Dektor Judgment/Injunction Order.

never shown any studies that prove it is better than a coin toss in real crimes." (available at http://www.dektorpse.com/information/imitations/).

47.     This statement is absolutely false as a 2012 peer reviewed published study (which Defendants are well aware of) of the CVSA showed its error rate to be less than 1%, thus exceeding the 97% accuracy rate claimed by Plaintiff.

48.     The Dektor website further stated that "CVSA is about $13,000 per device." (available at http://www.dektorpse.com/information/imitations/).

49.     This statement is false as the price of the CVSA is less than $9,000.00 and has been at that price point for a number of years.

50.     With respect to Plaintiff's founder, the Dektor website stated: "Its 'promoter/owner' gave himself the unearned (fake) title of 'Dr' (PhD). The fact was, the title was based on a 'mail order' type of certificate that the promotor bought from a store located near his original NITV office in Indiana. That same type of unearned educational 'diploma' anyone can buy from the internet today for about $100. Most people would call that type of store a 'diploma mill', a business that sells unearned educational degrees only for money." (available at http://www.dektorpse.com/information/cvsa/).

51.     This statement is false.  Plaintiff's founder (Charles Humble) was bestowed an Honorary Doctorate from Indiana Christian University in 1987.  It was one of only five that were granted within the previous five years.  The others were for commencement speakers.  Indiana Christian University has never been listed on any site or accused of being a diploma mill (other than by Defendants).

52.     The Dektor website further stated that: "The seller of CVSA having a earned educational title of "Dr" (PhD.) would be the first, of many lies, that would be revealed by the

12

news media and the courts in the many years ahead." (available at http://www.dektorpse.com/information/cvsa/).

53.    This statement is false as neither Plaintiff nor Charles Humble has ever claimed that the honorary degree was an "academic" degree.  Indeed, Charles Humble's personal website (available at http://www.charleshumble.com/background/) specifically explains that the degree is honorary.

54.    The Dektor website further stated that: "By 2018, after 25 years of being marketed to almost anyone as a "new" type of "computer voice stress" lie detector, CVSA and NITV training have been shown to be just an expensive prop by law enforcement types because of NITV's many untruths and gross exaggerations. This conclusion is based according to many law enforcement types contacted through the years who bought the CVSA...." (available at http://www.dektorpse.com/information/cvsa/).  This passage was updated by Defendants as it previously contended that CVSA was considered an expensive prop "according to almost all law enforcement types who bought it."

55.    This statement is false as nearly 2,500 law enforcement agencies worldwide are utilizing the CVSA system, including approximately 175 agencies in Florida alone.

56.    The Dektor website further stated that: "CVSA, its training and chart analysis techniques have not shown proven reliable accuracy better than about 50% in studies and real crimes." (available at http://www.dektorpse.com/information/cvsa/).

57.    This statement is false.  As explained above, a 2012 peer-reviewed and published study of the CVSA showed its error rate to be less than 1%.  Further, a 2007 U.S. Department of Defense survey of law enforcement users of the CVSA found that approximately 86% of the respondents indicated they thought the CVSA was either "very" or "extremely" effective in

detecting stress.

58.    The Dektor website further stated: "It has appeared through the years that none of the CVSA buyers had ever asked for a study that proved any CVSA accuracy BEFORE they wasted taxpayer's money and ruined criminal cases using the CVSA gadget. The law enforcement department, their detectives and the city themselves would certainly be sued when the public becomes aware their law enforcement department wasted the taxpayer's money on such expensive gadgets, useless training and wasteful 'recertification fees'. Lawsuits would also be brought against prisons, college campus police, district attorney's, probation departments and the federal government who bought the CVSA and training. Add to them ALL the people who ever took the CVSA tests who would claim they were innocent of their charge and they also would sue the law enforcement department, city, mayor, city council, etc. Hundreds of thousands of convicted criminals nationwide would be filing lawsuits because they would claim they were falsely accused because they 'flunked' those very unreliable CVSA tests. Minorities would sue either for their conviction or because they had no choice except to make a plea deal because they had flunked a CVSA test. Add to those costs in the lawsuits the huge amount of lawyer fees for each case against the law enforcement department, city, mayor, etc. Plus, the costs to the falsely accused of their lost wages because they went to jail and lost their jobs, loss of time with their families if they went to jail and more. On top of THOSE costs, the fact individuals of the law enforcement department would have judgements against themselves because they were careless and reckless for buying and using the CVSA without checking it out for accuracy BEFORE they used it on people.  NITV knew any non-law enforcement buyer (PI'S, etc) WOULD sue NITV if they bought a CVSA and training then they had discovered they had been lied to about the CVSA/training credibility, wasted their money and had been cheated." (available at

14

http://www.dektorpse.com/information/cvsa/).

