UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-80994-Civ-Brannon

NITV FEDERAL SERVICES, LLC,

      Plaintiff,

vs.

DEKTOR CORPORATION, and
ARTHUR HERRING III,

      Defendants.

_____/

## ORDER OF FINAL DEFAULT JUDGMENT
## AND PERMANENT INJUNCTION AGAINST BOTH DEFENDANTS

**THIS CAUSE** is before the Court upon Plaintiff NITV Federal Services, LLC's ("Plaintiff") Verified Motion for Default Final Judgment [DE 135] and Plaintiff's Motion for Entry of Permanent Injunction Against Dektor Corporation ("Dektor") and Arthur Herring, III ("Mr. Herring") (collectively, the "Defendants") [DE 134].  Also pending before the Court is Mr. Herring's Motion to Deny Claim of Damages [DE 145] and his Motion for Court to Sanction Plaintiff's Attorneys [DE 146].  The Court has reviewed all four motions and the entire record in this case.

The Court held an evidentiary hearing on December 10, 2019, at which time the parties submitted evidence and argument related to the Court's determination of the damages and injunctive relief sought by Plaintiff.  Plaintiff's corporate representative, Charles Humble, appeared with counsel for Plaintiff.  Mr. Herring appeared and proceeded without counsel.  Relevant affidavits and other documents were admitted into evidence, and the Court heard testimony from

1

Mr. Humble, Certified Public Accountant Kevin Foyteck, and Mr. Herring.  The Court has carefully considered the evidence, the entire record in this case, and the arguments presented by Plaintiff's counsel and Mr. Herring at the hearing.  Pursuant to Rule 55 of the Federal Rule of Civil Procedure, the Court concludes that Plaintiff has met its burden of showing that it is entitled to a final default judgment as to both Defendants.[1]  The Court further finds that under the circumstances of this case, and given Defendants' willful misconduct, multiplying Plaintiff's actual proven damages is appropriate under 15 U.S.C. § 1117(a). Plaintiff has also met its burden of showing that it is entitled to permanent injunctive relief under 15 U.S.C. § 1116 and Fla. Stat. § 501.211(1).  The Court's findings and reasoning are set forth below.

## I.   __INTRODUCTION__

This case involves two competing businesses that sell truth verification technology.  NITV is a Florida limited liability company based in Palm Beach County whose members are all Florida citizens.  Dektor is a Pennsylvania corporation headquartered in Coopersburg, Pennsylvania. Dektor's President and sole shareholder is Mr. Herring, who is a citizen and resident of Pennsylvania.

On July 27, 2018, NITV filed this action alleging four counts against Dektor and Mr. Herring:  false advertisement, unfair competition, and product disparagement under the Lanham Act, 15 U.S.C. § 1125(a) (Count I), deceptive and unfair trade practices under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count II), defamation/business disparagement (Count III), and tortious interference (Count IV) [DE 1].  Generally, NITV alleges that Dektor unfairly competes with NITV by making false and defamatory statements about NITV, NITV's

---

[1] The Court previously entered default final judgment against Dektor (as to liability only) and a permanent injunction against Dektor.  Because Plaintiff's two motions addressed herein address both Defendants and now include sufficient information to enter an award of monetary damages, this Order shall be deemed the governing Order and Judgment with respect to both Dektor and Mr. Herring.

founder, and NITV's CVSA product to gain an unfair advantage in the market [DE 1 ¶¶ 29-86]. NITV alleges that the false and defamatory statements have been (1) published on Dektor's website, (2) communicated by Mr. Herring on behalf of Dektor in emails and on phone calls with several different law enforcement agency contacts across the U.S., (3) made by Mr. Herring on behalf of Dektor during a speech at a polygraph summit in Texas, and (4) made to organizers of a "Crimes Against Children" conference at which NITV was scheduled to speak [*Id.*].   NITV alleges that the false and disparaging statements have caused incredible damage to NITV's reputation, goodwill, and sales—causing damages "estimated to exceed $7 million."  [*Id.* ¶¶ 35, 83, 85].

On March 12, 2019, a Clerk's default was entered against Dektor based upon its failure to appear, answer, or otherwise plead to NITV's Complaint, despite having been duly served [DE 85].  On April 1, 2019, pursuant to 11 U.S.C. § 362(a)(1), the Court stayed this case as to Mr. Herring only based upon Mr. Herring's filing of a bankruptcy petition on behalf of himself individually in a Pennsylvania bankruptcy court [DE 92].  The Court expressly noted that this case would proceed against Dektor [*Id.*].

