```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                     CASE NO. 18-CV-80994-DLB
 3

 4   NITV FEDERAL SERVICES, LLC,           West Palm Beach, Florida

 5                Plaintiff,               December 10, 2019

 6        vs.                             11:05 a.m. - 2:12 p.m.

 7   DEKTOR CORPORATION,

 8                Defendant.               Pages 1 to 142
     _____

 9

10                      EVIDENTIARY HEARING
              BEFORE THE HONORABLE DAVE LEE BRANNON
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13

14   FOR THE PLAINTIFF:          DANIEL DeSOUZA, ESQ.
                                 DeSOUZA LAW, P.A.
15                               101 N.E. Third Avenue, Suite 1500
                                 Fort Lauderdale, Florida 33301
16
                                 JAMES D. D'LOUGHY, ESQ.
17                               ADVISORLAW, PLLC
                                 2925 PGA Boulevard, Suite 204
18                               Palm Beach Gardens, Florida 33410

19   FOR THE DEFENDANT:          ARTHUR HERRING, III
                                 Pro Se
20

21   STENOGRAPHICALLY REPORTED BY:

22                               ILONA LUPOWITZ, CRR, RPR
                                 Official Court Reporter
23                               United States District Court
                                 400 North Miami Avenue
24                               8th Floor
                                 Miami, Florida 33128
25                               (305) 523-5634
```

```
 1                          I N D E X

 2    WITNESS                                          PAGE

 3    CHARLES HUMBLE

 4    DIRECT EXAMINATION BY MR. HERRING:                  3
      CROSS-EXAMINATION BY MR. D'LOUGHY:                  4
 5    REDIRECT EXAMINATION BY MR. DeSOUZA:              115

 6

 7                     DEFENDANT'S EXHIBITS

 8

 9
      Exhibit                                  Received
10    WWWW                                     76
      GGGG                                     101
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        * * * * * * * *

 2           THE COURT:  You can call your next witness,

 3   Mr. DeSouza.

 4           MR. DeSOUZA:  Your Honor, we'll call Charles Humble as

 5   our next witness.

 6           THE COURT:  Very well.

 7           Mr. Humble, come on up and be sworn, sir.

 8           (Defense witness, CHARLES HUMBLE, duly sworn.)

 9           THE COURTROOM DEPUTY:  Please state your full name, and

10   spell your last name for the record.

11           THE WITNESS:  Charles Humble, H-U-M-B-L-E.

12           THE COURT:  Thank you, sir.  You may be seated.

13           Counsel, you may inquire.

14           MR. D'LOUGHY:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16   BY MR. D'LOUGHY:

17   Q.  Good morning, Mr. Humble -- or Dr. Humble.

18   A.  Good morning.

19   Q.  Did you just receive a copy of your declaration of Charles

20   W. Humble?

21   A.  Yes, I did.

22   Q.  And is that your signature on the last page of the

23   declaration?

24   A.  It is.

25           THE COURT:  Is that marked as Plaintiff's Exhibit 1,
```

```
1    sir?

2            MR. D'LOUGHY:  That is marked as Plaintiff's Exhibit --

3            THE WITNESS:  Yes.  Yes, Your Honor.

4            THE COURT:  Okay.

5            MR. D'LOUGHY:  Your Honor, I'd like to tender the

6    witness over.  I have no further questions at this time.

7            THE COURT:  Very well.  Okay, Mr. Herring.  You may

8    inquire, sir.

9            MR. HERRING:  Okay.

10                        CROSS-EXAMINATION

11   BY MR. HERRING:

12   Q.  Mr. Humble, in 2012, you claimed a study was published in a

13   scientific journal -- that was the terms that your CVSA

14   association is using -- and to make it short, it's called --

15   let's refer to it as the Chapman study.

16       Do you know which one I'm talking about?

17   A.  Yes, I do.

18   Q.  Okay.  And it was claimed to be published in a scientific

19   journal called *Criminalistics and Court Expertise*.

20           MR. DeSOUZA:  Your Honor, we're gonna object on the

21   basis of relevance.  This is going back to Mr. Herring's

22   challenges to the merits of the case as opposed to damages.

23           THE COURT:  Mr. Herring, your focus here is on damages.

24   What relevance does this have to the damages?

25           MR. HERRING:  Well, the fact that it's been established
```

1    for 30 years, by various news media and other sources, that

2    NITV has lied about everything that it does, sells, trains and

3    even makes up fake studies to try to convince people to buy it.

4         Now, this is --

5         THE COURT:  Let me just interrupt you there,

6    Mr. Herring, just in the sense of saying.  The fact that news

7    media have had reports doesn't establish a fact as far as the

8    Court is concerned.  What it establishes is that people have

9    raised questions.  And then what happens is we have a trial and

10   we bring witnesses in, and we present the evidence, and then a

11   jury or the judge, depending upon who is the finder of fact,

12   then determines legal facts.

13        Do you understand what I'm saying so far?

14        MR. HERRING:  Yes.

15        THE COURT:  Okay.  In this case, what we're focusing on

16   here, at this point, is the damages that NITV claims to have

17   suffered.  Okay?  So your examination, to be relevant for this

18   hearing, needs to focus on this damage issue.

19        Do you understand that, sir?

20        MR. HERRING:  Yes.

21        THE COURT:  Okay.  So I'm going to sustain the

22   objection.  I'm going to ask you to point your questions

23   towards this issue of damages, like you did exactly with

24   Mr. Foyteck.

25        MR. HERRING:  Okay.  Again, I am pro se, so I'm not

```
 1   familiar with the procedures.  Please excuse that.

 2          THE COURT:  Well, that's why I'm not yelling at you,

 3   I'm just telling you.

 4          MR. HERRING:  Yes, sir.  I appreciate that.

 5          At this time, I am not presenting my case, am I?

 6          THE COURT:  No.  I mean, this is -- the purpose of

 7   today is only about damages.

 8          MR. HERRING:  Right.

 9          THE COURT:  Because of my previous ruling about -- due

10   to the discovery violations.  So liability has been

11   established.  The question is what these guys are gonna get, if

12   anything, for the damages.  That's what this hearing is about

13   today.

14          MR. HERRING:  Well, I see it as it all ties in

15   together, Your Honor, the fact that -- again, because I was not

16   a lawyer, I really did not have a lawyer, I could not raise

17   issues I'm sure a regular lawyer could do to present evidence,

18   whatever.

19          THE COURT:  You're familiar with my order back on -- in

20   September, docket entry 133, the order granting the plaintiff's

21   motion for sanctions for spoliation of evidence and discovery

22   abuse.

23          MR. HERRING:  I don't have that with me, and I don't

24   have a photographic memory that I can remember everything.  I'm

25   sorry.
```

1          THE COURT:  Well, that was a pretty meaningful order.

2     I'm sure you remember.  Do you want me to get you a copy?  We

3     can print out a copy for you.  It's not a problem.

4          MR. HERRING:  Well, I'd like to -- again, I'm not

5     saying it doesn't exist or anything.  I'm just saying I'd like

6     to proceed in that this case is an unusual case, in that it

7     involves a business suing for damages because it's been putting

8     or selling a product that has no credibility and has been --

9     established itself in many different ways, including on ABC

10    News, video which I have a copy of, which is on a tablet, by

11    the plaintiff himself in 2006 when he was asked, do you have

12    any independent studies that proves your gadget works?  He

13    said, no.

14         So for 20 years, he was selling a product that he had

15    no idea if it worked or not, training that he admits he made

16    up.  It was his training.  And a gadget that's never been

17    established as being a real device for lie detection in any

18    way.  So to me, that goes to show that if you're selling a

19    fraud, then you're not entitled to say, sorry, I lost sales

20    from my fraud any more than a 16-year-old boy that kills his

21    parents says, have pity on me because I'm an orphan now.

22         THE COURT:  Sir, the time to judge whether you and

23    Dektor were liable or not has come and gone because of the

24    Court's ruling.  So now the focus is on damages, and that's

25    what you need to have your focus on.

1          Now, we have been going now for a little while.  Do you

2   want a break before you cross-examine Mr. Humble, while you

3   concentrate on this issue of damages?  Because we're not

4   getting into whether NITV is operating a fraud or anything

5   else.  What we're getting into, at this point -- the whole

6   purpose of this hearing, and the reason I've given you a

7   hearing on this, is so that you have every opportunity to have

8   all the process you have -- that you can, since you are going

9   pro se, to focus on this issue of damages.

10          Do you want a break to think about that for a few

11   minutes?  I can take, like, a 10 minute comfort break now.

12          MR. HERRING:  No, Your Honor.  Let's proceed.

13          THE COURT:  Okay.

14          MR. HERRING:  Well, to --

15   BY MR. HERRING:

16   Q.  Mr. Humble, per damages, you have made statements, claims

17   in your ads and on your website as far as how many CVSAs you

18   have sold, correct?

19   A.  Correct.

20   Q.  Have you ever checked the numbers to see how they vary

21   dramatically at different times, that one year it's no sales

22   for three years, another time it suddenly jumps 500?  Have you

23   ever checked to see why those -- if that information was

24   correct that was being posted?

25          MR. DeSOUZA:  I object on the basis of foundation, Your

```
 1   Honor.
 2         THE COURT:  Overruled.  You can answer the question,
 3   sir.
 4         THE WITNESS:  I'm not sure what you're -- you're saying
 5   because we never had no sales for three years.
 6   BY MR. HERRING:
 7   Q.  Well, according to your websites and your ads, where you
 8   quote numbers sold --
 9         THE COURT:  Mr. Herring, do you have a specific one
10   that you can point to or that you can show him?
11         MR. HERRING:  Well --
12         THE COURT:  A printout of a page that you can show him
13   that says, hey, on this date, you did X, you said you did X and
14   on this date, you said you did Y?  Do you have anything like
15   that?
16         MR. HERRING:  Yes, I do, Your Honor.  I was going to
17   present it when it was my turn to --
18         THE COURT:  Well, it's your turn now, okay?  Because
19   we're not having a -- we're not having a separate -- once
20   again, the focus on this hearing today is on the damage issue.
21   So if you have -- and you have cross-examination.  You have the
22   ability to show him things and cross-examine about them.  Now
23   is the time to do it.
24         MR. HERRING:  Okay.  As I understood it, once the
25   plaintiff got done, then I was gonna be allowed to present my
```

```
 1    defense.  The fact that one of the lawyers had no questions,

 2    I'm a little bit confused as far as what I'm entitled to ask at

 3    this point.

 4              THE COURT:  You can ask him anything on the damage

 5    issue.  They'll make objections if they think you're asking

 6    something improper, and I'll rule on them.  If I sustain the

 7    objection, then you can't go into it.  If I overrule the

 8    objection, like I just did, you can.  So you can -- you can go

 9    into it.

10              MR. HERRING:  Okay.

11    BY MR. HERRING:

12    Q.  Who puts the information on the websites and who reviews

13    it?

14    A.  We have a webmaster that, actually, the information is sent

15    to him, and then he changes the website.

16    Q.  And what is his name, the person's name?

17    A.  Miguel Mascara.

18    Q.  So what is his title with your company?

19    A.  He doesn't really have a title, although he is a

20    representative in South America.  He's an independent

21    contractor, and he does sales in South America.  Plus, he runs

22    the website.

23    Q.  Both websites?

24    A.  I'm not sure about that.

25    Q.  You are the primary owner of NITV; is that correct in
```

```
 1  saying that?

 2  A.   Minority owner.

 3  Q.   Who is the majority owner?

 4  A.   My wife.

 5  Q.   What about Mr. Kane?  What percentage does he have?

 6  A.   Mr. --

 7            MR. DeSOUZA:  Objection.  Relevance.

 8            THE COURT:  What's the relevance as to who -- what

 9  percentage owns?

10            MR. HERRING:  Well, I'm trying to figure out -- there's

11  so many people.  There's Humble, his wife, Lourdes, Kane, his

12  wife Olga, who's CFO.  Mr. Humble is -- I'm trying to pin it

13  down as far as the chain of command or chain of events where

14  somebody gives information to Mascara, who then posts it on

15  websites.

16            THE COURT:  I'm going to sustain the objection as far

17  as who owns how much of the company, but you can focus on where

18  Mascara gets his information, if you wish.

19            MR. HERRING:  Okay.  Thank you.

20  BY MR. HERRING:

21  Q.   Where does Mr. Mascara get his information from?

22  A.   It's sent to him.

23  Q.   By who?

24  A.   Sometimes it's our training coordinator for the training

25  portion of the website.  Sometimes it's from our CFO for
```

```
 1    various information.  We have a -- sales and marketing will
 2    send him information to change on the website.  So it comes
 3    from various sources.
 4    Q.  So different people are sending this Mascara information as
 5    far as sales numbers?
 6    A.  I would say so.  I'm not sure if he -- if he puts sales
 7    numbers on there or not.  I don't think he puts sales numbers
 8    on the website.
 9    Q.  How often do you look at your websites?
10    A.  Personally, once a week.
11    Q.  Once a week?  So you know what's up there every week,
12    basically, right?
13    A.  Correct.
14    Q.  And you do have -- do you have two websites?
15    A.  Federal Services does not have two websites.
16    Q.  Okay.  You have several NITV named entities, correct?
17    A.  They're separate entities, yes.
18    Q.  Okay.  But to my knowledge, you have -- you, your company,
19    have two separate websites; is that correct?
20    A.  Federal Services only has one website.
21    Q.  But you, as CharlesHumble.com, have your own website,
22    correct?
23    A.  That's personal.
24         MR. DeSOUZA:  Objection.  Relevance.
25         MR. HERRING:  Relevance?
```

```
 1              THE COURT:  What's the relevance of the Charles Humble
 2   --
 3              MR. HERRING:  It all ties in, Your Honor, with the
 4   numbers and information that is put on these websites, which
 5   contradicts each other at different times.  I'm trying to find
 6   out who is responsible --
 7              THE COURT:  I'll allow.  I'll overrule the objection
 8   and allow a limited inquiry insofar as the personal website has
 9   anything to do -- has any numbers on it with respect to sales.
10              Let me ask Mr. Humble.  Mr. Humble, does the personal
11   website have any information about your business on it?
12              THE WITNESS:  A small amount, but no numbers, Your
13   Honor.
14              THE COURT:  Okay.  And that small amount -- tell me
15   what that small amount is.
16              THE WITNESS:  That just describes the business and what
17   we do, and then it goes more into my background, et cetera.
18   It's just a personal website.
19              THE COURT:  Okay.  So is it more like a CV entry that
20   says Mr. Humble is --
21              THE WITNESS:  Yeah.
22              THE COURT:  Okay, this is his business, correct?
23              THE WITNESS:  Yeah.
24              THE COURT:  Based upon that, I'll sustain the
25   objection, and you can't ask him about the Charles Humble
```

```
 1   personal website.
 2          MR. HERRING:  Okay.  The reason why I brought it up,
 3   Your Honor, was because it is referred to in the business
 4   website, which, again, is all about the puffery of trying to
 5   promote himself, promote his business, trying to get buyers.
 6   And I use --
 7          THE COURT:  I understand, but we're not gonna go into
 8   the Charles Humble website.
 9          MR. HERRING:  Okay.
10   BY MR. HERRING:
11   Q.  So you say you look at your website about once a week; is
12   that correct?
13   A.  Correct.
14   Q.  And when you see information on there, you -- if it's not
15   correct, do you have it changed?
16   A.  I don't peruse the entire website once a week.  When I say
17   I go to it once a week, sometimes I'm going on there to see if
18   a certain class is still on, somebody's contacted me, et
19   cetera.  So I don't actually go through the whole website and
20   check all of the information every week.  That's not correct.
21   Q.  You mentioned CFO.  Who's the CFO of NITV?
22   A.  That would be Olga Cane.
23   Q.  Okay.  And what is the title of Mr. Kane?
24   A.  That would be intergalactic commander.
25   Q.  Huh?
```

```
 1              THE COURT:  Next question.
 2     BY MR. HERRING:
 3     Q.   What is the title of Lourdes?
 4     A.   She's a primary owner.  She has no title.
 5     Q.   Now, Mr. Humble, who okays information that is put on your
 6     NITV federal website?  Who has the final say?
 7     A.   Well, not everything's passed through me.  Again, we have
 8     -- training goes over.  They put their information on.  I don't
 9     check that.  Sales, they put their information on.  I don't
10     check that.
11     Q.   Who's they, again?
12     A.   The training coordinator.
13     Q.   No.  But the other information, besides training, who puts
14     that up there?  Who sends it to Mascara to put it up there?
15     A.   Again, it depends on what kind of information.  If it
16     regards sales and marketing, then sales and marketing sends
17     that over.  I may send some things over.  For instance, when we
18     got the Illinois State Police as a client, I put that all
19     together and sent it over to Miguel to put up on our banner
20     that, you know, they joined the Atlanta police, California
21     Highway Patrol, Nashville police, New Orleans police, et
22     cetera.  When you look at our website you'll see a banner that
23     goes across the top --
24     Q.   Yes.
25     A.   -- and that has all the major -- not all.  It has many of
```

1    the major law enforcement agencies that use our system.

2        It gives us credibility to show we're not a fake or a fraud

3    or cheating people.  And so when the California Department of

4    Corrections bought 58 CVSAs to staff the entire state of

5    California, we put that right -- I put that up there.  In other

6    words, you ask who sends the information over.  When it comes

7    down to that portion of the marketing, I do that.  I send it

8    over to Miguel.

9            THE COURT:  Let me ask you a question, Mr. Humble, just

10   to make sure that I'm getting the picture here.

11           It sounds like there's no one person responsible for

12   the -- for the content on the web; that various people send the

13   content and Mr. Mascara is the one who's charged with putting

14   it on the web.  But -- in that sense, he's the webmaster

15   because he's the web doer, but everybody sends him data.

16           THE WITNESS:  That's correct, Your Honor.

17           THE COURT:  No one person overall looks at it all and

18   says this can go and this cannot go; is that correct?

19           THE WITNESS:  That's correct, Your Honor.

20           THE COURT:  Okay.  Mr. Herring?

21   BY MR. HERRING:

22   Q.  Did I just hear you say a couple of different times, these

23   different agencies bought the CVSA?

24   A.  Yes.

25   Q.  Well, when somebody buys something, they own it, don't

1    they?

2              MR. DeSOUZA:  I'm gonna object to relevance, Your

3    Honor, again.

4              MR. HERRING:  I will explain.

5              THE COURT:  Overruled.  You can go ahead and answer

6    that question.

7    BY MR. HERRING:

8    Q.  When somebody buys something, do they own it?

9    A.  Well, in this case, they sign a ULA, and that is -- that

10   pertains to the software.  They own the computer.  They bought

11   that computer and they own the computer.  The software on there

12   is licensed to them.

13   Q.  And how much is that license?

14   A.  Well, it comes with the computer, and right now, I think

15   the CVSA II is $8,900.

16   Q.  And how much is the CVSA III?

17   A.  $9,900.

18   Q.  So people, when they think they're buying a CVSA, they're

19   never buying it for $10,000; isn't that correct?

20   A.  They don't think that.  They're made very much aware that

21   that's a licensed software.

22   Q.  But you charge them $10,000, basically, for the privilege

23   of using it; is that correct?

24   A.  To allow them to use it in their investigations, correct.

25   Q.  Well, according to your ULA, isn't it true that they -- if

18

```
 1    they don't want the CVSA anymore they must give it back to NITV

 2    for free?  They're not allowed to sell it, give it away, loan

 3    it, whatever?  Isn't that true?

 4    A.   The last part's true.  The first part is not.

 5    Q.   What part is not true?

 6    A.   We will offer them money for the system.

 7    Q.   Well, that's not on the website, that I have found.

 8         Is it posted on your website?

 9    A.   I don't know.  I don't think it is.  I think that -- we do

10    that all the time.  I don't know if it's a rule that's in the

11    ULA or whatever.  We always buy the systems back, because used

12    systems are actually in high demand by smaller departments.

13    Q.   How would somebody know if it's a used system if it's in a

14    laptop?

15    A.   We tell them it's a used system.

16    Q.   Oh.

17         THE COURT:  Let me interrupt you for a second just to

18    make the record clear.  You both have used the term ULA.  Tell

19    me what that is.

20         THE WITNESS:  That's the end user's licensing

21    agreement.

22         THE COURT:  Okay.

23         THE WITNESS:  This is a protected technology, and we --

24    we control it very tightly.  We don't sell privately at all.

25    It's only government agencies.
```

```
 1              THE COURT:  Okay.  Very good, sir.  I just wanted to

 2    make sure that anybody reading this down the road knows what a

 3    ULA is.  We have people here that do know what it is and are

 4    using the term.

 5              You may proceed, Mr. Herring.

 6              MR. HERRING:  I have a copy of it, Your Honor, if the

 7    Court wishes to have it at this time.

 8              THE COURT:  What you introduce is up to you, sir.  I

 9    mean, I don't -- I don't need the agreement, unless you want to

10    provide it to me, for some reason.

11              Is this on your exhibit list, sir?

12              MR. HERRING:  Yes, sir.

13              THE COURT:  Which one is it?

14              MR. HERRING:  It's labeled A.

15              THE COURT:  Oh, so that's a U.  I couldn't tell if it

16    was a U or a V when I looked at it.

17              Any objection?

18              MR. DeSOUZA:  Your Honor, I don't believe it's

19    relevant.  But that's the only objection, standing objection on

20    relevance.

21              THE COURT:  Okay.  I'm going to admit Defense Exhibit A

22    over objection.

23              MR. HERRING:  The purpose is, again, the fact that

24    people are led to believe -- and it's on the NITV website, as

25    far as purchasing -- an entity purchasing so many CVSAs, which
```

1   gives the clear impression people own it, which they never do.

2   BY MR. HERRING:

3   Q.  Is it true, Mr. Humble, according to this ULA, you do not

4   allow the CVSA to be used for any type of research projects?

5   A.  I believe it is.

6   Q.  You believe it is what?

7         MR. DeSOUZA:  Your Honor, again, relevance.

8         THE COURT:  Which one of you is handling this witness?

9   Okay?  I mean, the general rule is, one lawyer has the witness.

10   So is this Mr. DeSouza's witness or Mr. D'Loughy's witness?

11         MR. D'LOUGHY:  Mr. DeSouza's handling this.  He's

12   handling objections.

13         MR. DeSOUZA:  I'll handle the redirect as well, Your

14   Honor.

15         THE COURT:  Okay.  Very well.  And what was the

16   objection?

17         MR. DeSOUZA:  Relevance, Your Honor.  I think the

18   document itself came in, but now he's asking questions about

19   research and development and whether it can be used for this

20   particular use or not, which has nothing to do with whether we

21   suffered damages or who bought the product or didn't buy the

22   product.

23         THE COURT:  I'll let you make brief argument as to why

24   it's relevant, sir.

25         MR. HERRING:  It's relevant because it's like a puzzle,

 1    okay?  There's hundreds of pieces to a puzzle, and this puzzle

 2    would show that the business called NITV, whether it's called

 3    NITV FS for Federal Services, NITV GS for Government Services,

 4    NITV LLC, NITV Incorporated -- they've used various names at

 5    various times -- is nothing but a scam.  It's been documented,

 6    shown.  Humble -- Mr. Humble had admitted that on nationwide TV

 7    15 years ago.  And the fact that, to my knowledge, after that,

 8    the studies that were claimed by NITV, claiming that it proved,

 9    again, 98 percent accuracy, are all made up.

10         THE COURT:  I'm going to sustain the objection.  You

11    can move onto your next question, sir.

12         MR. HERRING:  Okay.

13    BY MR. HERRING:

14    Q.  Pertaining to that ULA, it also says in there that it

15    cannot -- the CVSA cannot be used for any type of validation

16    studies; is that correct?

17         MR. DeSOUZA:  Objection.  Relevance.

18         THE COURT:  What's the relevance, sir?

19         MR. HERRING:  The relevance is NITV is trying to

20    protect itself, as it has not done in the past, from people

21    buying the CVSA -- sorry, purchasing the permission fee --

22    using it in various studies that have shown that the CVSA is no

23    better than a coin toss in various real crimes.  So it's NITV's

24    best interest to try to make that a -- not illegal, but not

25    allowed.  So basically, anybody that buys the CVSA and gets

1    trained by NITV, they're not allowed to see whether or not it

2    works.  They're supposed to just take NITV's word for it that

3    it's 98 percent accurate.  Well --

4              THE COURT:  I'll sustain the objection.  You can move

5    onto your next topic, sir.

6              MR. HERRING:  Okay.

7    BY MR. HERRING:

8    Q.  Mr. Humble, would you like to say where the contact

9    information or where this so-called study, or *Journal of*

10   *Criminalistics*, where it's located and the contact information

11   of it?  Because nobody can find it.

12             MR. DeSOUZA:  Objection.  Relevance.  This goes right

13   back to this Chapman study that we talked about when we first

14   started the hearing, Your Honor.

15             MR. HERRING:  But why is that question ignored?  I have

16   sent requests to the lawyers.  What is the contact information?

17   It's all pertained to showing that NITV lies about itself, its

18   product, its training and Mr. Humble, who claims he's the

19   father of voice stress analysis.  All that goes to damages,

20   Your Honor.

21             THE COURT:  I'm gonna overrule the objection on the

22   limited basis of telling us where the study is published.

23             Where is the study published, Mr. Humble?

24             THE WITNESS:  It's in the *Journal of Criminalistics*, I

25   believe.

```
 1              THE COURT:  Do you know who puts that out?

 2              THE WITNESS:  I'm not sure who published the journal.

 3   It's an 18-year peer review study, and I was not involved in it

 4   at all.  It's on our website.  I mean, if I could pull my

 5   website up, I could tell you who published it.  But it was well

 6   done.  It was an 18-year study, longevity by Professor Chapman,

 7   who is a very well-known criminologist out of New York.

 8              THE COURT:  I appreciate the information.  You can

 9   proceed with your next question, sir.

10              MR. HERRING:  Thank you.

11   BY MR. HERRING:

12   Q.  You brought up --

13              MR. HERRING:  Again, pertaining to this study.

14              THE COURT:  We're done on this study.

15              MR. HERRING:  Okay.

16              THE COURT:  We're done on this study.  Move onto your

17   next topic, sir.

18   BY MR. HERRING:

19   Q.  Mr. Chapman worked for your company for about 20 years,

20   correct?

21   A.  He never worked for our company.

22   Q.  He was associated with it, correct?

23   A.  He was a member of the National Association of Computer

24   Voice Stress Analysts, but he never drew a paycheck, was never

25   paid through our company.
```

24

```
 1    Q.   And NITV owns the CVSA association, correct?

 2    A.   They don't own it, no.

 3    Q.   Okay.   The CVSA association is located in Delaware; is that

 4    correct?

 5    A.   Correct.

 6    Q.   Okay.   And it has an address, correct?

 7    A.   Correct.

 8    Q.   And that address is of a business and rents P.O. boxes,

 9    correct?

10         MR. DeSOUZA:   Objection, Your Honor.   Relevance.

11         THE COURT:   What's the relevance as far as damages?

12         MR. HERRING:   The relevance is, again, another piece of

13    the puzzle that shows how NITV has lied about so many different

14    things, the fact that studies that are proclaimed are fake,

15    made up.   This all has to do with a person committing a crime,

16    an ongoing crime, and claiming feel sorry for me because I've

17    been exposed, and I should get paid money as damages for

18    promoting a scam.

19         THE COURT:   Objection sustained.   You have to move on

20    to another topic, sir.

21         MR. HERRING:   Well, again, I'm not allowed to say

22    anything or ask anything about the Chapman study?

23         THE COURT:   You go ahead and ask any question you want.

24    They'll make an objection and I'll rule on it.

25         MR. HERRING:   Okay.   All right.
```

1    BY MR. HERRING:

2    Q.   Mr. Chapman was the author of this study, correct, that's

3    referred to as the -- that is a referred to as the Chapman

4    study?

5          THE COURT:  Let me cut to the chase here.  What does

6    the Chapman study do for us on the damages issue?

7          MR. HERRING:  The Chapman study has been promoted by

8    NITV since 2012.  Okay.  It's claiming it is a 18-year study

9    that proves CVSA is 98 percent accurate.  CVSA association has

10   put that on its website for many years.  Okay.  Now, I tried to

11   establish that there is no office for the CVSA association --

12   yes, there is no office for the CVSA association, even though

13   its technical address is simply a P.O. box.

14         I was trying to -- I was going to ask where does the

15   phone ring for the NACVSA association.  I was going to ask that

16   question.  Can I ask that question?

17         THE COURT:  What is the relevance as far as damages?

18         MR. HERRING:  The relevance is according to documents

19   and information, the phone number rings in NITV office in

20   Florida.  So the real connection is, NACVSA is actually owned

21   and operated by NITV, and all of its recertification fees of

22   $400 per CVSA examiner every two years for life goes into a

23   bank account that the NITV owners are using.

24         THE COURT:  All of this information might have been

25   very relevant if we were litigating the issue of liability, but

1    because of the discovery violations that were the topic of my

2    order, which I discussed, we're not litigating liability

3    anymore.  What we're litigating is damages.  So I'm gonna find

4    that this inquiry here about the Chapman report is not relevant

5    to the issue of damages; and, therefore, I'm going to sustain

6    the objection to examination of the Chapman report.

7          So you can continue with another topic, if you have

8    another topic you want to address, sir.

9          MR. HERRING:  Well, I'd like to ask one final question.

10          THE COURT:  Okay.  Go ahead.

11          MR. HERRING:  Pertaining to Chapman.

12          THE COURT:  No.  You can ask a question about something

13   else, but you can't ask a question about Chapman.

14          MR. HERRING:  Your Honor, it is very important that I

15   ask this question, just one final question.

16          THE COURT:  Is this your last question?

17          MR. HERRING:  Pertaining to the Chapman issue, yes,

18   sir.

19          THE COURT:  Okay.

20          MR. HERRING:  Please, I --

21          THE COURT:  You ask it and I'll rule whether Mr. --

22   Mr. Humble, don't answer it until I rule whether you have to

23   answer it.

24          MR. HUMBLE:  Yes, sir.

25          MR. HERRING:  Okay.

| | |
|---|---|
| 1 | THE COURT:  Go ahead, sir. |
| 2 | BY MR. HERRING: |
| 3 | Q.  Does the Chapman study, which is a 14-page article, |
| 4 | actually, does it ever mention CVSA or NITV at all? |
| 5 | MR. DeSOUZA:  Same objection on relevance, Your Honor. |
| 6 | MR. HERRING:  The relevance is it's posted on their |
| 7 | website for the last six, seven years by their association, by |
| 8 | the website, NITV, as saying this Chapman study proves CVSA is |
| 9 | 98 percent accurate.  If the Chapman study never mentions NITV |
| 10 | or CVSA, which it does not -- and I have a copy of it -- then |
| 11 | how can NITV claim that it proves CVSA is 98 percent accurate |
| 12 | if it never mentions it? |
| 13 | THE COURT:  I'll sustain the objection.  You can move |
| 14 | onto your next topic, sir. |
| 15 | MR. HERRING:  Can I have a five-minute recess so I can |
| 16 | get my documents pertaining to Mr. Humble?  I did not know I |
| 17 | was going to be asking direct questions at this time.  I |
| 18 | thought it was just going to be -- |
| 19 | THE COURT:  It's still cross-examination.  But, yes, I |
| 20 | will allow that five-minute recess. |
| 21 | MR. HERRING:  Thank you. |
| 22 | THE COURT:  Now, what I suggest you do -- and I'm happy |
| 23 | to give you more than five minutes so you can do this, is I |
| 24 | want you to show them everything that you're going to show him |
| 25 | so that we can see whether there are any questions. |

```
 1              Mr. Humble, since you're in the midst of

 2     cross-examination, you're not to discuss anything about your

 3     testimony with your lawyers at this point.

 4              THE WITNESS:  I understand.

 5              THE COURT:  Okay?  So I recommend that you don't talk

 6     to them at all during this break.

 7              THE WITNESS:  Sure.

 8              THE COURT:  Okay.  Very well.  We're in recess.

 9              THE COURT SECURITY OFFICER:  All rise.

10              THE COURT:  Back on the record.

11              Mr. Humble, I want to remind you that you're still

12     under oath.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  I note for the record that all persons

15     required to be present when the Court recessed are present in

16     court.  No person required to be present is absent.

17              Mr. Herring, let me ask you -- do you want me to take

18     judicial notice of the -- of the website?  Judicial notice is a

19     thing that the Court can do.  It's like saying -- the Court can

20     take judicial notice that the sun comes up in the east.  It's

21     nothing that can be verified easily.  So do you want me to take

22     judicial notice of the website?

23              MR. HERRING:  Which website are you referring to, sir?

24              THE COURT:  The NITV website.

25              MR. HERRING:  Yes.
```

```
 1              THE COURT:  Any objection to me taking judicial notice

 2   of the website?

 3              MR. DeSOUZA:  No, Your Honor.

 4              THE COURT:  Okay.  What is the exact description of the

 5   website, as far as the address goes?  Let me get that from --

 6   Mr. Humble, can you give me the address of the website?

 7              THE WITNESS:  I can, Your Honor.  CVSA, the number one,

 8   dot com.

 9              THE COURT:  CVSA1.com.

10              THE WITNESS:  One, dot com.

11              THE COURT:  Okay.  I'll take judicial notice of that

12   website, without objection from the plaintiff.

13              Okay.  Have you all had an opportunity to consult?

14              MR. DeSOUZA:  Your Honor, Mr. Herring, just 30 seconds

15   before you came out, handed us a stack of documents that he

16   intends to use today.  I frankly think that just about all of

17   them have no relevance to the damages issue, but I suppose

18   we'll see as he attempts to introduce them, whether through

19   Mr. Humble or through his own testimony.

20              THE COURT:  Okay.  Have you given them to them in the

21   order that you're going to offer them up?

22              MR. HERRING:  Yes, sir, as stated on the exhibit list.

23              THE COURT:  Sure.  Well, I mean, like, are you planning

24   on, like, putting up Exhibit B before you put up Exhibit C?

25              MR. HERRING:  Well, it depends how I'm ruled about.  I
```

```
 1    mean, if certain documents in there are relevant to showing

 2    that NITV has just been a scam for 30 years on a fake voice lie

 3    detector that it can't defend with independent studies --

 4         THE COURT:  That's not why we're here today.

 5         MR. HERRING:  Well, it goes towards damages, Your

 6    Honor.  I mean, is the Court going to award damages to a

 7    business that has been defrauding the people, defrauding law

 8    enforcement, defrauding the U.S. military?

 9         THE COURT:  They're going to get damages out of this

10    suit.  The question is how much they're going to get in damages

11    out of this suit.

12         MR. HERRING:  Well, in order to determine how much,

13    Your Honor, this Court has to realize and accept my documents

14    showing that NITV has been established as a fraud by many

15    different sources --

16         THE COURT:  Actually, I don't have to do that because

17    we're not having a trial on liability because of the discovery

18    violations that resulted in me entering the order that's docket

19    entry, I believe, 133, which I understand you got a copy of --

20    another copy of today.  So the only issue is going to be what

21    that figure is.  They have suggested a figure of around

22    $5,000,000.  Okay?  I'm anxious to hear what figure you

23    suggest.  Okay?

24         So right now, we are somewhere between zero and five

25    million and change.  Okay?  Now, I've got to figure out where
```

```
 1   we are on that continuum.  Okay?  But there is going to be a

 2   damage figure, so that's what the focus needs to be on, is on

 3   the damage figure.

 4           Do you understand that, sir?

 5           MR. HERRING:  Yes.

 6           THE COURT:  I'm not asking whether you agree with it or

 7   not, but just do you understand it?

 8           MR. HERRING:  Yes, sir.

 9           THE COURT:  So that's the parameters of the hearing.

10   So you can proceed with your cross-examination.

11           MR. HERRING:  Okay.

12   BY MR. HERRING:

13   Q.  You had said Lourdes runs NITV.  All decisions are made by

14   her?

15   A.  I didn't say that.

16   Q.  Okay.  Who does run NITV?

17   A.  I run day-to-day operations.

18   Q.  You said you're a minority owner of it, though.

19   A.  I'm the managing member.

20   Q.  The managing member.  So you make the decisions, day -- of

21   those decisions?

22   A.  Correct.

23   Q.  And what does Lourdes do?

24   A.  She's a passive owner.

25   Q.  What does the passive owner do?
```

1 A. They hold the stock.  They make the money.

2 Q. But she doesn't make any of the decisions?

3 A. None.

4 Q. Okay.  Now, getting back to Mascara.  You said he was

5 basically in charge of Latin America sales.  And did I ask

6 whether or not he also handles your websites as an IT person?

7 A. Yes, he does.

8 Q. He does.  Okay.  For both websites, Humble.com and NITV?

9 He handles both those websites for --

10 A. I think he may only handle the CVSA website.

11 Q. Okay.  When a new page or a new section is going to be

12 added, or headlines on the homepage are going to be added, who

13 makes the decision as far as who -- who makes the decision

14 whether or not that gets put up?

15   MR. DeSOUZA:  Your Honor, I'll object on relevance and

16 retreading the same ground we already covered before the break.

17   THE COURT:  What's the relevance of that to the damages

18 issue, sir?

19   MR. HERRING:  Well, the relevance is that, as I will be

20 providing documents, again, this -- this lawsuit is about a

21 company claiming damages because of what I have said, but it

22 ignores the fact that whatever they claimed I said or mailed

23 out or whatever against them, they have done far, far worse

24 things against me in my 19 years of owning Dektor, which I have

25 documents that I will be submitting.  I'm trying to establish

1    who approves things to be posted on the NITV website and who

2    knows about those things.