59.     This statement is false. There is no mass series of lawsuits against Plaintiff and/or law enforcement agencies in connection with unreliable results.   Indeed, in March 2014, Northern District of New York Chief Judge Norman A. Mordue ruled that sex offenders can be required to submit to CVSA examinations as part of their post-release supervision because CVSA is analogous to polygraph examinations, which have been accepted by the 2nd U.S. Circuit Court of Appeals as a way to monitor the activities of those under post-release supervision.

60.     The Dektor website further stated: "At least one police officer had been wrongly fired because he flunked a CVSA test, but it was later shown he was truthful." (available at http://www.dektorpse.com/information/cvsa/).

61.     This statement is false.  Plaintiff is unaware of any such scenario occurring and Defendants have never provided any actual facts or names in support of their contention.

62.     The Dektor website further stated: "NITV "ideas" used in training, such as numeric scoring, DSR (Delayed Stress Response), cold calling, kinesics, F.A.C.T. and DBR (Defense Barrier Removal) have never been shown to have any real substance or credibility. Those ideas were invented by the NITV promoter /owner as part of his hype to sell his gadgets and to create the image he is some type of proven expert in lie detection." (available at http://www.dektorpse.com/information/cvsa/).

63.     This statement (and those that follow it which purport to explain why these methodologies are useless) is false.  Neither Herring nor any of his agents/employees have ever attended Plaintiff's training courses or have any actual information concerning Plaintiff's training techniques.  These techniques are both credible and effective and the reason why hundreds of law

enforcement agencies and personnel attend Plaintiff's training courses on an annual basis.

64.    The Dektor website further stated: "We have heard from many ex-CVSA examiners who have told us that they simply guessed on the final answer to a test because the NITV training ideas did not give them reliability and accuracy on lie detection tests. Dektor has heard from CVSA examiners that the software used for CVSA has serious flaws that cause the program to crash or freeze. The software program appears to be extremely basic as what the CVSA examiner can do using it."  (available at http://www.dektorpse.com/information/cvsa/).

65.    This statement is false as Defendants have not "heard from" any current or former CVSA examiners with respect to this subject matter – plainly stated, Defendants are making up allegations with no basis in fact.  There are no "serious flaws" with CVSA's software and guessing on the final exam will result in failure.

66.    The Dektor website further stated: "In 2007, a very large study, using real crimes and NITV instructors found an accuracy rate of only about chance level. That same study found VERY serious design flaws with the CVSA design that will produce flawed patterns, thus incorrect results."  (available at http://www.dektorpse.com/information/cvsa/).

67.    This statement is false and appears to be completely fabricated by Defendants.

68.    The Dektor website further stated: "On page 69, of the NITV training manual, it states that recently it was learned that if a person taking a CVSA test holds the microphone, it could cause static electricity and that could cause a distortion of CVSA patterns. Those same patterns are used to decide if a person is innocent or guilty. NITV has always told the person to hold the microphone since 1990. How many thousands of times did that problem happen and ruin a test, BUT nobody knew it? How many innocent people were falsely accused? How many GUILTY people were let go to commit more crimes (rape, murder, robbery, etc) because law

16

enforcement      thought      they      were      innocent?"      (available      at http://www.dektorpse.com/information/cvsa/).

69.    This statement (that Plaintiff tells the person to hold the microphone) is false. Plaintiff has never taught anyone to hold the microphone during an examination.  Plaintiff has always taught examiners to utilize a clip-on microphone, which is provided with all the CVSA systems when they are sold.

70.    The Dektor website further stated: "The facts indicate that the 'recertifications', according to former users and NITV's own CVSA association, are only 'bullshit' type classes of 3 days of the same things that were taught in the original course."    (available at http://www.dektorpse.com/information/cvsa/).

71.    This statement is false and inflammatory.  The recertification courses offered by Plaintiff (of which Herring or any of his agents/employees have never attended) ensure CVSA examiners are kept up to date on CVSA developments, allow CVSA examiners to receive free software upgrades, and reinforce the correct use of CVSA protocols.  Again, Defendants did not actually receive information from "former users and NITV's own CVSA association" – they simply made these statements up for purposes of the Dektor website.