On March 22, 2019, NITV moved for entry of final default judgment and a permanent injunction against Dektor [DE 88, DE 89].  At the time, NITV sought base compensatory damages of $1,360,000, and sought for this base amount to be trebled for a grand total of $4,080,000 [*Id.* ¶¶ 86, 89].  On May 17, 2019, the Court granted Plaintiff's Motion for Permanent Injunction and granted in part Motion for Final Default Judgment "as to liability only." [DE 95].  The Court found the record to be "devoid of evidentiary materials" to prove the amount of base damages sought [DE 95 at 14].  The Court further found that the requested damages enhancement might be warranted, but further evidentiary support was required before a determination could be made [*Id.* at 15].

3

On May 31, 2019, after Suggestions of Bankruptcy were filed as to Dektor and on Mr. Herring [DE 90, DE 97], the case was stayed as to both Defendants [DE 98].

On June 7, 2019, the stay was lifted upon notice that the separate bankruptcy proceedings were concluded [DE 102].  On June 10, 2019, Plaintiff filed a Motion for Sanctions Against Mr. Herring for Spoliation of Evidence and Discovery Abuse [DE 103].  On September 20, 2019, the Court issued a detailed order in support of the Court's final conclusion that:

> . . . the evidentiary submissions demonstrate that Mr. Herring affirmatively acted on various occasions with the intent to deprive NITV of discoverable ESI and other information.  The Court further finds that NITV suffered prejudice by this loss, such that sanctions are warranted.  Mr. Herring's extraordinary misconduct warrants the imposition of the extraordinary sanction of default.

[DE 133 at 18].

Plaintiff now seeks entry of final default judgment and a permanent injunction against both Defendants.  As compensatory damages, NITV now seeks base damages of $5,990,659.12, and seeks for this amount to be trebled for a grand total of $17,871,977.36 [DE 135 at 28, 30].  In support of this request, NITV relies principally upon the testimony and declaration of Charles Humble [DE 135-1], who is a managing member and minority owner of NITV.  NITV also relies upon the testimony of Certified Public Accountant Kevin Foyteck [who also authored a declaration, which is available at DE 155-1] and the declaration of Certified Public Accountant Matthew C. Smith [DE 135-2].  Mr. Herring largely focuses his response on the argument that NITV's lie detector software product is "a fake or fraud" and that NITV is seeking to wrongfully place the blame on Mr. Herring alone "for all of their troubles, problems, their lies and their sales losses." [DE 145 at 1, 4].

## II.   APPLICABLE LEGAL STANDARDS

Federal Rule of Civil Procedure 55 sets forth two steps to obtain a default judgment.  First,

when a defendant fails to plead or otherwise defend a lawsuit, the clerk of court may enter a clerk's default.  Fed. R. Civ. P. 55(a).  Second, after entry of the clerk's default, the Court may enter default judgment against the defendant so long as the defendant is not an infant or incompetent.  Fed. R. Civ. P. 55(b)(2).  "The effect of a default judgment is that the defendant admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by entry by the judgment, and is barred from contesting on appeal the facts thus established." *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

The Court must review the sufficiency of the complaint before determining if a moving party is entitled to default judgment.  *See U.S. v. Kahn*, 164 F. App'x 855, 858 (11th Cir. 2006) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206) (5th Cir. 1975); *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007).  "While a complaint . . . does not need detailed factual allegations," a plaintiff's obligation to show its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

If the admitted facts are enough to establish liability, the Court must then ascertain the appropriate amount of damages and enter final judgment in that amount.  *See Nishimatsu*, 515 F.2d at 1206.  Importantly, damages may be awarded only if the record adequately reflects the basis for the award, which can be shown by submission of detailed affidavits establishing the facts necessary to support entitlement to the damages requested.  *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985).   An evidentiary hearing on damages is not required by Rule 55, and it is within the Court's discretion to choose whether to hold such a hearing.  *See* Fed. R. Civ. P. 55(b)(2); *SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005); *Tara Productions, Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 911-12 (11th Cir. 2011).