3          THE COURT:  On that basis, I'll sustain the objection.

4    Move on to your next question.

5    BY MR. HERRING:

6    Q.   Who approved the section about Groveport police on your

7    homepage and that section, and in your ads?

8          MR. DeSOUZA:  Your Honor, I'll object to relevance,

9    again.  Where Mr. Herring is going with this is in one of his

10   exhibits that he has here is some section on the website of a

11   police agency that used to use the PSE, then started using the

12   CVSA.  I think where Mr. Herring is going is I want to show

13   that you badmouthed my company, that you've badmouthed the PSE

14   and that you published this information on your website.  It's

15   the same ground that he just tried to cover two seconds ago,

16   Your Honor.

17         MR. HERRING:  Yeah, I am showing the relevancy by

18   saying -- documenting that NITV and whoever runs it was posting

19   lies about my company, taking sales away from me by trying to

20   pretend, oh, well, we're not doing anything wrong.

21         THE COURT:  I'll sustain the objection.  Move on to

22   another topic, sir.

23         MR. HERRING:  Well, I have documents to present, Your

24   Honor.

25         THE COURT:  Move on to another topic, sir.

```
 1    BY MR. HERRING:

 2    Q.   Are you familiar with Dirk Bell?

 3    A.   Who is that?

 4    Q.   Are you familiar with Dirk Bell?

 5    A.   Yes, I am.

 6    Q.   Okay.  Can you tell me what you know about him?

 7    A.   He's the son of the -- one of the inventors of the original

 8    PSE, and ran Dektor Counterintelligence, I believe, in

 9    Virginia.

10         MR. DeSOUZA:  Your Honor, I'll also object to this line

11    of questioning.  Just based on Mr. Herring's exhibit list,

12    which appears to be Exhibits P through V on his exhibit list,

13    which he describes as discussing Bell email, Bell email to

14    somebody else, back from 2004.  Again, it's the

15    people-are-saying-bad-things-about-me approach that Mr. Herring

16    is trying to go down that path again.

17         THE COURT:  Mr. Herring, what's the relevance of

18    Mr. Bell?

19         MR. HERRING:  Well, Mr. Bell, yeah, is the son of the

20    co-inventor, the original co-inventor, one of the two, Howell

21    and Bell.  But if you look at the emails that were sent to me

22    and a website that NITV allowed him to post, the information

23    were just total lies.  And the emails that he sent to me were

24    just totally vile and disgusting, and yet NITV, without

25    consulting me, simply gave him his own section on their website
```

1   and allowing him to sprue (sic) these lies for 19 years.

2        THE COURT:  What relevance do these have to the damages

3   that NITV suffered?

4        MR. HERRING:  Well, the fact that they did not suffer

5   damages, the fact that they were making -- NITV was making

6   money because of posting things by this Dirk Bell, who had no

7   inside information about my company, who had no inside

8   information about my technology, whatever.  And NITV was always

9   quoting him and Groveport police as testimonies that, oh, boy,

10  you better not deal with Dektor or you'll be sorry and so

11  forth, when they did not post the facts why Groveport police

12  did not like my company, which was, I flunked them because they

13  got drunk every night at strip bars and they flunked the

14  course.  But NITV doesn't say that --

15       THE COURT:  I'll sustain the objection.  Move on to

16  another topic, sir.

17  BY MR. HERRING:

18  Q.  On your website and in your ads for the last 30 years, you

19  said that the CVSA was not affected by countermeasures.

20       Do you recall that?

21       MR. DeSOUZA:  Your Honor, objection to relevance.

22  Again, we're going down the path of challenging the substance

23  of the allegations.  Mr. Herring continuously wants to prove

24  that NITV and CVSA is a scam, it doesn't work.  That's what

25  he's been doing in every single filing that he's made in this

1    case, and the time for doing that is long past.

2              THE COURT:  What say you, Mr. Herring?

3              MR. HERRING:  Well, the fact, again, I'm establishing

4    different pieces of the puzzle that clearly show that NITV does

5    not tell the truth about itself, does not have a product of

6    credibility and has constantly been untruthful about the claims

7    Mr. Humble has claimed for himself, that he invented a machine

8    that he had no ability to invent, when in fact he simply took a

9    PSE, hired somebody to repackage it and make it look like his

10   own and sold it for 10 years as a computer voice stress

11   analyzer, when he admits in his website that the first CVSA

12   machine was analog.  Computers are digital.  It's another piece

13   of the puzzle where NITV is lying about itself, but is claiming

14   damages because it's been exposed.

15             THE COURT:  I'll sustain the objection.

16             What your focus needs to be on, sir, is having

17   Mr. Humble explain how what you did hurt Mr. Humble.  You've

18   got to be able to show me how he was hurt.  What dollar figures

19   sustained his being hurt.  That's what this hearing is about

20   here today, so focus your questions on that, sir.

21   BY MR. HERRING:

22   Q.  Mr. Humble, do you have any documentation of people not

23   buying the CVSA because of my information?

24   A.  Yes.

25   Q.  Okay.  And who was that?

1  A.   Actually, documentation, I think, mostly is in the form of

2  the agencies cancelling orders, that sort of thing, citing your

3  -- your faxes and your emails.  In many cases, we had one --

4  I'm trying to remember the sheriff's department now.  It was

5  one of our clients that you sent an email to, with your

6  information, and when we called them to trade in their system

7  on a new CVSA III, they said because of the information they

8  got from you, that they had shutdown their three CVSAs.  They

9  were shutting those down and not gonna use them anymore and not

10 trade them in.  Which brought us -- I think was a loss of

11 around $20,000.  Elko -- I think it's Elko County Sheriff's

12 Department.

13     It's here somewhere.  That's just one example.

14 Q.   Mmm-hmm.  So would you say that all of your customers have

15 been satisfied users?

16 A.   I'd say a vast majority.

17 Q.   Can you give a percentage?

18 A.   Ninety seven.

19 Q.   Ninety seven percent.

20     Okay.  In 2006, do you recall making a statement in your --

21 in one of your emails or letters or -- I forget what it is --

22 that an honest person would always list the names of buyers?

23     Do you recall that?

24 A.   No.

25 Q.   No.  Okay.  You used to -- starting in about 1990, you

1    listed, by state, the names of those buyers; is that correct?

2    A.   That's correct.

3    Q.   And you did that because you believed that people would see

4    those names in their states or their towns and they'd say, oh,

5    they bought it, we've got to buy it.  Basically, wasn't that

6    your purpose of putting the contact information names?

7    A.   Correct.

8    Q.   Okay.  And you had -- you had said --

9         MR. HERRING:  I'm sorry, Your Honor, for the delay

10   here.  I'm trying to find the copy.  Okay.  Well, I may find it

11   later.

12   BY MR. HERRING:

13   Q.   Pertaining to the names that you listed on your website,

14   you stopped doing that in 2006; isn't that correct?

15   A.   Correct.

16   Q.   And why?

17   A.   Our clients were getting the garbage that you sent them and

18   were starting to send it to us, and complaints started coming

19   in about the stuff that you sent out.  So in -- in deference to

20   them, we took those lists down because they didn't want them up

21   anymore because you were inundating them, their sheriffs, their

22   mayors, the newspapers.  They were getting all this crap.  So

23   they asked that their names be taken down.  We started getting

24   a lot of requests.  And so we took them down.

25   Q.   Okay.  And in that crap, as you refer to it -- first of

```
 1    all, the Constitution guarantees freedom of speech.  Would you
 2    agree?
 3           MR. DeSOUZA:  Your Honor, objection.
 4           THE COURT:  Mr. Herring, just go ahead and ask him a
 5    question.
 6           MR. HERRING:  Okay.
 7           THE COURT:  I'm familiar with the Constitution.
 8           MR. HERRING:  I just want to point that to Mr. Humble.
 9    BY MR. HERRING:
10    Q.  So Mr. Humble, you blame that whole reason on me; is that
11    correct?
12    A.  Yes.
13    Q.  Okay.  And it had nothing -- did it have anything to do
14    with the fact that buyers were telling other potential buyers,
15    don't buy it because it doesn't work?
16    A.  No.  That's not correct.
17    Q.  Uh-huh.  And in 1999, isn't it true, your company was sued
18    because of the use of a CVSA that falsely accused a 12-year-old
19    boy of murder?
20           MR. DeSOUZA:  Objection.  Relevance.
21           THE COURT:  What's the relevance to the damages issue?
22           MR. HERRING:  Well, the fact that in 1999, their
23    director, a 12-year director of NITV and a 25-year West Palm
24    Beach police captain, you know, who was a former captain, he
25    stated in federal court that the CVSA was not a lie detector
```

```
 1    and was not capable of lie detection.  So he put it on the
 2    record that the CVSA was not a lie detector, but they continued
 3    to advertise it as such.  Now --
 4         THE COURT:  I'll sustain the objection.  Move on to
 5    your next topic, sir.
 6         MR. DeSOUZA:  Your Honor, just for the record,
 7    Mr. Humble's damages and his declaration concern the years 2017
 8    and 2018, and then, I think, a three-year look forward, whereas
 9    Mr. Herring is now going into 1996, 1999, 20 years before any
10    of these damages figures even come up.
11         MR. HERRING:  Well, they --
12         THE COURT:  That's good advice as to where your focus
13    should be, sir.
14         MR. HERRING:  Well, again, it's interesting that,
15    according to the report by the CPA here, he never verified the
16    names, whether or not they were actual buyers, how many they
17    bought, how many were recertified, and --
18         THE COURT:  I have that point in my notes.
19         MR. HERRING:  Okay.  So --
20         THE COURT:  And you can -- you can move to another
21    topic.  We've already elicited testimony on that.  You were
22    getting on track when we had the discussion about the Elko
23    County Sheriff's Office dropping off due to your comments.
24    That would be fruitful ground for you to pursue.
25
```

1   BY MR. HERRING:

2   Q.  Do you have that letter?

3          THE COURT:  Well, it would be fruitful ground if any

4   other ones like Elko County.

5          MR. HERRING:  Well, he stated one.  I'd like to see

6   documentation of it, which seems -- documentation seems to be

7   lacking, it's just take my word for it, just like the claims by

8   NITV for 30 years.  Take our word it works, take our word it's

9   98 percent.  I'd like to see documents, facts.

10          THE COURT:  You can ask him if he has the

11   documentation.

12   BY MR. HERRING:

13   Q.  Do you have the documents, Mr. Humble?

14   A.  I don't believe I have a document here.  I'm not sure that

15   we have a letter from them.  We were contacting all of our

16   agencies out there that had the CVSA II and sent them little

17   flyers that they could trade it in, special discount price for

18   trading it in for the CVSA III.

19          When our staff contacted Elko County, and that's the Elko

20   -- El Paso, sorry, El Paso County Sheriff's Department in

21   Colorado, they were told that due to the information that they

22   received from you, they were discontinuing the CVSA program and

23   not -- would not be trading in their three CVSAs.  That

24   represents a loss of the three CVSA trade-ins of $18,000.

25   Q.  Well, isn't it true, Mr. Humble, that the information that

1   was sent to them was all factual, and that's why they decided

2   not to buy them or trade them in?  Isn't that true --

3          MR. DeSOUZA:  Objection.

4   BY MR. HERRING:

5   Q.  -- that the information that I sent was factual --

6          THE COURT:  I'll sustain --

7   BY MR. HERRING:

8   Q.  -- and they checked it out?

9          THE COURT:  I'll sustain the objection.

10          MR. HERRING:  I didn't hear --

11          THE COURT:  He objected.  He objected in the middle of

12   your question as to relevancy and I sustained the objection.

13   You don't have to answer that one.  Next question, sir.

14          MR. HERRING:  I don't understand why it's not relevant,

15   that the information that was being sent, they saw the

16   information for the first time, they verified it as being true,

17   and that's why they did not by any more CVSAs.

18          THE COURT:  It would all be quite relevant if liability

19   was the issue here, but liability is not the issue here.

20   Liability has already been established.

21          Mr. Humble, other than El Paso County, do you remember

22   any other specific customers that said we're gonna stop doing

23   business with you because of Mr. Herring or Dektor's comments?

24          THE WITNESS:  Basically the entire country of Ecuador.

25   They were very good clients of ours.  We sold them, I think,

```
 1    around 35 or 40 CVSAs.  Miguel Mascara was instrumental in
 2    having that done.  They started receiving Mr. Herring's
 3    information, and over about a year, year-and-a-half period of
 4    time, they just basically started putting the CVSAs away, and
 5    we haven't sold anything to them or heard from them in a couple
 6    of years now.
 7              THE COURT:  And how much money was that for Ecuador?
 8              THE WITNESS:  That was about 400 -- I'd say, 450,000.
 9              THE COURT:  Okay.  So we've got Ecuador and El Paso
10    County.  Any other specifics that you can remember?
11              THE WITNESS:  I don't normally handle the day-to-day
12    phone calls and that sort of thing.  I'm a three -- I drive up
13    from Miami three days a week and drink coffee and sit with the
14    employees.  So -- but they were telling me about it.  They were
15    saying they were having these problems, but I didn't document
16    those.
17              THE COURT:  But you're interested in the hits your
18    business takes because of Mr. Herring's comments, correct?
19              THE WITNESS:  Exactly, Your Honor.
20              THE COURT:  Mr. Herring, any other questions you want
21    to put, sir?
22              MR. HERRING:  Yes.
23              So do I understand it correctly, it doesn't matter that
24    the information was correct and truthful, but the fact they did
25    not buy it, that's worth damages?  I don't understand.
```

```
 1              THE COURT:  Because liability is not an issue, sir,
 2    because of the reasons as laid out in docket entry 133.  The
 3    time for litigating that has passed.
 4              MR. HERRING:  But --
 5              THE COURT:  So now the issue is strictly damages.  So
 6    they have to prove that they've been damaged by what you've
 7    done.  And what you're trying to do at this hearing should be
 8    to try to show that they haven't been damaged by what you've
 9    done, whether that's truthful or not.
10              Do you understand, sir?
11              MR. HERRING:  I'm trying to establish the fact that a
12    business that lies about itself cannot be claiming damages for
13    -- for doing -- for committing this fraud.  I don't understand
14    how they can say, yes, we are a fraud, but we deserve money.
15              THE COURT:  First, they're not saying they are a fraud.
16    The time for proving whether they're a fraud or not has been
17    passed.  The reason it's passed is because of all the discovery
18    violations that were discussed in docket entry 133, which has
19    led to this unusual result.  But that's why we are where we are
20    today.
21              So we are here because of the behavior that's taken
22    place.  Now the issue is what damages they get.  They're
23    claiming something akin to five million, and we're trying to
24    get some specifics like we got with El Paso County Colorado and
25    with Ecuador.
```

```
 1              MR. HERRING:  Do they have documentation of them?

 2     People don't buy things every day of the week.  People buy

 3     something, they find out --

 4              THE COURT:  Mr. Herring, your question to Mr. Humble

 5     is, do they have -- do you have documentation, sir?

 6              THE WITNESS:  No, Your Honor.  We can get an affidavit

 7     from Miguel because he was down there, and that's what they

 8     told him.

 9              THE COURT:  Okay.  Next question.

10     BY MR. HERRING:

11     Q.   This Miguel Mascara, who you said works on your websites,

12     right?

13     A.   Correct.

14     Q.   And he's head of your Latin America sales.  Is that the

15     same Mascara that signed an affidavit saying he had no

16     connection to NITV in the very beginning and said that he had

17     no connection to NITV, he didn't know anybody at NITV --

18              MR. DeSOUZA:  Objection.

19     BY MR. HERRING:

20     Q.   -- and the plaintiff used that to establish or to claim

21     that the jurisdiction of the lawsuit should be here in Florida,

22     even though I don't have any connection, no property, no sales,

23     no nothing to Florida.  So in other words -- is that the same

24     Mascara?

25              MR. DeSOUZA:  Objection.  Relevance.
```

1          MR. HERRING:  Relevance is the fact that these lawyers

2     submitted a fake affidavit, under penalty of perjury, where

3     this Mascara was supposed to be nobody, had no connection, and

4     I have a copy of that.  And yet, it turns out they lied who

5     this Mascara was.

6          THE COURT:  Sustained on this issue.  Next question.

7     Objection sustained.  Next question, sir.

8     BY MR. HERRING:

9     Q.   Mr. Humble, you're claiming that I had caused the sales of

10    all these losses; is that correct?

11    A.   All of what losses?

12    Q.   All of the losses you claim you would have made if I wasn't

13    around, basically.  Is that what you're claiming?

14    A.   If you had not sent out the information.

15    Q.   Okay.  What about all the news media stories that were done

16    for the last 30 years exposing your company as a scam?  Don't

17    they have any effect on police departments, sheriff, prisons,

18    whatever, who read those articles and make a decision not to

19    buy it?

20         MR. DeSOUZA:  I'm gonna object on the basis of

21    relevance.  Again, with liability established, the allegation

22    in the complaint is that Mr. Herring's emails are what caused

23    these agencies not to purchase the CVSA product, and he's now

24    trying to establish, no, that's not the case, there's other

25    reasons they were not purchased.

1           MR. HERRING:  Exactly, exactly, but they --

2           THE COURT:  Mr. Herring, let me rule.  Okay?

3  Overruled.  Answer the question, Mr. Humble.

4           THE WITNESS:  There could have been a few articles here

5  and there.  Most of them, I believe, by reading your e-mail

6  trail, were generated by you, and a lot of it was simply on

7  false information generated by you.

8  BY MR. HERRING:

9  Q.  Can you name examples of that false information?

10  A.  I don't have that in front of me here.

11  Q.  Off the top of your head, can you name one statement that I

12  ever made that was false about you or your company or your

13  product?

14  A.  Well, you said that I purchased my Ph.D. from a diploma

15  mill.

16  Q.  Well, Mr. Humble, that diploma mill was called Indiana

17  Christian University; is that correct?

18           MR. DeSOUZA:  Objection.  Relevance, Your Honor.

19           MR. HERRING:  He brought it up.

20           THE COURT:  What's the relevance to the issue of

21  damages?

22           MR. HERRING:  He stated he got -- one of my lies was

23  that he got a doctorate from a diploma mill.

24           THE COURT:  Mr. Humble, do you believe that cost you

25  business?

1          THE WITNESS:  Very minute.

2          THE COURT:  Okay.

3          MR. HERRING:  Well, again, it goes towards the fact

4    that he's blaming -- he's claiming one of the lies in the

5    emails or letters that I sent out was that he got his

6    doctorate, Ph.D. --

7          THE COURT:  I'll allow you to ask him limited questions

8    on this.  So you go ahead and ask your questions.

9          MR. HERRING:  Okay.

10         THE COURT:  Objection is overruled.

11         MR. HERRING:  Okay.

12   BY MR. HERRING:

13   Q.   You posted a copy of that certificate on your website,

14   correct?

15   A.   Correct.

16   Q.   Okay.  And what is your Ph.D. in?

17   A.   Psychology.

18   Q.   Okay.  And what did you do to obtain that degree of --

19   doctorate of psychology?

20   A.   That was an honorary degree.

21   Q.   And does it say that on the certificate?

22   A.   Yes.  It says honoris causa.  If you read the certificate,

23   right underneath where it says psychology, it says honoris

24   causa.

25   Q.   Does it say, in plain English, that is supposedly an

 1  honorary degree?

 2         MR. DeSOUZA:  Objection at this point, Your Honor, to

 3  relevance.

 4         MR. HERRING:  Well, it is relevant because the fact

 5  that --

 6         THE COURT:  You made -- you've made your point,

 7  Mr. Herring, that it's an honorary Ph.D.  Have you heard me

 8  address Mr. Humble as Dr. Humble here today?

 9         MR. HERRING:  No.

10         THE COURT:  Okay.  Next question.

11  BY MR. HERRING:

12  Q.  Did that -- what did you have to do to obtain that honorary

13  degree of doctorate?

14         MR. DeSOUZA:  Objection, relevance.

15         THE COURT:  I'm gonna sustain the objection.  You've

16  made your point on the Ph.D.  Move on to another topic, sir.

17         MR. HERRING:  Okay.

18  BY MR. HERRING:

19  Q.  Okay.  Let me read you some quotes, and you tell me your

20  comment.

21      "NITV agreed to pay civil penalties of $100,000 in

22  connection with unauthorized exports of CVSA to countries not

23  considered friendly to the United States."

24      That was by the Department of Commerce that published it in

25  2006?

```
 1              MR. DeSOUZA:  Objection.
 2    BY MR. HERRING:
 3    Q.  Do you think that had any relevancy on your sales?
 4              THE COURT:  What's the basis of the objection?
 5              MR. DeSOUZA:  Relevance, Your Honor.  I don't know why
 6    Mr. Herring thinks that some civil penalty against NITV from 10
 7    years prior to the damages at issue in this case has any
 8    relevance to NITV's damages.
 9              THE COURT:  So your contention is that it's not
10    relevant due to the time period?
11              MR. DeSOUZA:  Correct.
12              THE COURT:  Okay.  Sustained.
13              We're talking about the time period of this lawsuit,
14    Mr. Herring, so that's what you need to have your focus on.
15              MR. HERRING:  But the fact was, Your Honor -- the fact
16    that these things that happened before influenced people's
17    minds.  And the plaintiff is well aware, from the deposition
18    from last September of myself, when they asked me about how
19    many PSEs do you sell a year?  And I said, only about two or
20    three because of the wild claims by NITV in their claims.
21              So if these people were not buying the CVSA, where were
22    they going for lie detection?  It certainly wasn't Dektor.  So
23    basically, they decided not to buy it, and maybe in the future
24    they might be a PSE or polygraph or something else.  But again,
25    the fact is, they did not buy it from me, so they could --
```

1    plaintiff can't say that I was getting these sales because of

2    the emails and letters or whatever.

3         THE COURT:  I'll sustain the objection.  Move on to

4    your next topic, sir.

5         MR. HERRING:  So we're talking about only the claims

6    from 2014 to 2018?

7         THE COURT:  Counsel, what's our time period here?

8         MR. DeSOUZA:  Your Honor, the only damages that are

9    being sought here are 2017 and 2018, and then Mr. Humble

10   carries that forward by three years for sales specifically in

11   Texas.  The accountant, Mr. Foytek, dealt with loss profits, I

12   believe, in 2017 and 2018.  Actually, it's back to 2014 to

13   2018, loss profits generally through the U.S.  Mr. Humble

14   limited himself just to the state of Texas, from 17 forward.

15        THE COURT:  Okay, sir.  There's your parameters.

16        MR. HERRING:  So '14 to '18 in the United States.  And

17   what was it for Texas?

18        THE COURT:  2017 in Texas, which is part of the United

19   States.

20        MR. HERRING:  Okay.

21        THE COURT:  Even though they may not think so at times.

22   BY MR. HERRING:

23   Q.  Mr. Humble, explain the situation of Texas pertaining to

24   lie detection.

25   A.  For many years, Texas had a polygraph-only law.  You

1    couldn't use anything, regardless of how well it worked or how

2    effective it was, if it was not the polygraph.  The Texas

3    polygraph association had that law passed in 1975, I believe,

4    and in the instrumentation section they put the three functions

5    of the polygraph, which outlawed everything else.

6    Q.   Okay.  And you've operated or NITV has existed since 1988.

7         Did you make any attempts to get Texas or any of the other

8    five states that only have polygraph only, were you successful

9    in overturning any of those laws?

10   A.   Yes.

11   Q.   Really?  Which ones?

12   A.   Illinois.

13   Q.   Illinois.

14        Okay.  So you, NITV alone, got that law changed?

15   A.   Yes, we did.

16   Q.   Uh-huh.  Well, they were --

17            THE COURT:  I don't see the relevancy of that inquiry,

18   so let's move on to what you want to get on to.

19            MR. HERRING:  Okay.

20   BY MR. HERRING:

21   Q.   Pertaining to Texas, they have a licensing board called

22   TDLR, Texas Department of Licensing and Regulations; is that

23   correct?

24   A.   Correct.

25   Q.   Okay.  And on that board, had about 10 people,

1   approximately 10 people; is that correct?

2   A.  That's correct.

3   Q.  Okay.  And one of them was a polygraph examiner; is that

4   correct?

5   A.  I assume it was.

6   Q.  Okay.  And at that meeting, I also attended.  Are you aware

7   of that?

8   A.  Yes, I am.

9   Q.  Okay.  And the law had been changed about two years early

10  by other people, and probably -- you're gonna claim NITV did

11  too, along with Dektor --

12          MR. DeSOUZA:  Irrelevant.

13  BY MR. HERRING:

14  Q.  -- to help get that law changed to allow other types of lie

15  detectors to be allowed in Texas besides polygraph; is that

16  correct?

17  A.  We spent about $200,000 on lobbyists and a -- a lobbyist

18  and lobbying different senators to get that law changed, and

19  you, sir, were not involved.

20  Q.  How can you say that?

21          THE COURT:  What's the relevance of who was involved in

22  changing Texas law?

23          MR. HERRING:  Well, I'm just trying to give it some

24  background information.

25          THE COURT:  I don't need the background.  I need to

1    focus on the damages.

2    BY MR. HERRING:

3    Q.  Okay.  Do you have records today to prove you spent

4    $200,000?

5    A.  Yes, we do.

6         THE COURT:  What's the relevance of -- I just indicated

7    that I don't need background on it as to how the law was

8    changed.  I'm talking about the focus on damages.  Please keep

9    your focus on damages, sir.

10        MR. HERRING:  Well, I just wanted to see if there was

11   proof of that sustaining that 200,000.  Okay.

12   BY MR. HERRING:

13   Q.  And as I recall, there was about eight or so vendors there;

14   is that correct?

15   A.  I don't know how many.  There were several.

16   Q.  Okay.  There were -- a couple of polygraph companies were

17   there, and there was a charge, I believe, for the vendors'

18   table.  I think it was a couple of hundred dollars, $300,

19   something like that.

20        MR. DeSOUZA:  Objection.  Objection to relevance.

21        THE COURT:  What's the relevance?

22        MR. HERRING:  I'm getting to it.  I'm getting to it.

23        THE COURT:  I don't need all the details about, you

24   know, the conference and, you know, whether they provided

25   snacks or not.  I just need to focus on what the damages are.

```
 1            MR. HERRING:  Okay.

 2    BY MR. HERRING:

 3    Q.  Do you recall -- were you there at that meeting?

 4    A.  No, I was not.

 5    Q.  Okay.  I was.  There were about 25 people in the audience

 6    and all of them were polygraph examiners.

 7            MR. DeSOUZA:  Objection.

 8            MR. HERRING:  I'm trying to give some background here.

 9    I mean, come on.

10            THE COURT:  Mr. Herring, I don't need the background.

11    Focus on whether he lost any sales because of you in Texas.

12            MR. HERRING:  Well, I'd have to make it a statement,

13    which I can't do at this time.

14            THE COURT:  Yes, you can.

15            MR. HERRING:  Okay.

16            THE COURT:  You can ask him, is it true that you claim

17    that you lost sales due to me in Texas.  If so, how much.  You

18    can ask him that.

19            MR. HERRING:  Well, he's already stated he blamed

20    everything on me.  I'm trying to say that there was not -- that

21    there were other people that spoke about NITV that condemned it

22    and --

23            THE COURT:  I'm trying to give you a steer here so we

24    can focus on getting this information out.  Okay?  So why don't

25    you try -- why don't you just try it the way I suggested for a
```

1   second and see what happens.

2   BY MR. HERRING:

3   Q.   Mr. Humble, do you recall that you had three individual

4   persons connected to NITV at that conference?

5   A.   I believe there were two.

6   Q.   Okay.   There was one from NITV; is that correct?

7   A.   Yes.

8   Q.   And there was one from your CVSA member association; is

9   that correct?

10   A.   Correct.

11   Q.   And there was one from your international sales that was

12   there also; is that correct?

13   A.   I'm not familiar with that.

14   Q.   Okay.   Each vendor, as we were called, were allowed to

15   speak.   Each one of us was given approximately 15 minutes of

16   time; is that correct?

17        MR. DeSOUZA:   Your Honor, same objection on both

18   relevance and now it's gonna get into hearsay, because

19   Mr. Humble just said he wasn't even at the conference.   So

20   Mr. Herring is essentially testifying as to what happened and

21   asking him to agree to it.

22        MR. HERRING:   He had people there representing him and

23   they, I'm sure, told him what was going on and what happened.

24        THE COURT:   That's what we call hearsay.   I'll sustain

25   the objection.

1            Mr. Humble, did you lose any sales in Texas because of

2    direct actions of Mr. Herring?

3            THE WITNESS:  Yes, we did, Your Honor.

4            THE COURT:  And how much do you think you lost?

5            THE WITNESS:  We lost our initial investment of

6    $205,000.  The --

7            THE COURT:  Now, when you say your initial investment

8    of $205,000, what's that?

9            THE WITNESS:  That was to get the law changed by

10   lobbyists and about -- over -- about two years of going to the

11   legislature and convincing them to allow the CVSA to be used.

12           THE COURT:  Okay.

13           THE WITNESS:  So they did change the law, and it said

14   the director of licensing may -- instead of will, they put may.

15   So then we had to go down and make trips to the board and

16   discuss these things with the board, give them briefings, bring

17   in CHP people, and they finally agreed they were gonna have

18   their summit, which was -- they invited everybody in to give

19   their input before they wrote up the regulations for voice

20   stress.

21           THE COURT:  Let me make this real simple.  How many

22   machines do you think you were not able to sell in Texas

23   because of Mr. Herring's or Dektor's statements?

24           THE WITNESS:  We believe that, based on California's

25   purchases -- they're about the same size, law

```
 1    enforcement-wise --
 2           THE COURT:  Okay.
 3           THE WITNESS:  Just the California Highway Patrol has 32
 4    CVSA.  That's $320,000, plus all the training fees.  The
 5    California Department of Corrections has bought 58 CVSAs, plus
 6    all of the people who were trained.  We would assume just those
 7    two agencies in Texas, the Texas State Police and the Texas
 8    Department of Corrections, would have turned around and become
 9    some of our first customers and bought at least that many
10    systems.
11           And so we have about $500,000 a year in purchases of
12    CVSAs and about $250,000 a year in training and
13    re-certification expenses that we lost.
14           THE COURT:  Give me the first figure again.
15           THE WITNESS:  500,000.
16           THE COURT:  And that was in sales?
17           THE WITNESS:  For sales, and $250,000 a year in
18    training and re-certification fees.
19           THE COURT:  Okay.
20    BY MR. HERRING:
21    Q.  Mr. Humble, how does it stand today in Texas?
22    A.  It stands the same way.  There's no CVSA sales.  They did
23    not amend the law.  They didn't put into place -- they amended
24    the law.  They did not put in place the specific regulations
25    for voice stress analysis.  It's still polygraph only.
```

```
 1   Q.   So nobody, other than polygraph -- or I should say, no

 2   other machine, technology, whatever, for lie detection can be

 3   used in Texas except polygraph; is that correct?

 4   A.   Not to my knowledge.

 5   Q.   Okay.  So --

 6            THE COURT:  Wait a minute.  Can any machine other than

 7   a polygraph be used in Texas?

 8            THE WITNESS:  Not to my knowledge, Your Honor.

 9            THE COURT:  Okay.

10   BY MR. HERRING:

11   Q.   And that would include body language courses?

12   A.   They're not machines --

13            THE COURT:  Mr. Herring, why don't you quit while

14   you're ahead.

15   BY MR. HERRING:

16   Q.   Do you have any documentation that simply because I

17   contacted these -- this TDLR, which, by the way I was down

18   there and I spoke.  Do you have any documentation that blames

19   this whole problem on me but not the facts --

20            THE COURT:  Mr. Herring, what did I just say about

21   Texas?  I just said why don't you quit while you're ahead.

22            MR. HERRING:  Okay.

23   BY MR. HERRING:

24   Q.   You keep a list of the people that stopped using CVSA?

25   A.   Not an actual list.  If we contact an agency -- because
```

 1   every two years, they're required to recertify, and so we have

 2   that list of examiners.  I think we have 5,000 examiners

 3   throughout the U.S., and we send them a little card, you know,

 4   letting them know it's time for their re-certification.

 5       If we don't hear back from them for a while, then sales and

 6   marketing will go into their file and contact them to find out

 7   why.  And if, in fact, they have discontinued for one reason or

 8   another, then we mark them as discontinued.  But we don't have

 9   a file that, you know, generally keeps track of that.

10   Q.  So you're disregarding all outside influences why you don't

11   have sales, except that -- blaming everything on me; is that

12   correct?

13   A.  No.  I think we have a 10 or 15 percent discount on here

14   that may have been factors other than you.  I'm not sure where

15   it is in here that -- I think the attorneys might be able to

16   find it quicker than me.  But there is a discount in here

17   somewhere.

18   Q.  What do you mean, a discount?

19   A.  Well, a discount -- any loss in sales that we feel may be

20   out there.  No, we're not saying you're 100 percent.  There may

21   be other factors involved.  There may be -- the polygraphers

22   control the department and they talked the chief out of buying

23   our system.  There could be a number of things.

24   Q.  Mmm-hmm.  You had claimed -- I'm looking at your

25   declaration.  You claim you're the father of forensic voice

1    stress analysis.  How did you get that title?

2            MR. DeSOUZA:  Objection to relevance.

3            THE COURT:  What's the relevance?

4            MR. HERRING:  Well, again, it's called -- at the very

5    least, it's puffery.  At the very worst, it's lies.  It's

6    making people think they're buying into something of this

7    exceptional quality --

8            THE COURT:  Objection sustained.  Move on to another

9    topic, sir.

10   BY MR. HERRING:

11   Q.  You claim you developed the CVSA.  What did you do to

12   develop it?

13           MR. DeSOUZA:  Objection.  Relevance.

14           MR. HERRING:  I'm just quoting from his --

15           THE COURT:  I'll allow the question on the development

16   of the CVSA.  Overruled.

17           THE WITNESS:  A company called Contel International, in

18   Indianapolis, Indiana approached me.  I was an examiner there.

19   I had a pretty large lie detection company.  And they

20   approached me and said they would like to develop a new voice

21   stress analyzer that could be used covertly and that sort of

22   thing, and if I'd be willing -- I was using the PSE at the time

23   -- and if I would be willing to go 50/50 with them.

24           They were -- they would provide the technical people,

25   the funding, that sort of thing.  I would provide the

```
1    expertise.  At the end of the day, they would get to sell the
2    system in the private market, and I would get the government
3    market.  We spent about two years -- seems like we started in
4    1986 and took about two years and came out with the CVSA in
5    1998.
6               And I never said I invented anything.  I said I
7    developed.
8    BY MR. HERRING:
9    Q.  Well that's a very broad term, but you've clearly --
10   haven't you clearly made it visible that you're taking credit
11   for it?
12              THE COURT:  Mr. Herring, don't argue with the witness.
13   Just go ahead and pose your question to him.
14   BY MR. HERRING:
15   Q.  Isn't it true, Mr. Humble, that your so-called CVSA was
16   simply a PSE that you had and you hired a guy by the name of
17   Nick Torfino to basically repackage it and make it look like a
18   different type of lie detector?
19              MR. DeSOUZA:  I'm gonna object on relevance again, Your
20   Honor.
21              MR. HERRING:  Relevance is he's claiming he did
22   something when, in fact, he didn't.  He didn't invent anything.
23   He didn't develop --
24              THE COURT:  The objection is sustained.  Move on to the
25   next topic, sir.
```

1          MR. HERRING:  I have brought, Your Honor, a videotape

2    of the ABC News investigation story on Humble in 2006.  It's

3    listed on the exhibit list.  Will this Court be looking at it?

4          THE COURT:  You know, you need to keep your voice up so

5    the court reporter can hear you.

6          MR. DeSOUZA:  Your Honor, I'm gonna object on three

7    grounds to this video.  I've never seen it, but I believe it's

8    some news story from 2006, according to Mr. Herring.  One, it's

9    not relevant to the issue of damages.  Two, there's no

10   foundation for it.  There's no one here testifying to it as to

11   what it is.  And three, it's clearly hearsay.  In fact, I think

12   it's hearsay upon hearsay upon hearsay, because I suspect it's

13   a news article interviewing other people.  I don't know if it's

14   Mr. Herring speaking on it, but it's clearly hearsay, there's

15   no foundation, and it's got no relevance of damages.

16         THE COURT:  What is your response, Mr. Herring?

17         MR. HERRING:  Well, the response, Your Honor, is

18   Mr. Humble says that out of his own mouth, in 2006, when he was

19   asked directly by ABC News, are there any independent studies

20   that proves your CVSA is 98 percent accurate.  His reply was,

21   no.  A year earlier, in the Arizona republic, he --

22         THE COURT:  What's your response as to how this is

23   relevance to the issue of damages for the time period involved?