72.    The Dektor website further stated: "In fact, the person at SoCom (Special Operations Command) in the DoD who approved almost $700,000 to buy the CVSA devices pled guilty in 2006 to taking a bribe." (available at http://www.dektorpse.com/information/cvsa/).

73.    This statement is akin to Defendants' attempt to link Plaintiff with Joseph Goebbels and/or the Nazi party.  Here, Defendants are indirectly suggesting that Plaintiff bribed a government agent for use of its CVSA product – that allegation, of course, is completely false as any conviction (if one exists) certainly did not involve a bribe from Plaintiff (as none exists).

74.     The Dektor website further stated: "NITV has sued at least one business selling a imitation claiming the other imitation "stole" their machine and training from NITV. There seems to be no honor among thieves." (available at http://www.dektorpse.com/information/cvsa/).

75.     This statement is indicative of other statements throughout the Dektor website which accuse Plaintiff of 'stealing' Dektor Counterintelligence and Security, Inc.'s intellectual property.  This accusation is false and somewhat ironic given that Defendants misappropriated the 'Dektor' name, reverse engineered its PSE product, and have improperly capitalized on the 'Dektor' name for nearly 20 years.

76.     The Dektor website further stated: "In late 2006, NITV began to advertise in insurance magazines with full page ads. It appears they were trying to make up for the drastic drop in CVSA sales to law enforcement. NITV tried to get insurance companies to buy CVSA and use it as a over-the-phone lie detector for insurance fraud. If they did so, millions of real claims would be denied because of the poor accuracy caused by unreliable CVSA technology and unreliable NITV training. Dektor contacted the magazine and educated them about NITV. Soon, NITV was banned from advertising in those insurance magazines." (available at http://www.dektorpse.com/information/cvsa/).

77.     This statement is false.  Plaintiff did not experience any drop in sales to law enforcement and was never banned from advertising in insurance magazines.

78.     These are just some of the dozens of defamatory and disparaging remarks about Plaintiff and its CVSA product that were prevalent throughout the Dektor website (prior to Mr. Vanderhoff removing such statements pursuant to the Dektor Judgment/Injunction Order).

## PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

The above facts (all of which have been verified by Plaintiff's founder/President, Charles Humble), are sufficient to establish liability against Defendants on each of Plaintiff's four (4) causes of action. Defendants have clearly and unequivocally engaged in false advertising (by virtue of their wrongful suggestion that they are somehow linked to Dektor Counterintelligence and Security, Inc.). Defendants further violated the Lanham Act by engaging in product disparagement.[10] There is no question that Defendants' plethora of e-mails/letters/websites constitutes commercial advertising whose purpose was to steer customers toward Defendants' competing product. There is likewise no question that the above conduct constitutes a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"),[11] defamation/business disparagement,[12] and tortious interference.[13] Indeed, the Court already analyzed these claims in detail (based on the same factual proffer – with the exception of the most recent conduct by Herring described above) and found Dektor liable on each of the claims.

---

[10] See Fun Spot of Fla., Inc. v. Magical Midway of Cent. Fla., Ltd., 242 F. Supp. 2d 1183, 1203 n.3 (M.D. Fla. 2002) (Under the Lanham Act, a "cause of action for product disparagement includes the following elements: 1) there must be 'commercial advertising or promotion' constituting commercial speech of or concerning another's goods or services or commercial services, 2) by a defendant who is in commercial competition with plaintiff, 3) for the purpose of influencing consumers to buy defendant's goods or services, and 4) the promotion must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.").

[11] See BPI Sports, LLC v. Labdoor, Inc., No. 15-62212-CIV-BLOOM, 2016 U.S. Dist. LEXIS 23033, at *11 (S.D. Fla. Feb. 25, 2016) ("FDUTPA's purpose is to 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.' Fla. Stat. § 501.202(2). A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages.").

[12] Bassler v. George Weston Bakeries Distribution, No. 3:08-cv-595-J-32JRK, 2008 U.S. Dist. LEXIS 111209, at *7-8 (M.D. Fla. Oct. 24, 2008) ("Under Florida law, the elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.").

[13] Ethan Allen v. Georgetown Manor, 647 So. 2d 812, 814 (Fla. 1994) ("The elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.").