### III.   <u>FACTS</u>[2]

Generally stated, this lawsuit involves allegations that Defendants are unfairly competing with Plaintiff through a targeted campaign of sending disparaging communications to Plaintiff's current and prospective customers and by publishing at least two websites (one of which was published months after this lawsuit was commenced) which contain the same disparaging information.

NITV manufactures and is the sole source for a patented Computer Voice Stress Analyzer, II ("CVSA") product—which is described as digitized technology incorporated into a multi-functional, portable notebook computer that is "the most widely used truth verification tool in the United States law enforcement community" [DE 1 ¶¶ 8, 17].  According to NITV, the CVSA is used by approximately 2,000 local, state, federal, and international law enforcement agencies, including approximately 175 agencies within Florida and approximately 13 federal government agencies.  NITV holds three patents in forensic voice stress analysis/voice related technologies and "is recognized throughout the world as a leader in the field of voice stress analysis" [*Id.* ¶¶ 9, 11].

In 1972, Allan D. Bell, Jr., Wilson H. Ford, and Charles R. McQuiston–the three principals of a company known as Dektor Counterintelligence and Security, Inc.–patented an invention which would become known and sold as the "Psychological Stress Evaluator" ("PSE").  However, Dektor Counterintelligence and Security, Inc.'s voice stress analyzer product disappeared from the market after the company went out of business in the late 1990's.  Dektor, the corporate Defendant in this case, was formed in 1999 and is not a successor-in-interest or connected in any

---

[2] These facts are drawn from credible witness testimony and uncontested evidentiary submissions that have been presented to the Court.  The Court has independently analyzed and considered the evidence and has adopted only those findings which the Court has deemed to be properly supported.

way to the original Dektor Counterintelligence and Security, Inc.  Neither Defendant purchased or

otherwise received any of Dektor Counterintelligence and Security, Inc.'s intellectual property or

assets.    Instead, Dektor appropriated the "Dektor" name, reverse-engineered Dektor

Counterintelligence and Security, Inc.'s product, and began selling its own "PSE" voice stress

analyzer product while capitalizing on the name and history of the original Dektor

Counterintelligence and Security, Inc.  For instance, as of the date of NITV's Complaint, Dektor's

website (http://www.dektorpse.com/) represented that:

> PSE® stands for Psychological Stress Evaluator®. Since 1969, all PSE® models
> (PSE 7010, PSE 5128, PSE 4202, PSE 2000, PSE Dek, PSE 101, PSE 1) detect,
> measure, and graphically display the degree of presence or absence of inaudible
> body tremors known as micro-muscle tremors.
>
> Thousands of various PSE models have been sold worldwide for 45 years. For 50
> years, PSE® has been known worldwide because PSE® constantly proves it is the
> most superior system for truth verification. Only the Dektor system has proven it is
> the real technology for Voice Stress Analysis™.

[*Id.* ¶ 25].  Dektor directly competes with NITV by marketing and selling Dektor's "PSE-7010"

(described as a software-based voice stress analyzer) to the same law enforcement agencies, and

other entities to which NITV markets and sells its CVSA product.  Dektor's website has touted

that "[t]housands of various PSE models have been sold worldwide for 45 years" and PSE's are

used by law enforcement agencies, Fortune 500 companies, security companies, military, and

others [*Id.* ¶ 27].

Dektor's campaign to disparage NITV has included dozens of pages of defamatory

material concerning NITV and NITV's founder published on Dektor's website, as well as e-mails

to law enforcement agencies, telephone calls, and professional speaking engagements designed to

widely spread numerous and material falsehoods about NITV and its CVSA product.  NITV cites

the following examples of Dektor's targeted campaign to disparage NITV:

- On March 18, 2014, while speaking at a Texas Polygraph Summit hosted by the Texas Department of Licensing and Regulation, Mr. Herring publicly berated NITV and NITV's CVSA product as being scams that have been proven unreliable (no more reliable than a coin toss or 50% accuracy) and touted Dektor's PSE product and its storied (albeit false) history dating back some 50 years.

- Mr. Herring has contacted (telephonically or via e-mail) dozens (if not hundreds) of law enforcement agencies across the country to discredit NITV and its CVSA product by (1) referring to CVSA as a "scam," stating that CVSA has been proven unreliable (no more than 50% accuracy), (2) stating that NITV only sells to law enforcement because NITV knows such agencies will not sue NITV for selling an unreliable product as doing so would reopen cases on which CVSA was used, (3) stating that NITV's founder obtained a "store bought" diploma, and (4) conveying other false and disparaging information (falsely represented as "facts") concerning NITV and its CVSA product.