24         MR. HERRING:  It's relevant, the fact that the ABC News

25   segment was broadcast twice.  It was national, and that

```
 1    certainly had people watching it that were in law enforcement

 2    and other entities --

 3              THE COURT:  When was it broadcast nationally?

 4              MR. HERRING:  2006.  It's been up on the internet ever

 5    since then.  So again, to discard all those articles and

 6    interviews dating back 30 years, that the influence that it had

 7    -- and again, anybody that's in business knows, business goes

 8    up and down.  And anybody in business knows that outside

 9    stories, whatever, have an influence on their business.

10              THE COURT:  I'll sustain the objection.

11              MR. HERRING:  If Your Honor would look at Exhibit UUUU,

12    four Us.

13              THE COURT:  PSE, CVSA pictures?

14              MR. HERRING:  Yes, sir.

15              MR. DeSOUZA:  Your Honor, I'll again object on

16    relevance.  I don't see how it's relevant to damages.

17              MR. HERRING:  Well, it goes -- it's relevant to the

18    fact that PSE was bought -- I know that as a fact.  He hired

19    this Nick Torfino to repackage it, and you can see the dramatic

20    similarities between the two, the same suitcase, the same chart

21    recorder.  It was simply a PSE that he had repackaged just so

22    he could sell it as his own, and you --

23              THE COURT:  I'll sustain the objection.

24              MR. HERRING:  Your Honor, I forget.  Before we took

25    that recess, did we establish whether or not it was allowed
```

```
 1   that the -- when I ask a question, was there anywhere in the

 2   Chapman study that it ever mentioned CVSA or NITV?

 3              THE COURT:  I sustained on --

 4              MR. HERRING:  Was that ruled on?

 5              THE COURT:  I've sustained the objections using the

 6   Chapman study for our issue here today.

 7              MR. HERRING:  Well, it all goes to the fact that a scam

 8   is trying to claim damages and blaming me for everything,

 9   without documentation of outside influences, what relevancy

10   those outside influences had on that lack of sale, plus the

11   fact that people -- buyers were talking to each other.  And the

12   news media, nationwide, has been documenting the same things,

13   that it's not a real lie detector, which was admitted in

14   federal court.

15              THE COURT:  The testimony that I have before me is that

16   they are saying that you are responsible for 85 -- from 85 to

17   90 percent of their damages.  That's the testimony I have from

18   Mr. Humble.

19              Perhaps you might want to ask him how they determined

20   that figure.

21              MR. HERRING:  Okay, Your Honor.

22   BY MR. HERRING:

23   Q.  How did you determine that figure?

24   A.  The feedback that we get from our clients, from potential

25   clients and that sort of thing.  There's basically nothing out
```

1    there beside what you do that influenced -- influences them one

2    way or another.  When we go out to new clients and give

3    briefings, again, the only negative that comes up is you and

4    your mailings.

5         But we didn't -- again, we didn't want to sit here and say

6    that -- even though we don't know of any real other influences,

7    we didn't want to sit here and say 100 percent is you.  So

8    that's why we discounted it down to 10 to 15 percent.  Because

9    of all our experiences in the field, whether he we go out and

10   give a briefing at an agency, when we talk to the clients over

11   the phone, that's -- you are the only thing that comes up.

12   Q.  So do they ever ask you for independent studies that proves

13   your device works?

14   A.  Rarely.

15   Q.  Rarely.  So it's just take your word for it because you're

16   NITV, that, well, that's good enough to say that the machine

17   works and that the training is -- the made-up training that you

18   said you created is valid?

19        MR. DeSOUZA:  Objection.

20   BY MR. HERRING:

21   Q.  Just your word?

22        MR. DeSOUZA:  Objection, Your Honor.

23        THE COURT:  I'll object to the argumentative nature of

24   the question.  Just ask him the simple question.  Leave out the

25   argumentative stuff.

1          MR. HERRING:  Okay.

2   BY MR. HERRING:

3   Q.  You said -- did you just say that they rarely ask for a

4   study that proves it works?

5   A.  Yes.

6   Q.  Would you think that a law enforcement agency that's going

7   to be using it for criminal investigations and employment

8   screening of possible law enforcement and also Internal

9   Affairs, wouldn't you think that they would want to have some

10  proof that it works?

11         MR. DeSOUZA:  Objection.  Speculation.

12         MR. HERRING:  No, I think that's common sense, that if

13  you're going to buy a lie detector, you're going to say, what

14  proof do you have that it works?  I'm always asked.

15         THE COURT:  I'll allow this question.  Overruled.

16         THE WITNESS:  Normally I would say at least 50 percent

17  or 70 percent of our sales are word of mouth, one department to

18  another.  They go to a convention, they talk.  Hey, we got this

19  CVSA, this thing's great.  Or the agency next door buys it and

20  they start breaking cases right and left and then they come

21  over and run some cases.

22         That's how the Illinois police bought it.  They didn't

23  have enough polygraphers.  Their agents were going to local

24  police that had it and they did so well that the Illinois

25  police decided to staff their agency with it.

1          So in regards to that, it's mostly word of mouth, and

2     when they look on our website and they see the Atlanta police

3     has been using it since 2003 and they dropped the polygraph;

4     the California Highway Patrol has been using it since 2000 and

5     they dropped the polygraph.  And the list goes on and on.

6          So I don't think there's so much concern with, gee,

7     golly, where's your scientific evidence.  They look at the

8     preponderance of law enforcement agencies that use it, and

9     these are all accredited law enforcement agencies.

10    BY MR. HERRING:

11    Q.   Mmm-hmm.  Mr. Humble, are you aware, or can you tell me,

12    offhand, approximately how many police and sheriff's

13    departments there are in this country?

14    A.   I think there may be around 15,000 -- 12- to 15,000, I

15    think.  I really could be off there, but --

16    Q.   I would agree with your 15,000, in that I have a law

17    enforcement directory and I added up those numbers.  So there's

18    approximately 15,000 police and sheriff's departments in this

19    country, not including prisons, probation, college police,

20    state agencies, federal agencies.  Okay?  So out of that total

21    of 15,000, just police and sheriff's departments, you're

22    claiming in your documents that you gave the CPA, you currently

23    have approximately 2,703 so-called buyers of CVSA.  Would you

24    agree with that, that your number is about --

25    A.   Seems right.

69

1    Q.   Okay.  Have you -- you have been in business for about 30

2    years; is that correct?

3    A.   About, yes.

4    Q.   Okay.  And you advertised in a major, major international

5    police magazine called *The Police Chief* that's put out by the

6    International Association of Chiefs of Police, is a 25,000

7    member worldwide organization.  You took out, basically, two

8    page -- two full-page ads every month for about 15 years; is

9    that correct?

10   A.   That's incorrect.

11   Q.   Okay.  Give me your answer.  What is your answer as far as

12   the size of ads and how long you've advertised in that

13   magazine.

14   A.   We advertised for a very short period of time.  It was not

15   very productive at all.

16   Q.   Oh, I didn't know that.

17         MR. DeSOUZA:  Your Honor, just for a point of

18   clarification, I want to object on relevance because I think

19   the time period of these ads is well before the 2017, 2018 time

20   frame.  Perhaps Mr. Herring could ask that question, just to

21   help the Court determine the relevance here.

22         THE COURT:  When was the last time you advertised in

23   *The Police Chief* magazine?

24         THE WITNESS:  15 years ago.

25         THE COURT:  Okay.

1          MR. DeSOUZA:  Then I'll object on relevance.

2          THE COURT:  Very well.  There's no question before us

3    right now.

4          MR. HERRING:  Okay.

5    BY MR. HERRING:

6    Q.  So based on the fact that there's about 15,000 police and

7    sheriff's departments, just those, in the United States,

8    excluding prisons, college police, district attorneys and so

9    forth, your total sales that you're claiming is 2,700 after 30

10   years.  Why hasn't 50 percent of the police and sheriff's

11   departments bought it if it's 98 percent accurate?  Why not 75

12   percent?  What -- why haven't they?

13   A.  I would say, if you're familiar with the law enforcement

14   community, most of those agencies are very small.  Most of

15   those agencies have five, six, 10 employees, and they don't

16   have the funding to purchase the CVSA or the polygraph.  If you

17   really look at the percentage of agencies that -- that could

18   fund the polygraph, it probably would be more around 5,000 to

19   6,000 that could actually get that funding together.  Most are

20   rural agencies, rural sheriff's departments, rural police

21   departments, and they simply can't -- they simply can't afford

22   that.

23        And speaking to that, as well, you've been sending this

24   stuff out now for about 20 years, so I'm sure that had some

25   kind of blanketing effect on some of those departments.

```
1   Q.  I find it hard to believe -- I find it hard to believe that

2   an -- a police department or a sheriff's department doesn't

3   have crime.  And as far as the price is concerned --

4        THE COURT:  Mr. Herring, is there a question here about

5   damages?

6        MR. HERRING:  Well, I am showing that -- trying to

7   establish the fact that despite all the commotion and promises

8   of NITV about the complete accuracy of their device, that a

9   police department -- every police department, let alone college

10  police, harbor police, airport police, sheriff's --

11       THE COURT:  I get the point.

12       MR. HERRING:  Okay.  So the point is, out of 30 years

13  -- after 30 years, you've only sold -- you claim you've sold to

14  2,700 agencies, despite the fact there are 15,000 police and

15  sheriff's departments alone.  Is that -- would you agree with

16  that?

17       THE WITNESS:  Well, what I said was that about 7,000 or

18  so are actually qualified or could get the funding or are large

19  enough to purchase a system.  So we have about a third of the

20  -- of the departments.  And like I said, your efforts, I think,

21  have greatly affected the qualified buyers.

22  BY MR. HERRING:

23  Q.  Well, if they don't buy a lie detector from you, wouldn't

24  they be buying a lie detector from somebody else?

25  A.  You would have to ask them that.
```

1   Q.   What is your opinion?

2            THE COURT:  I'm going to object to that.  I don't

3   really care what Mr. Humble's opinion is as to why they are

4   buying it.  I don't know how he can give a meaningful opinion

5   as to why a police agency is buying or not buying a piece of

6   equipment.  No offense, Mr. Humble, to that.

7            THE WITNESS:  None taken, Your Honor.

8   BY MR. HERRING:

9   Q.   Pertaining to your website -- pertaining to your website --

10           THE COURT:  How much more cross-examination do you

11  think you have?

12           MR. HERRING:  Well, as I see it, you're going to have

13  the gentleman again for me to examine -- cross-examine or --

14  examine or --

15           THE COURT:  What evidence do you plan on putting on?  I

16  know there's some that you have introduced that we were not

17  getting into because it's not relevant.  You've offered your

18  Exhibit A and you've offered -- I don't know that you've really

19  offered Exhibit Quadruple U, but Exhibit A is the only one

20  you've offered into evidence, which has been admitted.

21  BY MR. HERRING:

22  Q.   Mr. Humble, on your website of this year, again, according

23  to the CPA numbers of 2,703, I went to your website.  I

24  downloaded it and I counted up the ones per state.  It only

25  comes out to 1,904.  And you say you look at your website every

1    week, and you have -- this Mascara supposedly is the one that

2    makes these changes.  How do you account for the difference of

3    1,903 that are on your website today compared to your claim of

4    2,700?

5    A.  Well, that doesn't -- the first number that you offered

6    doesn't include our foreign agencies and it doesn't include

7    agencies that we're not allowed to list.

8    Q.  Are you including them in your damages?

9    A.  I'm not sure if that's included in there or not, but we've

10   got our damages all weighed out --

11       THE COURT:  Mr. Herring, the question I have for you is

12   how much more do you think you have on examination of this

13   witness.  I'm looking to see about taking a break.  We have a

14   court reporter that we have to take a break for.  We have staff

15   that we need to take a break on.  I'm just trying to get an

16   idea how much longer --

17       MR. HERRING:  We can take a break now if you want, Your

18   Honor.

19       THE COURT:  We've budgeted four hours.  I want to come

20   to a logical break point with Mr. Humble.  How much more

21   cross-examination do you have for Mr. Humble?

22       MR. HERRING:  Well, I have many documents but it seems

23   they're not allowed to be asked, so it might be quite quick.

24       THE COURT:  Do you have an estimate as to how much

25   longer you're going to need?

```
 1            MR. HERRING:  At this pace, Your Honor, maybe 15 or 20

 2    minutes.

 3            THE COURT:  We'll go another 15 minutes.  We'll see how

 4    we're going.

 5            MR. HERRING:  Okay.

 6    BY MR. HERRING:

 7    Q.  I have the printout.  You said it does not include foreign

 8    agencies.  Well, according to your website, which I have a copy

 9    here and it's listed as WWWW, that total only comes out to 51

10    as of two weeks ago.  Okay?

11            THE COURT:  Is that from the CVSA1.com website that the

12    Court is taking judicial notice of?

13            MR. HERRING:  Yes, yes.

14            THE COURT:  Very well.

15    BY MR. HERRING:

16    Q.  Okay.  Now, the title of the section involving the states

17    says number of agencies per state.  Okay?  That number is

18    1,904.  Okay?

19        Now, if we include the next section that says other

20    agencies utilizing the CVSA, which I'm including that just to

21    double -- you know, just to cover everything -- that total

22    comes out to 209.  Okay?

23        So if we add the two together, and the 350 foreign, you

24    come out with, what, is a 1,900 -- total of 2,150.  That's far,

25    far short than 2,700 that you're claiming the CPA has on his
```

```
 1   list, a list that he has admitted he never got the names to

 2   contact them to see if they really are real.

 3         MR. DeSOUZA:  Your Honor, just for the record I'm

 4   objecting to Mr. Herring's math.  He's representing to the

 5   client that the second page adds up to 209.  Doing the math I'm

 6   looking at -- one of the numbers is 200 itself, plus 13, plus

 7   77.  I don't see how Mr. Herring's making a representation to

 8   the client.

 9         THE COURT:  Since the Court is taking judicial notice

10   of the website, the Court will go on the website and look at

11   what the numbers are.

12         MR. HERRING:  Okay, Your Honor.

13         THE COURT:  So that objection is sustained.  We can go

14   over the math.  Clearly, when Mr. Humble has nothing to look

15   at, other than your asking him questions --

16         MR. HERRING:  I have a copy he can look at.

17         THE COURT:  Are you offering that into evidence?

18         MR. HERRING:  Yes.

19         THE COURT:  Have you shown it to them?

20         MR. HERRING:  They have a copy.

21         THE COURT:  What's the designation?

22         MR. HERRING:  WWWW.

23         THE COURT:  Any objection to Quadruple W?

24         MR. DeSOUZA:  No, Your Honor.

25         THE COURT:  Admitted without objection.
```

1          (Defense Exhibit WWWW was received into evidence.)

2     BY MR. HERRING:

3     Q.   Okay.  I also did some more investigation, and using both

4     what is stated on your website through the last 30 years, and

5     also from your ads that have been up for 30 years in different

6     areas, I came up with some interesting numbers.

7          Now, this Court may or may not have heard of something

8     called Wayback Machine.  Is the Court familiar with it?

9               THE COURT:  I'm familiar with it.

10              MR. HERRING:  Well, that's what I used to go back in

11    time to get copies of numbers that were being posted by NITV,

12    and also the ads of what is claimed as buyers in the ads.

13    Okay?  And that is Document AA.

14              MR. DeSOUZA:  Your Honor, if Mr. Herring is offering

15    Exhibit AA as an exhibit, I'm certainly going to object to it

16    on the basis of hearsay and, likely, relevance.  It doesn't

17    even appear to be a document generated from any particular

18    website.  It's just regular text on a page.  It looks like

19    Mr. Herring put numbers on a page and is trying to offer it as

20    an exhibit.

21              THE COURT:  Mr. Herring, are these your notes from

22    using the Wayback Machine?

23              MR. HERRING:  Yes, and the ads that were in -- may I

24    pick that up, Your Honor?

25              THE COURT:  Of course.

1          MR. HERRING:  I said that, Your Honor, because in some

2     courts the Judge does not want people coming near the bench.

3     That's the only reason I said that.  I just don't want to step

4     on toes.

5          THE COURT:  I understand.

6          MR. HERRING:  Yeah.  As far as these numbers, these

7     numbers were legitimate numbers that came from ads --

8          THE COURT:  But AA was created by you?  It's your

9     typewritten notes?

10          MR. HERRING:  Yes.  Yes, Your Honor.

11          THE COURT:  Okay.  I'll sustain the objection.

12          MR. HERRING:  Okay.  Well, if you want to go to

13     Document XXXX, you'll see various places throughout the years

14     of where Humble, NITV, has claimed numbers sold.  And this is

15     why, to make it simple, instead of just talking back and forth

16     as far as on this ad, it says this and this website says this,

17     I made a list to make it very simple for everybody to

18     understand.

19          THE COURT:  We're past Double A at this point.  Okay?

20          MR. HERRING:  Well, Your Honor --

21          THE COURT:  Are you offering Quadruple X into evidence?

22          MR. HERRING:  Yes.

23          THE COURT:  Any objection?

24          MR. DeSOUZA:  Yes, Your Honor, because Triple X does

25     not appear -- well --

```
 1              THE COURT:  Is it triple or quadruple?
 2              MR. DeSOUZA:  Quadruple does not appear to be --
 3    looking at the first page is a page from NITV's website, which
 4    I have no problem with.  But then it goes on -- it looks like
 5    there's other websites pronounced.  It's a composite exhibit
 6    that I'm not sure where he's sourcing the material from.
 7              So if Quadruple X was just the first page, I would say
 8    no objection, but then he's got things from the Wayback
 9    Machine, he's got things from other websites that are not our
10    website, and he just lumped it all into one exhibit.  So I'll
11    object on both relevance, hearsay, foundation, authentication.
12              THE COURT:  Let me see Quadruple X.
13              MR. HERRING:  May I?
14              THE COURT:  You may approach.
15              MR. HERRING:  These are not fake.  These are
16    screenshots, sir.  They cannot be faked.  They're not made up.
17    But they show clearly the numbers made by NITV pertaining to
18    sales at different locations.
19              For example, just briefly, when they filed --
20              THE COURT:  Let me take a look at the document,
21    Mr. Herring.  Just give me a minute to take a look at it.
22              MR. HERRING:  Yes, sir.
23              THE COURT:  I'm going to sustain the objection on a
24    foundational basis.  You can take it back, sir.
25              MR. HERRING:  Okay.  Can you explain what that means?
```

1        THE COURT:  When documents are admitted into evidence,

2    there has to be a foundation laid about the documents so we

3    know exactly what it is and exactly how it was prepared, and we

4    don't have a foundation for that document.  You can't do that

5    just by proffering yourself what happened.

6        MR. HERRING:  I don't understand.  I'm giving the

7    actual screenshots of where I got those numbers.

8        THE COURT:  That and the foundation comes from people

9    on the witness stand.  That's how the foundation gets laid.

10   Somebody gets on the witness stand and the lawyer asks them

11   questions about how this document -- what the genesis of this

12   document was.  You can't do that yourself, without being under

13   oath and subject to cross-examination.

14   BY MR. HERRING:

15   Q.   Mr. Humble, are you familiar on your website, since the

16   lawsuit started about a year and a half ago, you had on your

17   home page that counts one, two, three, four and -- again --

18        MR. HERRING:  Again, this is Document CC, CC.

19   BY MR. HERRING:

20   Q.   At the bottom, as I've underlined, it says background

21   information about Dektor, et cetera, et cetera, as provided by

22   the son of the founder of the original Dektor, can be provided

23   here.

24        MR. DeSOUZA:  Your Honor, just for clarification, I

25   don't believe Mr. Herring has provided the witness with any of

1    these exhibits, so he's telling him what the document says.

2         MR. HERRING:  Well, you have it.

3         MR. DeSOUZA:  Mr. Humble is just kind of looking on.  I

4    don't know if he intends to show me the document or not.

5         MR. HERRING:  If he would like me to show it to him.

6         THE COURT:  You can approach him and show it to him.

7    Mr. Humble, just take a look at the exhibit for right now.  You

8    don't need to make any comment about it.

9         Mr. Herring, do you want to ask him any questions about

10   that?

11        MR. HERRING:  Yes.

12   BY MR. HERRING:

13   Q.  Did you do any verification of the information that

14   Mr. Bell put in your website?

15        MR. DeSOUZA:  Objection.  Relevance.

16        THE COURT:  Well, first, when you were shown Exhibit

17   CC, what is it?

18        THE WITNESS:  It appears to be an information box about

19   Dektor.

20        THE COURT:  Is that the kind of thing that's on your

21   website?

22        THE WITNESS:  I don't recognize it, but I can't say

23   it's not because we have a pretty large website.

24        MR. HERRING:  Well, this is a screenshot of it, with --

25        THE COURT:  He's got to say --

1          MR. HERRING:  -- with the location.

2          THE COURT:  He's got to say that he knows that.  Show

3     it to him and see if he can -- looking at that, if he can

4     verify that.

5     BY MR. HERRING:

6     Q.   What is the website listed at the top side, where my finger

7     was?

8     A.   CVSA1.com.

9     Q.   Yes.  So would you agree, it came from your website?

10    A.   I can agree it appears to have come -- I don't know that

11    this was not pasted on here.

12    Q.   Oh, I see.

13    A.   I mean --

14         THE COURT:  Mr. Herring, just let him answer the

15    question.

16         THE WITNESS:  It just does not look like -- it's not

17    centered.  It doesn't look like something that our people would

18    have put on there, but I'm not going to say it's not.  All I'm

19    saying it, it doesn't look like it to me.

20    BY MR. HERRING:

21    Q.   Uh-huh.  You had said, if I recall, that you usually look

22    at your website once a week or so?

23    A.   I go to our website to get some information, but I don't go

24    through the website.  I haven't gone through the website in,

25    maybe, a year.

1   Q.   Oh.   So the person -- I'm sort of confused as far as who

2   was in charge of this website, who was in charge of posting it,

3   who verifies the information before it's put on there?

4        THE COURT:  Are you done with Exhibit CC?

5        MR. HERRING:  Huh?

6        THE COURT:  Are you done with Exhibit CC?

7        MR. HERRING:  Well, my -- no.

8   BY MR. HERRING:

9   Q.   My question was, that information by Mr. Bell, did anybody

10  -- did you ever see what was posted by Mr. Bell?

11       MR. DeSOUZA:  Objection.  Relevance, Your Honor.  The

12  Court's already taken judicial notice of the website.  So this

13  is on the website, the Court can review it at a later time.

14  And what Exhibit CC seems to be is simply a posting that NITV

15  has sued Dektor and here are the four counts of the complaint.

16  It doesn't say anything else.  It doesn't pertain to damages,

17  doesn't have any numbers on it, so I don't see the relevance of

18  it.

19       THE COURT:  Very well.  I'll sustain the objection.

20  Exhibit CC is not admitted.

21       MR. HERRING:  Okay.  I'm going to be looking at

22  Documents DD to KK.

23  BY MR. HERRING:

24  Q.   Mr. Humble, you have not liked what I have said about your

25  company; is that correct?

A.   That's --

MR. DeSOUZA:  Objection.  Relevance.  Again, Your

Honor, just to speed things along, Exhibits DD through KK,

according to Mr. Herring, are portions of the NITV website,

which he describes as condemning the PSE and Dektor, which has

no relevance to the damages that are alleged here in this

lawsuit.

THE COURT:  What's the relevance as to damages?

MR. HERRING:  Relevance, clearly, Your Honor, is the

fact that the plaintiff likes to throw stones at people,

including lawsuits, made up, but when it seems he is -- likes

to insult, degrade, humiliate others.

THE COURT:  I'll sustain the objection.  They're not

admitted.

MR. HERRING:  Looking at Document MM.

BY MR. HERRING:

Q.   On your home page it says CVSA is the most accurate truth

verification technology worldwide.

MR. DeSOUZA:  Same -- same objection to this exhibit as

well, Your Honor.  Again, Mr. Herring describes it as NITV

claiming CVSA is the only validated VSA, 98 percent accurate --

THE COURT:  I see the description.  What's the

relevance?

MR. HERRING:  Relevance is I was gonna ask Mr. Humble

what proof he had to back that up.

```
 1              THE COURT:  Objection sustained.  Next topic, sir.
 2   BY MR. HERRING:
 3   Q.   In the Complaint, it stated that I had claimed the deputy
 4   sheriff was fired because he flunked -- because he flunked a
 5   CVSA.  Plaintiff claimed that was a lie, but then they said
 6   they weren't sure.  Document NN proves exactly that.
 7              MR. DeSOUZA:  Same objection on relevance, Your Honor.
 8              THE COURT:  Sustained.
 9   BY MR. HERRING:
10   Q.   Are you aware, Mr. Humble, of a letter that was sent out to
11   a website called antipolygraph.org?
12              MR. DeSOUZA:  Objection on relevance, Your Honor.  I
13   believe he's referring to Exhibit OO at this point, from -- a
14   letter from my co-counsel, Mr. D'Loughy, to someone that I
15   believe had posted the NITV CVSA website that Your Honor
16   ordered to take down.  I don't think it has any relevance to
17   damages.
18              THE COURT:  Is that what you're talking about, sir,
19   Exhibit OO?
20              MR. HERRING:  Okay.  I'm confused on who's saying what.
21   I'm --
22              THE COURT:  Are you talking about Exhibit OO?
23              MR. HERRING:  Yes, I'm talking about Exhibit OO.
24              THE COURT:  What's the relevance?
25              MR. HERRING:  The relevance is the fact that NITV has
```

1    taken the position of threatening lawsuits, using the courts as

2    weapons, as they have done many times for the last 25 years,

3    and they have threatened a lawsuit just to waste somebody's

4    money, by threatening a lawsuit unless they sanitize their

5    website, which is basically trying to repackage NITV to make it

6    look like this angelic organization when, in fact, facts are

7    facts are facts, and they've been documented in many different

8    ways for 30 years, proving NITV is just a scam.

9           THE COURT:  Objection sustained.

10          MR. HERRING:  So this document --

11          THE COURT:  Does not come in.  It does not come into

12   evidence at this hearing.

13   BY MR. HERRING:

14   Q.  Mr. Humble, you have objected to my sending out emails

15   about facts about NITV and CVSA, you, with your fake title,

16   doctor --

17          MR. DeSOUZA:  Objection.  Argumentative.

18          THE COURT:  Sustained.  Just do it without arguing with

19   him.  Ask your question simply, sir.

20          MR. HERRING:  Okay.

21   BY MR. HERRING:

22   Q.  Well, Mr. Humble, you dislike me doing this.  But, in fact,

23   you were doing it to me, correct?

24          MR. DeSOUZA:  Objection.  Relevance.

25          THE COURT:  Sustained.

1      MR. HERRING:  Well, the relevance is --

2      THE COURT:  Sustained.  On to your next question, sir.

3   BY MR. HERRING:

4   Q.  Does -- has NITV had any type of campaign to try to harass

5   me in any way?

6      MR. DeSOUZA:  Objection.  Relevance.

7      THE COURT:  Sustained.

8      MR. HERRING:  Your Honor --

9      THE COURT:  No, sir.  It's not relevant to this damage

10  issue here today.

11  BY MR. HERRING:

12  Q.  Are you familiar with, Mr. Humble, a letter sent out by

13  James Kane in January of 2016 where he claims the CVSA was 98

14  percent accurate?

15     MR. DeSOUZA:  Objection.  Relevance.

16     THE COURT:  Sustained.

17     MR. HERRING:  It was 2016.  That's within the time

18  period of '14 to '18.

19     THE COURT:  Right, but that letter -- or that claim is

20  not relevant to our hearing here today.

21  BY MR. HERRING:

22  Q.  Mr. Humble, you have used the Great Seal of the United

23  States for the last 30 years; is that correct?

24     MR. DeSOUZA:  Objection.  Relevance.

25     THE COURT:  Overruled.

1   BY MR. HERRING:

2   Q.  Is that correct?

3   A.  That's correct.

4   Q.  Are you aware that is a criminal offense, to use it to

5   imply that you're connected to the government in any way?

6   A.  It's been slightly altered, and our understanding is that

7   it is not illegal.

8   Q.  And who -- how is it altered, or how was it altered?

9   A.  That wasn't something I did.  We sent that out to have

10  done.

11  Q.  But in what way was it altered?  What part of that Great

12  Seal --

13  A.  I have no idea.  It was just sent back and we put it on our

14  letterhead.  That was years -- 20-something years ago.

15          THE COURT:  Are you relying upon advice of Counsel that

16  you sufficiently modified it?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Very well.

19  BY MR. HERRING:

20  Q.  Do you have examples of that modification from the Great

21  Seal itself to what is on your website?  Because, again, it

22  looks --

23          THE COURT:  Mr. Herring, you've established that

24  they've modified the Great Seal of the United States.  Okay?

25          MR. HERRING:  Well, I'm trying to find out how did they

1   alter it when it's basically identical, from everything I can

2   see, to the Great Seal, especially the fact that they have

3   their two names, NITV Federal Services --

4           THE COURT:  Am I gonna see that on the website?

5           MR. HERRING:  What, the Great Seal?

6           THE COURT:  Their version of the Great Seal.

7           MR. HERRING:  Yes.

8           THE COURT:  Okay.  And I can take judicial notice of

9   the Great Seal of the United States.

10          MR. HERRING:  Okay.

11          THE COURT:  And I will take judicial notice of the

12  Great Seal of the United States.  So when I go on and look at

13  the website, I can compare it for myself.

14          MR. HERRING:  Okay.

15  BY MR. HERRING:

16  Q.  In what way was the first CVSA different from the PSE?

17          MR. DeSOUZA:  Objection.

18          THE COURT:  I'm going to sustain the objection on that.

19  It's not relevant to our damages issue, sir.  It might have

20  been relevant to liability, but we're past liability.  So let's

21  keep the focus on damages.

22          Have you got any other questions for this witness?

23  We're well past the 15 minutes.

24          MR. HERRING:  Okay.

25

```
 1   BY MR. HERRING:

 2   Q.   Are you familiar with the Vancouver Sun article that was

 3   done in 2011?

 4           MR. DeSOUZA:   Is there an Exhibit number for that?

 5           MR. HERRING:   VV.

 6           MR. DeSOUZA:   I'm gonna object on the relevance, Your

 7   Honor.

 8           THE COURT:   What's the relevance?

 9           MR. HERRING:   The relevance is two of Humble's own

10   instructors admitted there was no proof that the CVSA had any

11   accuracy.   They're admitting it --

12           THE COURT:   Objection sustained.

13   BY MR. HERRING:

14   Q.   Pertaining to ITAC, Letter O, they basically gave a person

15   by the name of Brody the choice of being fired or demoted.

16           MR. DeSOUZA:   Objection on both relevance and hearsay,

17   Your Honor.

18           THE COURT:   What's the relevance?

19           MR. HERRING:   The relevance is the fact that NITV hired

20   this person as their sales director, a person that was

21   disgraced as an ITAC investigator, and this brought attention

22   to the fact that NITV hired somebody that was not helping solve

23   investigations pertaining to child porn, and yet NITV hired

24   him, which certainly brought disgrace -- some disgrace to NITV,

25   which meant loss of possible sales.
```

```
 1              THE COURT:  Objection sustained.

 2              MR. HERRING:  Okay.

 3   BY MR. HERRING:

 4   Q.   You stated, Mr. Humble, that CVSA does not have any

 5   attached wires; is that correct?

 6              MR. DeSOUZA:  Objection to relevance.

 7              THE COURT:  What's the relevance as far as damages go?

 8              MR. HERRING:  Well, it's claims that are false, that

 9   have been made about it when, in fact, they do have an attached

10   -- they do have an attached wire.  Again, it's all about fraud,

11   lying about who you are, what you are, what you have, what your

12   gadget is capable of doing.

13              THE COURT:  Objection sustained.

14              MR. HERRING:  Well, in the declaration by Mr. Humble,

15   number seven, he says, unlike a polygraph, the subject of CVSA

16   is not wired to an instrument.  And I have a picture -- it's

17   five As that clearly show it is.

18              THE COURT:  Ask him if it's wired to anything.

19              MR. HERRING:  I thought I just did.

20              MR. DeSOUZA:  Your Honor, it certainly has no relevance

21   to the damage issue.  I think what Mr. Herring is referring to

22   is a paragraph of the Complaint that was deemed admitted by

23   virtue of the default that's been entered by -- against both

24   Dektor and Mr. Herring individually.  So he's now trying to

25   back away from that and stating it's not true, some allegation
```

1    that I have already admitted as true, we're spending time on

2    something that's got nothing to do with damages.

3            THE COURT:  What's the relevance to damages, sir?

4            MR. HERRING:  The relevancy to damages is lies.  Lies

5    cause people not to buy something when they see it.

6            THE COURT:  Objection sustained.

7            Do you have anything else you want to examine this

8    witness on, other than what you claim to be -- are lies about

9    the machine?

10           MR. HERRING:  Well, I do.  But, again, every one of

11   them doesn't seem to be allowed in.

12           THE COURT:  Like what?

13           MR. HERRING:  As I said, it'll take more time to go

14   through them, even if you overrule it or sustain it, I should

15   say.  So take a break now.

16           THE COURT:  Do you have anything as to specific sales

17   that they claim that were lost because of you, as opposed to

18   you saying they lost the sales because the machines are no

19   good, because they've got bad people working for them or some

20   other thing?

21           MR. HERRING:  Publicity causes loss of a product.  When

22   it's in the news, people do not buy it.  When it's in the news

23   that a product is failing half the time or it's not living up

24   to its potential, you can go to Amazon.com, you will see

25   reviews of a product.  People are going to buy a product, they

1    read the reviews and they come to a conclusion.

2         THE COURT:  I understand your theory, okay?  Ask him

3    about that with respect to comments during the time period

4    we're talking about, which is the time period -- let's just go

5    over it again --

6         MR. HERRING:  '14 to '18.

7         THE COURT:  Correct.

8         MR. HERRING:  But years before that can determine

9    whether or not somebody buys a product or planning to buy a

10   product with -- if fund are available and so forth.  So the

11   sales that did not exist from '14 to '18, it could have been

12   determined five years before or 10 years before, based on

13   information that had been displayed or printed in the papers or

14   on the news sites or court cases where it had come up.  So

15   there's many influences on loss of sales.

16        THE COURT:  Very well.  Okay, Mr. Herring.  Do you have

17   anything else?

18        MR. DeSOUZA:  While he's looking, I'll just clarify for

19   the Court, Your Honor.  Just looking at Exhibits A through five

20   Bs, there's not a single exhibit on Mr. Herring's list that

21   purports to be a statement from a customer that says I didn't

22   buy from NITV because of this reason, or I bought this product

23   because of this news article, anything that would purport to be

24   relevant to damages whatsoever.  Everything on here are what

25   Mr. Herring terms newspaper articles from 2005, fake diplomas,

1    analyses from 2002, a patent office article, but nothing

2    dealing with why someone chose to buy or chose not to buy or

3    anything from any particular customer whatsoever.

4            THE COURT:  Well, I've already admitted A and quadruple

5    W, so those two are in.

6            Mr. Herring, you can make your argument.  In argument,

7    you can tell me what you just told me about the fact that there

8    are other news articles out there.

9            Do you understand what I'm saying?

10           MR. HERRING:  Yes.

11           THE COURT:  Okay.  So do you have anything else you

12   want to offer?

13   BY MR. HERRING:

14   Q.  Pertaining to Dirk Bell, are you aware of what information

15   he was putting on your website?

16           MR. DeSOUZA:  Objection.  Relevance.

17           THE COURT:  What's the relevance?

18           MR. HERRING:  The relevance is, it's taking -- it was

19   information that was not true.  NITV never contacted me before

20   they posted it.  That's liable, if nothing else.  But the fact,

21   again, if they're claiming they weren't getting sales, I wasn't

22   getting the sales, certainly.  So --

23           THE COURT:  Was the Dirk Bell commentary that was

24   posted adverse to NITV?

25           THE WITNESS:  No.  It was in praise of them, basically.

```
 1              THE COURT:  Very well.

 2              MR. HERRING:  It was anti me and Dektor and the PSE,

 3     claiming he knew this inside information, when he never did.

 4     He was never part of my company.

 5              THE COURT:  Objection sustained.

 6              MR. HERRING:  Well, I'd like to submit some of the

 7     emails that were sent to me from Mr. Bell, which -- and they

 8     were also sent to Mr. Humble, which clearly shows this Dirk

 9     Bell was not in the right frame of mind.  But they were very

10     happy to post anything negative on the NITV website against me

11     so people -- if they were thinking about buying Dektor, when

12     they were looking at different products of lie detectors, they

13     weren't buying it from me, probably because of the negative --

14              THE COURT:  Was this information negative about NITV?

15              MR. HERRING:  It was not negative about NITV.

16              THE COURT:  Objection sustained.  It's not relevant.

17              MR. HERRING:  Document U comes under the category

18     posters and imposters, which NITV gave to Mr. Bell, to have his

19     own private section on their website.

20              MR. DeSOUZA:  Objection.  Relevance.

21              THE COURT:  Sustained.

22              MR. HERRING:  Document ZZ comes from Humble's website,

23     2003.  He claims that the CVSA which was started in 1988, was

24     started in the Vietnam war, which ended in '74.

25              MR. DeSOUZA:  Objection.  Relevance.
```

```
 1              MR. HERRING:  He claimed it was called PSE back then.

 2              THE COURT:  Sustained.

 3              MR. HERRING:  He's trying to --

 4              THE COURT:  Sustained.

 5   BY MR. HERRING:

 6   Q.  Mr. Humble, do you have any independent studies that show

 7   countermeasures have no effect on the CVSA?

 8              MR. DeSOUZA:  Objection.  Relevance.

 9              THE COURT:  Sustained.

10   BY MR. HERRING:

11   Q.  Do you have any independent, as you claim, that drugs or

12   alcohol have no effect on the CVSA?

13              MR. DeSOUZA:  Same objection.

14              THE COURT:  Sustained.

15   BY MR. HERRING:

16   Q.  You were aware that in 2006, you were sued by Mr. Baker?

17              MR. DeSOUZA:  Objection.  Relevance.

18              THE COURT:  What's the relevance?

19              MR. HERRING:  The relevance is the fact that NITV likes

20   to use the courts as weapons against people, but when they are

21   sued and lose, they don't pay.  And currently, NITV owes about

22   an $800,000 judgment against a person that libeled him in those

23   law enforcement alert letters, which was not allowed in --

24              THE COURT:  Sustained.

25              MR. HERRING:  Just for easy reference, Document BBB is
```

```
 1   an illustration of the Great Seal compared to what's on the

 2   NITV website.

 3            MR. DeSOUZA:  Same objection, Your Honor.  I think you

 4   already stated that you've taken judicial notice and will be

 5   able to view the website.

 6            THE COURT:  Correct.  Sustained.

 7            MR. HERRING:  May I introduce these two documents for

 8   easy comparison?

 9            THE COURT:  I'm going to look at the website, and I'm

10   going to look at the Great Seal of the United States.

11            MR. HERRING:  Okay.

12            THE COURT:  Like over there?

13            MR. HERRING:  Okay.

14            Document FFF, called CVSA examiner training alert.

15            THE COURT:  What's the -- what's the relevance?

16            MR. HERRING:  The relevance is the fact that NITV is

17   basically withholding upgrades or fixes to software unless the

18   owners belong to the CVSA association at $400 every two years

19   for life.  It's basically coercing them to be a member and

20   withholding upgrades, supposedly, to training, supposedly fixes

21   to --

22            THE COURT:  Relevance, sustained.  It's not relevant.

23            MR. HERRING:  Does the Court wish to have a copy of the

24   article, the Chapman article?

25            THE COURT:  No, sir.  I don't need a copy of the
```

1    article.