## PLAINTIFF'S DAMAGES

### I.   Plaintiff's Base Damages[14]

79.   Defendants' false statements (which they know to be untrue or which were made with reckless disregard for their truth) are incredibly damaging to Plaintiff's reputation and goodwill.

80.   Such statements (whether made in-person, via e-mail, via telephone, or through Dektor's website) have caused and will cause Plaintiff to lose sales of CVSA product and certification courses.

81.   Although Defendants actively prevented Plaintiff from discovering the full scale of their campaign of disparagement (due to Defendants' failure to participate in discovery), Plaintiff is aware of hundreds/thousands) of e-mails sent by Defendants over the last two years to a multitude of law enforcement and/or media agencies with the sole purpose of disparaging Plaintiff and its CVSA product.

82.   During their deposition, Defendants boasted that they had sent or were sending (in just the two-week period thereof) approximately 1,100 press releases to various media entities around the country with the primary subject being Defendants' scam contentions:

> A. So far, approximately, 1100 press releases have gone out to, approximately, 1100 investigator reporters in this country, both the newspaper and TV.
> Q. When did you send those 1100 press releases?
> A. Well, I'm still sending them. It's been about a week now since I started sending out press releases about the lawsuit.
> Q. Are you sending those press releases via email?
> A. Yes.
> Q. Are you sending them via your Admin@DektorPSE.com email address?
> A. Yes.[15]

---

[14] The support for Plaintiff's damages is provided by both the Humble Decl. and the October 11, 2019 Declaration of Matthew C. Smith, CPA/ABV, CVA, CFF (the "Smith Decl."), set forth as Exhibit "2."

[15] See Deposition Transcript of Arthur Herring, III, dated October 24, 2018, a true and correct copy of which is attached hereto as Exhibit "3," at 63:7 – 63:18.

83.     Nearly every day since this lawsuit has been pending, Plaintiff receives notice from one or more law enforcement customers or prospective customers asking about communications received by Herring in which he repeats the same scam/other disparaging allegations as stated above.

84.     In the two weeks preceding Plaintiff's filing of its initial motion for default judgment against Dektor, Plaintiff has been contacted by 10 – 12 news organizations (including the Miami Herald) which have inquired into the veracity/effectiveness of Plaintiff's CVSA product as a result of communications received from Herring.

85.     Defendants have shown no sign of slowing down their onslaught – indeed, they doubled down on effort *after* this lawsuit was filed.  Several months after this lawsuit was filed, Defendants registered and published a new website, www.NITVCVSAexposed.com, whose sole purpose is to focus on the spread of lies against Plaintiff.[16]

86.     As described above, Defendants have sent multiple e-mails between August and September 2019 (after the Dektor Judgment/Injunction Order) to both law enforcement agencies and organizers of the Crimes Against Children Conference, all of which repeat the same 'lie detector' scam messages that Defendants have made thousands of times over the last two years.

87.     Given the unrelenting nature of Defendants' conduct, it is somewhat difficult for Plaintiff to specifically establish the damage that Defendants caused.  While Plaintiff believes its actual damages to be many millions of dollars more than what is set forth herein, in the interest of economy, Plaintiff will focus on the below measures.

88.     First, Defendants are directly responsible for Plaintiff's loss of *$205,000.00*

---

[16] A printout of the NITVCVSAexposed.com website (accessed on March 21, 2019) is attached hereto as Exhibit "4."

incurred in connection with the Texas Department of Licensing and Regulation. In approximately 2014, the Texas Department of Licensing and Regulation was tasked with writing the regulations for voice stress examiners after Plaintiff was able to get the Texas legislature to change its 'polygraph only' law to allow Texas law enforcement to use Plaintiff's CVSA technology. Plaintiff invested the $205,000.00 over a two-year period with approximately $85,000.00 spent on lobbyists and approximately $120,000.00 spent on expenses associated with the campaign, meetings with the Texas legislature, and travel.  Plaintiff had been approved, but such approval was subsequently revoked (as confirmed directly by the Texas Department of Licensing and Regulation) after various Texas state agencies began receiving Defendants' defamatory/disparaging e-mails and other communications.  The Texas Department of Licensing and Regulation confirmed that Defendants' e-mails/communications were the reason for the approval being revoked, meaning that Plaintiff could not market or sell its product/services to Texas law enforcement agencies thereafter.