- On July 22, 2018, Mr. Herring (using e-mail address admin@dektorpse.com) sent an unsolicited e-mail to a detective with the Garfield County Sheriff's Office (which uses NITV's CVSA product) in Glenwood Springs, CO with the subject line "lie detection scam." The email contains falsehoods and disparaging material concerning NITV and its CVSA product (including that the CVSA product is a scam and not more than 50% reliable), while touting the reliability and "proven superiority" of Dektor's PSE product in an effort to solicit business from the Garfield County Sheriff's Office. This email is just one of a multitude of similar e-mails sent to law enforcement agencies in the U.S. in 2018 alone.

- On July 25, 2018, Mr. Herring sent substantially the same e-mail (with "voice lie detector scam" as the subject line) to the Executive Director of the Missouri Police Chiefs Association. The Executive Director then forwarded Mr. Herring's e-mail to the organization's membership, meaning that with one e-mail Herring essentially spread his falsehoods and disparaging remarks throughout the entire State of Missouri.

- In May 2018, Dektor contacted the organizers of the Dallas Crimes Against Children's conference (NITV was a speaker at the 2017 conference and was scheduled to speak again at the 2018 conference). The 2018 conference was set for August 13–16, 2018. Dektor contacted the organizers with the specific intent to interfere with NITV's contract and participation at the conference and did so by making numerous false statements to conference organizers about NITV, NITV's employees (such as falsely stating that an employee scheduled to speak at the conference had been dishonorably fired from his prior position as a sex crimes investigator when in reality that employee retired), and NITV's CVSA product (the same factual allegations described above with respect to Mr. Herring's e-mails and other communications sent on Dektor's behalf). NITV gained business and sales from its speaking engagement at the 2017 conference and had invested substantial

sums to be a presenter—including a signed contract in place and paid in full—to speak at the 2018 conference.  Plaintiff has credibly shown that $5,660.83 and $6,513.13 were invested in marketing, travel, and associated expenses for Plaintiff's attendance and participation at the Crimes Against Children Conference in Dallas, Texas for the years 2018 and 2019, respectively. Because of Dektor's disparaging comments, NITV was uninvited from presenting at both the 2018 conference (notwithstanding NITV's paid contract with the organizers) and the 2019 conference.

- On October 24, 2018, during Mr. Herring's deposition in this lawsuit (on behalf of himself individually and as Dektor's corporate representative), Mr. Herring confirmed that he sent approximately 1,100 of the same type of e-mails concerning NITV and the CVSA product, and was continuing to "send[] out press releases about the lawsuit."

[*Id.* ¶¶ 34-44; DE 88-1, Herring Dep. 63:3-63:18].   The full extent of Mr. Herring's communications to other potential and existing NITV customers could not be fully and fairly discovered as Defendants failed to participate in discovery and Mr. Herring's deceitful and obstructionist conduct necessitated the Court entering an Order allowing a forensic examination of Defendants' hard drives and e-mail files and, ultimately, an Order sanctioning Mr. Herring in the form of entry of default as a result of substantial discovery violations.

According to NITV's verified motion, Dektor's main business website used to contain an entire section (previously available at http://www.dektorpse.com/information/cvsa/) dedicated to disparaging NITV and NITV's CVSA product (with the section stating that it was last updated in June 2018).  The Court has previously reviewed the Dektor website (the website has now been taken down following the Court's prior directives) and found it to contain a substantial amount of disparaging material directed toward NITV and the CVSA product.

According to NITV, Defendants have shown no sign of slowing down their campaign of disparaging NITV—as evidenced by Dektor's registration and publication of a new website, www.NITVCVSAexposed.com, after this lawsuit was filed.  The NITVCVSAexposed website is

dedicated entirely to the disparagement of NITV and its CVSA product.  In Mr. Herring's own words, the NITVCVSAexposed website is "a huge, beautiful website of all the documents and information showing that [NITV] is a liar, a con man, and a scam artist" [DE 88-1, Herring Dep. 61:10-12].