2          MR. HERRING:  Exhibit PPP.  May I show this to the

3    witness?

4          THE COURT:  Is this the press release lying about the

5    polygraph?

6          MR. HERRING:  Yes.

7          MR. DeSOUZA:  I'll object on relevance, Your Honor.

8          THE COURT:  Sustained.

9          MR. HERRING:  The relevance is the fact that he's

10   trying to claim 1900 law enforcement departments changed to

11   CVSA, and in that year there were 2000 total of CVSA owners.

12   Now, that is clearly a lie, which -- unless it's checked.

13         THE COURT:  I made my ruling.  It's sustained.  It's

14   not coming in.

15   BY MR. HERRING:

16   Q.  Mr. Humble, you were a police officer for several years in

17   the early '70s; is that true?

18   A.  Five years in the Indianapolis Police Department.

19   Q.  What is rule number two?

20         MR. DeSOUZA:  Objection to relevance, Your Honor.

21         THE COURT:  What's the relevance?

22         MR. HERRING:  Character, the fact that this person is

23   claiming that his credibility and his expertise is what should

24   being taken for people to believe in the CVSA, to buy it.  And

25   after it's learned that it's full of holes, that's another

```
 1    example why people aren't buying the CVSA.

 2            THE COURT:  What is the relevance of this rule number

 3    two?

 4            MR. HERRING:  Well, according to rule number two -- I

 5    have a copy of his police record.  According to the police

 6    department that gave me a copy of this, they said rule number

 7    two, where he was suspended for about five days, dealt with

 8    honesty on the job.

 9            THE COURT:  So this is essentially some type of police

10    action -- disciplinary action that you want to introduce?

11            MR. HERRING:  Yes.

12            THE COURT:  From how long ago?

13            MR. HERRING:  Well, the action took place back in '72.

14    But, again, it goes -- again, all the pieces of the puzzle show

15    that a person that is claiming to be somebody and brags about

16    himself as somebody, as a hero cop and so forth, it's all

17    pieces in the puzzle to show it's just a scam.

18            THE COURT:  Well, you're trying to impeach the

19    credibility of a witness with an administrative action that was

20    taken some 47 years ago, so I'm going to sustain the objection.

21    BY MR. HERRING:

22    Q.  Mr. Humble, is it true that you owed a lawyer recently

23    $86,000?

24            MR. DeSOUZA:  Objection.  Relevance.

25            THE COURT:  What's the relevance?
```

1           MR. HERRING:  Relevance is the fact, it was back in --

2  what was it, 2014?  The fact that Mr. Humble doesn't care about

3  anything but his own self.

4           THE COURT:  Sustained.

5           MR. HERRING:  The fact that he cheated a lawyer --

6           THE COURT:  Objection sustained.

7  BY MR. HERRING:

8  Q.  In 1998, Mr. Humble, is it true you were convicted of

9  copyright fraud?

10          MR. DeSOUZA:  Objection.  Relevance.

11          THE COURT:  Sustained.  Is it improper impeachment?

12          MR. HERRING:  It's all going to character, and

13  character is what is being used to sell and promote CVSAs as

14  the so-called inventor, so-called Ph.D. doctor.

15          THE COURT:  It's improper impeachment under the rules

16  of evidence.

17          MR. HERRING:  XXX document, Mr. Humble stating in front

18  of a full-time staff of professionals, he says --

19          MR. DeSOUZA:  Objection.  Relevance.

20          MR. HERRING:  Relevance is it's a lie.

21          THE COURT:  Sustained.

22  BY MR. HERRING:

23  Q.  Mr. Humble, on your website -- you, on your private

24  website, say that you are proud that you're a singer, a

25  songwriter and so forth?

```
 1              MR. DeSouza:  Objection.  Relevance.

 2              THE COURT:  What's the relevance about songs?

 3              MR. HERRING:  The songs is he claims he wrote them

 4    when, in fact, that's copyright fraud.

 5              THE COURT:  Objection sustained.

 6         Are we going to get into the Patriotic Act for selling

 7    fake lie detectors?

 8              MR. HERRING:  Are we what?

 9              THE COURT:  Are you getting into, next, the ZZZ, the --

10    he claims to be patriotic after selling fake lie detectors?

11              MR. HERRING:  Well, I wasn't going to show that

12    document, but --

13              THE COURT:  I'm going to sustain an objection that it's

14    not relevant.

15              MR. HERRING:  Okay.

16         GGGG are the ads where he claims buyers for

17    different --

18              THE COURT:  What's the time frame?

19              MR. HERRING:  Well, they start from --

20              THE COURT:  We need for our time frame.  Are they for

21    our time frame?

22              MR. DeSOUZA:  Your Honor, I see dates on the bottom of

23    Page 2 of 1992.

24              MR. HERRING:  Yes.  They do not --

25              MR. DeSOUZA:  1995, 1996.  I don't -- 2006.
```

1           MR. HERRING:  That is correct, Your Honor.  I do not

2     have any ads from any CVSA ad from '14 to '18.  That's quite

3     true.  However --

4           THE COURT:  Very well.  Then I'll sustain the

5     objection.

6           MR. HERRING:  Well, it was going to show, as far as the

7     timeline of advertising in the IACP magazine, which Mr. Humble

8     claimed he stopped doing -- or he only advertised in a few

9     times, which was not true.  He advertised in it, basically,

10    steadily for 15 years, but --

11          THE COURT:  In an abundance of caution, which one was

12    that again?

13          MR. HERRING:  GGGG.

14          THE COURT:  I'll admit it for that limited purpose.

15       (Defense Exhibit GGGG was received into evidence.)

16    BY MR. HERRING:

17    Q.  Mr. Humble, when you got the military contract around 2002,

18    and it was for approximately -- how much was it for; do you

19    recall?

20    A.  I don't recall.

21          MR. DeSOUZA:  Object on relevance.

22          THE COURT:  What's the relevance?

23          MR. HERRING:  Well, the relevance was one of the

24    documents that was posted on the NITV exposed website, which,

25    again, all these documents were, for people to see that there

```
 1    was no testimony that was made up.  It was all documents,

 2    factual documents.  The person that provided that money to

 3    Mr. Humble, he pled guilty to taking bribes.

 4              THE COURT:  Objection sustained.

 5              MR. HERRING:  All right.

 6    BY MR. HERRING:

 7    Q.   In your newsletter in 1995 -- 2005 -- no, I'm sorry, 1995,

 8    document -- what is that, IIII?

 9              THE COURT:  Is this the McQuiston insulted document?

10              MR. HERRING:  Yes.

11              THE COURT:  What's the relevancy?

12              MR. HERRING:  Relevance goes to character, which goes

13    to his actions for the last 30 years, as far as lying about

14    himself, his gadget, his inventions and so forth.

15              MR. DeSOUZA:  Objection.  Relevance.

16              THE COURT:  Sustained.

17              MR. HERRING:  What about the video?  Will you be

18    looking at that, Your Honor?

19              THE COURT:  This is the ABC News 2006 article?

20              MR. HERRING:  That is correct.

21              THE COURT:  No.  I believe I've already ruled on that.

22              MR. HERRING:  Okay.

23              THE COURT:  So, no, that's not coming in.

24              MR. HERRING:  What about JJJJ, which is the transcript

25    from the segment?
```

1           THE COURT:  I'm not going to take that either.

2           MR. HERRING:  Document LLLL, the letter threatening

3    Mr. Vanderhoff --

4           MR. DeSOUZA:  Objection.  Relevance.

5           MR. HERRING:  -- with a federal lawsuit unless he gives

6    the PSE source codes to them for free.

7           THE COURT:  Objection sustained.

8           Any evidence that the only purpose of it coming in is

9    to show your claim that Mr. Humble is a bad character is not

10   relevant.  It's not going to come in.

11          MR. HERRING:  But that information was public, and

12   other people have seen it, and that is the reason why sales

13   have dropped off dramatically, because of it.

14          THE COURT:  And where was this information public?  Was

15   it publicized on your website?

16          MR. HERRING:  On television, in newsprint, on the

17   internet.  News organizations have internet websites, I'm sure

18   you're aware of.  So all that other publicity, to deny that it

19   had an effect on sales, is just reaching for the moon to deny

20   that it did.

21          THE COURT:  The Court has to make its own decision as

22   to whether you are responsible for 85 to 90 percent of their

23   lost sales.  That's what the Court has to determine.  There's

24   been a lot of evidence entered in here, but I'm not gonna admit

25   evidence attacking Mr. Humble's character as some kind of

1    impeachment evidence.

2           MR. HERRING:  But Mr. Humble is NITV.  He is.

3           THE COURT:  Mr. Herring, I've ruled.

4           MR. HERRING:  Okay.

5           Pertaining to the Chapman study -- wait.  The Document

6    RRRR is an analysis of the study.

7           MR. DeSOUZA:  Objection.

8           MR. HERRING:  And it's also --

9           MR. DeSOUZA:  Relevance, Your Honor.

10          MR. HERRING:  -- said he can't find it anyplace, which

11   goes to show that study that's being used to promote CVSA was

12   totally fake, made up.

13          THE COURT:  Objection sustained.

14          MR. HERRING:  Document VVVV, from 2003, a letter sent

15   by a lawyer from NITV, McHale and Slavin --

16          MR. DeSOUZA:  Objection.

17          MR. HERRING:  -- threatening me with a lawsuit back in

18   2003, shortly after I started Dektor.

19          MR. DeSOUZA:  Objection.  Relevance.

20          THE COURT:  Sustained.

21          MR. HERRING:  The relevance was using the courts as a

22   weapon to intimidate and threaten people.

23          Exhibit OOOO, Library of Congress says it does not

24   exist, the Chapman study.

25          MR. DeSOUZA:  Same objection.

```
 1              THE COURT:  Sustained.

 2              When we're done with the cross-examination of

 3    Mr. Humble, Mr. DeSouza, do you have any other evidence you're

 4    going to offer?

 5              MR. DeSOUZA:  I have maybe three to five minutes of

 6    redirect.

 7              THE COURT:  Okay.

 8              MR. DeSOUZA:  And I do plan to call Mr. Herring as a

 9    witness on direct, briefly, just to go through a couple of

10    exhibits with him that are on our exhibit list.

11              THE COURT:  Okay.

12    BY MR. HERRING:

13    Q.  Mr. Humble, on your declaration Number 9, you say CVSA is

14    used by 2,500 local, state and federal.  Do you have

15    documentation to prove that?

16              THE COURT:  When you say your declaration, what are you

17    talking about?  Are you talking about --

18              MR. HERRING:  Plaintiff's Exhibit 1.

19              THE COURT:  Okay.  Go ahead, sir.

20    BY MR. HERRING:

21    Q.  Do you have documentation to prove that you have 2,500 CVSA

22    buyers?

23    A.  Yes, we do.

24    Q.  Do you have it here today?

25    A.  No, I don't.
```

1    Q.  Well, then --

2         MR. DeSOUZA:  I'm gonna object to the line of

3    questioning.  Again, Your Honor, this is an allegation that was

4    specifically admitted by virtue of the default.  It's not

5    having to do with damages; it has to do with liability.

6         THE COURT:  Well, the damages are, to a certain extent,

7    calculated upon the number of clients, correct?

8         MR. DeSOUZA:  To a limited extent based on what the

9    expert's analysis was, yes.

10        THE COURT:  Okay.  And the Court's the one that has to

11   be convinced of the number of clients.

12        MR. HERRING:  And that can only be done, Your Honor, if

13   you have the actual names to verify that they were those

14   buyers, which according to the CPA here, he never got them.

15        THE COURT:  Do we have a list that actually has all of

16   the customers?

17        MR. DeSOUZA:  The -- yes, Your Honor, and the CPA was

18   provided a list with the actual customers names.  The names

19   were taken out prior to filing in this case by virtue of

20   everything Mr. Herring has done for the last 16 months because

21   he'll just use it as a roadmap to continue emailing thousands

22   of people --

23        MR. HERRING:  I'm entitled to this information, Your

24   Honor.  I'm the defendant.  I had to verify that it's true, and

25   I've provided so many documents to prove the numbers that are

 1   being thrown out by NITV, as far as sales one year are

 2   different from the sales -- or contradict the sales numbers of

 3   another year.  I mean, I have documents where I list these

 4   things, for easy reference.

 5        If I can't have these documents, how can I be punished

 6   for loss of sales when I can't even verify, which nobody else

 7   has ever thought of, actually contacting those people, saying

 8   did you buy it, do you still use it, why not, if you're not

 9   using it, how many people did you get trained, how can people

10   are recertified?

11        THE COURT:  You see, the issue -- the problem in this

12   case is this, Mr. Herring:  You know, there's cases that are

13   like this.  Okay.  And what's normally done in cases like this

14   is people have attorneys.  And then what happens is, the list

15   of all those customers would be provided for attorney's eyes

16   only.  In other words, the attorney would be able to see it.

17   But you wouldn't be able to see it.  Because their allegation

18   is you're the problem, because if they provide you with a list

19   of all their customers, you're gonna contact their customers

20   and try to hurt his business.

21        Do you understand that?

22        MR. HERRING:  Information is information.

23        THE COURT:  Do you -- sir, do you understand what I'm

24   saying?

25        MR. HERRING:  Well, as an attorney -- as pro se, I am

```
 1    basically a so-called lawyer representing myself.

 2         THE COURT:  And they're saying we're not gonna give you

 3    the opportunity to do further damage to us by giving you a list

 4    of our customers which you'll now email, because you don't care

 5    that the Court says that you're not supposed to contact people.

 6         Do you understand that?

 7         MR. HERRING:  The fact is, under the Constitution I do

 8    have freedom of speech, and I do have the right to protect my

 9    income and protect myself and protect my company, most

10    important.

11         THE COURT:  Do you have responsibility to follow court

12    orders?

13         MR. HERRING:  I have followed the court orders.  I took

14    down the section of NITV exposed.  But Mr. Maschke, from the

15    AntiPolygraph.org, he archived it so it's going to be up

16    forever.  I had no -- nothing to do with that.  I took down the

17    ABC video on my Dektor Corporation website, as directed.  I

18    took down the section about NITV on my Dektor Corporation

19    website, as directed.

20         THE COURT:  What if they provide the Court, under seal,

21    so I can see it but you can't see it, a list of all their

22    customers, so I can see if there are that many customer names

23    on there.

24         MR. HERRING:  Are you going to call up each one and

25    verify --
```

1        THE COURT:  I'm not conducting my own investigation,

2   but I can look at the list and see what's what.

3        MR. HERRING:  I can put 20,000 names on a list.  That

4   doesn't mean I sold it to them.

5        THE COURT:  So do you not want me to do that, to get a

6   customer list under seal?

7        MR. HERRING:  Are you going to verify each and every

8   entity --

9        THE COURT:  No, I'm not.

10       MR. HERRING:  Well, then, what's the point of even

11  looking at it, then?

12       THE COURT:  Okay, then I won't ask them to give me a

13  list under seal so I can at least see if there's 2,800 names

14  there and that there's actually 2,800 people or entities.

15       Do you understand that, sir?

16       But if you don't want me to look at it, I won't look at

17  it.

18       MR. HERRING:  Your Honor, I have a list from 15 years

19  ago of just about 25 -- some of the names I got from random --

20       THE COURT:  Very well.

21       MR. HERRING:  -- where people stopped using them.

22       THE COURT:  Okay.

23       MR. HERRING:  So I'm sure there's far, far more.

24       And again, no entity is going to stop using a perfect

25  lie detector --

```
 1            THE COURT:  Anything else for Mr. Humble?

 2   BY MR. HERRING:

 3   Q.   Pertaining to ITAC --

 4            THE COURT:  Which is what?

 5            MR. HERRING:  What is that, the international --

 6   something against --

 7            MR. DeSOUZA:  Crimes against children, I believe.

 8            MR. HERRING:  Yeah, internet crimes against children.

 9   Okay?  It consists of 61 task forces, four and a half thousand

10   federal, state and local enforcement -- government agencies --

11            THE COURT:  Ask him what you want to ask him about

12   ITAC.

13            MR. HERRING:  Okay.

14   BY MR. HERRING:

15   Q.   How many buyers belong to ITAC of CVSA?

16   A.   I don't have that information.

17   Q.   You cannot say how many departments bought CVSA that were

18   from ITAC?

19   A.   No.

20   Q.   But you're claiming that because of me, ITAC was not buying

21   them; is that correct?

22   A.   I'm saying I don't handle sales, so I -- I don't keep a

23   record of that.  I wouldn't know what the record is.

24   Q.   But you run NITV, correct?

25   A.   Correct.
```

1   Q.   So the claim has been made against me, that I have taken

2   sales away from ITAC because of me contacting one or two

3   people.  But you don't know anything more about that than --

4   A.   I don't have the data.

5   Q.   Mmm-hmm.  Do you have that data here at all?

6        THE COURT:  Mr. Herring, you've gotten your answer.

7   Move on, sir.

8   BY MR. HERRING:

9   Q.   Is it true, Mr. Humble, that the conference, the ITAC

10  conference in Texas, Mr. Crotty was allowed to be a vendor, but

11  he was simply not allowed to speak in front of the audience

12  that was there?

13  A.   I think the first year, when you sent him that information,

14  they did.  They pulled him from being a speaker and allowed him

15  to be a vendor.  Then the second year you sent the information

16  they just locked us out, said you can't -- you can't be a

17  vendor here or speak at all.

18  Q.   Okay.  They did so because of what, my speaking to them

19  alone, or was it because that they verified the information

20  that I had sent them?

21  A.   I think that from the emails that we subpoenaed from them,

22  that the information you sent them -- I'm not sure if you sent

23  them an email or spoke to them, but they verified that fact.

24  And then the second year, they again verified the fact that

25  they had either spoken for or there was an email.

1        And they didn't say anything about validating.  They just

2   said the information they received from you was cause for them

3   to disallow us from attending.

4   Q.   And what about the fact that the person you sent there,

5   Mr. Crotty, was this disgraced sheriff deputy that had been

6   written about in a major newspaper article the year before?

7   A.   What about it?

8   Q.   Well, it was a newspaper that printed the article about it.

9   That's how I found out about it.

10  A.   Well --

11  Q.   Are you saying that there was no -- that that newspaper

12  article had no effect on organizations not buying from -- or

13  ITAC organizations not buying it?

14  A.   Well, I think that you sent them that article and they

15  believed the article.  Our investigation showed that it was a

16  he-said-she-said, and there was a lot of bad blood between him

17  and the captain.  So he finally just resigned.

18       And the newspaper article was very inaccurate, that you

19  sent them.

20       THE COURT:  You have five minutes more and then you're

21  done on cross-examination.

22       MR. HERRING:  Okay.

23  BY MR. HERRING:

24  Q.   So if the article was so inaccurate, why -- why did -- did

25  you take any action against the newspaper?

1    A.   I don't think it was up to us to take action.  That was

2    Jerry Crotty's decision.

3           THE COURT:  So you took no action?

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  Next question.

6    BY MR. HERRING:

7    Q.   For all those people that were named, all these different

8    agencies and so forth, do you really think that based upon what

9    one person says in an email would change their minds when

10   they're looking for that perfect lie detector to use for their

11   investigations?

12   A.   I don't know.  You'd have to ask them.

13   Q.   Did you?

14   A.   Did I what?

15   Q.   Did you ask them?  Did you contact all those different

16   agencies to find out why they didn't buy or why aren't they

17   buying it?

18   A.   We rarely -- we rarely get law enforcement agencies that

19   call us and say, hey, we just got this in from Arthur Herring

20   and we're not buying your system.  That rarely happens.  We

21   find out very, very much by chance that someone says that.

22        But when you send them that information, they simply don't

23   either go to our website and try to find out if it's true, they

24   don't call us and ask if -- us if it's true.  They simply read

25   it.  And the sheriff, who's appointed by the mayor, who gets

1    elected, don't want the controversy, and they say, they --

2    that's what ITAC said:  We don't want any controversy here.

3        So everything you provide them, it's not that they look

4    into it and say, well, is this right or is this right.  They

5    read it and they say, woo, controversial, we don't want that.

6    And that's how you harmed us.

7    Q.  Do you base that on any facts, or just your conjecture or

8    speculation, basically, that, well, Herring was connected in

9    some way so let's blame Herring instead of them not verifying

10   information?  You don't know that as a fact, do you, that they

11   never verified the information that I said about NITV and CVSA

12   and that's why they didn't buy it?

13   A.  Only the few that we've talked to.

14   Q.  So from that, you can get 100 percent certainty, out of a

15   couple that you talked to, that they -- nobody else bought it

16   because of what Herring says in an email or on his website?

17   A.  I didn't say that was 100 percent.

18   Q.  Well, you're saying -- didn't you say 10 or 15 percent, a

19   half hour or so ago, that except for 10 or 15 percent, all the

20   rest were caused by Herring?

21   A.  Correct.

22   Q.  And you have documents to prove that those people were

23   contacted, and that's how you came to your conclusion?

24   A.  No.  We don't have proof or letters or anything that --

25   Q.  Oh, but you're demanding damages without proof?

1          THE COURT:  Mr. Herring, let him finish his answer.

2          THE WITNESS:  Just -- like I said, the individuals that

3     we talked to, the few that would talk to us about it, that was

4     their -- that was their problem.  And all the people down in

5     Ecuador told Miguel Mascara, hey, the general got this stuff,

6     the commander got this stuff, and they just kind of went, whoa,

7     shut it down.

8     BY MR. HERRING:

9     Q.  But why haven't they bought PSE?

10         THE COURT:  Mr. Herring, time's up.

11         MR. HERRING:  Okay, sir.

12         THE COURT:  Okay.  Thank you.

13         Redirect?  You said it was brief.

14         MR. DeSOUZA:  Yes, Your Honor.  Brief.

15         THE COURT:  Okay.  And then we're going to take a

16    break.

17                       REDIRECT EXAMINATION

18    BY MR. DeSOUZA:

19    Q.  Mr. Humble, in your declaration, will you turn to Paragraph

20    66 for me, please?

21    A.  Yes.

22         THE COURT:  Mr. Herring, could you sit down, please?

23         MR. HERRING:  I've got to take the papers off the

24    chair.

25         THE COURT:  Okay.

```
 1   BY MR. DeSOUZA:

 2   Q.   Paragraph 66 is talking about the loss of sales within the

 3   State of Texas, correct?

 4   A.   Correct.

 5   Q.   And in here you state that Plaintiff lost $205,000 of

 6   invested money.  You testified about that earlier, correct?

 7   A.   Correct.

 8   Q.   And towards of the bottom of this paragraph, there's a

 9   sentence that says the Texas Department of Licensing and

10   Regulation confirmed that Defendant's emails communications

11   were the reason for the approval being revoked.

12        Do you see that?

13   A.   Yes.

14   Q.   So is that something that came directly from the Texas

15   licensing board to NITV, stating that the reason why you're not

16   selling CVSA -- the reason why you're not accepting these

17   stress analyzers is because of Mr. Herring?

18   A.   I believe that's correct.

19   Q.   Okay.  Now, the plaintiff here is seeking damages in

20   connection with both past sales in Texas, 2017 and 2018,

21   correct?

22   A.   Correct.

23   Q.   As well as future sales carrying forward three years.  I

24   think it was 2019 through 2022; is that right?

25   A.   Correct.
```

1   Q.   And your estimate of that, I believe, was set forth in

2   Paragraph 69, correct?

3   A.   Yes.

4   Q.   And is that based on your experience over the last 30 years

5   in selling the CVSA product throughout the United States?

6   A.   Correct.

7   Q.   As to what your expectation of the sales would have been

8   within the State of Texas?

9   A.   Yes.

10   Q.   And, in fact, if you look at Page 19 of your declaration,

11   there's a chart that sets out the number of agencies using the

12   CVSA in -- I think the CV -- the five largest CVSA users in the

13   United States, correct?

14   A.   Correct.

15   Q.   And the average number of CVSA sales, I think you

16   calculated it to be 11.2; is that right?

17   A.   Yes.

18   Q.   You're only using a number of two for the State of Texas,

19   correct?

20   A.   Correct.

21   Q.   As opposed to the 11.2 average?

22   A.   Well, you know, we were trying to be as conservative as

23   possible and not overstate the case.

24   Q.   Okay.  So one aspect of the damages that you, yourself,

25   have calculated is lost sales within the State of Texas,

1    correct?

2    A.   Correct.

3    Q.   One aspect of the damages that you, yourself, have

4    calculated is the loss of sales within El Paso -- I'm sorry --

5    the El Paso County Sheriff's Department.

6    A.   Correct.

7    Q.   And that's set out in Paragraph 70?

8    A.   Yes.

9          THE COURT:  Now, was that El Paso -- there was also an

10   El Paso County in Colorado.

11         MR. DeSOUZA:  This was the Colorado.

12         THE WITNESS:  Colorado, Your Honor.

13   BY MR. DeSOUZA:

14   Q.   You calculated that total to the plaintiff, from the El

15   Paso County Sheriff's Department in Colorado, to be $38,000,

16   correct?

17   A.   Correct, correct.

18   Q.   And Mr. Herring was just asking you about crimes against

19   children conferences, correct?

20   A.   Correct.

21   Q.   And I believe in your declaration you talk about the lost

22   profits that the plaintiff would have expected to make out of

23   these conferences, correct?

24   A.   Correct.

25   Q.   But you don't actually include that in your final damages

1    amount, because that might be duplicative of what the

2    accountants came up with, correct?

3    A.   Correct.

4    Q.   Rather, the only part of the crimes against children

5    conference that you include in your damages were the

6    out-of-pockets that the plaintiff paid to attend these

7    conferences or to be a speaker, correct?

8    A.   Correct.

9    Q.   And I think in 2018; is that right, in Paragraph 73, you

10   have $5,600?

11   A.   Yes.

12   Q.   And in Paragraph 74 -- this is for the 2019 conference,

13   $6,500; is that correct?

14   A.   Correct.

15   Q.   And so your total damages are being set forth, it looks

16   like in Paragraph 76 -- and again, this is towards the bottom

17   of the page.  Therefore, Plaintiff's adjusted damages amount

18   would be $4,245,256.31, minus the crimes against children,

19   minus the other conference; is that right?

20   A.   Yes, that's correct.

21   Q.   And then from there, you're adding in the -- what the

22   accountants took into account other than within the State of

23   Texas?

24   A.   Correct.

25   Q.   And then, finally, just in closing, Mr. Humble, I think you

1    -- you have a, I believe, a 10 to 12 percent estimate of what

2    you say are losses that are caused by something other than

3    Mr. Herring, correct?

4    A.   Correct.

5    Q.   Just briefly tell the Court what you would include within

6    that 10 to 12 percent, what -- other than Mr. Herring, why do

7    people discontinue using the CVSA or not buy the CVSA?

8    A.   Or not -- yeah, or not by the CVSA.  I would think, in most

9    cases that we've seen, polygraph has controlled the mountain

10   for a long time.  You know, they're everywhere and they're

11   entrenched, and we have to come and climb the hill, so to

12   speak, and prove we're better.

13        That's why a lot of our sales are word of mouth, because

14   cops trust other cops.  But the polygrapher still have their

15   hold, and they'll go and talk to their chief and say, hey, this

16   is terrible.  They'll take all the stuff they got from

17   Mr. Herring and they'll say look at all this horrible stuff.

18   You know, don't get involved with these people.

19        But besides Herring, you've got eye detectors out there.

20   They're not a very big part of the market.  Eye detect is a lie

21   detector using the pupil, the iris.  And a few other things

22   that they come in and -- a new chief comes in, and he's a

23   polygraph only, and he goes out and buys the polygraph or

24   whatever.

25        So those are some of the things that cause departments not

1    to want to buy our system.

2    Q.   What about general attrition, someone just decides to stop

3    using the CVSA product?  That happens, correct?

4    A.   It happens.  It's really rare.  I would -- I really tried

5    to think hard about that, because the only way we find out they

6    stop using it is they don't re-cert their people, and then we

7    have to call them, what's going on, a new chief came in, he

8    wanted to go back to polygraph, whatever.  It's about three

9    percent.

10   Q.   What is NITV's share of the market in the lie detector

11   market, generally?

12   A.   Lie detector generally, I would say we're about 70 percent.

13   Q.   What about in the VSA market, in the voice stress analysis?

14   A.   We're about 95 percent to -- yeah, 95 to 98 percent.

15   Q.   Has that been relatively consistent over the last 10 years?

16   A.   Oh, yes.

17   Q.   And do you believe yourself capable, in your position as,

18   essentially, the leader of NITV, to be able to fairly estimate

19   that 10 to 12 percent discount figure of losses that cannot be

20   attributed to Mr. Herring?

21   A.   Yes.

22            MR. DeSOUZA:  No further questions, Your Honor.

23            THE COURT:  I just want to clarify one thing, and that

24   is, you mentioned the number of states that were polygraph

25   only.

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  And you changed one of them, and that was

3    Illinois, correct?

4          THE WITNESS:  Correct, Your Honor.

5          THE COURT:  What was the number of states that were

6    polygraph only?

7          THE WITNESS:  It started at 15, Your Honor.

8          THE COURT:  Okay.

9          THE WITNESS:  That's the -- when the polygraphers tried

10   to get this done nationally, only 15 states ended up passing

11   those polygraph-only laws.  And a few, one here or over here,

12   the departments would go and get it changed.  We went into

13   Illinois, spent about 120- to $150,000 doing the same thing we

14   did in Texas and got the law changed there.  Right now I think

15   there are six states that still have the polygraph-only laws.

16         THE COURT:  Okay.  And by going from the 15 to the six,

17   you think that you made a difference -- you're confident that

18   you made a difference in Illinois.

19         THE WITNESS:  Oh, we were the only players there.

20         THE COURT:  Okay.

21         MR. HERRING:  Oh, bull.

22         THE WITNESS:  We went in and did it.

23         THE COURT:  Okay.

24         THE WITNESS:  Same way in Texas.  We were the only ones

25   there in Texas.  We put the money up and we did all the

```
 1    lobbying.

 2              THE COURT:  Very well.

 3              Okay.  We're gonna break now for -- let's break for --

 4    tell me how long.  About 30 minutes?  Okay.  We're gonna break

 5    for 30 minutes, then you can come back.  Any other evidence

 6    you've got -- Mr. Herring, if you have any other evidence that

 7    you're going to put on -- you're going to apparently be called

 8    by the other side to testify.  You get to examine yourself on

 9    cross-examination.

10              Do you have any other evidence other than that?

11              MR. HERRING:  I'll have to go through my documents,

12    Your Honor.

13              THE COURT:  All right.  We'll have 30 minutes to do

14    that, and then we'll have brief arguments and then we're going

15    to wrap this up.  Thank you.

16              MR. DeSOUZA:  Thank you, Your Honor.

17              (Recess was taken at 2:12 p.m.)

18                        * * * * * * * *

19

20

21

22

23

24

25
```