89.    Texas has the largest number of law enforcement agencies in the United States.[17] Last year, the California Highway Patrol purchased 32 CVSA's for $320,000 and has trained over 300 CVSA examiners at $1,295 each = $388,500.  The California Department of Correction and Rehabilitation purchased 58 CVSA's two years ago for $580,000 and have trained 213 examiners at $1,295 =  $275,835.  These are just two (2) of the 212 California agencies that use Plaintiff's CVSA technology.  Based on the 212 current California law enforcement agencies that use the CVSA, Plaintiff's conservative expectation is that sales to Texas law enforcement agencies would have generated at minimum ***$500,000*** a year in sales and at minimum

---

[17] See Census of State and Local Law Enforcement Agencies, 2008 (published by the US Department of Justice), available at https://www.bjs.gov/content/pub/pdf/csllea08.pdf.  According to the census, Texas (as of 2008) has 1,913 law enforcement agencies.

***$250,000.00*** a year in training and recertification expenses. These estimates are extremely conservative when compared to Plaintiff's annual product and training sales for the primary states (immediately below) in which Plaintiff's sells its CVSA Systems:

| Highest Producing States | Number of Agencies Using CVSA | No. of CVSA Sales- 2017 | CVSA Sales Earnings 2017 | No. of CVSA Sales - 2018 | CVSA Sales Earnings 2018 | Training Fees – 2017 | Training Fees - 2018 |
|---|---|---|---|---|---|---|---|
| California | 206 | 18 | $161,910 | 22 | $197,890 | $82,880 | $91,945 |
| Florida | 189 | 11 | $98,945 | 13 | $116,935 | $53,095 | $55,685 |
| Missouri | 92 | 9 | $80,995 | 5 | $44,975 | $41,440 | $40,145 |
| Ohio | 221 | 13 | $116,030 | 15 | $134,925 | $62,160 | $45,325 |
| Indiana | 126 | 5 | $44,975 | 4 | $35,890 | $20,720 | $22,015 |

90.     The normal course of Plaintiff's business is that once a law enforcement/government agency becomes a customer, that agency remains a customer for an extended period of years.  The number of agency customers that cease their use of Plaintiff's CVSA product and/or training services is, on average, less than 3% per year.  Plaintiff's customers normally continue to purchase additional CVSA's, trade-in their old systems for new ones, and train additional examiners as personnel retire, get promoted, or get transferred.  For example, the New Orleans Police Department purchased its first CVSA in 2002, now has 29 CVSA's, and has trained 375 examiners over the years. The Nashville Police Department purchased its first CVSA in 2004, now has 26 CVSA's, and has trained 315 examiners over the years).

91.     According to the 2008 Census of State and Local Law Enforcement Agencies, there are 1,913 law enforcement agencies in Texas (as of 2008).  Given Plaintiff's market penetration

in the above-referenced states/law enforcement agencies, Plaintiff can fairly estimate within a reasonable degree of certainty that at least Eighty (80) of the 1,913 Texas law enforcement agencies would have purchased at least two (2) CVSA systems during calendar years 2017 and 2018. This estimate is extremely conservative because, as set forth above, Plaintiff sold an average of 11.2 CVSA Systems in 2017 within the above-named states and sold an average of 11.8 System within 2018 in the same states. Given that the number of law enforcement agencies in Texas far exceeds the agencies in any of the five states, the actual number of CVSA sales that Plaintiff could expect, is likely much greater than the 11.2 or 11.8 averages for 2017 and 2018. Nevertheless, in the interest of being conservative, Plaintiff is only using two (2) sales per agency for purposes of this damage calculation. This would have resulted in net profit to Plaintiff of approximately $1,440,000 if on average, two units were sold to each department.  Further, Plaintiff can fairly estimate within a reasonable degree of certainty that those agencies would have purchased training (at $1,295.00 each) for at least One Hundred and Eighty (180) examiners during calendar years 2017 and 2018.  This would have resulted in net profit to Plaintiff of approximately $385,000 in 2017 and 2018 alone.  Given Plaintiff's low customer attrition rate and growth rate when entering a new geographic market, Plaintiff can fairly estimate[18] future net profits from sales/training in Texas alone, from 2019 – 2022 (a very conservative 3-year period given that the substantial bulk of Plaintiff's customers remain as customers for at least 10-years) to be $1,965,000, which together with lost profits from 2017 and 2018 amounts to $3,790,000. Together with Plaintiff's $205,000 of investment monies spent on the licensing, this amounts to

---

[18] See Gregg v. U.S. Indus., 887 F.2d 1462, 1469 (11th Cir. 1989) (plaintiff could provide opinion on his company's value, noting, "in Florida, an owner of property is qualified to testify regarding the value of his property…" and "an officer of a corporation may testify to the value of the property 'if the officer is qualified by virtue of his experience, his management of the affairs of the company and his knowledge of relevant value.'").

a total of *$3,995,000* in damages specifically caused by Defendants' defamatory/disparaging remarks to the Texas Department of Licensing and Regulation.