At the hearing, Mr. Humble credibly testified about certain damaging effects of Defendants' conduct.  Mr. Humble described lost sales of new product as well as related product training that has resulted from Mr. Herring's campaign to disparage NITV in the marketplace.  Mr. Humble testified about a recent incident in which Plaintiff sent a notice out to all of Plaintiff's clients that they could upgrade their older existing CVSA systems with Plaintiff's latest version, the CVSA II. When Plaintiff's marketing person contacted the El Paso County Sheriff's Department in Colorado, the person was told that due to information received from Defendants, they were discontinuing the CVSA program and would not be trading in their existing CVSA's.  This one client, according to Mr. Humble and Plaintiff's verified motion, represents a loss of $18,000.00 in expected profits for selling three upgraded CVSA products.  In addition, over the next five years, based on prior training needs, the El Paso County Sheriff's Department would be expected to train three additional examiners per year at approximately $1,300.00 each.  Thus, the $18,000.00 in lost product sales plus the $19,500.00 in lost training revenue equates to a total loss of $37,500.00.

## IV.   ANALYSIS

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter a final judgment of default against a party who has failed to timely plead in response to a complaint.  Here, the clerk's default against Dektor constitutes an admission by Dektor of the well-pleaded allegations in the Complaint.  *See Cancienne v. Drain Master of S. Fla., Inc.*, 2008 WL 5111264, at *1 (S.D. Fla. Dec. 3, 2008) (citing *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277–78 (11th Cir. 2005)).

Mr. Herring has also been defaulted out due to his misconduct in discovery.

However, because a defaulting party is not held to admit facts that are not well pleaded or to admit conclusions of law, the Court must determine if there is a sufficient basis in the pleadings for final judgment to be entered before turning to the appropriateness of granting relief in the form of a permanent injunction and monetary damages.  The Court now turns to an evaluation of each of Plaintiff's claims in this case.

### A.      Lanham Act Violations (Count I)

The Lanham Act prohibits making "false or misleading representation[s] of fact … in commercial advertising or promotion" which "misrepresent[] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. §1125(a)(1).  To prevail on a false advertising/unfair competition claim under the Lanham Act, the movant must show (1) that the opposing party's advertisements were false or misleading; (2) that the advertisements deceived, or had the capacity to deceive, consumers; (3) that the deception materially affected purchasing decisions; (4) that the misrepresentation affects interstate commerce; (5) and that the movant has been injured or is likely to suffer injury because of the false advertising.  *N. American Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  Under the Lanham Act, a "cause of action for product disparagement includes the following elements: 1) there must be 'commercial advertising or promotion' constituting commercial speech of or concerning another's goods or services or commercial activities, 2) by a defendant who is in commercial competition with plaintiff, 3) for the purpose of influencing consumers to buy defendant's goods or services, and 4) the promotion must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.").  *See Fun*

*Spot of Fla., Inc. v. Magical Midway of Cent. Fla., Ltd.*, 242 F. Supp. 2d 1183, 1203 n.3 (M.D. Fla. 2002) (collecting cases).

Here, Plaintiff is entitled to judgment against Defendants on its Lanham Act claims. Defendants have falsely represented their own PSE product as being the same product sold by Dektor Counterintelligence and Security, Inc. and falsely stated that Dektor has been in business since 1969. Defendants' various e-mails, letters, and websites constitute commercial speech from a competitor with the purpose of influencing customers to purchase Dektor's PSE product. Plaintiff has offered credible proof that these communications by Defendants contain materially false information concerning Plaintiff and its CVSA product. Plaintiff has offered specific details showing that Dektor and Mr. Herring are the source of these communications containing materially false information about Plaintiff and its CVSA product. As such, Plaintiff is entitled to judgment on its false advertising, unfair competition, and product disparagement claims arising under the Lanham Act.

### B.      *Florida's Deceptive and Unfair Trade Practices (Count II)*

One stated purpose of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). A FDUTPA claim has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012); *BPI Sports, LLC v. Labdoor, Inc.*, 2016 WL 739652, at *4 (S.D. Fla. Feb. 25, 2016) (citing Florida case law).