124

```
1                    C E R T I F I C A T E

2

3

4           I hereby certify that the foregoing is an

    accurate transcription of the proceedings in the
5
    above-entitled matter.
6

7


8   DATE:  May 5, 2020          /s/Ilona Lupowitz
                                ILONA LUPOWITZ, CRR, RPR
9                               Official Court Reporter
                                United States District Court
10                              400 North Miami Avenue, 8th Floor
                                Miami, Florida 33128
11                              (305) 523-5634

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$10,000** [2] - 17:19, 17:22
**$100,000** [1] - 49:21
**$150,000** [1] - 122:13
**$18,000** [1] - 41:24
**$20,000** [1] - 37:11
**$200,000** [2] - 53:17, 54:4
**$205,000** [3] - 57:6, 57:8, 116:5
**$250,000** [2] - 58:12, 58:17
**$300** [1] - 54:18
**$320,000** [1] - 58:4
**$38,000** [1] - 118:15
**$4,245,256.31** [1] - 119:18
**$400** [2] - 25:22, 96:18
**$5,000,000** [1] - 30:22
**$5,600** [1] - 119:10
**$500,000** [1] - 58:11
**$6,500** [1] - 119:13
**$8,900** [1] - 17:10
**$800,000** [1] - 95:22
**$86,000** [1] - 98:23
**$9,900** [1] - 17:17

## '

**'14** [5] - 51:16, 86:18, 92:6, 92:11, 101:2
**'18** [5] - 51:16, 86:18, 92:6, 92:11, 101:2
**'70s** [1] - 97:17
**'72** [1] - 98:13
**'74** [1] - 94:24

## /

**/s/Ilona** [1] - 124:8

## 1

**1** [3] - 1:8, 3:25, 105:18
**1,900** [1] - 74:24
**1,903** [1] - 73:3
**1,904** [2] - 72:25, 74:18
**10** [16] - 1:5, 8:11, 36:10, 50:6, 52:25, 53:1, 60:13, 66:8, 70:15, 92:12, 114:18, 114:19, 120:1, 120:6, 121:15, 121:19
**100** [4] - 60:20, 66:7, 114:14, 114:17
**101** [2] - 1:15, 2:10
**11.2** [2] - 117:16, 117:21
**115** [1] - 2:5
**11:05** [1] - 1:6
**12** [4] - 68:14, 120:1, 120:6, 121:19
**12-year** [1] - 39:23
**12-year-old** [1] - 39:18

**120** [1] - 122:13
**13** [1] - 75:6
**133** [4] - 6:20, 30:19, 44:2, 44:18
**14-page** [1] - 27:3
**15** [16] - 21:7, 56:15, 60:13, 66:8, 69:8, 69:24, 74:1, 74:3, 88:23, 101:10, 109:18, 114:18, 114:19, 122:7, 122:10, 122:16
**15,000** [7] - 68:14, 68:16, 68:18, 68:21, 70:6, 71:14
**1500** [1] - 1:15
**16** [1] - 106:20
**16-year-old** [1] - 7:20
**17** [1] - 51:14
**18-CV-80994-DLB** [1] - 1:2
**18-year** [3] - 23:3, 23:6, 25:8
**19** [3] - 32:24, 35:1, 117:10
**1900** [1] - 97:10
**1975** [1] - 52:3
**1986** [1] - 62:4
**1988** [2] - 52:6, 94:23
**1990** [1] - 37:25
**1992** [1] - 100:23
**1995** [3] - 100:25, 102:7
**1996** [2] - 40:9, 100:25
**1998** [2] - 62:5, 99:8
**1999** [3] - 39:17, 39:22, 40:9

## 2

**2** [1] - 100:23
**2,150** [1] - 74:24
**2,500** [2] - 105:14, 105:21
**2,700** [4] - 70:9, 71:14, 73:4, 74:25
**2,703** [2] - 68:23, 72:23
**2,800** [2] - 109:13, 109:19
**20** [5] - 7:14, 23:19, 40:9, 70:24, 74:1
**20,000** [1] - 109:3
**20-something** [1] - 87:14
**200** [1] - 75:6
**200,000** [1] - 54:11
**2000** [2] - 68:4, 97:11
**2002** [2] - 93:1, 101:17
**2003** [4] - 68:3, 94:23, 104:14, 104:18
**2004** [1] - 34:14
**2005** [2] - 92:25, 102:7
**2006** [11] - 7:11, 37:20, 38:14, 49:25, 63:2, 63:8, 63:18, 64:4, 95:16, 100:25, 102:19
**2011** [1] - 89:3
**2012** [2] - 4:12, 25:8
**2014** [3] - 51:6, 51:12, 99:2

**2016** [2] - 86:13, 86:17
**2017** [6] - 40:7, 51:9, 51:12, 51:18, 69:19, 116:20
**2018** [8] - 40:8, 51:6, 51:9, 51:12, 51:13, 69:19, 116:20, 119:9
**2019** [3] - 1:5, 116:24, 119:12
**2020** [1] - 124:8
**2022** [1] - 116:24
**204** [1] - 1:17
**209** [2] - 74:22, 75:5
**25** [3] - 55:5, 85:2, 109:19
**25,000** [1] - 69:6
**25-year** [1] - 39:23
**2925** [1] - 1:17
**2:12** [2] - 1:6, 123:17

## 3

**3** [1] - 2:4
**30** [20] - 5:1, 29:14, 30:2, 35:18, 41:8, 46:16, 64:6, 69:1, 70:9, 71:12, 71:13, 76:4, 76:5, 85:8, 86:23, 102:13, 117:4, 123:4, 123:5, 123:13
**305** [2] - 1:25, 124:11
**32** [1] - 58:3
**33128** [2] - 1:24, 124:10
**33301** [1] - 1:15
**33410** [1] - 1:18
**35** [1] - 43:1
**350** [1] - 74:23

## 4

**4** [1] - 2:4
**40** [1] - 43:1
**400** [3] - 1:23, 43:8, 124:10
**450,000** [1] - 43:8
**47** [1] - 98:20

## 5

**5** [1] - 124:8
**5,000** [2] - 60:2, 70:18
**50** [2] - 67:16, 70:10
**50/50** [1] - 61:23
**500** [1] - 8:22
**500,000** [1] - 58:15
**51** [1] - 74:9
**523-5634** [2] - 1:25, 124:11
**58** [2] - 16:4, 58:5

## 6

**6,000** [1] - 70:19
**61** [1] - 110:9
**66** [2] - 115:20, 116:2

**69** [1] - 117:2

## 7

**7,000** [1] - 71:17
**70** [3] - 67:17, 118:7, 121:12
**73** [1] - 119:9
**74** [1] - 119:12
**75** [1] - 70:11
**76** [2] - 2:10, 119:16
**77** [1] - 75:7

## 8

**85** [3] - 65:16, 103:22
**8th** [2] - 1:24, 124:10

## 9

**9** [1] - 105:13
**90** [2] - 65:17, 103:22
**95** [2] - 121:14
**98** [11] - 21:9, 22:3, 25:9, 27:9, 27:11, 41:9, 63:20, 70:11, 83:21, 86:13, 121:14

## A

**a.m** [1] - 1:6
**AA** [3] - 76:13, 76:15, 77:8
**ABC** [6] - 7:9, 63:2, 63:19, 63:24, 102:19, 108:17
**ability** [2] - 9:22, 36:8
**able** [7] - 36:18, 57:22, 60:15, 96:5, 107:16, 107:17, 121:18
**above-entitled** [1] - 124:5
**absent** [1] - 28:16
**abundance** [1] - 101:11
**abuse** [1] - 6:22
**accept** [1] - 30:13
**accepting** [1] - 116:16
**according** [12] - 9:7, 17:25, 20:3, 25:18, 40:15, 63:8, 72:22, 74:8, 83:4, 98:4, 98:5, 106:14
**account** [3] - 25:23, 73:2, 119:22
**accountant** [1] - 51:11
**accountants** [2] - 119:2, 119:22
**accredited** [1] - 68:9
**accuracy** [3] - 21:9, 71:8, 89:11
**accurate** [10] - 22:3, 25:9, 27:9, 27:11, 63:20, 70:11, 83:17, 83:21, 86:14, 124:4
**accused** [1] - 39:18
**Act** [1] - 100:6

**action** [7] - 98:10, 98:13, 98:19, 112:25, 113:1, 113:3
**actions** [2] - 57:2, 102:13
**actual** [5] - 40:16, 59:25, 79:7, 106:13, 106:18
**ad** [2] - 77:16, 101:2
**add** [1] - 74:23
**added** [3] - 32:12, 68:17
**adding** [1] - 119:21
**address** [7] - 24:6, 24:8, 25:13, 26:8, 29:5, 29:6, 49:8
**adds** [1] - 75:5
**adjusted** [1] - 119:17
**administrative** [1] - 98:19
**admit** [3] - 19:21, 101:14, 103:24
**admits** [2] - 7:15, 36:11
**admitted** [13] - 21:6, 65:13, 72:20, 75:1, 75:25, 79:1, 82:20, 83:14, 89:10, 90:22, 91:1, 93:4, 106:4
**admitting** [1] - 89:11
**ads** [14] - 8:17, 9:7, 33:7, 35:18, 69:8, 69:12, 69:19, 76:5, 76:12, 76:23, 77:7, 100:16, 101:2
**adverse** [1] - 93:24
**advertise** [1] - 40:3
**advertised** [6] - 69:4, 69:12, 69:14, 69:22, 101:8, 101:9
**advertising** [1] - 101:7
**advice** [2] - 40:12, 87:15
**ADVISORLAW** [1] - 1:17
**Affairs** [1] - 67:9
**affected** [2] - 35:19, 71:21
**affidavit** [3] - 45:6, 45:15, 46:2
**afford** [1] - 70:21
**agencies** [26] - 16:1, 16:23, 18:25, 37:2, 41:16, 46:23, 58:7, 68:8, 68:9, 68:20, 70:14, 70:15, 70:17, 70:20, 71:14, 73:6, 73:7, 74:8, 74:17, 74:20, 110:10, 113:8, 113:16, 113:18, 117:11
**agency** [7] - 33:11, 59:25, 66:10, 67:6, 67:19, 67:25, 72:5
**agents** [1] - 67:23
**ago** [10] - 21:7, 33:15, 69:24, 74:10, 79:16, 87:14, 98:12, 98:20, 109:19, 114:19
**agree** [8] - 31:6, 39:2, 56:21, 68:16, 68:24, 71:15, 81:9, 81:10
**agreed** [2] - 49:21, 57:17
**agreement** [2] - 18:21, 19:9
**ahead** [10] - 17:5, 24:23, 26:10, 27:1, 39:4, 48:8,

59:14, 59:21, 62:13, 105:19
**airport** [1] - 71:10
**akin** [1] - 44:23
**alcohol** [1] - 95:12
**alert** [2] - 95:23, 96:14
**allegation** [4] - 46:21, 90:25, 106:3, 107:17
**allegations** [1] - 35:23
**alleged** [1] - 83:6
**allow** [10] - 13:7, 13:8, 17:24, 20:4, 27:20, 48:7, 53:14, 57:11, 61:15, 67:15
**allowed** [16] - 9:25, 18:2, 21:25, 22:1, 24:21, 34:22, 53:15, 56:14, 64:25, 73:7, 73:23, 91:11, 95:23, 111:10, 111:11, 111:14
**allowing** [1] - 35:1
**alone** [4] - 52:14, 71:9, 71:15, 111:19
**alter** [1] - 88:1
**altered** [4] - 87:6, 87:8, 87:11
**Amazon.com** [1] - 91:24
**amend** [1] - 58:23
**amended** [1] - 58:23
**America** [4] - 10:20, 10:21, 32:5, 45:14
**amount** [5] - 13:12, 13:14, 13:15, 119:1, 119:17
**analog** [1] - 36:12
**analyses** [1] - 93:1
**analysis** [6] - 22:19, 58:25, 61:1, 104:6, 106:9, 121:13
**Analysts** [1] - 23:24
**analyzer** [2] - 36:11, 61:21
**analyzers** [1] - 116:17
**angelic** [1] - 85:6
**answer** [9] - 9:2, 17:5, 26:22, 26:23, 42:13, 47:3, 69:11, 81:14, 111:6, 115:1
**anti** [1] - 94:2
**antipolygraph.org** [1] - 84:11
**AntiPolygraph.org** [1] - 108:15
**anxious** [1] - 30:22
**anyplace** [1] - 104:10
**appear** [3] - 76:17, 77:25, 78:2
**APPEARANCES** [1] - 1:12
**appointed** [1] - 113:25
**appreciate** [2] - 6:4, 23:8
**approach** [3] - 34:15, 78:14, 80:6
**approached** [2] - 61:18, 61:20
**approval** [1] - 116:11
**approved** [1] - 33:6
**approves** [1] - 33:1

**archived** [1] - 108:15
**areas** [1] - 76:6
**argue** [1] - 62:12
**arguing** [1] - 85:18
**argument** [3] - 20:23, 93:6
**argumentative** [3] - 66:23, 66:25, 85:17
**arguments** [1] - 123:14
**Arizona** [1] - 63:21
**ARTHUR** [1] - 1:19
**Arthur** [1] - 113:19
**article** [16] - 27:3, 63:13, 89:2, 92:23, 93:1, 96:24, 97:1, 102:19, 112:6, 112:8, 112:12, 112:14, 112:15, 112:18, 112:24
**articles** [5] - 46:18, 47:4, 64:5, 92:25, 93:8
**aspect** [2] - 117:24, 118:3
**associated** [1] - 23:22
**association** [4] - 4:14, 24:1, 24:3, 25:9, 25:11, 25:12, 25:15, 27:7, 52:3, 56:8, 96:18
**Association** [2] - 23:23, 69:6
**assume** [2] - 53:5, 58:6
**Atlanta** [2] - 15:20, 68:2
**attached** [3] - 90:5, 90:9, 90:10
**attacking** [1] - 103:25
**attempts** [2] - 29:18, 52:7
**attend** [1] - 119:6
**attended** [1] - 53:6
**attending** [1] - 112:3
**attention** [1] - 46:3
**attorney** [2] - 107:16, 107:25
**attorney's** [1] - 107:15
**attorneys** [3] - 60:15, 70:8, 107:14
**attributed** [1] - 121:20
**attrition** [1] - 121:2
**audience** [2] - 55:5, 111:11
**authentication** [1] - 78:11
**author** [1] - 25:2
**available** [1] - 92:10
**Avenue** [3] - 1:15, 1:23, 124:10
**average** [2] - 117:15, 117:21
**award** [1] - 30:6
**aware** [9] - 17:20, 50:17, 53:6, 68:11, 84:10, 87:4, 93:14, 95:16, 103:18

**B**

**background** [7] - 13:17, 53:24, 53:25, 54:7, 55:8,

55:10, 79:20
**bad** [4] - 34:15, 91:19, 103:9, 112:16
**badmouthed** [2] - 33:13
**baker** [1] - 95:16
**bank** [1] - 25:23
**banner** [2] - 15:19, 15:22
**bars** [1] - 35:13
**base** [1] - 114:7
**based** [8] - 13:24, 34:11, 57:24, 70:6, 92:12, 106:8, 113:8, 117:4
**basis** [8] - 4:21, 8:25, 22:22, 33:3, 46:20, 50:4, 76:16, 78:24
**BBB** [1] - 95:25
**BEACH** [1] - 1:2
**Beach** [3] - 1:4, 1:18, 39:24
**become** [1] - 58:8
**BEFORE** [1] - 1:10
**beginning** [1] - 45:16
**behavior** [1] - 44:21
**Bell** [9] - 34:2, 34:4, 34:13, 34:21, 35:6, 93:14, 93:23, 94:9
**bell** [7] - 34:18, 34:19, 80:14, 82:9, 82:10, 94:7, 94:18
**belong** [2] - 96:18, 110:15
**bench** [1] - 77:2
**beside** [1] - 66:1
**best** [1] - 21:24
**better** [3] - 21:23, 35:10, 120:12
**between** [3] - 30:24, 64:20, 112:16
**big** [1] - 120:20
**bit** [1] - 10:2
**blame** [2] - 39:10, 114:9
**blamed** [1] - 55:19
**blames** [1] - 59:18
**blaming** [3] - 48:4, 60:11, 65:8
**blanketing** [1] - 70:25
**blood** [1] - 112:16
**board** [5] - 52:21, 52:25, 57:15, 57:16, 116:15
**body** [1] - 59:11
**bottom** [4] - 79:20, 100:22, 116:8, 119:16
**bought** [15] - 16:4, 16:23, 17:10, 20:21, 38:5, 40:17, 58:5, 58:9, 64:18, 67:22, 70:11, 92:22, 110:17, 114:15, 115:9
**Boulevard** [1] - 1:17
**box** [2] - 25:13, 80:18
**boxes** [1] - 24:8
**boy** [3] - 7:20, 35:9, 39:19

**brags** [1] - 98:15
**BRANNON** [1] - 1:10
**break** [15] - 8:2, 8:10, 8:11, 28:6, 32:16, 73:13, 73:14, 73:15, 73:17, 73:20, 91:15, 115:16, 123:3, 123:4
**breaking** [1] - 67:20
**bribes** [1] - 102:3
**brief** [4] - 20:23, 115:13, 115:14, 123:14
**briefing** [1] - 66:10
**briefings** [2] - 57:16, 66:3
**briefly** [3] - 78:19, 105:9, 120:5
**bring** [2] - 5:10, 57:16
**broad** [1] - 62:9
**broadcast** [2] - 63:25, 64:3
**Brody** [1] - 89:15
**brought** [7] - 14:2, 23:12, 37:10, 47:19, 63:1, 89:21, 89:24
**Bs** [1] - 92:20
**budgeted** [1] - 73:19
**bull** [1] - 122:21
**business** [19] - 7:7, 13:11, 13:16, 13:22, 14:3, 14:5, 21:2, 24:8, 30:7, 42:23, 43:18, 44:12, 47:25, 64:7, 64:8, 64:9, 69:1, 107:20
**buy** [27] - 5:3, 18:11, 20:21, 38:5, 39:15, 42:2, 43:25, 45:2, 46:19, 50:23, 50:25, 67:13, 71:23, 91:5, 91:22, 91:25, 92:9, 92:22, 93:2, 97:24, 107:8, 113:16, 114:12, 120:7, 121:1
**buyers** [14] - 14:5, 37:22, 38:1, 39:14, 40:16, 65:11, 68:23, 71:21, 76:12, 100:16, 105:22, 106:14, 110:15
**buying** [19] - 17:18, 17:19, 21:21, 36:23, 50:21, 60:22, 61:6, 71:24, 72:4, 72:5, 94:11, 94:13, 98:1, 110:20, 112:12, 112:13, 113:17, 113:20
**buys** [6] - 16:25, 17:8, 21:25, 67:19, 92:9, 120:23
**BY** [107] - 1:21, 2:4, 2:4, 2:5, 3:16, 4:11, 8:15, 9:6, 10:11, 11:20, 14:10, 15:2, 16:21, 17:7, 20:2, 21:13, 22:7, 23:11, 23:18, 25:1, 27:2, 31:12, 33:5, 34:1, 35:17, 36:21, 38:12, 39:9, 41:1, 41:12, 42:4, 42:7, 45:10, 45:19, 46:8, 47:8, 48:12, 49:11, 49:18, 50:2, 51:22, 52:20, 53:13, 54:2, 54:12, 55:2, 56:2, 58:20,

59:10, 59:15, 59:23, 61:10, 62:8, 62:14, 65:22, 66:20, 67:2, 68:10, 70:5, 71:22, 72:8, 72:21, 74:6, 74:15, 76:2, 79:14, 79:19, 80:12, 81:5, 81:20, 82:8, 82:23, 83:16, 84:2, 84:9, 85:13, 85:21, 86:3, 86:11, 86:21, 87:1, 87:19, 88:15, 89:1, 89:13, 90:3, 93:13, 95:5, 95:10, 95:15, 97:15, 98:21, 99:7, 99:22, 101:16, 102:6, 105:12, 105:20, 110:2, 110:14, 111:8, 112:23, 113:6, 115:8, 115:18, 116:1, 118:13

## C

**calculated** [2] - 106:7, 117:16, 117:25, 118:4, 118:14
**California** [6] - 15:20, 16:3, 16:5, 58:3, 58:5, 68:4
**California's** [1] - 57:24
**campaign** [1] - 86:4
**cancelling** [1] - 37:2
**Cane** [1] - 14:22
**cannot** [7] - 16:18, 21:15, 44:12, 78:16, 110:17, 121:19
**capable** [3] - 40:1, 90:12, 121:17
**captain** [3] - 39:24, 112:17
**card** [1] - 60:3
**care** [3] - 72:3, 99:2, 108:4
**carries** [1] - 51:10
**carrying** [1] - 116:23
**CASE** [1] - 1:2
**case** [12] - 4:22, 5:15, 6:5, 7:6, 17:9, 36:1, 46:24, 50:7, 106:19, 107:12, 117:23
**cases** [7] - 37:3, 67:20, 67:21, 92:14, 107:12, 107:13, 120:9
**category** [1] - 94:17
**causa** [2] - 48:22, 48:24
**caused** [4] - 46:9, 46:22, 114:20, 120:2
**causes** [1] - 91:21
**caution** [1] - 101:11
**CC** [7] - 79:18, 80:17, 82:4, 82:6, 82:14, 82:20
**centered** [1] - 81:17
**cert** [1] - 121:6
**certain** [3] - 14:18, 30:1, 106:6
**certainly** [6] - 50:22, 64:1, 76:15, 89:24, 90:20, 93:22
**certainty** [1] - 114:14
**certificate** [3] - 48:13,

48:21, 48:22
**certification** [3] - 58:13, 58:18, 60:4
**certify** [1] - 124:3
**cetera** [5] - 13:17, 14:19, 15:22, 79:21
**CFO** [4] - 11:12, 11:25, 14:21
**chain** [2] - 11:13
**chair** [1] - 115:24
**challenges** [1] - 4:22
**challenging** [1] - 35:22
**chance** [1] - 13:21
**change** [4] - 12:2, 30:25, 57:13, 113:9
**changed** [11] - 14:15, 52:14, 53:9, 53:14, 53:18, 54:8, 57:9, 97:10, 122:2, 122:12, 122:14
**changes** [2] - 10:15, 73:2
**changing** [1] - 53:22
**Chapman** [22] - 4:15, 22:13, 23:6, 23:19, 24:22, 25:2, 25:3, 25:6, 25:7, 26:4, 26:6, 26:11, 26:13, 26:17, 27:3, 27:8, 27:9, 65:2, 65:6, 96:24, 104:5, 104:24
**character** [6] - 97:22, 99:12, 99:13, 102:12, 103:9, 103:25
**charge** [5] - 17:22, 32:5, 54:17, 82:2
**charged** [1] - 16:13
**CHARLES** [2] - 2:3, 3:8
**Charles** [6] - 3:4, 3:11, 3:19, 13:1, 13:25, 14:8
**CharlesHumble.com** [1] - 12:21
**chart** [2] - 64:20, 117:11
**chase** [1] - 25:5
**cheated** [1] - 99:5
**cheating** [1] - 16:3
**check** [3] - 14:20, 15:9, 15:10
**checked** [4] - 8:20, 8:23, 42:8, 97:12
**Chief** [2] - 69:5, 69:23
**chief** [4] - 60:22, 120:15, 120:22, 121:7
**Chiefs** [1] - 69:6
**child** [1] - 89:23
**children** [5] - 110:7, 110:8, 118:19, 119:4, 119:18
**choice** [1] - 89:15
**chose** [2] - 93:2
**CHP** [1] - 57:17
**Christian** [1] - 47:17
**citing** [1] - 37:2
**civil** [2] - 49:21, 50:6
**claim** [17] - 27:11, 45:20,

46:12, 53:10, 55:16, 60:25, 61:11, 65:8, 71:13, 73:3, 86:19, 91:8, 91:17, 95:11, 97:10, 103:9, 111:1
**claimed** [12] - 4:12, 4:18, 21:8, 32:22, 36:7, 60:24, 76:12, 77:14, 84:3, 84:5, 95:1, 101:8
**claiming** [20] - 21:8, 24:16, 25:8, 32:21, 36:13, 44:12, 44:23, 46:9, 46:13, 48:4, 62:21, 68:22, 70:9, 74:25, 83:21, 93:21, 94:3, 97:23, 98:15, 110:20
**claims** [14] - 5:16, 8:16, 22:18, 36:6, 41:7, 50:20, 51:5, 86:13, 90:8, 94:23, 100:3, 100:10, 100:16
**clarification** [2] - 69:18, 79:24
**clarify** [2] - 92:18, 121:23
**class** [1] - 14:18
**clear** [2] - 18:18, 20:1
**clearly** [11] - 36:4, 62:9, 62:10, 63:11, 63:14, 75:14, 78:17, 83:9, 90:17, 94:8, 97:12
**client** [3] - 15:18, 75:5, 75:8
**clients** [9] - 37:5, 38:17, 42:25, 65:24, 65:25, 66:2, 66:10, 106:7, 106:11
**climb** [1] - 120:11
**closing** [1] - 119:25
**co** [3] - 34:20, 84:14
**co-counsel** [1] - 84:14
**co-inventor** [2] - 34:20
**codes** [1] - 103:6
**coercing** [1] - 96:19
**coffee** [1] - 43:13
**coin** [1] - 21:23
**college** [3] - 68:19, 70:8, 71:9
**Colorado** [6] - 41:21, 44:24, 118:10, 118:11, 118:12, 118:15
**com** [2] - 29:8, 29:10
**comfort** [1] - 8:11
**coming** [5] - 38:18, 77:2, 97:14, 102:23, 103:8
**command** [1] - 11:13
**commander** [2] - 14:24, 115:6
**comment** [2] - 49:20, 80:8
**commentary** [1] - 93:23
**comments** [4] - 40:23, 42:23, 43:18, 92:3
**Commerce** [1] - 49:24
**committing** [2] - 24:15, 44:13
**common** [1] - 67:12

**commotion** [1] - 71:7
**communications** [1] - 116:10
**community** [1] - 70:14
**companies** [1] - 54:16
**company** [19] - 10:18, 11:17, 12:18, 23:19, 23:21, 23:25, 32:21, 33:13, 33:19, 35:7, 35:12, 39:17, 46:16, 47:12, 61:17, 61:19, 82:25, 94:4, 108:9
**compare** [1] - 88:13
**compared** [2] - 73:3, 96:1
**comparison** [1] - 96:8
**Complaint** [1] - 84:3, 90:22
**complaint** [2] - 46:22, 82:15
**complaints** [1] - 38:18
**complete** [1] - 71:8
**composite** [1] - 78:5
**Computer** [1] - 23:23
**computer** [5] - 17:10, 17:11, 17:14, 36:10
**computers** [1] - 36:12
**concentrate** [1] - 8:3
**concern** [2] - 40:7, 68:6
**concerned** [2] - 5:8, 71:3
**conclusion** [2] - 92:1, 114:23
**condemned** [1] - 55:21
**condemning** [1] - 83:5
**conducting** [1] - 109:1
**conference** [8] - 54:24, 56:4, 56:19, 111:9, 111:10, 119:5, 119:12, 119:19
**conferences** [3] - 118:19, 118:23, 119:7
**confident** [1] - 122:17
**confirmed** [1] - 116:10
**confused** [3] - 10:2, 82:1, 84:20
**Congress** [1] - 104:23
**conjecture** [1] - 114:7
**connected** [3] - 56:4, 87:5, 114:8
**connection** [7] - 25:20, 45:16, 45:17, 45:22, 46:3, 49:22, 116:20
**conservative** [1] - 117:22
**considered** [1] - 49:23
**consistent** [1] - 121:15
**consists** [1] - 110:9
**constantly** [1] - 36:6
**Constitution** [3] - 39:1, 39:7, 108:7
**consult** [1] - 29:13
**consulting** [1] - 34:25
**contact** [10] - 22:8, 22:10, 22:16, 38:6, 59:25, 60:6,

75:2, 107:19, 108:5, 113:15
**contacted** [5] - 14:18, 41:19, 59:17, 93:19, 114:23
**contacting** [3] - 41:15, 107:7, 111:2
**Contel** [1] - 61:17
**content** [2] - 16:12, 16:13
**contention** [1] - 50:9
**continue** [2] - 26:7, 106:21
**continued** [1] - 40:2
**continuously** [1] - 35:23
**continuum** [1] - 31:1
**contract** [1] - 101:17
**contractor** [1] - 10:21
**contradict** [1] - 107:2
**contradicts** [1] - 13:5
**control** [2] - 18:24, 60:22
**controlled** [1] - 120:9
**controversial** [1] - 114:5
**controversy** [2] - 114:1, 114:2
**convention** [1] - 67:18
**convicted** [1] - 99:8
**convince** [1] - 5:3
**convinced** [1] - 106:11
**convincing** [1] - 57:11
**coordinator** [2] - 11:24, 15:12
**cop** [1] - 98:16
**copies** [1] - 76:11
**cops** [2] - 120:14
**copy** [18] - 3:19, 7:2, 7:3, 7:10, 19:6, 27:10, 30:19, 30:20, 38:10, 46:4, 48:13, 74:8, 75:16, 75:20, 96:23, 96:25, 98:5, 98:6
**copyright** [2] - 99:9, 100:4
**Corporation** [2] - 108:17, 108:18
**CORPORATION** [1] - 1:7
**correct** [113] - 8:18, 8:19, 8:24, 10:25, 12:13, 12:16, 12:19, 12:22, 13:22, 14:12, 14:13, 14:15, 14:20, 16:16, 16:18, 16:19, 17:19, 17:23, 17:24, 21:16, 23:20, 23:22, 24:1, 24:4, 24:5, 24:6, 24:7, 24:9, 25:2, 31:22, 38:1, 38:2, 38:7, 38:14, 38:15, 39:11, 39:16, 43:18, 43:24, 45:13, 46:10, 47:17, 48:14, 48:15, 50:11, 52:23, 52:24, 53:1, 53:2, 53:4, 53:16, 54:14, 56:6, 56:9, 56:10, 56:12, 56:16, 59:3, 60:12, 69:2, 69:9, 82:25, 85:23, 86:23, 87:2, 87:3, 90:5, 92:7, 96:6, 101:1, 102:20, 106:7, 110:21, 110:24, 110:25, 114:21, 116:3, 116:4, 116:6,

116:7, 116:18, 116:21, 116:22, 116:25, 117:2, 117:6, 117:13, 117:14, 117:19, 117:20, 118:1, 118:2, 118:6, 118:16, 118:17, 118:19, 118:20, 118:23, 118:24, 119:2, 119:3, 119:7, 119:8, 119:13, 119:14, 119:20, 119:24, 120:3, 120:4, 121:3, 122:3, 122:4
**Corrections** [3] - 16:4, 58:5, 58:8
**correctly** [1] - 43:23
**cost** [1] - 47:24
**Counsel** [1] - 87:15
**counsel** [3] - 3:13, 51:7, 84:14
**counted** [1] - 72:24
**Counterintelligence** [1] - 34:8
**countermeasures** [2] - 35:19, 95:7
**countries** [1] - 49:22
**country** [3] - 42:24, 68:13, 68:19
**counts** [2] - 79:17, 82:15
**County** [11] - 37:11, 40:23, 41:4, 41:19, 41:20, 42:21, 43:10, 44:24, 118:5, 118:10, 118:15
**couple** [6] - 16:22, 43:5, 54:16, 54:18, 105:9, 114:15
**course** [2] - 35:14, 76:25
**courses** [1] - 59:11
**Court** [27] - 1:22, 1:23, 4:19, 5:8, 19:7, 28:15, 28:19, 30:6, 30:13, 63:3, 69:21, 74:12, 75:9, 75:10, 76:7, 76:8, 82:13, 92:19, 96:23, 103:21, 103:23, 108:5, 108:20, 120:5, 124:9, 124:9
**court** [8] - 28:16, 39:25, 63:5, 65:14, 73:14, 92:14, 108:11, 108:13
**COURT** [363] - 1:1, 3:2, 3:6, 3:12, 3:25, 4:4, 4:7, 4:23, 5:5, 5:15, 5:21, 6:2, 6:6, 6:9, 6:19, 7:1, 7:22, 8:13, 9:2, 9:9, 9:12, 9:18, 10:4, 11:8, 11:16, 13:1, 13:7, 13:14, 13:19, 13:22, 13:24, 14:7, 15:1, 16:9, 16:17, 16:20, 17:5, 18:17, 18:22, 19:1, 19:8, 19:13, 19:15, 19:21, 20:8, 20:15, 20:23, 21:10, 21:18, 22:4, 22:21, 23:1, 23:8, 23:14, 23:16, 24:11, 24:19, 24:23, 25:5, 25:17, 25:24, 26:10, 26:12, 26:16,

26:19, 26:21, 27:1, 27:13, 27:19, 27:22, 28:5, 28:8, 28:9, 28:10, 28:14, 28:24, 29:1, 29:4, 29:9, 29:11, 29:20, 29:23, 30:4, 30:9, 30:16, 31:6, 31:9, 32:17, 33:3, 33:21, 33:25, 34:17, 35:2, 35:15, 36:2, 36:15, 39:4, 39:7, 39:21, 40:4, 40:12, 40:18, 40:20, 41:3, 41:10, 42:6, 42:9, 42:11, 42:18, 43:7, 43:9, 43:17, 43:20, 44:1, 44:5, 44:15, 45:4, 45:9, 46:6, 47:2, 47:20, 47:24, 48:2, 48:7, 48:10, 49:6, 49:10, 49:15, 50:4, 50:9, 50:12, 51:3, 51:7, 51:15, 51:18, 51:21, 52:17, 53:21, 53:25, 54:6, 54:21, 54:23, 55:10, 55:14, 55:16, 55:23, 56:24, 57:4, 57:7, 57:12, 57:21, 58:2, 58:14, 58:16, 58:19, 59:6, 59:9, 59:13, 59:20, 61:3, 61:8, 61:15, 62:12, 62:24, 63:4, 63:16, 63:22, 64:3, 64:10, 64:13, 64:23, 65:3, 65:5, 65:15, 66:23, 67:15, 69:22, 69:25, 70:2, 71:4, 71:11, 72:2, 72:10, 72:15, 73:11, 73:19, 73:24, 74:3, 74:11, 74:14, 75:9, 75:13, 75:17, 75:19, 75:21, 75:23, 75:25, 76:9, 76:21, 76:25, 77:5, 77:8, 77:11, 77:19, 77:21, 77:23, 78:1, 78:12, 78:14, 78:20, 78:23, 79:1, 79:8, 80:6, 80:16, 80:20, 80:25, 81:2, 81:14, 82:4, 82:6, 82:19, 83:8, 83:13, 83:22, 84:1, 84:8, 84:18, 84:22, 84:24, 85:9, 85:11, 85:18, 85:25, 86:2, 86:7, 86:9, 86:16, 86:19, 86:25, 87:15, 87:18, 87:23, 88:4, 88:6, 88:8, 88:11, 88:18, 89:8, 89:12, 89:18, 90:1, 90:7, 90:13, 90:18, 91:3, 91:6, 91:12, 91:16, 92:2, 92:7, 92:16, 93:4, 93:11, 93:17, 93:23, 94:1, 94:5, 94:14, 94:16, 94:21, 95:2, 95:4, 95:9, 95:14, 95:18, 95:24, 96:6, 96:9, 96:12, 96:15, 96:22, 96:25, 97:4, 97:8, 97:13, 97:21, 98:2, 98:9, 98:12, 98:18, 98:25, 99:4, 99:6, 99:11, 99:15, 99:21, 100:2, 100:5, 100:9, 100:13, 100:18, 100:20, 101:4, 101:11, 101:14, 101:22,

102:4, 102:9, 102:11, 102:16, 102:19, 102:21, 102:23, 103:1, 103:7, 103:14, 103:21, 104:3, 104:13, 104:20, 105:1, 105:7, 105:11, 105:16, 105:19, 106:6, 106:10, 106:15, 107:11, 107:23, 108:2, 108:11, 108:20, 109:1, 109:5, 109:9, 109:12, 109:20, 109:22, 110:1, 110:4, 110:11, 111:6, 112:20, 113:3, 113:5, 115:1, 115:10, 115:12, 115:15, 115:22, 115:25, 118:9, 121:23, 122:2, 122:5, 122:8, 122:16, 122:20, 122:23, 123:2, 123:13
**Court's** [3] - 7:24, 82:12, 106:10
**COURTROOM** [1] - 3:9
**courts** [4] - 77:2, 85:1, 95:20, 104:21
 **cover** [2] - 33:15, 74:21
 **covered** [1] - 32:16
 **covertly** [1] - 61:21
**CPA** [6] - 40:15, 68:22, 72:23, 74:25, 106:14, 106:17
**crap** [2] - 38:22, 38:25
**created** [2] - 66:18, 77:8
**credibility** [5] - 7:8, 16:2, 36:6, 97:23, 98:19
**credit** [1] - 62:10
**crime** [3] - 24:15, 24:16, 71:3
**crimes** [6] - 21:23, 110:7, 110:8, 118:18, 119:4, 119:18
**criminal** [2] - 67:7, 87:4
**Criminalistics** [3] - 4:19, 22:10, 22:24
**criminologist** [1] - 23:7
**cross** [13] - 8:2, 9:21, 9:22, 27:19, 28:2, 31:10, 72:10, 72:13, 73:21, 79:13, 105:2, 112:21, 123:9
 **CROSS** [2] - 2:4, 4:10
 **cross-examination** [10] - 9:21, 27:19, 28:2, 31:10, 72:10, 73:21, 79:13, 105:2, 112:21, 123:9
 **CROSS-EXAMINATION** [2] - 2:4, 4:10
 **cross-examine** [3] - 8:2, 9:22, 72:13
**Crotty** [2] - 111:10, 112:5
**Crotty's** [1] - 113:2
**CRR** [2] - 1:22, 124:8
**customer** [4] - 92:21, 93:3, 108:22, 109:6
 **customers** [10] - 37:14,

42:22, 58:9, 106:16, 106:18, 107:15, 107:19, 108:4, 108:22