92.    Recently, Plaintiff sent a notice out to all of Plaintiff's clients that they could upgrade their older CVSA systems with our latest version, the CVSA III.  When Plaintiff's marketing person contacted the El Paso Co. Sheriff's Dept. (CO), they were told that due to the information received from Defendants, they were discontinuing the CVSA program and would not be trading-in their 3 CVSA's. This one client represents a loss of profits for the 3 CVSA trade-ins of $18,000.00.  Over the next five years, based on previous training needs, the El Paso Co. Sheriff's Dept. would be expected to train three additional examiners a year at approximately $1,300.00 each, representing a loss of close to $20,000.00 for a total loss of *$38,000.00*.  This is just one client that Plaintiff happened to find out about. When these decisions are made, Plaintiff normally never finds out as existing clients simply do not re-certify their examiners and do not purchase new equipment.

93.    In 2018, Plaintiff was scheduled to be a speaker at the Crimes Against Children Conference in Dallas, Texas.  This was an industry event with hundreds of law enforcement agency participants.  Plaintiff had presented at previous conferences (including the 2017 conference) for the same entity and had secured substantial business as a direct and proximate result of its presentations.  Plaintiff participates in multiple law enforcement conferences throughout the country on an annual basis.  In 2017 alone, Plaintiff participated in approximately two (2) conferences similar to the Crimes Against Children where Plaintiff participated as both a vendor and a speaker.  In 2016, Plaintiff participated in approximately three (3) conferences similar to the Crimes Against Children where Plaintiff participated as both a vendor and a speaker.  Plaintiff has participated in a similar capacity at a similar number of conferences for at

least a period of ten (10) years, meaning that Plaintiff has served as a vendor and speaker in at least ten (10) conferences during that period of time.

94.    Given the time and expense associated with serving as both a vendor and speaker, Plaintiff keeps track internally in its accounting records any changes in its net sales/profits following such speaking/vendor engagements.  Plaintiff's records reflect that Plaintiff on average generates an additional $130,000.00 - $160,000.00 in net sales as a direct result of each conference it participates in as both a vendor and a speaker.  These sales figures are confirmed by asking new customers what caused them to sign up with Plaintiff in an effort to keep track of what marketing efforts are successful and determine how Plaintiff should allocate such budget.

95.    In 2018, Defendants sent defamatory/disparaging correspondence to the organizers of the Crimes Against Children Conference in Dallas, Texas.  At the time, Plaintiff was scheduled to be both a vendor and speaker at the conference.  Following Defendants' correspondence, the organizers of the conference contacted Plaintiff and stated that, based on Defendants' correspondence, Plaintiff's invitation was being rescinded and therefore Plaintiff was not allowed to speak at the conference.  At the time, Plaintiff had invested approximately *$5,660.83* in marketing, travel, and associated expenses for its attendance and participation at the conference.  Based on Plaintiff's average sales generated from similar conferences (including the same conference in 2017), Plaintiff's conservative estimate of net sales from the 2018 conference is *$100,000.00* (representing a 23% - 38% reduction in the average net sales generated from such conferences).

96.    In 2019, Plaintiff sent further defamatory correspondence to the organizers of the Crimes Against Children Conference in Dallas, Texas (which was scheduled to occur between August 12 – 15, 2019).  Again, Plaintiff was scheduled to be both a vendor and speaker at the

conference, but was disinvited from participating at the conference following Defendants'
defamatory correspondence.   The organizers again confirmed to Plaintiff that it was being
disinvited for the same reasons as 2018 – namely, Defendants' defamatory correspondence.  At
the time, Plaintiff had invested approximately *$6,513.31* in marketing, travel, and associated
expenses for its attendance and participation at the conference.  Based on Plaintiff's average sales
generated from similar conferences (including the same conference in 2017), Plaintiff's
conservative estimate of net sales from the 2019 conference is *$100,000.00* (representing a 23%
- 38% reduction in the average net sales generated from such conferences).