Based on the Court's factual findings, the Court concludes that Plaintiff has demonstrated each element to succeed on its FDUTPA claim.  As described in detail above, Plaintiff alleges that Dektor and Mr. Herring have engaged in a widespread scheme of intentionally deceptive acts to promote Dektor's own PSE product to the direct detriment of Plaintiff's product and legitimate business.  Dektor has engaged in a widespread campaign of disparaging NITV and NITV's competing CVSA product through websites, in emails, during phone calls, and at speaking engagements.  NITV alleges that Dektor's deceptive and unfair trade practices have damaged NITV's reputation, goodwill, and overall sales.  Plaintiff's FDUTPA claim is legally sound.

### C.      Defamation/Business Disparagement (Count III)

Under Florida law, the elements of defamation are: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

Here, the evidence shows that Dektor and Mr. Herring published numerous false and defamatory statements about Plaintiff and Plaintiff's product and related services to a multitude of existing and potential consumers of Plaintiff's products and services.   Defendants knew or should have known that the defamatory statements were false when made and Plaintiff has suffered damages, including but not limited to lost sales and lost goodwill as a direct result of the defamation.  Plaintiff is entitled to judgment against Defendants on this claim.

### D.      Tortious Interference (Count IV)

Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the

defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff. *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994)).

Here, Plaintiff has shown that it had existing contracts or prospective business relationships with various law enforcement agencies and other entities for the sale of its CVSA product and related services. Plaintiff claims Dektor and Mr. Herring knew about these contracts and business relationships and intentionally interfered by making false and disparaging statements about Plaintiff and the CVSA product to dissuade known CVSA users from using NITV's products and instead use Dektor's PSE competing product. NITV is thus entitled to judgment against Dektor on this fourth and final count.

### E.    Request for Permanent Injunction

Pursuant to the Lanham Act, a district court may issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). Injunctive relief is also available to remedy FDUTPA violations. *See* Fla. Stat. § 501.211(1); *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 2012 WL 3870405 *2-3 (Fla. 5th DCA Sept. 7, 2012). Injunctive relief is a "remedy of choice" in unfair competition cases and is available in the default judgment setting. *See Burger King Corp. v. Agad*, 911 F.Supp. 1499, 1509–10 (S.D. Fla. 1995); *Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1290 (S.D. Fla. 2016). Permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d

1200, 1208 (11th Cir. 2008).

Here, Plaintiff has carried its burden on each of the four factors.  As discussed above, Plaintiff is entitled to judgment against Defendants on all four claims asserted in the Complaint. The Court concludes that, absent a permanent injunction, Plaintiff will suffer an irreparable injury as it appears likely that Defendants will continue their campaign of disparaging e-mails, letters, and websites dedicated to damaging Plaintiff's business. The balance of the harms likewise favors issuance of a permanent injunction.  Plaintiff has a statutorily protected right to be free from Defendants' deceptive trade practices and Lanham Act violations. The harm to Plaintiff from Defendants' continued activities will be immeasurable and the public interest is served by encouraging fair competition in the marketplace and the provision of accurate and truthful information in a party's advertisements and marketing materials.

## V.   DAMAGES

In addition to permanent injunctive relief, Plaintiff seeks monetary damages.  As the Court has made clear in prior rulings, it remains incumbent on NITV to prove the amount of damages to which it is entitled.  To be sure, a plaintiff's allegations regarding the amount of damages are not admitted by virtue of default; rather, the Court must determine both the amount and character of damages.  Even in the default judgment context, the Court "has an obligation to assure that there is a legitimate basis for any damage award it enters."  *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir.2003); *see also Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir.1985) (damages may be awarded on default judgment only if the record adequately reflects the basis for award).

Earlier this same year and approximately nine months ago, Plaintiff sought $1,360,000.00 in base damages, trebled to $4,080,000.00 [DE 88 at 19-20].  At the time, the Court noted that the

record was devoid of evidentiary materials to support these claimed damages.  The Court thus concluded that "[g]iven the current state of the record, the Court has no reasonable evidentiary basis for computing a damages award" and that for "the Court to simply adopt NITV's estimated damages would be an act of pure speculation." [DE 95 at 15].

Plaintiff now seeks total base damages amount of ***$5,990,659.12*** against both Defendants. Plaintiff further seeks for this base damage figure be trebled to ***$17,871,977.36***, arguing that Defendants' willful disparagement of NITV and Defendants' refusal to participate in this case supports the enhanced damage award.  In support, Plaintiff relies on the declaration and testimony of its own corporate representative, Mr. Humble, and the declaration and testimony of two CPA's hired by Plaintiff.  While Plaintiff has satisfactory established some damages attributable to Defendants, the evidence presented simply does not support the requested amount of damages sought by Plaintiff.