 **cut** [1] - 25:5
**CV** [2] - 13:19, 117:12
**CVSA** [91] - 4:13, 16:23, 17:15, 17:16, 17:18, 18:1, 20:4, 21:15, 21:21, 21:22, 21:25, 24:1, 24:3, 25:9, 25:11, 25:12, 25:22, 27:4, 27:8, 27:10, 27:11, 29:7, 32:10, 33:12, 35:19, 35:24, 36:11, 36:23, 37:7, 39:18, 39:25, 40:2, 41:16, 41:18, 41:22, 41:24, 46:23, 49:22, 50:21, 56:8, 57:11, 58:4, 58:22, 59:24, 61:11, 61:16, 62:4, 62:15, 63:20, 64:13, 65:2, 67:19, 68:23, 70:16, 74:20, 83:17, 83:21, 84:5, 84:15, 85:15, 86:13, 88:16, 89:10, 90:4, 90:15, 94:23, 95:7, 95:12, 96:14, 96:18, 97:11, 97:24, 98:1, 101:2, 104:11, 105:13, 105:21, 110:15, 110:17, 114:11, 116:16, 117:5, 117:12, 117:15, 120:7, 120:8, 121:3
**CVSA1.com** [3] - 29:9, 74:11, 81:8
**CVSAs** [11] - 8:17, 16:4, 19:25, 37:8, 41:23, 42:17, 43:1, 43:4, 58:5, 58:12, 99:13

# D

**D'LOUGHY** [7] - 1:16, 2:4, 3:14, 3:16, 4:2, 4:5, 20:11
**D'Loughy** [1] - 84:14
**D'Loughy's** [1] - 20:10
 **damage** [8] - 5:18, 9:20, 10:4, 31:2, 31:3, 86:9, 90:21, 108:3
 **damaged** [2] - 44:6, 44:8
 **damages** [75] - 4:22, 4:23, 4:24, 5:16, 5:23, 6:7, 6:12, 7:7, 7:24, 8:3, 8:9, 8:16, 20:21, 22:19, 24:11, 24:17, 25:6, 25:17, 26:3, 26:5, 29:17, 30:5, 30:6, 30:9, 30:10, 32:17, 32:21, 35:2, 35:5, 36:14, 39:21, 40:7, 40:10, 43:25, 44:5, 44:12, 44:22, 47:21, 50:7, 50:8, 51:8, 54:1, 54:8, 54:9, 54:25, 63:9, 63:15, 63:23, 64:16, 65:8, 65:17, 71:5, 73:8, 73:10, 82:16, 83:6, 83:8, 84:17, 88:19, 88:21, 90:7,

91:2, 91:3, 91:4, 92:24, 106:5, 106:6, 114:25, 116:19, 117:24, 118:3, 118:25, 119:5, 119:15, 119:17
 **DANIEL** [1] - 1:14
 **data** [3] - 16:15, 111:4, 111:5
 **DATE** [1] - 124:8
 **date** [2] - 9:13, 9:14
 **dates** [1] - 100:22
 **dating** [1] - 64:6
 **DAVE** [1] - 1:10
 **day-to-day** [2] - 31:17, 43:11
 **days** [2] - 43:13, 98:7
 **DD** [2] - 82:22, 83:3
 **deal** [1] - 35:10
 **dealing** [1] - 93:2
 **dealt** [2] - 51:11, 98:7
 **December** [1] - 1:5
 **decided** [3] - 42:1, 50:23, 67:25
 **decides** [1] - 121:2
 **decision** [5] - 32:13, 46:18, 103:21, 113:2
 **decisions** [4] - 31:13, 31:20, 31:21, 32:2
 **declaration** [10] - 3:19, 3:23, 40:7, 60:25, 90:14, 105:13, 105:16, 115:19, 117:10, 118:21
 **deemed** [1] - 90:22
 **default** [2] - 90:23, 106:4
 **defend** [1] - 30:3
**DEFENDANT** [1] - 1:19
 **defendant** [1] - 106:24
**Defendant** [1] - 1:8
**DEFENDANT'S** [1] - 2:7
**Defendant's** [1] - 116:10
 **defense** [1] - 10:1
**Defense** [4] - 3:8, 19:21, 76:1, 101:15
 **deference** [1] - 38:19
 **defrauding** [3] - 30:7, 30:8
 **degrade** [1] - 83:12
 **degree** [4] - 48:18, 48:20, 49:1, 49:13
**DEKTOR** [1] - 1:7
**Dektor** [17] - 7:23, 32:24, 34:8, 35:10, 50:22, 53:11, 79:21, 79:22, 80:19, 82:15, 83:5, 90:24, 94:2, 94:11, 104:18, 108:17, 108:18
**Dektor's** [2] - 42:23, 57:23
**Delaware** [1] - 24:3
 **delay** [1] - 38:9
 **demand** [1] - 18:12
 **demanding** [1] - 114:25

 **demoted** [1] - 89:15
 **deny** [2] - 103:18, 103:19
 **department** [8] - 37:4, 60:22, 67:17, 71:2, 71:9, 98:6
 **Department** [11] - 16:3, 37:12, 41:20, 49:24, 52:22, 58:5, 58:8, 97:18, 116:9, 118:5, 118:15
 **departments** [16] - 18:12, 46:17, 68:13, 68:18, 68:21, 70:7, 70:11, 70:20, 70:21, 70:25, 71:15, 71:20, 97:10, 110:17, 120:25, 122:12
 **deposition** [1] - 50:17
**DEPUTY** [1] - 3:9
 **deputy** [2] - 84:3, 112:5
 **describes** [4] - 13:16, 34:13, 83:5, 83:20
 **description** [2] - 29:4, 83:22
 **deserve** [1] - 44:14
 **designation** [1] - 75:21
 **deSouza** [1] - 105:3
**DeSouza** [113] - 1:14, 1:14, 2:5, 3:3, 3:4, 4:20, 8:25, 11:7, 12:24, 17:2, 19:18, 20:7, 20:13, 20:17, 21:17, 22:12, 24:10, 27:5, 29:3, 29:14, 32:15, 33:8, 34:10, 35:21, 39:3, 39:20, 40:6, 42:3, 45:18, 45:25, 46:20, 47:18, 49:2, 49:14, 50:1, 50:5, 50:11, 51:8, 53:12, 54:20, 55:7, 56:17, 61:2, 61:13, 62:19, 63:6, 64:15, 66:19, 66:22, 67:11, 69:17, 70:1, 75:3, 75:24, 76:14, 77:24, 78:2, 79:24, 80:3, 80:15, 82:11, 83:2, 83:19, 84:7, 84:12, 85:17, 85:24, 86:6, 86:15, 86:24, 88:17, 89:4, 89:6, 89:16, 90:6, 90:20, 92:18, 93:16, 94:20, 94:25, 95:8, 95:13, 95:17, 96:3, 97:7, 97:20, 98:24, 99:10, 99:19, 100:1, 100:22, 100:25, 101:21, 102:15, 103:4, 104:7, 104:9, 104:16, 104:19, 104:25, 105:5, 105:8, 106:2, 106:8, 106:17, 110:7, 115:14, 115:18, 116:1, 118:11, 118:13, 121:22, 123:16
**DeSouza's** [2] - 20:10, 20:11
 **despite** [2] - 71:7, 71:14
 **details** [1] - 54:23
 **detect** [1] - 120:20
 **detection** [6] - 7:17, 40:1,

50:22, 51:24, 59:2, 61:19
**detector** [13] - 30:3, 39:25, 40:2, 62:18, 65:13, 67:13, 71:23, 71:24, 109:25, 113:10, 120:21, 121:10, 121:12
**detectors** [5] - 53:15, 94:12, 100:7, 100:10, 120:19
**determine** [5] - 30:12, 65:23, 69:21, 92:8, 103:23
**determined** [2] - 65:19, 92:12
**determines** [1] - 5:12
**develop** [3] - 61:12, 61:20, 62:23
**developed** [2] - 61:11, 62:7
**development** [2] - 20:19, 61:15
**device** [3] - 7:17, 66:13, 71:8
**difference** [3] - 73:2, 122:17, 122:18
**different** [20] - 7:9, 8:21, 12:4, 13:5, 16:22, 16:23, 24:13, 30:15, 36:4, 53:18, 62:18, 76:5, 78:18, 85:7, 88:16, 94:12, 100:17, 107:2, 113:7, 113:15
**digital** [1] - 36:12
**diploma** [3] - 47:14, 47:16, 47:23
**diplomas** [1] - 92:25
**direct** [3] - 27:17, 57:2, 105:9
**DIRECT** [2] - 2:4, 3:15
**directed** [2] - 108:17, 108:19
**directly** [2] - 63:19, 116:14
**director** [4] - 39:23, 57:14, 89:20
**directory** [1] - 68:17
**Dirk** [6] - 34:2, 34:4, 35:6, 93:14, 93:23, 94:8
**disallow** [1] - 112:3
**discard** [1] - 64:5
**disciplinary** [1] - 98:10
**discontinue** [1] - 120:7
**discontinued** [2] - 60:7, 60:8
**discontinuing** [1] - 41:22
**discount** [6] - 41:17, 60:13, 60:16, 60:18, 60:19, 121:19
**discounted** [1] - 66:8
**discovery** [5] - 6:10, 6:21, 26:1, 30:17, 44:17
**discuss** [2] - 28:2, 57:16
**discussed** [2] - 26:2, 44:18
**discussing** [1] - 34:13
**discussion** [1] - 40:22
**disgrace** [2] - 89:24

**disgraced** [2] - 89:21, 112:5
**disgusting** [1] - 34:24
**dislike** [1] - 85:22
**displayed** [1] - 92:13
**disregarding** [1] - 60:10
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 70:8
**District** [2] - 1:23, 124:9
**DIVISION** [1] - 1:2
**docket** [4] - 6:20, 30:18, 44:2, 44:18
**doctor** [2] - 85:16, 99:14
**doctorate** [4] - 47:23, 48:6, 48:19, 49:13
**document** [21] - 20:18, 41:14, 43:15, 76:17, 78:20, 79:4, 79:11, 79:12, 80:1, 80:4, 84:6, 85:10, 94:17, 94:22, 96:14, 99:17, 100:12, 102:8, 102:9, 103:2, 104:14
**Document** [6] - 76:13, 77:13, 79:18, 83:15, 95:25, 104:5
**documentation** [12] - 36:22, 37:1, 41:6, 41:11, 45:1, 45:5, 59:16, 59:18, 65:9, 105:15, 105:21
**documented** [2] - 21:5, 85:7
**documenting** [2] - 33:18, 65:12
**Documents** [1] - 82:22
**documents** [24] - 25:18, 27:16, 29:15, 30:1, 30:13, 32:20, 32:25, 33:23, 41:9, 41:13, 68:22, 73:22, 79:1, 79:2, 96:7, 101:24, 101:25, 102:1, 102:2, 106:25, 107:3, 107:5, 114:22, 123:11
**doer** [1] - 16:15
**dollar** [1] - 36:18
**dollars** [1] - 54:18
**done** [21] - 9:25, 21:20, 23:6, 23:14, 23:16, 32:23, 43:2, 44:7, 44:9, 46:15, 82:4, 82:6, 85:2, 87:10, 89:3, 105:2, 106:12, 106:20, 107:13, 112:21, 122:10
**door** [1] - 67:19
**dot** [2] - 29:8, 29:10
**double** [1] - 74:21
**Double** [1] - 77:19
**down** [21] - 11:13, 16:7, 19:2, 34:16, 35:22, 37:9, 38:20, 38:23, 38:24, 45:7, 57:15, 59:17, 64:8, 66:8, 84:16, 108:14, 108:16, 108:18, 115:4, 115:7, 115:22
**downloaded** [1] - 72:24

**Dr** [2] - 3:17, 49:8
**dramatic** [1] - 64:19
**dramatically** [2] - 8:21, 103:13
**drew** [1] - 23:24
**drink** [1] - 43:13
**drive** [1] - 43:12
**dropped** [3] - 68:3, 68:5, 103:13
**dropping** [1] - 40:23
**drugs** [1] - 95:11
**drunk** [1] - 35:13
**due** [5] - 6:9, 40:23, 41:21, 50:10, 55:17
**duly** [1] - 3:8
**duplicative** [1] - 119:1
**during** [3] - 28:6, 92:3

## E

**e-mail** [1] - 47:5
**early** [2] - 53:9, 97:17
**easily** [1] - 28:21
**east** [1] - 28:20
**easy** [3] - 95:25, 96:8, 107:4
**Ecuador** [5] - 42:24, 43:7, 43:9, 44:25, 115:5
**effect** [6] - 46:17, 70:25, 95:7, 95:12, 103:19, 112:12
**effective** [1] - 52:2
**efforts** [1] - 71:20
**eight** [1] - 54:13
**either** [3] - 103:1, 111:25, 113:23
**El** [10] - 41:20, 42:21, 43:9, 44:24, 118:4, 118:5, 118:9, 118:10, 118:14
**elected** [1] - 114:1
**elicited** [1] - 40:21
**Elko** [3] - 37:11, 40:22, 41:4, 41:19
**email** [3] - 34:13, 37:5, 108:4, 111:23, 111:25, 113:9, 114:16
**emailing** [1] - 106:21
**emails** [11] - 34:21, 34:23, 37:3, 37:21, 46:22, 48:5, 51:2, 85:14, 94:7, 111:21, 116:10
**employees** [2] - 43:14, 70:15
**employment** [1] - 67:7
**end** [2] - 18:20, 62:1
**ended** [2] - 94:24, 122:10
**enforcement** [14] - 16:1, 30:8, 58:1, 64:1, 67:6, 67:8, 68:8, 68:9, 68:17, 70:13, 95:23, 97:10, 110:10, 113:18
**enforcement-wise** [1] -

58:1
**English** [1] - 48:25
**entered** [2] - 90:23, 103:24
**entering** [1] - 30:18
**entire** [3] - 14:16, 16:4, 42:24
**entities** [4] - 12:16, 12:17, 64:2, 109:14
**entitled** [4] - 7:19, 10:2, 106:23, 124:5
**entity** [3] - 19:25, 109:8, 109:24
**entrenched** [1] - 120:11
**entry** [5] - 6:20, 13:19, 30:19, 44:2, 44:18
**equipment** [1] - 72:6
**especially** [1] - 88:2
**ESQ** [2] - 1:14, 1:16
**essentially** [3] - 56:20, 98:9, 121:18
**establish** [8] - 5:7, 25:11, 32:25, 44:11, 45:20, 46:24, 64:25, 71:7
**established** [8] - 4:25, 6:11, 7:9, 7:17, 30:14, 42:20, 46:21, 87:23
**establishes** [1] - 5:8
**establishing** [1] - 36:3
**estimate** [4] - 73:24, 117:1, 120:1, 121:18
**et** [5] - 13:17, 14:18, 15:21, 79:21
**events** [1] - 11:13
**everywhere** [1] - 120:10
**evidence** [21] - 5:10, 6:17, 6:21, 68:7, 72:15, 72:20, 75:17, 76:1, 77:21, 79:1, 85:12, 99:16, 101:15, 103:8, 103:24, 103:25, 104:1, 105:3, 123:5, 123:6, 123:10
**EVIDENTIARY** [1] - 1:10
**exact** [1] - 29:4
**exactly** [7] - 5:23, 43:19, 47:1, 79:3, 84:6
**EXAMINATION** [6] - 2:4, 2:4, 2:5, 3:15, 4:10, 115:17
**examination** [13] - 5:17, 9:21, 26:6, 27:19, 28:2, 31:10, 72:10, 73:12, 73:21, 79:13, 105:2, 112:21, 123:9
**examine** [7] - 8:2, 9:22, 72:13, 72:14, 91:7, 123:8
**examiner** [4] - 25:22, 53:3, 61:18, 96:14
**examiners** [3] - 55:6, 60:2
**example** [5] - 37:13, 78:19, 98:1
**examples** [2] - 47:9, 87:20
**except** [3] - 59:3, 60:11, 114:19

exceptional [1] - 61:7
excluding [1] - 70:8
excuse [1] - 6:1
exhibit [13] - 19:11, 29:22, 34:11, 34:12, 63:3, 76:15, 76:20, 78:5, 78:10, 80:7, 83:19, 92:20, 105:10
Exhibit [26] - 2:9, 3:25, 4:2, 19:21, 29:24, 64:11, 72:18, 72:19, 76:1, 76:15, 80:16, 82:4, 82:6, 82:14, 82:20, 84:13, 84:19, 84:22, 84:23, 89:4, 97:2, 101:15, 104:23, 105:18
exhibits [3] - 33:10, 80:1, 105:10
EXHIBITS [1] - 2:7
Exhibits [3] - 34:12, 83:3, 92:19
exist [3] - 7:5, 92:11, 104:24
existed [1] - 52:6
expectation [1] - 117:7
expected [1] - 118:22
expenses [1] - 58:13
experience [1] - 117:4
experiences [1] - 66:9
expert's [1] - 106:9
Expertise [1] - 4:19
expertise [2] - 62:1, 97:23
explain [4] - 17:4, 36:17, 51:23, 78:25
exports [1] - 49:22
exposed [4] - 24:17, 36:14, 101:24, 108:14
exposing [1] - 46:16
extent [2] - 106:6, 106:8
eye [2] - 120:19, 120:20
eyes [1] - 107:15

**F**

fact [59] - 4:25, 5:6, 5:7, 5:11, 6:15, 10:1, 19:23, 21:7, 24:14, 32:22, 35:4, 35:5, 36:3, 36:8, 39:14, 39:22, 43:24, 44:11, 46:1, 48:3, 49:4, 50:15, 50:25, 60:7, 62:22, 63:11, 63:24, 64:18, 65:7, 65:11, 70:6, 71:7, 71:14, 83:10, 84:25, 85:6, 85:22, 88:2, 89:19, 89:22, 90:9, 93:7, 93:20, 95:19, 96:16, 97:9, 97:22, 99:1, 99:2, 99:5, 100:4, 108:7, 111:23, 111:24, 112:4, 114:10, 117:10
factors [2] - 60:14, 60:21
facts [9] - 5:12, 35:11, 41:9, 59:19, 85:6, 85:7, 85:15,

114:7
factual [3] - 42:1, 42:5, 102:2
failing [1] - 91:23
fairly [1] - 121:18
fake [11] - 5:3, 16:2, 24:14, 30:2, 46:2, 78:15, 85:15, 92:25, 100:7, 100:10, 104:12
faked [1] - 78:16
false [4] - 47:7, 47:9, 47:12, 90:8
falsely [1] - 39:18
familiar [12] - 6:1, 6:19, 34:2, 34:4, 39:7, 56:13, 70:13, 76:8, 76:9, 79:15, 86:12, 89:2
far [27] - 5:7, 5:13, 8:17, 10:2, 11:13, 11:16, 12:5, 19:25, 24:11, 25:17, 29:5, 32:13, 32:23, 69:11, 71:3, 74:24, 74:25, 77:6, 77:16, 82:1, 90:7, 101:6, 102:13, 107:1, 109:23
father [2] - 22:19, 60:25
faxes [1] - 37:3
Federal [4] - 12:15, 12:20, 21:3, 88:3
federal [7] - 15:6, 39:25, 65:14, 68:20, 103:5, 105:14, 110:10
FEDERAL [1] - 1:4
fee [1] - 21:21
feedback [1] - 65:24
fees [3] - 25:21, 58:4, 58:18
few [7] - 8:10, 47:4, 101:8, 114:13, 115:3, 120:21, 122:11
FFF [1] - 96:14
field [1] - 66:9
figure [11] - 11:10, 30:21, 30:22, 30:25, 31:2, 31:3, 58:14, 65:20, 65:23, 121:19
figures [2] - 36:18, 40:10
file [2] - 60:6, 60:9
filed [1] - 78:19
filing [2] - 35:25, 106:19
final [4] - 15:6, 26:9, 26:15, 118:25
finally [3] - 57:17, 112:17, 119:25
finder [1] - 5:11
finger [1] - 81:6
finish [1] - 115:1
fired [2] - 84:4, 89:15
first [14] - 18:4, 22:13, 36:11, 38:25, 42:16, 44:15, 58:9, 58:14, 73:5, 78:3, 78:7, 80:16, 88:16, 111:13
five [15] - 27:15, 27:20, 27:23, 30:24, 44:23, 52:8,

70:15, 90:17, 92:12, 92:19, 97:18, 98:7, 105:5, 112:20, 117:12
five-minute [2] - 27:15, 27:20
fixes [2] - 96:17, 96:20
Floor [2] - 1:24, 124:10
FLORIDA [1] - 1:1
Florida [8] - 1:4, 1:15, 1:18, 1:24, 25:20, 45:21, 45:23, 124:10
flunked [4] - 35:12, 35:13, 84:4
flyers [1] - 41:17
focus [19] - 4:23, 5:18, 7:24, 7:25, 8:9, 9:20, 11:17, 31:2, 36:16, 36:20, 40:12, 50:14, 54:1, 54:8, 54:9, 54:25, 55:11, 55:24, 88:21
focusing [1] - 5:15
follow [1] - 108:11
followed [1] - 108:13
FOR [2] - 1:14, 1:19
forces [1] - 110:9
foregoing [1] - 124:3
foreign [3] - 73:6, 74:7, 74:23
forensic [1] - 60:25
forever [1] - 108:16
forget [2] - 37:21, 64:24
form [1] - 37:1
former [1] - 39:24
Fort [1] - 1:15
forth [10] - 35:11, 70:9, 77:15, 92:10, 98:16, 99:25, 102:14, 113:8, 117:1, 119:15
forward [4] - 40:8, 51:10, 51:14, 116:23
foundation [8] - 8:25, 63:10, 63:15, 78:11, 79:2, 79:4, 79:8, 79:9
foundational [1] - 78:24
founder [1] - 79:22
four [5] - 64:12, 73:19, 79:17, 82:15, 110:9
Foyteck [1] - 5:24
Foytek [1] - 51:11
frame [5] - 69:20, 94:9, 100:18, 100:20, 100:21
frankly [1] - 29:16
fraud [12] - 7:19, 7:20, 8:4, 16:2, 30:14, 44:13, 44:14, 44:15, 44:16, 90:10, 99:9, 100:4
free [2] - 18:2, 103:6
freedom [2] - 39:1, 108:8
friendly [1] - 49:23
front [3] - 47:10, 99:17, 111:11
fruitful [2] - 40:24, 41:3

FS [1] - 21:3
full [4] - 3:9, 69:8, 97:25, 99:18
full-page [1] - 69:8
full-time [1] - 99:18
functions [1] - 52:4
fund [2] - 70:18, 92:10
funding [4] - 61:25, 70:16, 70:19, 71:18
future [2] - 50:23, 116:23

**G**

gadget [4] - 7:12, 7:16, 90:12, 102:14
garbage [1] - 38:17
Gardens [1] - 1:18
gee [1] - 68:6
general [3] - 20:9, 115:5, 121:2
generally [4] - 51:13, 60:9, 121:11, 121:12
generated [3] - 47:6, 47:7, 76:17
genesis [1] - 79:11
gentleman [1] - 72:13
GGGG [2] - 2:10, 100:16, 101:13, 101:15
given [3] - 8:6, 29:20, 56:15
golly [1] - 68:7
gonna [25] - 4:20, 6:11, 9:25, 14:7, 17:2, 22:21, 26:3, 37:9, 42:22, 46:20, 49:15, 53:10, 56:18, 57:17, 62:19, 63:6, 83:24, 88:4, 89:6, 103:24, 106:2, 107:19, 108:2, 123:3, 123:4
Government [1] - 21:3
government [4] - 18:25, 62:2, 87:5, 110:10
granting [1] - 6:20
Great [11] - 86:22, 87:11, 87:20, 87:24, 88:2, 88:5, 88:6, 88:9, 88:12, 96:1, 96:10
great [1] - 67:19
greatly [1] - 71:21
ground [4] - 32:16, 33:15, 40:24, 41:3
grounds [1] - 63:7
Groveport [3] - 33:6, 35:9, 35:11
GS [1] - 21:3
guarantees [1] - 39:1
guilty [1] - 102:3
guy [1] - 62:16
guys [1] - 6:11

# H

**H-U-M-B-L-E** [1] - 3:11
**half** [5] - 43:3, 79:16, 91:23, 110:9, 114:19
**handed** [1] - 29:15
**handle** [4] - 20:13, 32:10, 43:11, 110:22
**handles** [2] - 32:6, 32:9
**handling** [3] - 20:8, 20:11, 20:12
**happy** [2] - 27:22, 94:10
**harass** [1] - 86:4
**harbor** [1] - 71:10
**hard** [3] - 71:1, 121:5
**harmed** [1] - 114:6
**he-said-she-said** [1] - 112:16
**head** [2] - 45:14, 47:11
**headlines** [1] - 32:12
**hear** [5] - 16:22, 30:22, 42:10, 60:5, 63:5
**heard** [3] - 43:5, 49:7, 76:7
**HEARING** [1] - 1:10
**hearing** [11] - 5:18, 6:12, 8:6, 8:7, 9:20, 22:14, 31:9, 36:19, 44:7, 85:12, 86:20
**hearsay** [10] - 56:18, 56:24, 63:11, 63:12, 63:14, 76:16, 78:11, 89:16
**help** [2] - 53:14, 69:21
**helping** [1] - 89:22
**hereby** [1] - 124:3
**hero** [1] - 98:16
**herring** [62] - 4:7, 4:23, 5:6, 9:9, 16:20, 19:5, 28:17, 29:14, 33:9, 33:12, 34:15, 34:17, 35:23, 36:2, 39:4, 40:9, 42:23, 43:20, 45:4, 49:7, 50:6, 50:14, 55:10, 56:20, 57:2, 59:13, 59:20, 62:12, 63:8, 63:14, 63:16, 69:20, 71:4, 73:11, 76:14, 76:19, 76:21, 78:21, 79:25, 80:9, 81:14, 83:4, 83:20, 87:23, 90:21, 90:24, 92:16, 92:25, 93:6, 104:3, 105:8, 106:20, 107:12, 111:6, 115:1, 115:10, 115:22, 116:17, 118:18, 120:3, 126:2, 120:17
**HERRING** [364] - 1:19, 2:4, 4:9, 4:11, 4:25, 5:14, 5:20, 5:25, 6:4, 6:8, 6:14, 6:23, 7:4, 8:12, 8:14, 8:15, 9:6, 9:11, 9:16, 9:24, 10:10, 10:11, 11:10, 11:19, 11:20, 12:25, 13:3, 14:2, 14:9, 14:10, 15:2, 16:21, 17:4, 17:7, 19:6, 19:12, 19:14,

19:23, 20:2, 20:25, 21:12, 21:13, 21:19, 22:6, 22:7, 22:15, 23:10, 23:11, 23:13, 23:15, 23:18, 24:12, 24:21, 24:25, 25:1, 25:7, 25:18, 26:9, 26:11, 26:14, 26:17, 26:20, 26:25, 27:2, 27:6, 27:15, 27:21, 28:23, 28:25, 29:22, 29:25, 30:5, 30:12, 31:5, 31:8, 31:11, 31:12, 32:19, 33:5, 33:17, 33:23, 34:1, 34:19, 35:4, 35:17, 36:3, 36:21, 38:9, 38:12, 39:6, 39:8, 39:9, 39:22, 40:11, 40:14, 40:19, 41:1, 41:5, 41:12, 42:4, 42:7, 42:10, 42:14, 43:22, 44:4, 44:11, 45:1, 45:10, 45:19, 46:1, 46:8, 47:1, 47:8, 47:19, 47:22, 48:3, 48:9, 48:11, 48:12, 49:4, 49:9, 49:11, 49:17, 49:18, 50:2, 50:15, 51:5, 51:16, 51:20, 51:22, 52:19, 52:20, 53:13, 53:23, 54:2, 54:10, 54:12, 54:22, 55:1, 55:2, 55:8, 55:12, 55:15, 55:19, 56:2, 56:22, 58:20, 59:10, 59:15, 59:22, 59:23, 61:4, 61:10, 61:14, 62:8, 62:14, 62:21, 63:1, 63:17, 63:24, 64:4, 64:11, 64:14, 64:17, 64:24, 65:4, 65:7, 65:21, 65:22, 66:20, 67:1, 67:2, 67:12, 68:10, 70:4, 70:5, 71:6, 71:12, 71:22, 72:8, 72:12, 72:21, 73:17, 73:22, 74:1, 74:5, 74:6, 74:13, 74:15, 75:12, 75:16, 75:18, 75:20, 75:22, 76:2, 76:10, 76:23, 77:1, 77:6, 77:10, 77:12, 77:20, 77:22, 78:13, 78:15, 78:22, 78:25, 79:6, 79:14, 79:18, 79:19, 80:2, 80:5, 80:11, 80:12, 80:24, 81:1, 81:5, 81:20, 82:5, 82:7, 82:8, 82:21, 82:23, 83:9, 83:15, 83:16, 83:24, 84:2, 84:9, 84:20, 84:23, 84:25, 85:10, 85:13, 85:20, 85:21, 86:1, 86:3, 86:8, 86:11, 86:17, 86:21, 87:1, 87:19, 87:25, 88:5, 88:7, 88:10, 88:14, 88:15, 88:24, 89:1, 89:5, 89:12, 89:13, 89:19, 90:2, 90:3, 90:8, 90:14, 90:19, 91:4, 91:10, 91:13, 91:21, 92:6, 92:8, 93:10, 93:13, 93:18, 94:2, 94:6, 94:15, 94:17, 94:22, 95:1, 95:3, 95:5, 95:10, 95:15, 95:19,

95:25, 96:7, 96:11, 96:13, 96:16, 96:23, 97:2, 97:6, 97:9, 97:15, 97:22, 98:4, 98:11, 98:13, 98:21, 99:1, 99:5, 99:7, 99:12, 99:17, 99:20, 99:22, 100:3, 100:8, 100:11, 100:15, 100:19, 100:24, 101:1, 101:6, 101:13, 101:16, 101:23, 102:5, 102:6, 102:10, 102:12, 102:17, 102:20, 102:22, 102:24, 103:2, 103:5, 103:11, 103:16, 104:2, 104:4, 104:8, 104:10, 104:14, 104:17, 104:21, 105:12, 105:18, 105:20, 106:12, 106:23, 107:22, 107:25, 108:7, 108:13, 108:24, 109:3, 109:7, 109:10, 109:18, 109:21, 109:23, 110:2, 110:5, 110:8, 110:13, 110:14, 111:8, 112:22, 112:23, 113:6, 115:8, 115:11, 115:23, 122:21, 123:11
    **Herring** [9] - 47:2, 113:19, 114:8, 114:9, 114:16, 114:20, 120:19, 121:20, 123:6
    **Herring's** [9] - 4:21, 34:11, 43:2, 43:18, 46:22, 57:23, 75:4, 75:7, 92:20
    **high** [1] - 18:12
    **Highway** [3] - 15:21, 58:3, 68:4
    **hill** [1] - 120:11
    **himself** [6] - 7:11, 14:5, 36:7, 51:14, 98:16, 102:14
    **hired** [6] - 36:9, 62:16, 64:18, 89:19, 89:22, 89:23
    **hits** [1] - 43:17
    **hmm** [4] - 37:14, 60:24, 68:11, 111:5
    **hold** [2] - 32:1, 120:15
    **holes** [1] - 97:25
    **home** [2] - 79:17, 83:17
    **homepage** [2] - 32:12, 33:7
    **honest** [1] - 37:22
    **honesty** [1] - 98:8
    **Honor** [108] - 3:4, 3:14, 4:3, 4:5, 4:20, 6:15, 8:12, 9:1, 9:16, 13:3, 13:13, 14:3, 16:16, 16:19, 17:3, 19:6, 19:18, 20:7, 20:14, 20:17, 22:14, 22:20, 24:10, 26:14, 27:5, 29:3, 29:7, 29:14, 30:6, 30:13, 32:15, 33:8, 33:16, 33:24, 34:10, 35:21, 38:9, 39:3, 40:6, 43:19, 45:6, 47:18, 49:2, 50:5, 50:15,

51:8, 56:17, 57:3, 59:8, 62:20, 63:1, 63:6, 63:17, 64:11, 64:15, 64:24, 65:21, 66:22, 69:17, 72:7, 73:18, 74:1, 75:3, 75:12, 75:24, 76:14, 76:24, 77:1, 77:10, 77:20, 77:24, 79:24, 82:11, 83:3, 83:9, 83:20, 84:7, 84:12, 84:15, 86:8, 87:17, 89:7, 89:17, 90:20, 92:19, 96:3, 97:7, 97:20, 100:22, 101:1, 102:18, 104:9, 106:3, 106:12, 106:17, 106:24, 109:18, 113:4, 115:14, 118:12, 121:22, 122:1, 122:4, 122:7, 123:12, 123:16
    **HONORABLE** [1] - 1:10
    **honorary** [4] - 48:20, 49:1, 49:7, 49:12
    **honoris** [2] - 48:22, 48:23
    **horrible** [1] - 120:17
    **hour** [1] - 114:19
    **hours** [1] - 73:19
    **Howell** [1] - 34:20
    **HUMBLE** [3] - 2:3, 3:8, 26:24
    **humble** [40] - 36:17, 51:23, 56:19, 57:1, 58:21, 62:15, 63:18, 68:11, 72:6, 73:21, 75:14, 79:15, 80:3, 80:7, 82:24, 83:24, 84:10, 85:14, 85:22, 86:12, 86:22, 90:4, 90:14, 94:8, 95:6, 97:16, 98:22, 99:2, 99:8, 99:23, 101:7, 101:17, 102:3, 103:9, 104:2, 105:3, 105:13, 111:9, 115:19, 119:25
    **Humble** [56] - 3:4, 3:7, 3:11, 3:17, 3:20, 4:12, 8:2, 8:16, 11:11, 11:12, 13:1, 13:10, 13:20, 13:25, 14:8, 15:5, 16:9, 20:3, 21:6, 22:8, 22:18, 22:23, 26:22, 27:16, 28:1, 28:11, 29:6, 29:19, 36:7, 36:17, 36:22, 39:8, 39:10, 41:13, 41:25, 42:21, 45:4, 46:9, 47:3, 47:16, 47:24, 49:8, 51:9, 51:13, 56:3, 63:2, 65:18, 72:22, 73:20, 77:14, 99:17, 110:1
    **Humble's** [5] - 40:7, 72:3, 89:9, 94:22, 103:25
    **Humble.com** [1] - 32:8
    **humiliate** [1] - 83:12
    **hundred** [1] - 54:18
    **hundreds** [1] - 21:1
    **hurt** [4] - 36:17, 36:18, 36:19, 107:20

**I**

**IACP** [1] - 101:7
**idea** [3] - 7:15, 73:16, 87:13
**identical** [1] - 88:1
**ignored** [1] - 22:15
**ignores** [1] - 32:22
**II** [2] - 17:15, 41:16
**III** [4] - 1:19, 17:16, 37:7, 41:18
**IIII** [1] - 102:8
**illegal** [2] - 21:24, 87:7
**Illinois** [8] - 15:18, 52:12, 52:13, 67:22, 67:24, 122:3, 122:13, 122:18
**illustration** [1] - 96:1
**ILONA** [2] - 1:22, 124:8
**impeach** [1] - 98:18
**impeachment** [3] - 99:11, 99:15, 104:1
**imply** [1] - 87:5
**important** [2] - 26:14, 108:10
**imposters** [1] - 94:18
**impression** [1] - 20:1
**improper** [3] - 10:6, 99:11, 99:15
**inaccurate** [2] - 112:18, 112:24
**include** [8] - 59:11, 73:6, 74:7, 74:19, 118:25, 119:5, 120:5
**included** [1] - 73:9
**including** [5] - 7:9, 68:19, 73:8, 74:20, 83:11
**income** [1] - 108:9
**Incorporated** [1] - 21:4
**incorrect** [1] - 69:10
**independent** [7] - 7:12, 10:20, 30:3, 63:19, 66:12, 95:6, 95:11
**Indiana** [2] - 47:16, 61:18
**Indianapolis** [2] - 61:18, 97:18
**indicated** [1] - 54:6
**individual** [1] - 56:3
**individually** [1] - 90:24
**individuals** [1] - 115:2
**influence** [2] - 64:6, 64:9
**influenced** [2] - 50:16, 66:1
**influences** [6] - 60:10, 65:9, 65:10, 66:1, 66:6, 92:15
**information** [70] - 8:23, 10:12, 10:14, 11:14, 11:18, 11:21, 12:1, 12:2, 12:4, 13:4, 13:11, 14:14, 14:20, 15:5, 15:8, 15:9, 15:13, 15:15, 16:6, 22:9, 22:10, 22:16, 23:8, 25:19, 25:24, 33:14, 34:22, 35:7, 35:8, 36:23,

37:6, 37:7, 38:6, 41:21, 41:25, 42:5, 42:15, 42:16, 43:3, 43:24, 46:14, 47:7, 47:9, 53:24, 55:24, 79:21, 80:13, 80:18, 81:23, 82:3, 82:9, 92:13, 93:14, 93:19, 94:3, 94:14, 103:11, 103:14, 106:23, 107:22, 110:16, 111:13, 111:15, 111:19, 111:22, 112:2, 113:22, 114:10, 114:11