97.    All of the above amounts constitute damages categories that are within Plaintiff's
fair capability of estimating and total *$4,245,256.31*.

98.    Because Plaintiff could not estimate the lost profits associated with Defendants'
conduct, Plaintiff underwent the additional expense of retaining Ellrich, Neal, Smith & Stohlman,
P.A. (a professional forensic accounting/valuation firm) to determine past damages (from 2014
– 2018 only) associated with Defendants' conduct. Because of the potential for overlap, Plaintiff
believes it proper to "back-out" or "remove" from Plaintiff's damages estimate any amounts
associated with lost profits (such as losses associated with El Paso Co. Sheriff's Dept. and losses
associated with speaking at the Crimes Against Children Conference in Dallas, Texas) because
such lost profit amounts might be accounted for within Ellrich, Neal, Smith & Stohlman, P.A.'s
analysis. Therefore, Plaintiff's adjusted damages amount would be $4,245,256.31, minus
$100,000 (2018 Crimes Against Children's Conference), minus $100,00 (2019 Crimes Against
Children's Conference), minus $38,000 (El Paso Co. Sheriff's Dept.), equals *$4,007,256.31*.

99.    The other components of Plaintiff's estimated damages (including lost profits in
Texas) are not accounted for in Ellrich, Neal, Smith & Stohlman, P.A.'s analysis. As set forth

more fully in the Smith Decl., Ellrich, Neal, Smith & Stohlman, P.A. undertook a task of reviewing Plaintiff's historical sales, new customer influx, and revenue associated with such expected new customer influx. The Smith Decl. ultimately concludes that Plaintiff suffered approximately $3,470,419.00 in lost new customer revenue from 2014 – 2018 which, based on Plaintiff's average profit margins during this time, results in **$2,424,201.00** in lost profits.

100.   Based on Mr. Humble's extensive knowledge of the lie detector/voice stress analyzer industry, competitors within the industry, and market conditions during the preceding 20+ years (as set forth in the Humble Decl.), Humble believes that market conditions other than Defendants' conduct (such as normal customer attrition, introduction of new competitors, new technologies, dis-use of products, downsizing of departments, policy changes and other relevant market factors) amounts to, at most, 10 – 12% of the unrealized new customers during 2014 – 2018.

101.   Plaintiff believes it appropriate to apply a discount factor equal to 11% so as to be sure that all market factors other than Defendants are adequately covered in any damages estimate.  This would result in a **final damages number of _$5,990,659.12,_** calculated as follows: $4,007,256.31 (Plaintiff's Analysis from Paragraph 98 above) minus 11% discount rate (which equals $3,566,458.12), plus $2,424,201.00 (Ellrich, Neal, Smith & Stohlman, P.A. analysis which already includes the 11% discount rate).

II.    **Plaintiff's Lanham Act Damages**

102.   In addition to the obvious damage to Plaintiff's business as a result of Defendants' onslaught, Plaintiff has suffered (and continues to) additional damage as a result of Defendants' violations of the Lanham Act. Importantly, Plaintiff is entitled to recover both compensatory

damages on its state law claims and additional damages under the Lanham Act as such damages are awarded for two "set of wrongs."  See Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1566 (11th Cir. 1986) (upholding award of both liquidated damages and trademark infringement damages because such damages were awarded for two "set of wrongs"); Choice Hotels Int'l, Inc. v. Chewl's Hosp., Inc., 91 F. App'x 810, 817 (4th Cir. 2003) (noting that breach of contract and trademark infringement claims are independent claims that are separately compensable); see also La Quinta Corp. v. Heartland Properties LLC, 603 F.3d 327, 345 (6th Cir. 2010) (finding that award of both liquidated damages for breach of contract and treble damages for trademark infringement was permissible because "[c]laims for breach of contract and trademark infringement are distinct actions, based on separate conduct and addressing disparate harms").

103.   In assessing damages for violation of 15 U.S.C. § 1125(a), "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  See 15 U.S.C. § 1117(a).  Any such enhanced award is discretionary "but it may not be punitive."  Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 Fed. Appx. 899, 903 (11th Cir. 2007).  Importantly, an enhanced award under § 1117(a) may serve a deterrent function – sending a strong signal to potential infringers – without such award being considered punitive.  See La Quinta Corp. v. Heartland Properties LLC, 603 F.3d 327, 342 (6th Cir. 2010) (quoting Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 113 (2d Cir. 1988)) ("So long as its purpose is to compensate a plaintiff for its actual injuries—even though the award is designed to deter wrongful conduct—the Lanham Act remains remedial.").