Damages in a case of this type involve an inherent degree of speculation.  For instance, in this case alone, the proposed amount of base damages has changed from $1.3 million to $5.99 million within less than one year.  The amount has been requested to be trebled.  Not only has the amount changed but the amount determined is also speculative.  Mr. Humble chose to use a figure of 10-15% for existing and prospective customers choosing not to buy Plaintiff's product and services for reasons other than Mr. Herring and Dektor.  Thus, Mr. Humble speculates that Mr. Herring and Dektor are responsible for 85-90% of the speculated lost sales.  Although Mr. Herring and Dektor pointed out alleged defects and disseminated materially false information about Plaintiff's product to existing and prospective customers who would not have heard of any issues, other customers may have learned of these items by their own searches.  In the internet age, it is fair to say that clients buying truth verification technology will check that technology on the

16

internet.   Perhaps the court should use 50%, but then the Court itself would be speculating.

The Court accepts as reliable hearsay the evidence of the loss of business in El Paso County, Colorado totaling $37,500.00.  The Court also accepts Mr. Humble's testimony regarding the expenses incurred to attend the Crimes Against Children Conference in 2018 and 2019, $5,660.83 and $6,513.13, respectively.  These accepted amounts total ***$49,673.96***.  The Court does not accept that Mr. Herring is the sole reason that the State of Texas did not change its polygraph-only laws.  The Court does not therefore accept Plaintiff's estimate of lost sales in the entire state of Texas.  Taking a minimal approach, and using El Paso County, Colorado as a model, Plaintiff has lost at least ten customers for another ***$375,000.00***.  Using these figures, the total amount of proven base damages would be **$424,673.96**.

Turning to Plaintiff's request for treble damages under 15 U.S.C. § 1117(a), the Eleventh Circuit has held that "to be eligible for Lanham Act treble damages, the plaintiff must prove that the defendant's conduct was intentional."  *Vector Prod., Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1320 (11th Cir. 2005) (citing *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472 (11th Cir. 1991)).  The Court may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages, whichever is greater, as justice shall require.  *See* 15 U.S.C. § 1117(a).  Such an award is discretionary, but it may not be punitive, and must be based on a showing of actual harm.  *Island Fund Mgmt., Inc. v. RWS, Inc.*, 2019 WL 1466707, at *4 (S.D. Fla. Feb. 11, 2019), report & recommendation adopted, *Island Fund Mgmt., Inc. v. RWS, Inc.*, 2019 WL 1468540 (S.D. Fla. Mar. 12, 2019).

Here, Plaintiff has shown that Defendants intentionally engaged in false advertising, unfair competition, disparagement, and tortious interference under governing federal and Florida law.  As discussed previously, the full extent of damage caused by Defendants will likely never be known

17

given Defendants' refusal to properly participate in discovery.  The Court gives some credit to Mr. Herring for appearing before this Court for an evidentiary hearing and making an appropriate, albeit decidedly late, effort to provide relevant information on the matter of damages.  Mr. Herring did make some good points, however, his skillful interweaving of some truths with hyperbole and untruths requires a strong sanction.

Ultimately, having presided actively over this case for nearly one year now and having heard from the parties at a recent evidentiary hearing, the Court finds that in light of Defendants' willful violation of the Lanham Act, misuse of the internet to convey materially disparaging information about Plaintiff and Plaintiff's product, and discovery misconduct leading to an additional unknown amount of actual damages, doubling is appropriate here.  Accordingly, the Court will award Plaintiff two times the amount of actual damages proved in this case, or **$849,347.92**.