**initial** [2] - 57:5, 57:7
**input** [1] - 57:19
**inquire** [2] - 3:13, 4:8
**inquiry** [3] - 13:8, 26:4, 52:17
**inside** [3] - 35:7, 94:3
**insofar** [1] - 13:8
**instance** [1] - 15:17
**instead** [3] - 57:14, 77:15, 114:9
**instructors** [1] - 89:10
**instrument** [1] - 90:16
**instrumental** [1] - 43:1
**instrumentation** [1] - 52:4
**insult** [1] - 83:12
**insulted** [1] - 102:9
**intends** [2] - 29:16, 80:4
**interest** [1] - 21:24
**interested** [1] - 43:17
**interesting** [2] - 40:14, 76:6
**intergalactic** [1] - 14:24
**Internal** [1] - 67:8
**international** [3] - 56:11, 69:4, 110:5
**International** [2] - 61:17, 69:6
**internet** [4] - 64:4, 103:17, 110:8
**interrupt** [2] - 5:5, 18:17
**interviewing** [1] - 65:13
**interviews** [1] - 64:6
**intimidate** [1] - 104:22
**introduce** [4] - 19:8, 29:18, 96:7, 98:10
**introduced** [1] - 72:16
**inundating** [1] - 38:21
**invent** [2] - 36:8, 62:22
**invented** [2] - 36:7, 62:6
**inventions** [1] - 102:14
**inventor** [3] - 34:20, 99:14
**inventors** [1] - 34:7
**invested** [1] - 116:6
**investigation** [4] - 63:2, 76:3, 109:1, 112:15
**investigations** [4] - 17:24, 87:7, 89:23, 113:11
**investigator** [1] - 89:21
**investment** [2] - 57:5, 57:7

**invited** [1] - 57:18
**involved** [6] - 23:3, 53:19, 53:21, 60:21, 63:23, 120:18
**involves** [1] - 7:7
**involving** [1] - 74:16
**iris** [1] - 120:21
**irrelevant** [1] - 53:12
**issue** [29] - 5:18, 5:23, 8:3, 8:9, 9:20, 10:5, 25:6, 25:25, 26:5, 26:17, 29:17, 30:20, 32:18, 39:21, 42:19, 44:1, 44:5, 44:22, 46:6, 47:20, 50:7, 63:9, 63:23, 65:6, 86:10, 88:19, 90:21, 107:11
**issues** [1] - 6:17
**IT** [1] - 32:6
**it'll** [1] - 91:13
**ITAC** [11] - 89:14, 89:21, 110:3, 110:12, 110:15, 110:18, 110:20, 111:2, 111:9, 112:13, 114:2
**itself** [9] - 7:9, 20:18, 21:20, 22:17, 36:5, 36:13, 44:12, 75:6, 87:21

**J**

**JAMES** [1] - 1:16
**James** [1] - 86:13
**January** [1] - 86:13
**Jerry** [1] - 113:2
**JJJJ** [1] - 102:24
**job** [1] - 98:8
**joined** [1] - 15:20
**Journal** [2] - 22:9, 22:24
**journal** [3] - 4:13, 4:19, 23:2
**judge** [2] - 5:11, 7:22
**Judge** [1] - 77:2
**JUDGE** [1] - 1:11
**judgment** [1] - 95:22
**judicial** [12] - 28:18, 28:20, 28:22, 29:1, 29:11, 74:12, 75:9, 82:12, 88:8, 88:11, 96:4
**jumps** [1] - 8:22
**jurisdiction** [1] - 45:21
**jury** [1] - 5:11

**K**

**Kane** [4] - 11:5, 11:11, 14:23, 86:13
**keep** [5] - 54:8, 59:24, 63:4, 88:21, 110:22
**keeps** [1] - 60:9
**kills** [1] - 7:20
**kind** [6] - 15:15, 70:25, 80:3, 80:20, 103:25, 115:6
**KK** [2] - 82:22, 83:3

**knowledge** [4] - 12:18, 21:7, 59:4, 59:8
**known** [1] - 23:7
**knows** [5] - 19:2, 33:2, 64:7, 64:8, 81:2

**L**

**labeled** [1] - 19:14
**lack** [1] - 65:10
**lacking** [1] - 41:7
**laid** [3] - 44:2, 79:2, 79:9
**language** [1] - 59:11
**laptop** [1] - 18:14
**large** [3] - 61:19, 71:18, 80:23
**largest** [1] - 117:12
**last** [16] - 3:10, 3:22, 18:4, 26:16, 27:7, 35:18, 46:16, 50:18, 69:22, 76:4, 85:2, 86:23, 102:13, 106:20, 117:4, 121:15
**Latin** [2] - 32:5, 45:14
**Lauderdale** [1] - 1:15
**law** [26] - 16:1, 30:7, 51:25, 52:3, 52:14, 53:9, 53:14, 53:18, 53:22, 54:7, 57:9, 57:13, 57:25, 58:23, 58:24, 64:1, 67:6, 67:8, 68:8, 68:9, 68:16, 70:13, 95:23, 97:10, 113:18, 122:14
**LAW** [1] - 1:14
**laws** [3] - 52:9, 122:11, 122:15
**lawsuit** [1] - 32:20, 45:21, 50:13, 79:16, 83:7, 85:3, 85:4, 103:5, 104:17
**lawsuits** [2] - 83:11, 85:1
**lawyer** [9] - 6:16, 6:17, 20:9, 79:10, 98:22, 99:5, 104:15, 108:1
**lawyers** [4] - 10:1, 22:16, 28:3, 46:1
**leader** [1] - 121:18
**learned** [1] - 97:25
**least** [4] - 58:9, 61:5, 67:16, 109:13
**leave** [1] - 66:24
**led** [2] - 19:24, 44:19
**LEE** [1] - 1:10
**left** [1] - 67:20
**legal** [1] - 5:12
**legislature** [1] - 57:11
**legitimate** [1] - 77:7
**Letter** [1] - 89:14
**letter** [8] - 41:2, 41:15, 84:10, 84:14, 86:12, 86:19, 103:2, 104:14
**letterhead** [1] - 87:14
**letters** [5] - 37:21, 48:5,

51:2, 95:23, 114:24
**letting** [1] - 60:4
**liability** [12] - 6:10, 25:25,
26:2, 30:17, 42:18, 42:19,
42:20, 44:1, 46:21, 88:20,
106:5
**liable** [2] - 7:23, 93:20
**libeled** [1] - 95:22
**Library** [1] - 104:23
**license** [1] - 17:13
**licensed** [2] - 17:12, 17:21
**Licensing** [2] - 52:22, 116:9
**licensing** [4] - 18:20, 52:21,
57:14, 116:15
**lie** [26] - 7:17, 30:2, 39:25,
40:1, 40:2, 50:22, 51:24,
53:14, 59:2, 61:19, 62:18,
65:13, 67:13, 71:23, 71:24,
84:5, 94:12, 97:12, 99:20,
100:7, 100:10, 109:25,
113:10, 120:20, 121:10,
121:12
**lied** [3] - 5:2, 24:13, 46:4
**lies** [11] - 22:17, 33:19,
34:23, 35:1, 44:12, 47:22,
48:4, 61:5, 91:4, 91:8
**life** [2] - 25:22, 96:19
**likely** [1] - 76:16
**limited** [6] - 13:8, 22:22,
48:7, 51:14, 101:14, 106:8
**line** [2] - 34:10, 106:2
**list** [28] - 19:11, 29:22,
34:11, 34:12, 37:22, 59:24,
59:25, 60:2, 63:3, 68:5, 73:7,
75:1, 77:17, 92:20, 105:10,
106:15, 106:18, 107:3,
107:14, 107:18, 108:3,
108:21, 109:2, 109:3, 109:6,
109:13, 109:18
**listed** [5] - 38:1, 38:13,
63:3, 74:9, 81:6
**lists** [1] - 38:20
**litigating** [4] - 25:25, 26:2,
26:3, 44:3
**living** [1] - 91:23
**LLC** [2] - 1:4, 21:4
**LLLL** [1] - 103:2
**loan** [1] - 18:2
**lobbying** [2] - 53:18, 123:1
**lobbyist** [1] - 53:17
**lobbyists** [2] - 53:17, 57:10
**local** [3] - 67:23, 105:14,
110:10
**located** [2] - 22:10, 24:3
**location** [1] - 81:1
**locations** [1] - 78:18
**locked** [1] - 111:16
**logical** [1] - 73:20
**longevity** [1] - 23:6
**look** [32] - 12:9, 14:11,

15:22, 34:21, 36:9, 40:8,
62:17, 64:11, 68:2, 68:7,
70:17, 72:25, 75:10, 75:14,
75:16, 78:20, 78:21, 80:7,
81:16, 81:17, 81:19, 81:21,
85:6, 88:12, 96:9, 96:10,
109:2, 109:16, 114:3,
117:10, 120:17
**looked** [1] - 19:16
**looking** [15] - 60:24, 63:3,
73:13, 75:6, 78:3, 80:3, 81:3,
82:21, 83:15, 92:18, 92:19,
94:12, 102:18, 109:11,
113:10
**looks** [5] - 16:17, 76:18,
78:4, 87:22, 119:15
**lose** [2] - 57:1, 95:21
**loss** [11] - 37:10, 41:24,
51:11, 51:13, 60:19, 89:25,
91:21, 92:15, 107:6, 116:2,
118:4
**losses** [5] - 46:10, 46:11,
46:12, 120:2, 121:19
**lost** [12] - 7:19, 55:11,
55:17, 57:4, 57:5, 58:13,
91:17, 91:18, 103:23, 116:5,
117:25, 118:21
**Lourdes** [4] - 11:11, 15:3,
31:13, 31:23
**lumped** [1] - 78:10
**LUPOWITZ** [2] - 1:22, 124:8
**Lupowitz** [1] - 124:8
**lying** [4] - 36:13, 90:11,
97:4, 102:13

# M

**Machine** [3] - 76:8, 76:22,
78:9
**machine** [6] - 36:7, 36:12,
59:2, 59:6, 66:16, 91:9
**machines** [3] - 57:22,
59:12, 91:18
**made-up** [1] - 66:17
**magazine** [4] - 69:5, 69:13,
69:23, 101:7
**MAGISTRATE** [1] - 1:11
**mail** [1] - 47:5
**mailed** [1] - 32:22
**mailings** [1] - 66:4
**major** [5] - 15:25, 16:1,
69:4, 112:6
**majority** [1] - 11:3, 37:16
**managing** [2] - 31:19,
31:20
**mark** [1] - 60:8
**marked** [2] - 3:25, 4:2
**market** [6] - 62:2, 62:3,
120:20, 121:10, 121:11,
121:13

**marketing** [5] - 12:1, 15:16,
16:7, 60:6
**Mascara** [16] - 10:17, 11:14,
11:18, 11:21, 12:4, 15:14,
16:13, 32:4, 43:1, 45:11,
45:15, 45:24, 46:3, 46:5,
73:1, 115:5
**Maschke** [1] - 108:14
**material** [1] - 78:6
**math** [3] - 75:4, 75:5, 75:14
**matter** [2] - 43:23, 124:5
**mayor** [1] - 113:25
**mayors** [1] - 38:22
**McHale** [1] - 104:15
**McQuiston** [1] - 102:9
**mean** [12] - 6:6, 19:9, 20:9,
23:4, 29:23, 30:1, 30:6, 55:9,
60:18, 81:13, 107:3, 109:4
**meaningful** [2] - 7:1, 72:4
**means** [1] - 78:25
**meant** [1] - 89:25
**media** [4] - 5:1, 5:7, 46:15,
65:12
**meeting** [2] - 53:6, 55:3
**member** [6] - 23:23, 31:19,
31:20, 56:8, 69:7, 96:19
**memory** [1] - 6:24
**mention** [1] - 27:4
**mentioned** [3] - 14:21,
65:2, 121:24
**mentions** [2] - 27:9, 27:12
**merits** [1] - 4:22
**Miami** [5] - 1:23, 1:24,
43:13, 124:10, 124:10
**middle** [1] - 42:11
**midst** [1] - 28:1
**might** [7] - 25:24, 50:24,
60:15, 65:19, 73:23, 88:19,
119:1
**Miguel** [7] - 10:17, 15:19,
16:8, 43:1, 45:7, 45:11,
115:5
**military** [2] - 30:8, 101:17
**mill** [3] - 47:15, 47:16,
47:23
**million** [2] - 30:25, 44:23
**mind** [1] - 94:9
**minds** [2] - 50:17, 113:9
**minority** [2] - 11:2, 31:18
**minus** [2] - 119:18, 119:19
**minute** [6] - 8:11, 27:15,
27:20, 48:1, 59:6, 78:21
**minutes** [11] - 8:11, 27:23,
56:15, 74:2, 74:3, 88:23,
105:5, 112:20, 123:4, 123:5,
123:13
**MM** [1] - 83:15
**mmm-hmm** [4] - 37:14,
60:24, 68:11, 111:5
**modification** [1] - 87:20

**modified** [2] - 87:16, 87:24
**money** [10] - 18:6, 24:17,
32:1, 35:6, 43:7, 44:14, 85:4,
102:2, 116:6, 122:25
**month** [1] - 69:8
**months** [1] - 106:20
**moon** [1] - 103:19
**morning** [2] - 3:17, 3:18
**most** [7] - 47:5, 70:14,
70:19, 83:17, 108:9, 120:8
**mostly** [2] - 37:1, 68:1
**motion** [1] - 6:21
**mountain** [1] - 120:9
**mouth** [4] - 63:18, 67:17,
68:1, 120:13
**move** [17] - 21:11, 22:4,
23:16, 24:19, 27:13, 33:4,
33:21, 33:25, 35:15, 40:4,
40:20, 49:16, 51:3, 52:18,
61:8, 62:24, 111:7
**MR** [480] - 2:4, 2:4, 2:5, 3:4,
3:14, 3:16, 4:2, 4:5, 4:9,
4:11, 4:20, 4:25, 5:14, 5:20,
5:25, 6:4, 6:8, 6:14, 6:23,
7:4, 8:12, 8:14, 8:15, 8:25,
9:6, 9:11, 9:16, 9:24, 10:10,
10:11, 11:7, 11:10, 11:19,
11:20, 12:24, 12:25, 13:3,
14:2, 14:9, 14:10, 15:2,
16:21, 17:2, 17:4, 17:7, 19:6,
19:12, 19:14, 19:18, 19:23,
20:2, 20:7, 20:11, 20:13,
20:17, 20:25, 21:12, 21:13,
21:17, 21:19, 22:6, 22:7,
22:12, 22:15, 23:10, 23:11,
23:13, 23:15, 23:18, 24:10,
24:12, 24:21, 24:25, 25:1,
25:7, 25:18, 26:9, 26:11,
26:14, 26:17, 26:20, 26:24,
26:25, 27:2, 27:5, 27:6,
27:15, 27:21, 28:23, 28:25,
29:3, 29:14, 29:22, 29:25,
30:5, 30:12, 31:5, 31:8,
31:11, 31:12, 32:15, 32:19,
33:5, 33:8, 33:17, 33:23,
34:1, 34:10, 34:19, 35:4,
35:17, 35:21, 36:3, 36:21,
38:9, 38:12, 39:3, 39:6, 39:8,
39:9, 39:20, 39:22, 40:6,
40:11, 40:14, 40:19, 41:1,
41:5, 41:12, 42:3, 42:4, 42:7,
42:10, 42:14, 43:22, 44:4,
44:11, 45:1, 45:10, 45:18,
45:19, 45:25, 46:1, 46:8,
46:20, 47:1, 47:8, 47:18,
47:19, 47:22, 48:3, 48:9,
48:11, 48:12, 49:2, 49:4,
49:9, 49:11, 49:14, 49:17,
49:18, 50:1, 50:2, 50:5,
50:11, 50:15, 51:5, 51:8,

51:16, 51:20, 51:22, 52:19, 52:20, 53:12, 53:13, 53:23, 54:2, 54:10, 54:12, 54:20, 54:22, 55:1, 55:2, 55:7, 55:8, 55:12, 55:15, 55:19, 56:2, 56:17, 56:22, 58:20, 59:10, 59:15, 59:22, 59:23, 61:2, 61:4, 61:10, 61:13, 61:14, 62:8, 62:14, 62:19, 62:21, 63:1, 63:6, 63:17, 63:24, 64:4, 64:11, 64:14, 64:15, 64:17, 64:24, 65:4, 65:7, 65:21, 65:22, 66:19, 66:20, 66:22, 67:1, 67:2, 67:11, 67:12, 68:10, 69:17, 70:1, 70:4, 70:5, 71:6, 71:12, 71:22, 72:8, 72:12, 72:21, 73:17, 73:22, 74:1, 74:5, 74:6, 74:13, 74:15, 75:3, 75:12, 75:16, 75:18, 75:20, 75:22, 75:24, 76:2, 76:10, 76:14, 76:23, 77:1, 77:6, 77:10, 77:12, 77:20, 77:22, 77:24, 78:2, 78:13, 78:15, 78:22, 78:25, 79:6, 79:14, 79:18, 79:19, 79:24, 80:2, 80:3, 80:5, 80:11, 80:12, 80:15, 80:24, 81:1, 81:5, 81:20, 82:5, 82:7, 82:8, 82:11, 82:21, 82:23, 83:2, 83:9, 83:15, 83:16, 83:19, 83:24, 84:2, 84:7, 84:9, 84:12, 84:20, 84:23, 84:25, 85:10, 85:13, 85:17, 85:20, 85:21, 85:24, 86:1, 86:3, 86:6, 86:8, 86:11, 86:15, 86:17, 86:21, 86:24, 87:1, 87:19, 87:25, 88:5, 88:7, 88:10, 88:14, 88:15, 88:17, 88:24, 89:1, 89:4, 89:5, 89:6, 89:9, 89:13, 89:16, 89:19, 90:2, 90:3, 90:6, 90:8, 90:14, 90:19, 90:20, 91:4, 91:10, 91:13, 91:21, 92:6, 92:8, 92:18, 93:10, 93:13, 93:16, 93:18, 94:2, 94:6, 94:15, 94:17, 94:20, 94:22, 94:25, 95:1, 95:3, 95:5, 95:8, 95:10, 95:13, 95:15, 95:17, 95:19, 95:25, 96:3, 96:7, 96:11, 96:13, 96:16, 96:23, 97:2, 97:6, 97:7, 97:9, 97:15, 97:20, 97:22, 98:4, 98:11, 98:13, 98:21, 98:24, 99:1, 99:5, 99:7, 99:10, 99:12, 99:17, 99:19, 99:20, 99:22, 100:1, 100:3, 100:8, 100:11, 100:15, 100:19, 100:22, 100:24, 100:25, 101:1, 101:6, 101:13, 101:16, 101:21, 101:23, 102:5,

102:6, 102:10, 102:12, 102:15, 102:17, 102:20, 102:22, 102:24, 103:2, 103:4, 103:5, 103:11, 103:16, 104:2, 104:4, 104:7, 104:8, 104:9, 104:10, 104:14, 104:16, 104:17, 104:19, 104:21, 104:25, 105:5, 105:8, 105:12, 105:18, 105:20, 106:2, 106:8, 106:12, 106:17, 106:23, 107:22, 107:25, 108:7, 108:13, 108:24, 109:3, 109:7, 109:10, 109:18, 109:21, 109:23, 110:2, 110:5, 110:7, 110:8, 110:13, 110:14, 111:8, 112:22, 112:23, 113:6, 115:8, 115:11, 115:14, 115:18, 115:23, 116:1, 118:11, 118:13, 121:22, 122:21, 123:11, 123:16
**murder** [1] - 39:19
**must** [1] - 18:1

## N

**N.E** [1] - 1:15
**NACVSA** [2] - 25:15, 25:20
**name** [8] - 3:9, 3:10, 10:16, 47:9, 47:11, 62:16, 89:15
**named** [2] - 12:16, 113:7
**names** [17] - 21:4, 37:22, 38:1, 38:4, 38:6, 38:13, 38:23, 40:16, 75:1, 88:3, 106:13, 106:18, 108:22, 109:3, 109:13, 109:19
**Nashville** [1] - 15:21
**National** [1] - 23:23
**national** [1] - 63:25
**nationally** [2] - 64:3, 122:10
**nationwide** [2] - 21:6, 65:12
**nature** [1] - 66:23
**near** [1] - 77:2
**need** [15] - 7:25, 19:9, 50:14, 53:25, 54:7, 54:23, 54:25, 55:10, 63:4, 73:15, 73:25, 80:8, 96:25, 100:20
**needs** [3] - 5:18, 31:2, 36:16
**negative** [1] - 66:3, 94:10, 94:13, 94:14, 94:15
**never** [18] - 7:16, 9:5, 17:19, 20:1, 23:21, 23:24, 27:9, 27:12, 40:15, 62:6, 63:7, 75:1, 93:19, 94:3, 94:4, 106:14, 114:11
**new** [7] - 32:11, 37:7, 61:20, 66:2, 120:22, 121:7

**New** [2] - 15:21, 23:7
**news** [12] - 5:1, 5:6, 46:15, 63:8, 63:13, 65:12, 91:22, 92:14, 92:23, 93:8, 103:17
**News** [5] - 7:10, 63:2, 63:19, 63:24, 102:19
**newsletter** [1] - 102:7
**newspaper** [6] - 92:25, 112:6, 112:8, 112:11, 112:18, 112:25
**newspapers** [1] - 38:22
**newsprint** [1] - 103:16
**next** [23] - 3:2, 3:5, 15:1, 21:11, 22:5, 23:9, 23:17, 27:14, 33:4, 40:5, 42:13, 45:9, 46:6, 46:7, 49:10, 51:4, 62:25, 67:19, 74:19, 84:1, 86:2, 100:9, 113:5
**Nick** [2] - 62:17, 64:19
**night** [1] - 35:13
**ninety** [2] - 37:18, 37:19
**NITV** [101] - 1:4, 5:2, 5:16, 8:4, 10:25, 12:16, 14:21, 15:6, 18:1, 19:24, 21:2, 21:3, 21:4, 21:8, 21:19, 22:1, 22:17, 24:1, 24:13, 25:8, 25:19, 25:21, 25:23, 27:4, 27:8, 27:9, 27:11, 28:24, 30:2, 30:14, 31:13, 31:16, 32:8, 33:1, 33:18, 34:22, 34:24, 35:3, 35:5, 35:8, 35:14, 35:24, 36:4, 36:13, 39:23, 41:8, 45:16, 45:17, 49:21, 50:6, 50:20, 52:6, 52:14, 53:10, 55:21, 56:4, 56:6, 65:2, 66:16, 71:8, 76:11, 77:14, 78:17, 82:14, 83:4, 83:20, 84:15, 84:25, 85:5, 85:8, 85:15, 86:4, 88:3, 89:19, 89:22, 89:23, 89:24, 92:22, 93:19, 93:24, 94:10, 94:14, 94:15, 94:18, 95:19, 95:21, 96:2, 96:16, 101:24, 104:2, 104:15, 107:1, 108:14, 108:18, 110:24, 114:11, 116:15, 121:18
**NITV's** [5] - 21:23, 22:2, 50:8, 78:3, 121:10
**NN** [1] - 84:6
**NO** [1] - 1:2
**nobody** [5] - 22:11, 46:3, 59:1, 107:6, 114:15
**none** [2] - 32:3, 72:7
**normally** [3] - 43:11, 67:16, 107:13
**North** [2] - 1:23, 124:10
**note** [1] - 28:14
**notes** [3] - 40:18, 76:21, 77:9
**nothing** [11] - 20:20, 21:5,

28:21, 39:13, 45:23, 65:25, 75:14, 91:2, 93:1, 93:20, 108:16
**notice** [12] - 28:18, 28:20, 28:22, 29:1, 29:11, 74:12, 75:9, 82:12, 88:8, 88:11, 96:4
**Number** [1] - 105:13
**number** [20] - 25:19, 29:7, 60:23, 68:24, 73:5, 74:17, 89:4, 90:15, 97:19, 98:2, 98:4, 98:6, 106:7, 106:11, 117:11, 117:15, 117:18, 121:24, 122:5
**numbers** [24] - 8:20, 9:8, 12:5, 12:7, 13:4, 13:9, 13:12, 68:17, 72:23, 75:6, 75:11, 76:6, 76:11, 76:19, 77:6, 77:7, 77:14, 78:17, 79:7, 82:17, 106:25, 107:2

## O

**oath** [2] - 28:12, 79:13
**object** [20] - 4:20, 8:25, 17:2, 32:15, 33:8, 34:10, 46:20, 62:19, 63:6, 64:15, 66:23, 69:18, 70:1, 72:2, 76:15, 78:11, 89:6, 97:7, 101:21, 106:2
**objected** [3] - 42:11, 85:14
**objecting** [1] - 75:4
**objection** [120] - 5:22, 10:7, 10:8, 11:7, 11:16, 12:24, 13:7, 13:25, 19:17, 19:19, 19:22, 20:16, 21:10, 21:17, 22:4, 22:12, 22:21, 24:10, 24:19, 24:24, 26:6, 27:5, 27:13, 29:1, 29:12, 33:3, 33:21, 35:15, 35:21, 36:15, 39:3, 39:20, 40:4, 42:3, 42:9, 42:12, 45:18, 45:25, 46:7, 47:18, 48:10, 49:2, 49:14, 49:15, 50:1, 50:4, 51:3, 54:20, 55:7, 56:17, 56:25, 61:2, 61:8, 61:13, 62:24, 64:10, 64:23, 66:19, 66:22, 67:11, 75:13, 75:23, 75:25, 77:11, 77:23, 78:8, 78:23, 80:15, 82:11, 82:19, 83:2, 83:13, 83:19, 84:1, 84:7, 84:12, 85:9, 85:17, 85:24, 86:6, 86:15, 86:24, 88:17, 88:18, 89:12, 89:16, 90:1, 90:6, 90:13, 91:6, 93:16, 94:5, 94:16, 94:20, 94:25, 95:8, 95:13, 95:17, 96:3, 97:20, 98:20, 98:24, 99:6, 99:10, 99:19, 100:1, 100:5, 100:13, 101:5, 102:4,

102:15, 103:4, 103:7, 104:7, 104:13, 104:16, 104:19, 104:25
**objections** [3] - 10:5, 20:12, 65:5
**obtain** [2] - 48:18, 49:12
**OF** [1] - 1:1
**offense** [2] - 72:6, 87:4
**offer** [5] - 18:6, 29:21, 76:19, 93:12, 105:4
**offered** [5] - 72:17, 72:18, 72:19, 72:20, 73:5
**offering** [3] - 75:17, 76:14, 77:21
**offhand** [1] - 68:12
**office** [4] - 25:11, 25:12, 25:19, 93:1
**Office** [1] - 40:23
**OFFICER** [1] - 28:9
**officer** [1] - 97:16
**official** [1] - 1:22
**Official** [1] - 124:9
**often** [1] - 12:9
**okays** [1] - 15:5
**Olga** [2] - 11:12, 14:22
**once** [8] - 9:19, 9:24, 12:10, 12:11, 14:11, 14:16, 14:17, 81:22
**one** [55] - 4:16, 8:21, 9:9, 10:1, 12:20, 16:11, 16:13, 16:17, 19:13, 20:8, 20:9, 26:9, 26:15, 29:7, 29:10, 33:9, 34:7, 34:20, 37:3, 37:5, 37:13, 37:21, 41:5, 42:13, 47:11, 47:22, 48:4, 53:3, 56:6, 56:8, 56:11, 56:15, 60:7, 63:8, 63:10, 66:1, 67:17, 72:19, 73:1, 75:6, 78:10, 79:17, 91:10, 101:11, 101:23, 106:10, 107:1, 108:24, 111:2, 113:9, 117:24, 118:3, 121:23, 122:2, 122:11
**ones** [4] - 41:4, 52:11, 72:24, 122:24
**ongoing** [1] - 24:16
**OO** [4] - 84:13, 84:19, 84:22, 84:23
**OOOO** [1] - 104:23
**operated** [2] - 25:21, 52:6
**operating** [1] - 8:4
**operations** [1] - 31:17
**opinion** [3] - 72:1, 72:3, 72:4
**opportunity** [3] - 8:7, 29:13, 108:3
**opposed** [3] - 4:22, 91:17, 117:21
**order** [7] - 6:19, 6:20, 7:1, 26:2, 29:21, 30:12, 30:18

**ordered** [1] - 84:16
**orders** [3] - 37:2, 108:12, 108:13
**organization** [2] - 69:7, 85:6
**organizations** [3] - 103:17, 112:12, 112:13
**original** [3] - 34:7, 34:20, 79:22
**Orleans** [1] - 15:21
**orphan** [1] - 7:21
**out-of-pockets** [1] - 119:6
**outlawed** [1] - 52:5
**outside** [4] - 60:10, 64:8, 65:9, 65:10
**overall** [1] - 16:17
**overrule** [4] - 10:7, 13:7, 22:21, 91:14
**overruled** [7] - 9:2, 17:5, 47:3, 48:10, 61:16, 67:15, 86:25
**overstate** [1] - 117:23
**overturning** [1] - 52:9
**owed** [1] - 98:22
**owes** [1] - 95:21
**own** [17] - 12:21, 16:25, 17:8, 17:10, 17:11, 20:1, 24:2, 29:19, 34:25, 36:10, 63:18, 64:22, 89:9, 94:19, 99:3, 103:21, 109:1
**owned** [1] - 97:11
**owner** [7] - 10:25, 11:2, 11:3, 15:4, 31:18, 31:24, 31:25
**owners** [3] - 25:23, 96:18, 97:11
**owning** [1] - 32:24
**owns** [3] - 11:9, 11:17, 24:1

---

## P

**P.A** [1] - 1:14
**p.m** [2] - 1:6, 123:17
**P.O** [2] - 24:8, 25:13
**pace** [1] - 74:1
**PAGE** [1] - 2:2
**page** [14] - 3:22, 9:12, 32:11, 69:8, 75:5, 76:18, 76:19, 78:3, 78:7, 79:17, 83:17, 119:17
**Page** [2] - 100:23, 117:10
**Pages** [1] - 1:8
**paid** [3] - 23:25, 24:17, 119:6
**PALM** [1] - 1:2
**Palm** [3] - 1:4, 1:18, 39:23
**papers** [2] - 92:13, 115:23
**Paragraph** [7] - 115:19, 116:2, 117:2, 118:7, 119:9, 119:12, 119:16

**paragraph** [2] - 90:22, 116:8
**parameters** [2] - 31:9, 51:15
**parents** [1] - 7:21
**part** [7] - 18:4, 18:5, 51:18, 87:11, 94:4, 119:4, 120:20
**part's** [1] - 18:4
**particular** [2] - 20:20, 76:17, 93:3
**Paso** [10] - 41:20, 42:21, 43:9, 44:24, 118:4, 118:5, 118:9, 118:10, 118:15
**passed** [5] - 15:7, 44:3, 44:17, 52:3
**passing** [1] - 122:10
**passive** [2] - 31:24, 31:25
**past** [6] - 21:20, 36:1, 77:19, 88:20, 88:23, 116:20
**pasted** [1] - 81:11
**patent** [1] - 93:1
**path** [2] - 34:16, 35:22
**Patriotic** [1] - 100:6
**patriotic** [1] - 100:10
**Patrol** [3] - 15:21, 58:3, 68:4
**pay** [2] - 49:21, 95:21
**paycheck** [1] - 23:24
**peer** [1] - 23:3
**penalties** [1] - 49:21
**penalty** [2] - 46:2, 50:6
**people** [62] - 5:3, 5:8, 11:11, 12:4, 16:3, 16:12, 17:18, 19:3, 19:24, 20:1, 21:20, 30:7, 34:15, 36:22, 38:3, 45:2, 50:21, 52:25, 53:1, 53:10, 55:5, 55:21, 56:22, 57:17, 58:6, 59:24, 61:6, 61:24, 63:13, 64:1, 65:11, 77:2, 79:8, 81:17, 83:10, 91:5, 91:19, 91:22, 91:25, 94:11, 95:20, 97:24, 98:1, 101:25, 103:12, 104:22, 106:22, 107:7, 107:9, 107:14, 108:5, 109:14, 109:21, 111:3, 113:7, 114:22, 115:4, 120:7, 120:18, 121:6
**people's** [1] - 50:16
**people-are-saying-bad-things-about-me** [1] - 34:15
**per** [4] - 8:16, 25:22, 72:24, 74:17
**percent** [32] - 21:9, 22:3, 25:9, 27:9, 27:11, 37:19, 41:9, 60:13, 60:20, 63:20, 65:17, 66:7, 66:8, 67:16, 67:17, 70:10, 70:11, 70:12, 83:21, 86:14, 103:22, 114:14, 114:17, 114:18,

114:19, 120:1, 120:6, 121:9, 121:12, 121:14, 121:19
**percentage** [4] - 11:5, 11:9, 37:17, 70:17
**perfect** [2] - 109:24, 113:10
**perhaps** [2] - 65:19, 69:20
**period** [10] - 43:3, 50:10, 50:13, 51:7, 63:23, 69:14, 69:19, 86:18, 92:3, 92:4
**perjury** [1] - 46:2
**permission** [1] - 21:21
**person** [16] - 16:11, 16:17, 24:15, 28:16, 32:6, 37:22, 82:1, 89:14, 89:20, 95:22, 97:22, 98:15, 102:2, 112:4, 113:9
**person's** [1] - 10:16
**personal** [5] - 12:23, 13:8, 13:10, 13:18, 14:1
**personally** [1] - 12:10
**persons** [2] - 28:14, 56:4
**pertain** [1] - 82:16
**pertained** [1] - 22:17
**pertaining** [16] - 21:14, 23:13, 26:11, 26:17, 27:16, 38:13, 51:23, 52:21, 72:9, 78:17, 89:14, 89:23, 93:14, 104:5, 110:3
**pertains** [1] - 17:10
**peruse** [1] - 14:16
**PGA** [1] - 1:17
**Ph.D** [6] - 47:14, 48:6, 48:16, 49:7, 49:16, 99:14
**phone** [4] - 25:15, 25:19, 43:12, 66:11
**photographic** [1] - 6:24
**pick** [1] - 76:24
**picture** [2] - 16:10, 90:16
**pictures** [1] - 64:13
**piece** [3] - 24:12, 36:12, 72:5
**pieces** [4] - 21:1, 36:4, 98:14, 98:17
**pin** [1] - 11:12
**pity** [1] - 7:21
**place** [4] - 44:22, 58:23, 58:24, 98:13
**places** [1] - 77:13
**plain** [1] - 48:25
**plaintiff** [12] - 7:11, 9:25, 29:12, 45:20, 50:17, 51:1, 83:10, 84:5, 116:19, 118:14, 118:22, 119:6
**Plaintiff** [2] - 1:5, 116:5
**PLAINTIFF** [1] - 1:14
**Plaintiff's** [3] - 3:25, 4:2, 119:17
**plaintiff's** [2] - 6:20, 105:18
**plan** [2] - 72:15, 105:8
**planning** [2] - 29:23, 92:9

**players** [1] - 122:19
**pled** [1] - 102:3
**PLLC** [1] - 1:17
**plus** [6] - 10:21, 58:4, 58:5, 65:10, 75:6
**pockets** [1] - 119:6
**point** [18] - 5:16, 5:22, 8:5, 9:10, 10:3, 28:3, 39:8, 40:18, 49:2, 49:6, 49:16, 69:17, 71:11, 71:12, 73:20, 77:19, 84:13, 109:10
**Police** [6] - 15:18, 58:7, 69:5, 69:6, 69:23, 97:18
**police** [34] - 15:20, 15:21, 33:6, 33:11, 35:9, 35:11, 39:24, 46:17, 67:22, 67:24, 67:25, 68:2, 68:12, 68:18, 68:19, 68:21, 69:5, 70:6, 70:8, 70:10, 70:20, 71:2, 71:9, 71:10, 71:14, 72:5, 97:16, 98:5, 98:9
**polygraph** [28] - 50:24, 51:25, 52:2, 52:5, 52:8, 53:3, 53:15, 54:16, 55:6, 58:25, 59:1, 59:3, 59:7, 68:3, 68:5, 70:16, 70:18, 90:15, 97:5, 120:9, 120:23, 121:8, 121:24, 122:6, 122:11, 122:15
**polygraph-only** [3] - 51:25, 122:11, 122:15
**polygrapher** [1] - 120:14
**polygraphers** [3] - 60:21, 67:23, 122:9
**porn** [1] - 89:23
**portion** [2] - 11:25, 16:7
**portions** [1] - 83:4
**pose** [1] - 62:13
**position** [2] - 85:1, 121:17
**possible** [3] - 67:8, 89:25, 117:23
**post** [3] - 34:22, 35:11, 94:10
**posted** [11] - 8:24, 18:8, 27:6, 33:1, 48:13, 76:11, 82:10, 84:15, 93:20, 93:24, 101:24
**posters** [1] - 94:18
**posting** [4] - 33:18, 35:6, 82:2, 82:14
**posts** [1] - 11:14
**potential** [3] - 39:14, 65:24, 91:24
**PPP** [1] - 97:2
**praise** [1] - 93:25
**prepared** [1] - 79:3
**preponderance** [1] - 68:8
**present** [8] - 5:10, 6:17, 9:17, 9:25, 28:15, 28:16, 33:23

**presenting** [1] - 6:5
**press** [1] - 97:4
**pretend** [1] - 33:20
**pretty** [3] - 7:1, 61:19, 80:23
**previous** [1] - 6:9
**price** [2] - 41:17, 71:3
**print** [1] - 7:3
**printed** [2] - 92:13, 112:8
**printout** [2] - 9:12, 74:7
**prisons** [3] - 46:17, 68:19, 70:8
**private** [3] - 62:2, 94:19, 99:23
**privately** [1] - 18:24
**privilege** [1] - 17:22
**pro** [4] - 1:19, 5:25, 8:9, 107:25
**probation** [1] - 68:19
**problem** [6] - 7:3, 59:19, 78:4, 107:11, 107:18, 115:4
**problems** [1] - 43:15
**procedures** [1] - 6:1
**proceed** [5] - 7:6, 8:12, 19:5, 23:9, 31:10
**proceedings** [1] - 124:4
**process** [1] - 8:8
**proclaimed** [1] - 24:14
**product** [17] - 7:8, 7:14, 20:21, 20:22, 22:18, 36:5, 46:23, 47:13, 91:21, 91:23, 91:25, 92:9, 92:10, 92:22, 117:5, 121:3
**productive** [1] - 69:15
**products** [1] - 94:12
**professionals** [1] - 99:18
**Professor** [1] - 23:6
**proffering** [1] - 79:5
**profits** [3] - 51:11, 51:13, 118:22
**program** [1] - 41:22
**projects** [1] - 20:4
**promises** [1] - 71:7
**promote** [4] - 14:5, 99:13, 104:11
**promoted** [1] - 25:7
**promoting** [1] - 24:18
**pronounced** [1] - 78:5
**proof** [7] - 54:11, 67:10, 67:14, 83:25, 89:10, 114:24, 114:25
**property** [1] - 45:22
**protect** [4] - 21:20, 108:8, 108:9
**protected** [1] - 18:23
**proud** [1] - 99:24
**prove** [8] - 35:23, 44:6, 54:3, 105:15, 105:21,

106:25, 114:22, 120:12