104.   Here, Plaintiff's damages should not be limited to the handful of examples of lost

business identified above (which does not even account for future losses which Plaintiff has chosen not to include at this time).  Defendants have sent thousands (if not tens of thousands) of additional defamatory messages to law enforcement/government agencies around the country and have stymied Plaintiff's efforts to discover the full extent of Defendants' conduct (necessitating an Order authorizing a forensic examination of Defendants' computers and ultimately an Order sanctioning Herring for substantial and shocking discovery violations).  Defendants' willful conduct warrants an enhanced award under § 1117(a).  The full extent of damage caused by Defendants' actions will likely never be known given Defendants' refusal to participate in discovery, and therefore Plaintiff requests that the Court treble Plaintiff's known damages of *$5,990,659.12* and award Plaintiff compensatory damages of $*17,871,977.36*.  This trebling is appropriate in situations such as these where Defendants acted willfully and where Plaintiff has presented a conservative picture of its actual damages.  See Tracfone Wireless, Inc. v. Truc, 281 F.R.D. 692, 695 (S.D. Fla. 2012) ("The Court finds in light of Truc's willful violations of the Lanham Act, use of stolen credit card information or other stolen funds, absence from this case, and the unknown amount of additional unidentified transactions causing damage beyond that confirmed by TracFone's investigation, trebling is appropriate here. Accordingly, the Court awards TracFone three times the amount of actual damages proved in this case, or $184,913.94."); Choice Hotels Int'l, Inc. v. Zeal, LLC, Civil Action No. 4:13-01961-BHH, 2016 U.S. Dist. LEXIS 99342, at *19 (D.S.C. July 29, 2016) (trebling summary judgment damages of $148,225.53 and noting that would be infringers would be incentivized if court did not do so); Gillette Co. v. Save & Disc. LLC, No. 1:15-cv-636, 2016 U.S. Dist. LEXIS 90925, at *8 (S.D. Ohio July 13, 2016) ("Given Defendant's willful infringement, the Court finds that Plaintiff is entitled to recover three times its conservative estimate of damages, or $55,047.42.").

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting this Motion for Default Final Judgment against Dektor.  Plaintiff seeks final judgment in favor of Plaintiff in the sum of **$17,871,977.36** (trebled compensatory damages).[19]  Plaintiff shall file a separate motion for entry of a permanent injunction against Dektor.

Respectfully submitted          Respectfully submitted,

ADVISORLAW PLLC               DESOUZA LAW, P.A.
2925 PGA Boulevard            101 NE Third Avenue
Suite 204                     Suite 1500
Palm Beach Gardens, FL 33410  Fort Lauderdale, FL 33301
Telephone: (561) 622-7788     Telephone:  (954) 603-1340
Jdloughy@advisorlaw.com       DDesouza@desouzalaw.com

By:/s/ James D'Loughy          By: /s/ Daniel DeSouza, Esq._____
     James D'Loughy, Esq.           Daniel DeSouza, Esq.
     Florida Bar No: 052700         Florida Bar No.:  19291

---

[19] As the Court will recall, Plaintiff previously moved for a final judgment against Defendant Dektor in an amount substantially less than what is sought in this Motion. At the time, Plaintiff did not know the full extent of Plaintiff's damages, nor had Plaintiff hired a professional accounting firm who calculated lost profits.

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record. I further certify that on October 11, 2019, I served the foregoing document via US Mail to Dektor Corporation and Arthur Herring, III, 400 E. Station Avenue, Coopersburg, PA 18036 and via e-mail to admin@dektorpse.com.

/s/ James D'Loughy___

James D'Loughy, Esq.

EXHIBIT 1
October 11, 2019 Declaration of Charles W. Humble (the "Humble Decl.")

EXHIBIT 2
October 11, 2019 Declaration of Matthew C. Smith, CPA/ABV, CVA, CFF (the "Smith Decl.")

EXHIBIT 3
Transcript of Arthur Herring, III, dated October 24, 2018

EXHIBIT 4
printout of the NITVCVSAexposed.com website