## VI.    **CONCLUSION**

### A.    *Permanent Injunction*

Plaintiff's Motion for Entry of Permanent Injunction Against Defendants [de 134] is **GRANTED**.  Defendants, their shareholders, directors, officers, agents, servants, employees, successors, assigns, affiliates, joint venturers, and any and all other persons in active concert, in privity with them are PERMANENTLY ENJOINED from:

(a)      Sending or transmitting any e-mails, text messages, letters, or other written correspondence to any entity (including any law enforcement agency or government agency) or person which contains any false or disparaging remarks or statements about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble. To avoid any doubt, this restriction specifically includes, but is not limited to: (1) any statement concerning the purported

accuracy/reliability of CVSA; (2) any statement suggesting that Plaintiff and/or its products are a scam or ineffective; (3) any statement concerning the PSE's supposed proven superiority over the CVSA; (4) any statement comparing or equating Plaintiff, its product, or its employees to the German Nazi party or Joseph Goebbels specifically; (5) any statement that Plaintiff's products (including the CVSA) are no more accurate than a coin toss; (6) any statement misrepresenting the pricing of Plaintiff's products; (7) any statement that Mr. Humble received an unearned, fake, or 'store bought' diploma; (8) any statement suggesting that the CVSA is just an expensive prop; (9) any statement that law enforcement agencies continue to use Plaintiff's products in some conspiratorial effort to avoid overturned verdicts or lawsuits from defendants falsely convicted; (10) any statement that any law enforcement officer has been wrongly fired because he flunked/failed a CVSA test yet was being truthful; (11) any statement that the processes/procedures used by Plaintiff (such as numeric scoring, DSR [Delayed Stress Response], cold calling, kinesics, F.A.C.T. and DBR [Defense Barrier Removal]) have no real substance or credibility; (12) any statement that any of the enjoined parties has "heard from" current or former CVSA examiners that there are serious flaws with the CVSA; (13) any statement that some purported 2007 study found serious design flaws with the CVSA that will produce flawed patterns/incorrect results; (14) any statement suggesting that CVSA tests were affected/ruined by persons holding the microphone during the test; (15) any statement that Plaintiff's recertification courses are 'bullshit' type classes and the same information taught in Plaintiff's original training courses; (16) any statement suggesting that Plaintiff 'stole' or misappropriated Dektor's technology; and/or (17) any suggestion that Plaintiff was somehow banned from advertising in insurance magazines or stopped advertising as a result of a drop in sales to law enforcement.

      (b)    Making any oral statement (whether in-person, telephonically, or otherwise) to any

19

entity (including any law enforcement agency or government agency) or person which contains any false or disparaging remarks or statements about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble – including, but not limited to, the examples provided in subparagraph (a) above.

      (c)      Publishing or posting any website, blog, or other writing accessible via the internet which contains any false or disparaging remarks or statements about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble – including, but not limited to, the examples provided in subparagraph (a) above. For the avoidance of doubt, this includes all information published on the www.NITVCVSAexposed.com website, all information published on the http://www.dektorpse.com/information/cvsa/ sub-page, and all mentions of Plaintiff/CVSA/Humble on http://www.dektorpse.com/information/imitations/. The enjoined parties shall *immediately* remove the aforementioned information from the subject websites (to the extent still there) and shall *immediately* remove from public view/unpublish the www.NITVCVSAexposed.com website in its entirety (to the extent still published). To be clear, the above-referenced content is not to be published or re-published on any website, blog, or other writing accessible via the internet and Defendants shall not do so or cooperate or assist any person with doing so.

      (d)      Representing or suggesting, explicitly or implicitly, that Dektor and Dektor Counterintelligence and Security, Inc. have any relationship or affiliation, that Dektor has been in business since 1969, that Dektor and Dektor Counterintelligence and Security, Inc. have cooperated in any way, or that Dektor's PSE product is in any way related to the PSE product sold by Dektor Counterintelligence and Security, Inc.

      (e)      The Court cautions that well-proven intentional violations of the permanent

20

injunction will be treated very seriously.

**B.** *Damages*

For the reasons discussed above, Plaintiff's Verified Motion for Default Final Judgment [DE 135] is **GRANTED**.  Final Default Judgment is hereby entered in favor of Plaintiff and against Defendants in the total amount of **$849,347.92**, representing the total proven base damages of $424,673.96**.**  In accordance with Federal Rule of Civil Procedure 58, the Court will separately enter a final judgment.

DONE AND ORDERED in Chambers at West Palm Beach in the Southern District of Florida, this 16th day of December, 2019.

Dave Lee Brannon
DAVE LEE BRANNON
U.S. MAGISTRATE JUDGE

Copy via U.S. Mail:
Mr. Arthur Herring, III, *pro se*
Dektor Corporation
400 E. Station Avenue #400
Coopersburg, PA 18036