**proved** [1] - 21:8
**proves** [8] - 7:12, 25:9, 27:8, 27:11, 63:20, 66:12, 67:4, 84:6
**provide** [6] - 19:10, 61:24, 61:25, 107:18, 108:20, 114:3
**provided** [8] - 54:24, 79:21, 79:22, 79:25, 102:2, 106:18, 106:25, 107:15
**providing** [1] - 32:20
**proving** [2] - 44:16, 85:8
**PSE** [16] - 33:11, 33:13, 34:8, 36:9, 50:24, 61:22, 62:16, 64:13, 64:18, 64:21, 83:5, 88:16, 94:2, 95:1, 103:6, 115:9
**PSEs** [1] - 50:19
**psychology** [3] - 48:17, 48:19, 48:23
**public** [2] - 103:11, 103:14
**publicity** [2] - 91:21, 103:18
**publicized** [1] - 103:15
**published** [8] - 4:12, 4:18, 22:22, 22:23, 23:2, 23:5, 33:14, 49:24
**puffery** [2] - 14:4, 61:5
**pull** [1] - 23:4
**pulled** [1] - 111:14
**punished** [1] - 107:5
**pupil** [1] - 120:21
**purchase** [2] - 46:23, 70:16, 71:19
**purchased** [2] - 46:25, 47:14
**purchases** [2] - 57:25, 58:11
**purchasing** [2] - 19:25, 21:21
**purport** [1] - 92:23
**purports** [1] - 92:21
**purpose** [6] - 6:6, 8:6, 19:23, 38:6, 101:14, 103:8
**pursue** [1] - 40:24
**put** [27] - 13:4, 15:5, 15:8, 15:9, 15:14, 15:18, 15:19, 16:5, 25:10, 29:24, 32:14, 40:1, 43:21, 52:4, 57:14, 58:23, 58:24, 69:5, 76:19, 80:14, 81:18, 82:3, 87:13, 109:3, 122:25, 123:7
**puts** [5] - 10:12, 12:6, 12:7, 15:13, 23:11
**putting** [7] - 7:7, 16:13, 29:24, 38:6, 43:4, 72:15, 93:15
**puzzle** [8] - 20:25, 21:1, 24:13, 36:4, 36:13, 98:14, 98:17

**Q**

**quadruple** [3] - 78:1, 78:2, 93:4
**Quadruple** [5] - 72:19, 75:23, 77:21, 78:7, 78:12
**qualified** [2] - 71:18, 71:21
**quality** [1] - 61:7
**questioning** [2] - 34:11, 106:3
**questions** [16] - 4:6, 5:9, 5:22, 10:1, 20:18, 27:17, 27:25, 36:20, 43:20, 48:7, 48:8, 75:15, 79:11, 80:9, 88:22, 121:22
**quick** [1] - 73:23
**quicker** [1] - 60:16
**quit** [2] - 59:13, 59:21
**quite** [3] - 42:18, 73:23, 101:2
**quote** [1] - 9:8
**quotes** [1] - 49:19
**quoting** [2] - 35:9, 61:14

**R**

**raise** [1] - 6:16
**raised** [1] - 5:9
**ran** [1] - 34:8
**random** [1] - 109:19
**rare** [1] - 121:4
**rarely** [6] - 66:14, 66:15, 67:3, 113:18, 113:20
**rather** [1] - 119:4
**re** [4] - 58:13, 58:18, 60:4, 121:6
**re-cert** [1] - 121:6
**re-certification** [3] - 58:13, 58:18, 60:4
**reaching** [1] - 103:19
**read** [6] - 46:18, 48:22, 49:19, 92:1, 113:24, 114:5
**reading** [2] - 19:2, 47:5
**real** [7] - 7:17, 21:23, 25:20, 57:21, 65:13, 66:6, 75:2
**realize** [1] - 30:13
**really** [11] - 6:16, 10:19, 52:11, 68:15, 70:17, 72:3, 72:18, 75:2, 113:8, 121:4
**reason** [12] - 8:6, 14:2, 19:10, 39:10, 44:17, 60:7, 77:3, 92:22, 103:12, 116:11, 116:15, 116:16
**reasons** [2] - 44:2, 46:25
**receive** [1] - 3:19
**Received** [1] - 2:9
**received** [4] - 41:22, 76:1, 101:15, 112:2
**receiving** [1] - 43:2
**recently** [1] - 98:22

**recertification** [1] - 25:21
**recertified** [2] - 40:17, 107:10
**recertify** [1] - 60:1
**recess** [5] - 27:15, 27:20, 28:8, 64:25, 123:17
**recessed** [1] - 28:15
**recognize** [1] - 80:22
**recommend** [1] - 28:5
**record** [10] - 3:10, 18:18, 28:10, 28:14, 40:2, 40:6, 75:3, 98:5, 110:23
**recorder** [1] - 64:21
**records** [1] - 54:3
**redirect** [3] - 20:13, 105:6, 115:13
**REDIRECT** [2] - 2:5, 115:17
**refer** [2] - 4:15, 38:25
**reference** [2] - 95:25, 107:4
**referred** [3] - 14:3, 25:3
**referring** [3] - 28:23, 84:13, 90:21
**regardless** [1] - 52:1
**regards** [2] - 15:16, 68:1
**regular** [2] - 6:17, 76:18
**Regulation** [1] - 116:10
**Regulations** [1] - 52:22
**regulations** [2] - 57:19, 58:24
**relatively** [1] - 121:15
**release** [1] - 97:4
**relevance** [121] - 4:21, 4:24, 11:8, 12:24, 12:25, 13:1, 17:2, 19:20, 20:7, 20:17, 21:17, 21:18, 21:19, 22:12, 24:10, 24:11, 24:12, 25:17, 25:18, 27:5, 27:6, 29:17, 32:15, 32:17, 32:19, 33:8, 34:17, 35:2, 35:21, 39:20, 39:21, 45:25, 46:1, 46:21, 47:18, 47:20, 49:3, 49:14, 50:5, 50:8, 53:21, 54:6, 54:20, 54:21, 56:18, 61:2, 61:3, 61:13, 62:19, 62:21, 63:15, 63:23, 64:16, 69:18, 69:21, 70:1, 76:16, 78:11, 80:15, 82:11, 82:17, 83:2, 83:6, 83:8, 83:9, 83:23, 83:24, 84:7, 84:12, 84:16, 84:24, 84:25, 85:24, 86:1, 86:6, 86:15, 86:24, 89:6, 89:8, 89:9, 89:16, 89:18, 89:19, 90:6, 90:7, 90:20, 91:3, 93:16, 93:17, 93:18, 94:20, 94:25, 95:8, 95:17, 95:18, 95:19, 96:15, 96:16, 96:22, 97:7, 97:9, 97:20, 97:21, 98:2, 98:24, 98:25, 99:1, 99:10, 99:19, 99:20, 100:1, 100:2, 101:21,

101:22, 101:23, 102:12, 102:15, 103:4, 104:9, 104:19, 104:21
**Relevance** [1] - 11:7
**relevancy** [7] - 33:17, 42:12, 50:3, 52:17, 65:9, 91:4, 102:11
**relevant** [25] - 5:17, 19:19, 20:24, 20:25, 25:25, 26:4, 30:1, 42:14, 42:18, 49:4, 50:10, 63:9, 63:24, 64:16, 64:17, 72:17, 86:9, 86:20, 88:19, 88:20, 92:24, 94:16, 96:22, 100:14, 103:10
**relying** [1] - 87:15
**remember** [5] - 6:24, 7:2, 37:4, 42:21, 43:10
**remind** [1] - 28:11
**rents** [1] - 24:8
**repackage** [4] - 36:9, 62:17, 64:19, 85:5
**repackaged** [1] - 64:21
**reply** [1] - 63:20
**report** [3] - 26:4, 26:6, 40:15
**REPORTED** [1] - 1:21
**reporter** [2] - 63:5, 73:14
**Reporter** [2] - 1:22, 124:9
**reports** [1] - 5:7
**representation** [1] - 75:7
**representative** [1] - 10:20
**representing** [3] - 56:22, 75:4, 108:1
**represents** [1] - 41:24
**republic** [1] - 63:21
**requests** [2] - 22:16, 38:24
**required** [3] - 28:15, 28:16, 60:1
**research** [2] - 20:4, 20:19
**resigned** [1] - 112:17
**respect** [2] - 13:9, 92:3
**response** [3] - 63:16, 63:17, 63:22
**responsibility** [1] - 108:11
**responsible** [4] - 13:6, 16:11, 65:16, 103:22
**rest** [1] - 114:20
**result** [1] - 44:19
**resulted** [1] - 30:18
**retreading** [1] - 32:16
**review** [2] - 23:3, 82:13
**reviews** [3] - 10:12, 91:25, 92:1
**revoked** [1] - 116:11
**ring** [1] - 25:15
**rings** [1] - 25:19
**rise** [1] - 28:9
**road** [1] - 19:2
**roadmap** [1] - 106:21

**RPR** [2] - 1:22, 124:8
**RRRR** [1] - 104:6
**rule** [11] - 10:6, 18:10, 20:9, 24:24, 26:21, 26:22, 47:2, 97:19, 98:2, 98:4, 98:6
**ruled** [4] - 29:25, 65:4, 102:21, 104:3
**rules** [1] - 99:15
**ruling** [2] - 6:9, 7:24, 97:13
**run** [4] - 31:16, 31:17, 67:21, 110:24
**runs** [3] - 10:21, 31:13, 33:18
**rural** [3] - 70:20

## S

**sale** [1] - 65:10
**sales** [58] - 7:19, 8:21, 9:5, 10:21, 12:1, 12:5, 12:6, 12:7, 13:9, 15:9, 15:16, 32:5, 33:19, 45:14, 45:22, 46:9, 50:3, 51:1, 51:10, 55:11, 55:17, 56:11, 57:1, 58:16, 58:17, 58:22, 60:5, 60:11, 60:19, 67:17, 70:9, 78:18, 89:20, 89:25, 91:16, 91:18, 92:11, 92:15, 93:21, 93:22, 103:12, 103:19, 103:23, 107:1, 107:2, 107:6, 110:22, 116:2, 116:2, 116:20, 116:23, 117:7, 117:15, 117:25, 118:4, 120:13
**sanctions** [1] - 6:21
**sanitize** [1] - 85:4
**satisfied** [1] - 37:15
**saw** [1] - 42:15
**scam** [8] - 21:5, 24:18, 30:2, 35:24, 46:16, 65:7, 85:8, 98:17
**scientific** [3] - 4:13, 4:18, 68:7
**screening** [1] - 67:8
**screenshot** [1] - 80:24
**screenshots** [2] - 78:16, 79:7
**se** [3] - 5:25, 8:9, 107:25
**Se** [1] - 1:19
**seal** [3] - 108:20, 109:6, 109:13
**Seal** [11] - 86:22, 87:12, 87:21, 87:24, 88:2, 88:5, 88:6, 88:9, 88:12, 96:1, 96:10
**seated** [1] - 3:12
**second** [5] - 18:17, 56:1, 75:5, 111:15, 111:24
**seconds** [2] - 29:14, 33:15
**section** [11] - 32:11, 33:6, 33:7, 33:10, 34:25, 52:4,

74:16, 74:19, 94:19, 108:14, 108:18
**SECURITY** [1] - 28:9
**see** [45] - 6:14, 8:20, 8:23, 14:14, 14:17, 15:22, 22:1, 27:25, 29:18, 38:3, 41:5, 41:9, 52:17, 54:10, 56:1, 64:16, 64:19, 68:2, 72:12, 73:13, 74:3, 75:2, 75:7, 77:13, 78:12, 81:3, 81:12, 82:10, 82:17, 83:22, 88:2, 88:4, 91:5, 91:24, 100:22, 101:25, 107:11, 107:16, 107:17, 108:21, 108:22, 109:2, 109:13, 116:12
**seeking** [1] - 116:19
**seem** [1] - 91:11
**segment** [2] - 63:25, 102:25
**self** [1] - 99:3
**sell** [7] - 18:2, 18:24, 50:19, 57:22, 62:1, 64:22, 99:13
**selling** [7] - 7:8, 7:14, 7:18, 100:6, 100:10, 116:16, 117:5
**sells** [1] - 5:2
**senators** [1] - 53:18
**send** [7] - 12:2, 15:17, 16:7, 16:12, 38:18, 60:3, 113:22
**sending** [2] - 12:4, 70:23, 85:14
**sends** [4] - 15:14, 15:16, 16:6, 16:15
**sense** [3] - 5:6, 16:14, 67:12
**sent** [30] - 10:14, 11:22, 15:19, 22:16, 34:21, 34:23, 37:5, 38:17, 38:19, 41:16, 42:1, 42:5, 42:15, 46:14, 48:5, 84:10, 86:12, 87:9, 87:13, 94:7, 94:8, 104:14, 111:13, 111:15, 111:20, 111:22, 112:4, 112:14, 112:19
**sentence** [1] - 116:9
**separate** [3] - 9:19, 12:17, 12:19
**September** [2] - 6:20, 50:18
**SERVICES** [1] - 1:4
**Services** [5] - 12:15, 12:20, 21:3, 88:3
**set** [3] - 117:1, 118:7, 119:15
**sets** [1] - 117:11
**seven** [4] - 27:7, 37:18, 37:19, 90:15
**several** [3] - 12:16, 54:15, 97:16
**share** [1] - 121:10
**sheriff** [4] - 46:17, 84:4, 112:5, 113:25
**sheriff's** [10] - 37:4, 68:12,

15

68:18, 68:21, 70:7, 70:10, 70:20, 71:2, 71:10, 71:15
**Sheriff's** [5] - 37:11, 40:23, 41:20, 118:5, 118:15
**sheriffs** [1] - 38:21
**short** [3] - 4:14, 69:14, 74:25
**shortly** [1] - 104:18
**show** [26] - 7:18, 9:10, 9:12, 9:22, 16:2, 21:2, 27:24, 33:12, 36:4, 36:18, 44:8, 78:17, 80:4, 80:5, 80:6, 81:2, 90:17, 95:6, 97:2, 98:14, 98:17, 100:11, 101:6, 103:9, 104:11
**showed** [1] - 112:15
**showing** [5] - 22:17, 30:1, 30:14, 33:17, 71:6
**shown** [4] - 21:6, 21:22, 75:19, 80:16
**shows** [2] - 24:13, 94:8
**shut** [1] - 115:7
**shutdown** [1] - 37:8
**shutting** [1] - 37:9
**sic** [1] - 35:1
**side** [2] - 81:6, 123:8
**sign** [1] - 17:9
**signature** [1] - 3:22
**signed** [1] - 45:15
**similarities** [1] - 64:20
**simple** [4] - 57:21, 66:24, 77:15, 77:17
**simply** [14] - 25:13, 34:25, 36:8, 47:6, 59:16, 62:16, 64:21, 70:21, 82:14, 85:19, 111:11, 113:22, 113:24
**singer** [1] - 99:24
**single** [2] - 35:5, 92:20
**sit** [4] - 43:13, 66:5, 66:7, 115:22
**sites** [1] - 92:14
**situation** [1] - 51:23
**six** [4] - 27:7, 70:15, 122:15, 122:16
**size** [2] - 57:25, 69:12
**Slavin** [1] - 104:15
**slightly** [1] - 87:6
**small** [4] - 13:12, 13:14, 13:15, 70:14
**smaller** [1] - 18:12
**snacks** [1] - 54:25
**so-called** [6] - 22:9, 62:15, 68:23, 99:14, 108:1
**software** [4] - 17:10, 17:11, 17:21, 96:17
**sold** [9] - 8:18, 9:8, 36:10, 42:25, 43:5, 71:13, 77:14, 109:4
**solve** [1] - 89:22
**someone** [4] - 84:14, 93:2,

113:21, 121:2
**sometimes** [3] - 11:24, 11:25, 14:17
**somewhere** [3] - 30:24, 37:13, 60:17
**son** [3] - 34:7, 34:19, 79:22
**songs** [2] - 100:2, 100:3
**songwriter** [1] - 99:25
**sorry** [9] - 6:25, 7:19, 21:21, 24:16, 35:10, 38:9, 41:20, 102:7, 118:4
**sort** [6] - 37:2, 43:12, 61:21, 61:25, 65:25, 82:1
**sought** [1] - 51:9
**sounds** [1] - 16:11
**source** [1] - 103:6
**sources** [5] - 5:1, 12:3, 30:15
**sourcing** [1] - 78:6
**South** [2] - 10:20, 10:21
**SOUTHERN** [1] - 1:1
**speaker** [2] - 111:14, 119:7
**speaking** [3] - 63:14, 70:23, 111:18
**special** [1] - 41:17
**specific** [4] - 9:9, 42:22, 58:24, 91:16
**specifically** [2] - 51:10, 106:4
**specifics** [2] - 43:10, 44:24
**speculation** [2] - 67:11, 114:8
**speech** [2] - 39:1, 108:8
**speed** [1] - 83:3
**spell** [1] - 3:10
**spending** [1] - 91:1
**spent** [4] - 53:17, 54:3, 62:3, 122:13
**spoken** [1] - 111:25
**spoliation** [1] - 6:21
**sprue** [1] - 29:15
**stack** [1] - 29:15
**staff** [5] - 16:4, 41:19, 67:25, 73:14, 99:18
**stand** [3] - 58:21, 79:9, 79:10
**standing** [1] - 19:19
**stands** [1] - 58:22
**start** [2] - 67:20, 100:19
**started** [12] - 22:14, 33:11, 38:18, 38:23, 43:2, 43:4, 62:3, 79:16, 94:23, 94:24, 104:18, 122:7
**starting** [2] - 37:25, 38:18
**state** [10] - 3:9, 16:4, 38:1, 51:14, 68:20, 72:24, 74:17, 105:14, 110:10, 116:5
**State** [7] - 15:18, 58:7, 116:3, 117:8, 117:18, 117:25, 119:22

**statement** [4] - 37:20, 47:11, 55:12, 92:21
**statements** [2] - 8:16, 57:23
**States** [13] - 1:23, 49:23, 51:16, 51:19, 70:7, 86:23, 87:24, 88:9, 88:12, 96:10, 117:5, 117:13, 124:9
**STATES** [2] - 1:1, 1:11
**states** [7] - 38:4, 52:8, 74:16, 121:24, 122:5, 122:10, 122:15
**stating** [3] - 90:25, 99:17, 116:15
**steadily** [1] - 101:10
**steer** [1] - 55:23
**STENOGRAPHICALLY** [1] - 1:21
**step** [1] - 77:3
**still** [7] - 14:18, 27:19, 28:11, 58:25, 107:8, 120:14, 122:15
**stock** [1] - 32:1
**stones** [1] - 83:10
**stop** [4] - 42:22, 109:24, 121:2, 121:6
**stopped** [4] - 38:14, 59:24, 101:8, 109:21
**stories** [2] - 46:15, 64:9
**story** [2] - 63:2, 63:8
**stress** [8] - 22:19, 36:10, 57:20, 58:25, 61:1, 61:21, 116:17, 121:13
**Stress** [1] - 23:24
**strictly** [1] - 44:5
**strip** [1] - 35:13
**studies** [10] - 5:3, 7:12, 21:8, 21:16, 21:22, 24:14, 30:3, 63:19, 66:12, 95:6
**study** [27] - 4:12, 4:15, 22:9, 22:13, 22:22, 22:23, 23:3, 23:6, 23:13, 23:14, 23:16, 24:22, 25:2, 25:4, 25:6, 25:7, 25:8, 27:3, 27:8, 27:9, 65:2, 65:6, 67:4, 104:5, 104:6, 104:11, 104:24
**stuff** [7] - 38:19, 66:25, 70:24, 115:5, 115:6, 120:16, 120:17
**subject** [2] - 79:13, 90:15
**submit** [1] - 94:6
**submitted** [1] - 46:2
**submitting** [1] - 32:25
**subpoenaed** [1] - 111:21
**substance** [1] - 35:22
**successful** [1] - 52:8
**suddenly** [1] - 8:22
**sued** [4] - 39:17, 82:15, 95:16, 95:21
**suffer** [1] - 35:4

**suffered** [3] - 5:17, 20:21, 35:3
**sufficiently** [1] - 87:16
**suggest** [1] - 27:22, 30:23
**suggested** [2] - 30:21, 55:25
**suing** [1] - 7:7
**suit** [2] - 30:10, 30:11
**suitcase** [1] - 64:20
**Suite** [2] - 1:15, 1:17
**summit** [1] - 57:18
**sun** [1] - 28:20
**Sun** [1] - 89:2
**suppose** [1] - 29:17
**supposed** [3] - 22:2, 46:3, 108:5
**supposedly** [4] - 48:25, 73:1, 96:20
**suspect** [1] - 63:12
**suspended** [1] - 98:7
**sustain** [29] - 5:21, 10:6, 11:16, 13:24, 21:10, 22:4, 26:5, 27:13, 33:3, 33:21, 35:15, 36:15, 40:4, 42:6, 42:9, 49:15, 51:3, 56:24, 64:10, 64:23, 77:11, 78:23, 82:19, 83:13, 88:18, 91:14, 98:20, 100:13, 101:4
**sustained** [46] - 24:19, 36:19, 42:12, 46:6, 46:7, 50:12, 61:8, 62:24, 65:3, 65:5, 75:13, 84:1, 84:8, 85:9, 85:18, 85:25, 86:2, 86:7, 86:16, 89:12, 90:1, 90:13, 91:6, 94:5, 94:16, 94:21, 95:2, 95:4, 95:9, 95:14, 95:24, 96:6, 96:22, 97:8, 97:13, 99:4, 99:6, 99:11, 99:21, 100:5, 102:4, 102:16, 103:7, 104:13, 104:20, 105:1
**sustaining** [1] - 54:11
**sworn** [2] - 3:7, 3:8
**system** [10] - 16:1, 18:6, 18:13, 18:15, 37:6, 60:23, 62:2, 71:19, 113:20, 121:1
**systems** [3] - 18:11, 18:12, 58:10

**T**

**table** [1] - 54:18
**tablet** [1] - 7:10
**task** [1] - 110:9
**TDLR** [2] - 52:22, 59:17
**technical** [2] - 25:13, 61:24
**technology** [4] - 18:23, 35:8, 59:2, 83:18
**television** [1] - 103:16
**tender** [1] - 4:5
**term** [3] - 18:18, 19:4, 62:9

**terms** [2] - 4:13, 92:25
**terrible** [1] - 120:16
**testified** [1] - 116:6
**testify** [1] - 123:8
**testifying** [2] - 56:20, 63:10
**testimonies** [1] - 35:9
**testimony** [6] - 28:3, 29:19, 40:21, 65:15, 65:17, 102:1
**Texas** [35] - 51:11, 51:14, 51:17, 51:18, 51:23, 51:25, 52:2, 52:7, 52:21, 52:22, 53:15, 53:22, 55:11, 55:17, 57:1, 57:22, 58:7, 58:21, 59:3, 59:7, 59:21, 111:10, 116:3, 116:9, 116:14, 116:20, 117:8, 117:18, 117:25, 119:23, 122:14, 122:24, 122:25
**text** [1] - 76:18
**THE** [420] - 1:10, 1:14, 1:19, 3:2, 3:6, 3:9, 3:11, 3:12, 3:25, 4:3, 4:4, 4:7, 4:23, 5:5, 5:15, 5:21, 6:2, 6:6, 6:9, 6:19, 7:1, 7:22, 8:13, 9:2, 9:4, 9:9, 9:12, 9:18, 10:4, 11:8, 11:16, 13:1, 13:7, 13:12, 13:14, 13:16, 13:19, 13:21, 13:22, 13:23, 13:24, 14:7, 15:1, 16:9, 16:16, 16:17, 16:19, 16:20, 17:5, 18:17, 18:20, 18:22, 18:23, 19:1, 19:8, 19:13, 19:15, 19:21, 20:8, 20:15, 20:23, 21:10, 21:18, 22:4, 22:21, 22:24, 23:1, 23:2, 23:8, 23:14, 23:16, 24:11, 24:19, 24:23, 25:5, 25:17, 25:24, 26:10, 26:12, 26:16, 26:19, 26:21, 27:1, 27:13, 27:19, 27:22, 28:4, 28:5, 28:7, 28:8, 28:9, 28:10, 28:13, 28:14, 28:24, 29:1, 29:4, 29:7, 29:9, 29:10, 29:11, 29:20, 29:23, 30:4, 30:9, 30:16, 31:6, 31:9, 32:17, 33:3, 33:21, 33:25, 34:17, 35:2, 35:15, 36:2, 36:15, 39:4, 39:7, 39:21, 40:4, 40:12, 40:18, 40:20, 41:3, 41:10, 42:6, 42:9, 42:11, 42:18, 42:24, 43:7, 43:8, 43:9, 43:11, 43:17, 43:19, 43:20, 44:1, 44:5, 44:15, 45:4, 45:6, 45:9, 46:6, 47:2, 47:4, 47:20, 47:24, 48:1, 48:2, 48:7, 48:10, 49:6, 49:10, 49:15, 50:4, 50:9, 50:12, 51:3, 51:7, 51:15, 51:18, 51:21, 52:17, 53:21, 53:25, 54:6, 54:21, 54:23, 55:10, 55:14, 55:16, 55:23,

56:24, 57:3, 57:4, 57:5, 57:7, 57:9, 57:12, 57:13, 57:21, 57:24, 58:2, 58:3, 58:14, 58:15, 58:16, 58:17, 58:19, 59:6, 59:8, 59:9, 59:13, 59:20, 61:3, 61:8, 61:15, 61:17, 62:12, 62:24, 63:4, 63:16, 63:22, 64:3, 64:10, 64:13, 64:23, 65:3, 65:5, 65:15, 66:23, 67:15, 67:16, 69:22, 69:24, 69:25, 70:2, 71:4, 71:11, 71:17, 72:2, 72:7, 72:10, 72:15, 73:11, 73:19, 73:24, 74:3, 74:11, 74:14, 75:9, 75:13, 75:17, 75:19, 75:21, 75:23, 75:25, 76:9, 76:21, 76:25, 77:5, 77:8, 77:11, 77:19, 77:21, 77:23, 78:1, 78:12, 78:14, 78:20, 78:23, 79:1, 79:8, 80:6, 80:16, 80:18, 80:20, 80:22, 80:25, 81:2, 81:14, 81:16, 82:4, 82:6, 82:19, 83:8, 83:13, 83:22, 84:1, 84:8, 84:18, 84:22, 84:24, 85:9, 85:11, 85:18, 85:25, 86:2, 86:7, 86:9, 86:16, 86:19, 86:25, 87:15, 87:17, 87:18, 87:23, 88:4, 88:6, 88:8, 88:11, 88:18, 88:19, 89:12, 89:18, 90:1, 90:7, 90:13, 90:18, 91:3, 91:6, 91:12, 91:16, 92:2, 92:7, 92:16, 93:4, 93:11, 93:17, 93:23, 93:25, 94:1, 94:5, 94:14, 94:16, 94:21, 95:2, 95:4, 95:9, 95:14, 95:18, 95:24, 96:6, 96:9, 96:12, 96:15, 96:22, 96:25, 97:4, 97:8, 97:13, 97:21, 98:2, 98:9, 98:12, 98:18, 98:25, 99:4, 99:6, 99:11, 99:15, 99:21, 100:2, 100:5, 100:9, 100:13, 100:18, 100:20, 101:4, 101:11, 101:14, 101:22, 102:4, 102:9, 102:11, 102:16, 102:19, 102:21, 102:23, 103:1, 103:7, 103:14, 103:21, 104:3, 104:13, 104:20, 105:1, 105:7, 105:11, 105:16, 105:19, 106:6, 106:10, 106:15, 107:11, 107:23, 108:2, 108:11, 108:20, 109:1, 109:5, 109:9, 109:12, 109:20, 109:22, 110:1, 110:4, 110:11, 111:6, 112:20, 113:3, 113:4, 113:5, 115:1, 115:2, 115:10, 115:12, 115:15, 115:22, 115:25, 118:9, 118:12,

121:23, 122:1, 122:2, 122:4, 122:5, 122:7, 122:8, 122:9, 122:16, 122:19, 122:20, 122:22, 122:23, 122:24, 123:2, 123:13
**theory** [1] - 92:2
**therefore** [2] - 26:5, 119:17
**they've** [5] - 21:4, 44:6, 85:7, 87:24, 91:19
**thing's** [1] - 67:19
**thinking** [1] - 94:11
**thinks** [1] - 50:6
**Third** [1] - 1:15
**third** [1] - 71:19
**thousand** [1] - 110:9
**thousands** [1] - 106:21
**threaten** [1] - 104:22
**threatened** [1] - 85:3
**threatening** [4] - 85:1, 85:4, 103:2, 104:17
**three** [8] - 8:22, 9:5, 37:8, 40:8, 41:23, 41:24, 43:12, 43:13, 50:20, 51:10, 52:4, 56:3, 63:6, 63:11, 79:17, 105:5, 116:23, 121:8
**three-year** [1] - 40:8
**throughout** [3] - 60:3, 77:13, 117:5
**throw** [1] - 83:10
**thrown** [1] - 107:1
**ties** [2] - 6:14, 13:3
**tightly** [1] - 18:24
**time's** [1] - 115:10
**timeline** [1] - 101:7
**title** [8] - 10:18, 10:19, 14:23, 15:3, 15:4, 61:1, 74:16, 85:15
**today** [16] - 6:7, 6:13, 9:20, 29:16, 30:4, 30:20, 36:20, 44:20, 49:8, 54:3, 58:21, 65:6, 73:3, 86:10, 86:20, 105:24
**toes** [1] - 77:4
**together** [4] - 6:15, 15:19, 70:19, 74:23
**took** [12] - 36:8, 38:20, 38:24, 62:4, 64:24, 69:7, 98:13, 108:13, 108:16, 108:18, 113:3, 119:22
**top** [3] - 15:23, 47:11, 81:6
**topic** [17] - 22:5, 23:17, 24:20, 26:1, 26:7, 26:8, 27:14, 33:22, 33:25, 35:16, 40:5, 40:21, 49:16, 51:4, 61:9, 62:25, 84:1
**Torfino** [1] - 62:17, 64:19
**toss** [1] - 21:23
**total** [9] - 34:23, 68:20, 70:9, 74:9, 74:21, 74:24, 97:11, 118:14, 119:15

**totally** [2] - 34:24, 104:12
**towards** [5] - 5:23, 30:5, 48:3, 116:8, 119:16
**towns** [1] - 38:4
**track** [2] - 40:22, 60:9
**trade** [5] - 37:6, 37:10, 41:17, 41:24, 42:2
**trade-ins** [1] - 41:24
**trading** [2] - 41:18, 41:23
**trail** [1] - 47:6
**trained** [3] - 22:1, 58:6, 107:9
**training** [15] - 7:15, 7:16, 11:24, 15:8, 15:12, 15:13, 22:18, 58:4, 58:12, 58:18, 66:17, 96:14, 96:20
**trains** [1] - 5:2
**transcript** [1] - 102:24
**transcription** [1] - 124:4
**trial** [2] - 5:9, 30:17
**tried** [4] - 25:10, 33:15, 121:4, 122:9
**Triple** [1] - 77:24
**triple** [1] - 78:1
**trips** [1] - 57:15
**true** [23] - 17:25, 18:3, 18:4, 18:5, 20:3, 39:17, 41:25, 42:2, 42:16, 55:16, 62:15, 90:25, 91:1, 93:19, 97:17, 98:22, 99:8, 101:3, 101:9, 106:24, 111:9, 113:23, 113:24
**trust** [1] - 120:14
**truth** [2] - 36:5, 83:17
**truthful** [2] - 43:24, 44:9
**try** [8] - 5:3, 21:24, 44:8, 55:25, 86:4, 107:20, 113:23
**trying** [31] - 11:10, 11:12, 13:5, 14:4, 14:5, 21:19, 25:14, 32:25, 33:19, 34:16, 37:4, 38:10, 44:7, 44:11, 44:23, 46:24, 53:23, 55:8, 55:20, 55:23, 65:8, 71:6, 73:15, 76:19, 85:5, 87:25, 90:24, 95:3, 97:10, 98:18, 117:22
**turn** [3] - 9:17, 9:18, 115:19
**turned** [1] - 58:8
**turns** [1] - 46:4
**TV** [1] - 21:6
**twice** [1] - 63:25
**two** [32] - 12:14, 12:15, 12:19, 25:22, 33:15, 34:20, 50:19, 53:9, 56:5, 57:10, 58:7, 60:1, 62:3, 62:4, 63:9, 64:20, 69:7, 69:8, 74:10, 74:23, 79:17, 88:3, 89:9, 93:5, 96:7, 96:18, 97:19, 98:3, 98:4, 98:7, 111:2, 117:18

**type** [5] - 20:4, 21:15, 62:18, 86:4, 98:9
**types** [1] - 53:14
**typewritten** [1] - 77:9

**U**

**U.S** [3] - 30:8, 51:13, 60:3
**ULA** [7] - 17:9, 17:25, 18:11, 18:18, 19:3, 20:3, 21:14
**unauthorized** [1] - 49:22
**under** [9] - 28:12, 46:2, 79:12, 94:17, 99:15, 108:7, 108:20, 109:6, 109:13
**underlined** [1] - 79:20
**underneath** [1] - 48:23
**understood** [1] - 9:24
**united** [1] - 1:23
**UNITED** [2] - 1:1, 1:11
**United** [12] - 49:23, 51:16, 51:18, 70:7, 86:22, 87:24, 88:9, 88:12, 96:10, 117:5, 117:13, 124:9
**University** [1] - 47:17
**unless** [5] - 19:9, 85:4, 96:17, 97:12, 103:5
**unlike** [1] - 90:15
**untruthful** [1] - 36:6
**unusual** [2] - 7:6, 44:19
**up** [51] - 3:7, 5:3, 7:16, 12:11, 14:2, 15:14, 15:19, 16:5, 19:8, 21:9, 23:5, 23:12, 24:15, 28:20, 29:21, 29:24, 32:14, 38:20, 40:10, 43:12, 47:19, 57:19, 63:4, 64:4, 64:8, 66:3, 66:11, 66:17, 68:17, 72:24, 75:5, 76:5, 76:6, 76:24, 78:16, 83:11, 83:25, 91:23, 92:14, 102:1, 104:12, 108:15, 108:24, 113:1, 115:10, 119:2, 122:10, 122:25, 123:15
**upgrades** [2] - 96:17, 96:20
**user's** [1] - 18:20
**users** [2] - 37:15, 117:12
**utilizing** [1] - 74:20
**UUUU** [1] - 64:11

**V**

**valid** [1] - 66:18
**validated** [1] - 83:21
**validating** [1] - 112:1
**validation** [1] - 21:15
**Vancouver** [1] - 89:2
**Vanderhoff** [1] - 103:3
**various** [9] - 5:1, 12:1, 12:3, 16:12, 21:4, 21:5, 21:22, 21:23, 77:13

**vary** [1] - 8:20
**vast** [1] - 37:16
**vendor** [4] - 56:14, 110:10, 111:15, 111:17
**vendors** [1] - 54:13
**vendors'** [1] - 54:17
**verification** [2] - 80:13, 83:18
**verified** [7] - 28:21, 40:15, 42:16, 111:19, 111:23, 111:24, 114:11
**verifies** [1] - 82:3
**verify** [6] - 81:4, 106:13, 106:24, 107:6, 108:25, 109:7
**verifying** [1] - 114:9
**version** [1] - 88:6
**video** [4] - 7:10, 63:7, 102:17, 108:17
**videotape** [1] - 63:1
**Vietnam** [1] - 94:24
**view** [1] - 96:5
**vile** [1] - 34:24
**violations** [4] - 6:10, 26:1, 30:18, 44:18
**Virginia** [1] - 34:9
**virtue** [3] - 90:23, 106:4, 106:19
**visible** [1] - 62:10
**voice** [9] - 22:19, 30:2, 36:10, 57:19, 58:25, 60:25, 61:20, 63:4, 121:13
**Voice** [1] - 23:24
**vs** [1] - 1:6
**VSA** [2] - 83:21, 121:13
**VV** [1] - 89:5
**VVVV** [1] - 104:14

**W**

**wait** [2] - 59:6, 104:5
**wants** [1] - 35:23
**war** [1] - 94:24
**waste** [1] - 85:3
**watching** [1] - 64:1
**Wayback** [3] - 76:8, 76:22, 78:8
**ways** [2] - 7:9, 85:8
**weapon** [1] - 104:22
**weapons** [2] - 85:2, 95:20
**web** [3] - 16:12, 16:14, 16:15
**webmaster** [2] - 10:14, 16:14
**website** [96] - 8:17, 10:15, 10:22, 11:25, 12:2, 12:8, 12:20, 12:21, 13:8, 13:11, 13:18, 14:1, 14:4, 14:8, 14:11, 14:16, 14:19, 15:6, 15:22, 18:7, 18:8, 19:24, 23:4, 23:5, 25:10, 27:7, 27:8,

28:18, 28:22, 28:23, 28:24, 29:2, 29:5, 29:6, 29:12, 32:10, 33:1, 33:10, 33:14, 34:22, 34:25, 35:18, 36:11, 38:13, 48:13, 68:2, 72:9, 72:22, 72:23, 72:25, 73:3, 74:8, 74:11, 75:10, 76:4, 76:18, 77:16, 78:3, 78:10, 79:15, 80:14, 80:21, 80:23, 81:6, 81:9, 81:22, 81:23, 81:24, 82:2, 82:12, 82:13, 83:4, 84:11, 84:15, 85:5, 87:21, 88:4, 88:13, 93:15, 94:10, 94:19, 94:22, 96:2, 96:5, 96:9, 99:23, 99:24, 101:24, 103:15, 108:17, 108:19, 113:23, 114:16
**websites** [16] - 9:7, 10:12, 10:23, 11:15, 12:9, 12:14, 12:15, 12:19, 13:4, 32:6, 32:8, 32:9, 45:11, 78:5, 78:9, 103:17
**week** [17] - 12:10, 12:11, 14:11, 14:16, 14:17, 14:20, 43:13, 45:2, 73:1, 81:22
**weeks** [1] - 74:10
**weighed** [1] - 73:10
**well-known** [1] - 23:7
**WEST** [1] - 1:2
**West** [2] - 1:4, 39:23
**whatsoever** [2] - 92:24, 93:3
**whereas** [1] - 40:8
**whoa** [1] - 115:6
**whole** [4] - 8:5, 14:19, 39:10, 59:19
**wife** [3] - 11:4, 11:11, 11:12
**wild** [1] - 50:20
**willing** [2] - 61:22, 61:23
**wire** [1] - 90:10
**wired** [2] - 90:16, 90:18
**wires** [1] - 90:5
**wise** [1] - 58:1
**wish** [2] - 11:18, 96:23
**wishes** [1] - 19:7
**withholding** [2] - 96:17, 96:20
**WITNESS** [55] - 2:2, 3:11, 4:3, 9:4, 13:12, 13:16, 13:21, 13:23, 16:16, 16:19, 18:20, 18:23, 22:24, 23:2, 28:4, 28:7, 28:13, 29:7, 29:10, 42:24, 43:8, 43:11, 43:19, 45:6, 47:4, 48:1, 57:3, 57:5, 57:9, 57:13, 57:24, 58:3, 58:15, 58:17, 59:8, 61:17, 67:16, 69:24, 71:17, 72:7, 80:18, 80:22, 81:16, 87:17, 93:25, 113:4, 115:2, 118:12, 122:1, 122:4, 122:7, 122:9,

122:19, 122:22, 122:24
**witness** [18] - 3:2, 3:5, 3:8, 4:6, 20:8, 20:9, 20:10, 62:12, 73:13, 79:9, 79:10, 79:25, 88:22, 91:8, 97:3, 98:19, 105:9
**witnesses** [1] - 5:10
**woo** [1] - 114:5
**word** [9] - 22:2, 41:7, 41:8, 66:15, 66:21, 67:17, 68:1, 120:13
**words** [3] - 16:6, 45:23, 107:16
**works** [9] - 7:12, 22:2, 41:8, 45:11, 66:13, 66:17, 67:4, 67:10, 67:14
**worldwide** [2] - 69:7, 83:18
**worse** [1] - 32:23
**worst** [1] - 61:5
**worth** [1] - 43:25
**wrap** [1] - 123:15
**written** [1] - 112:6
**wrote** [2] - 57:19, 100:3
**WWWW** [4] - 2:10, 74:9, 75:22, 76:1

**X**

**XXX** [1] - 99:17
**XXXX** [1] - 77:13

**Y**

**year** [19] - 8:21, 40:8, 43:3, 50:19, 58:11, 58:12, 58:17, 63:21, 72:22, 79:16, 81:25, 97:11, 107:1, 107:3, 111:13, 111:15, 111:24, 112:6
**year-and-a-half** [1] - 43:3
**years** [56] - 5:1, 7:14, 8:22, 9:5, 21:7, 23:19, 25:10, 25:22, 27:7, 30:2, 32:24, 35:1, 35:18, 36:10, 40:7, 40:9, 41:8, 43:6, 46:16, 50:7, 51:10, 51:25, 53:9, 57:10, 60:1, 62:3, 62:4, 64:6, 69:2, 69:8, 69:24, 70:10, 70:24, 71:12, 71:13, 76:4, 76:5, 77:13, 85:2, 85:8, 86:23, 87:14, 92:8, 92:12, 96:18, 97:16, 97:18, 98:20, 101:10, 102:13, 109:18, 116:23, 117:4, 121:15
**yelling** [1] - 6:2
**York** [1] - 23:7
**yourself** [6] - 79:5, 79:12, 117:24, 118:3, 121:17, 123:8

## Z

**zero** [1] - 30:24
**ZZ** [1] - 94:22
**ZZZ** [1] - 100:9